IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CHRISTINA MONGELLI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 05-359-SLR |
| | ) | |
| RED CLAY CONSOLIDATED SCHOOL | ) | TRIAL BY JURY |
| DISTRICT BOARD OF EDUCATION, | ) | DEMANDED |
| et al., | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Barry M. Willoughby, Esquire (No. 1016)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6666, 6553
Facsimile: (302) 576-3345, 3470
Email: bwilloughby@ycst.com;
mstafford@ycst.com

Dated:  January 31, 2007

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

SUMMARY OF THE ARGUMENT ............................................................................ 2

STATEMENT OF FACTS ....................................................................................... 4

    A.    Mongelli's Education and Employment Before Red Clay. .................................4

    B.    Mongelli is Hired as a Special Needs Teacher at Red Clay in January
        2004. ...........................................................................................................4

        1.    Mongelli Receives a Temporary Contract and an Emergency
               Certificate to teach Special Education Students.................................4

        2.    From the Beginning of Her Employment, Mongelli Has Classroom
               Management Problems. .....................................................................6

        3.    Mongelli's "Sexual harassment" Claims Are Based Solely her
               Allegations About Conduct that is a "Manifestation of the Disability"
               Of One of her Special Needs Students. ..............................................7

    C.    Mongelli's Employment is Not Renewed.......................................................... 9

    D.    Mongelli's Subsequent Employment. ............................................................. 12

STANDARD OF REVIEW ..................................................................................... 14

ARGUMENT ...................................................................................................... 15

   I.    PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS FAIL AS A
       MATTER OF LAW. ..................................................................................... 16

    A.    Red Clay Is Not Liable for Alleged Sexual Harassment of a Teacher by
        a Special Education Student. ..........................................................................16

    B.    Mongelli Has Not Established A *Prima Facie* Case of Sexual
        Harassment Because the Conduct she Alleges Is Not Sufficiently Severe
        or Pervasive to Create a Hostile Working Environment for a Reasonable
        Person. ......................................................................................................18

    C.    The District Took Action to Promptly End JW's Behavior and Mongelli
        Unreasonably Failed To Use Red Clay's Policy Against Harassment. .............23

i

                              

D.   Defendant's are Entitled to Summary Judgment on Mongelli's Claims
     Under the Fourteenth Amendment Because Mongelli Cannot Show Any
     Discriminatory Intent..........................................................................................24

II.   MONGELLI'S RETALIATION CLAIMS FAIL AS A MATTER OF LAW
      BECAUSE SHE DID NOT ENGAGE IN PROTECTED ACTIVITY AND,
      ALTERNATIVELY, BECAUSE THERE IS NO CAUSAL LINK BETWEEN
      HER REPORT CONCERNING JW'S BEHAVIOR AND THE NON-
      RENEWAL OF HER EMPLOYMENT CONTRACT. ...................................... 25

   A.   Mongelli did not engage in any protected activity.......................................... 25

   B.   No Causal Connection Exists Between Mongelli's Complaint About JW
        and the District's Decision Not to Renew Her Contract. .................................28

III.  MONGELLI'S REINSTATEMENT CUTS OFF ANY RIGHT TO
      DAMAGES...........................................................................................................30

CONCLUSION ....................................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Abramson v. William Paterson Coll. of N.J.*,
   260 F.3d 265 (3d Cir. 2001) ................................................................................. 19

*Adusumilli v. City of Chicago*,
   164 F.3d 353 (7th Cir. 1998) ................................................................................ 20

*Al-Salem v. Bucks County Water & Sewer Auth.*,
   No. 97-6843, 1999 U.S. Dist. LEXIS 3609 (E.D. Pa. Mar. 25, 1999) ....................... 19

*Andrews v. City of Philadelphia*,
   895 F.2d 1469 (3d Cir. 1990) ................................................................................ 19

*Barber v. CSX Distribution Services.*,
   68 F.3d 694 (3d Cir. 1995) .................................................................................... 27

*Bell v. Waste Management, Inc.*,
   No. 03-002-KAJ, 2004 U.S. Dist. LEXIS 21864  (D. Del. Oct. 29, 2004) .................. 19

*Booker v. Brown & Williamson Tobacco Co., Inc.*,
   879 F.2d 1304 (6th Cir. 1989) ............................................................................... 27

*Bowman v. Shawnee State Univ.*,
   220 F.3d 456 (6th Cir. 2002) ................................................................................ 20

*Brooks v. City of San Mateo*,
   229 F.3d 917 (9th Cir. 2000) ................................................................................ 20

*Burlington Indus., Inc. v. Ellerth*,
   524 U.S. 742 (1998) ......................................................................................18, 23

*Cass v. American Prop.*,
   861 F. Supp. 55 (N.D. Ill.1994) ............................................................................. 27

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................ 14

*Clark County Sch. Dist. v. Breeden*,
   532 U.S. 268 (2001) ............................................................................................ 30

*Cooper-Nicholas v. City of Chester*,
   No. 95-6493, 1997 U.S. Dist. LEXIS 20810 (E.D. Pa. Dec. 30, 1997) ..................... 19

*Crowley v. Prince George's County*,
   890 F.2d 683 (4th Cir. 1989) ................................................................................ 27

*Curay-Cramer v. Ursuline Academy of Wilm.,Del., Inc.*,
    450 F.3d 130 (3d Cir. 2006)..................................................................................26, 30

*Ebert v. Office of Info. Sys.*,
    No. 97-530-SLR, 1998 U.S. Dist. LEXIS 9100 (D. Del. June 12, 1998)................... 14

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998)..........................................................................................18, 23

*Ferguson v. E .I. DuPont de Nemours and Co.*,
    560 F. Supp. 1172, 1200 (D. Del. 1983)................................................................ 28

*Ford v. EEOC*,
    458 U.S. 219 (1982)............................................................................................ 30

*Garcetti v. Ceballos*,
    126 S. Ct. 1951, 164 L. Ed 2d 689 (2006) ............................................................ 13

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993)............................................................................................. 18

*Horowitz v. Fed. Kemper Life Assurance Co.*,
    57 F.3d 300 (3d Cir. 1995)................................................................................... 14

*Joyner v. State*,
    No. N-80-09-0435FC, 1982 Del. Super. LEXIS 976 (Del. Super. Ct. Jan. 15, 1987) . 16

*Kachmar v. Sungard Data Sys., Inc.*,
    109 F.3d 173 (3d Cir. 1999) ................................................................................ 25

*Kidd v. MBNA Am. Bank*,
    224 F. Supp. 2d 807, 813 (D. Del. 2002) .............................................................. 19

*King v. Board of Regents*,
    898 F.2d 533 (7th Cir. 1990)............................................................................. 25

*King v. City of Philadelphia*,
    No. 02-2845, 2003 U.S. App. LEXIS 6290 (3d Cir. Apr. 1, 2003)............................ 19

*Krouse v. American Sterilizer Co.*,
    126 F. 3d 494 (3d Cir. 1997)............................................................................... 25

*Lamb-Bowmin v. Delaware St. Univ.*,
    152 F. Supp. 2d 553 (D. Del. 2001)...................................................................... 26

*Laughlin v. Metro. Wash. Airports Auth.*,
    149 F.3d 253 (4th Cir. 1998)................................................................................ 25

iv

*Lockard v. Pizza Hut,*
  162 F. 3d 1062 (10th Cir. 1998) ............................................................. 17

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ............................................................................. 15

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973) ............................................................................. 25

*McGraw v. Wyeth-Ayerst Labs. Inc.,*
  No. 96-5780, 1997 U.S. Dist. LEXIS 20813 (E.D. Pa. Dec. 30, 1997) ...................... 21

*Meritor Sav. Bank, FSB v. Vinson,*
  477 U.S. 57 (1986) ............................................................................... 18

*Oncale v. Sundower Offshore Servs.*
  523 U.S. 75, 81 (1998) ..................................................................... 21, 22

*Overall v. Univ. of Pa.,*
  No. 02-1628, 2003 U.S. Dist LEXIS 23892 (E.D. Pa. Dec. 19, 2003) ...................... 22

*Pamintuan v. Nanticoke Mem'l Hosp.,*
  No. 96-233-SLR, 1998 U.S. Dist. LEXIS 16764 (D. Del. Oct. 15, 1998) ............... 14

*Pennsylvania State Police v. Suders,*
  124 S. Ct. 2342 (2004) .......................................................................... 18

*Quiroga v. Hasbro, Inc.,*
  934 F.2d 497 (3d Cir. 1991) .................................................................. 14

*Richards v. City of Wilmington,*
  No. 03-106-SLR, 2004 U.S. Dist. LEXIS 4987 (D. Del. Mar. 24 2004 ............... passim

*Robinson v. SEPTA,*
  982 F.2d 892 (3rd Cir. 1993) ................................................................. 28

*Saville v. Houston County Healthcare Auth.,*
  852 F. Supp. 1512 (M.D. Ala. 1994) ...................................................... 24

*Schoch v. First Fidelity Bancorporation,*
  912 F.2d 654 (3d Cir. 1990) .................................................................. 15

*Seldomridge v. Uni-Marts, Inc.,*
  No. 99-496 GMS, 2001 U.S. Dist. LEXIS 9491 (D. Del. July 10, 2001) ................... 20

*Shaner v. Synthes (USA),*
  204 F.3d 494 (3d Cir. 2000) .................................................................. 29

v

*Sheridan v. E.I. DuPont de Nemours & Co.*,
   100 F.3d 1061 (3d Cir. 1996) ................................................................. 25

*Stinson v. Del. River Port Auth.*,
   935 F. Supp. 531 (D.N.J. 1996) .............................................................. 14

*Taylor v. Proctor & Gamble Dover Wipes Co.*,
   184 F. Supp. 2d 402 (D. Del. 2002) ........................................................ 15

*Walden v. Georgia-Pacific Corp.*,
   126 F.3d 506 (3d Cir. 1997), *cert. denied*, 523 U.S. 1074 (1988) ............................. 27

## Other Authorities

14 *Del. C.* § 701 ..................................................................................... 16

42 U.S.C. § 1983 ................................................................................. 1, 18

42 U.S.C. § 2000e(2)(a) ....................................................................... 1, 26

Fed. R. Civ. P. 56(c) ............................................................................. 14

Title VII of the Civil Rights Act of 1964 ................................................. passim

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff's First Amended Complaint raises claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(2)(a), and 42 U.S.C. § 1983 based on alleged Fourteenth Amendment constitutional violations.  Plaintiff is seeking a declaratory judgment, general and special compensatory damages, including back pay, front pay, and fringe benefits.  Plaintiff is also seeking punitive damages, interest, costs, and attorneys' fees.  Plaintiff has dismissed, with prejudice, her First Amendment claims.  (D.I. 35).

Plaintiff has also "withdrawn with prejudice her claims previously asserted against the Individual Defendants, in both their individual and official capacities, under Title VII of the Civil Rights Act of 1964" and "under the Fourteenth Amendment to the United States Constitution." (D.I. 8).  Accordingly, Plaintiff's only remaining claims are against the District as an entity under Title VII and the Fourteenth Amendment.

This is Defendants' Opening Brief in Support of their Motion for Summary Judgment.

1

# SUMMARY OF THE ARGUMENT

1.      Defendants are entitled to judgment as a mater of law on Mongelli's hostile work environment claims based on alleged "sexual harassment" of a teacher by a special education student.  First, claims of student-on-teacher sexual harassment are not actionable under either Title VII or the 14th Amendment.  In Delaware, teachers stand *in loco parentis* authority over students.  Second, Mongelli's claims fail as a matter of law because the conduct she alleges is not severe and pervasive enough to create a hostile working environment for a reasonable person in the plaintiff's position- a public school special education teacher.  Third, the District immediately took action to remove the student from Mongelli's classroom upon learning of his behavior.  In addition, Mongelli failed to utilize the District's sexual harassment reporting policies.  Finally, the Mongelli's claims under the 14th Amendment fail as a matter of law because she cannot show that any of the Defendants acted with a discriminatory intent towards her.

2.      Defendants are entitled to judgment as a matter of law on Mongelli's retaliation claims because she did not engage in any protected activity or, alternatively, because no causal connection exists between the District's decision not to renew her teaching contract and her disciplinary reports concerning the student she alleges harassed her.  In the instant matter, Mongelli's purported protected activity involves the submission of standard student disciplinary referral forms and a verbal conversation concerning the student's classroom behavior.  These actions, however, do not constitute protected activity because they do not involve complaints concerning an "employment practice made unlawful" by Title VII.  Similarly, the record clearly shows that Mongelli's

2

contract was not renewed because of her failure to take the required steps to maintain her teaching license- not because of her complaints concerning the student.

3.      Defendant's potential liability for an award of back pay damages to Mongelli is limited to the period between the end of her employment in June, 2004, and her reinstatement as a teacher in January, 2005.

3

## STATEMENT OF FACTS

A.    **Mongelli's Education and Employment Before Red Clay.**

Christine Mongelli graduated from Hofstra University in New York in 1994 with a Masters Degree in teaching with a specialization in reading. (A44; 48; A2). She was not qualified for a standard teaching certificate in Special Education either in New York or Delaware. (A45-46). Over the next several years, she worked as a substitute teacher in various school districts in New York state. (A48-49; A2). Her last position before moving to Delaware was with the Hicksville School District ("Hicksville") where she was a permanent substitute. (A64-65). She applied for regular teaching positions with Hicksville, but was never offered employment. (A50). Although she had a contract at Hicksville, she was paid on a per diem basis and did not receive health insurance benefits. (A47).

In September 2003, she moved to Delaware with her parents. (A47). She applied for employment with the Red Clay. (A1). Mongelli was first employed in Red Clay at Dickinson High School in the fall of 2003 as a substitute teacher hired through a vendor, Substitute Teacher Service ("STS"). (A54; 105).

B.    **Mongelli is Hired as a Special Needs Teacher at Red Clay in January 2004.**

1.    **Mongelli Receives a Temporary Contract and an Emergency Certificate to teach Special Education Students.**

In January of 2004 Mongelli was hired on a temporary contract to teach special education students at Dickinson. (A59). Although reading was her teaching preference, she accepted the special education position because she wanted full time employment. (A55-56; 106). From her prior substitute teaching experience before her employment at

4

Red Clay, she was aware that special needs students sometimes act out and use abuse language. (A51-52). She admitted that she was fully aware that many of the behavior problems exhibited by special needs students are a "manifestation of the student's disability." A "manifestation of a disability" is an educational term for behavior caused by the student's disability. She also aware that the District has an obligation under a number of statutes to teach all students and that students have due process rights the District cannot ignore. (A51-52; 67). Nevertheless, she testified that she was excited about the job even though she had been warned that it was a difficult assignment. (A55-58).

By its terms her temporary contract expired on June 30, 2004. (A6). Mongelli understood when she accepted the assignment that she needed additional educational requirements to continue working as a special education teacher. (A59-60). Mongelli applied for and received an emergency teacher certificate from the Delaware Department of Education. (A13; 15; 82-83). Her emergency Certificate was good for three years. DOE rules, however, specify that a teacher employed on an emergency certificate must make progress towards a standard certificate. (A7). Mongelli also received a letter from DOE advising her that she had three options she could pursue: (1) Matriculate in a approved program for Exceptional Children; (2) Submit passing scores on the PRAXIS II test for Exceptional Children; or (3) Complete 27 hours in course work from an specified list of courses identified to her. (A13).

### 2.    From the Beginning of Her Employment, Mongelli Has Classroom Management Problems.

It is not disputed that Mongelli had difficulty dealing with the special needs students under her charge[1] throughout her assignment at Dickinson.  She agreed that "right from the beginning" of her assignment in January/February of 2004 she had such difficulty.  (A65).  At Dickinson High School, students with behavior issues that the classroom teacher is unable to manage are referred to the Assistant Principal for action. (A128).  The teacher completes a "student behavior referral" form and sends it to the Assistant Principal.  (A128; 108-10).  The Assistant Principal then follows up the teacher, students, and witnesses, if appropriate.  (A129).  The teacher is given a carbon copy of the form showing the disciplinary action taken.  (A131).  Mongelli had over 82 student disciplinary referrals during her brief employment from mid January to mid June, 2004. (A40-42; 29-31).  A high number of disciplinary referrals suggests that the teacher has classroom management problems.  (A122).

In February of 2004, approximately one month after she accepted her assignment, Mongelli requested a meeting with the school education diagnostician Kristin Norton and Assistant Principal John Kennedy are as a result of her classroom management problems. (A68-69; 34-36).  Mongelli sought removal of certain students from her classroom. (A68-69; 132).  Kennedy complied with her request.  (A68-69; 34-36).

---

[1] Under Delaware law, a public school teacher stands *in loco parentis* for the students under her care.  In other words, she has the powers and responsibilities of a parent.

### 3. Mongelli's "Sexual harassment" Claims Are Based Solely her Allegations About Conduct that is a "Manifestation of the Disability" Of One of her Special Needs Students.

Mongelli's "sexual harassment" claims are based solely on the conduct of one special needs student in her class referred to in the litigation as "JW." (First Amended Complaint ¶¶ 14-19; I.D. #15). Notably, JW was not one of the students she asked to have removed from her classroom at the February 24, 2004 meeting with Norton and Kennedy. (A132; 69; 34-36). Beginning in March of 2004, Mongelli submitted disciplinary referral forms for JW due his use of inappropriate language. (A8-12; A20-26). Of course, such conduct is not unusual for special needs students. Mongelli had experienced such conduct before when she was a substitute in New York. (A51-52).

A disciplinary action form dated April 26, 2004, contains the first allegation that JW engaged in inappropriate physical conduct towards Mongelli by grabbing her and, in her words, attempting to "hump" her when leaned over to assist another student. (A20). Mongelli wrote seven additional student referrals of various dates between April 26 and May 7 alleging, among other things, that JW directed inappropriate sexual remarks to her. (A20-26; 71-72).

There is a factual dispute between the parties as to timing of Mongelli's delivery of the referrals. She claims that she left each of the referrals in Kennedy's "in-box" on the date shown on the form. A72-73). Kennedy testified that she gave the discipline referral forms dated April 26 through May 7 to him as a group on May 7, 2004. Mongelli gave him the forms following his meeting on May 6, 2004 with Mongelli when she first verbally reported JW's inappropriate conduct. (A133-36; 34-36). Kennedy testified that Mongelli gave the documents to him as a result of his request at their May 6, 2004

meeting that she provide him with a list of JW's transgressions.  (A34-36; 136-37; 138; 144-45).

For purposes of this motion, of course, Plaintiff's version must be accepted. Importantly,  Mongelli testified her final written report of inappropriate physical conduct occurred on April 26, 2004.  (A72).  Notably, however, Mongelli agrees that she **did not** follow up with Kennedy about JW's conduct until May 6.  (A74).  She further admitted that she never went to Kennedy to speak with him about her concerns at any time from the April 26 until May 6.  (A73-75).  Consistent with Kennedy's testimony, Mongelli agrees that the first time she had a long discussion with Kennedy about JW was on May 6.  (A73-75).

Mongelli also admits that she never filed a complaint with the District under the District's student code of conduct or its employee sexual harassment policy.  (A76-77). She did not she file a grievance with the Union that represented her.  (A76-66).  By her own account, all she did during the April 26 through May 6, 2004 time period was leave disciplinary referral forms in Kennedy's in box.  (A77-78; 79).

It is not disputed that Kennedy took prompt action when Mongelli verbally advised him of JW's actions on May 6.  On May 7, 2004, JW was removed from Mongelli's classroom and was never assigned to her again.  (A34-36; 75).  Kennedy began an investigation to determine the accuracy of the report.  (A81; 34-36).  JW was suspended from school.  (A34-36; 138-45).  Red Clay also referred the matter to the state police for prosecution in Family Court.  (A80).

In accordance with federal law, the school district also conducted a "manifestation meeting" to determine if JW's actions were, in fact,  caused by his disability.  (A28; 169-

70).  The panel concluded that JW's actions were, in fact, a "manifestation of his

disability."  (A28; 170).  That finding legally restricts the District from suspending a

student for more that ten (10) days for actions that are caused by his disability. (A130,

146-50; 171).  Mongelli does not contend that there were any other incidents that

constituted "sexual harassment" during the rest of the school year.  In other words, all of

her claims relate to the classroom misbehavior JW exhibited between April 26 and May

6, 2004 that constituted a "manifestation of his disability."

      **C.**     **Mongelli's Employment is Not Renewed.**

      Mongelli had spoken to the Principal of Dickinson High School, Chad Carmack

("Carmack") during the spring semester of the 2003-2004 school year about her

difficulties in handling her special need students. (A70; 107-08; 123). Carmack had also

heard from the Assistant Principals at Dickinson about Mongelli's classroom

management problems.  (A123-24).  Mongelli expressed her desire to work in a reading

position at Dickinson.  (A116-17).  Carmack was aware that Mongelli did not have a

standard certificate for special education.  (A114-15).

      Since Mongelli was on a temporary contract, her employment would expire on

June 30, 2004, unless the school district affirmatively acted to renew it. Carmack's

understanding was that if he left Mongelli's name off the staffing list for DHS, she would

automatically be non-renewed by the District office.  (A118).  Consistent with his

understanding that as a temporary employee she would not be renewed unless her name

appeared on the list, Carmack submitted paperwork to the District office for DHS's

staffing for the following year without Mongelli's name on it.  A16-19).  Notably, this list

was submitted on April 22, 2004, four days before Mongelli claims she first a submitted a

student behavior form to the Assistant Principal on concerning JW's inappropriate

9

actions she now terms "sexual harassment."  (A20; 16-19; 111-112).  This staffing memorandum also shows an opening in "Special Education."  (A16-19; 117).  It listed the teachers' names and positions for the following year, 2004-1005.  (A113).  Mongelli's name does not appear on the list.  (A113-14).

The District office, however, issued a letter of renewal to Mongelli because her name was not on the list of teachers who were identified as teachers not to be renewed. (A27; 165-67).  In other words, Carmack and the District Office had different understandings concerning the method by what he should communicate his desire not to re-employ Mongelli.  Carmack thought that since Mongelli was a temporary employee he should just not include her on the staffing list.  (A119; 125-26; 156-57). The District Human Resources Office practice, however, required that he needed to affirmatively include her on a list of teachers not to be re-employed.  (A165-67; 156).

Carmack found out that Mongelli had received a renewal letter when Mongelli approached him.  (A86; 155).  He was surprised to learn that she had been reemployed and contacted the Deputy Superintendent, Diane Dunmon, about the matter.  (A155). Carmack was clear that he did not want to continue Mongelli in a special education position because of her classroom management problems.  (A120; 122-22; 159.  In fact, Mongelli herself told Carmack that she had classroom management problems.  (A123). He testified that even aside from Mongelli's certificate problems, she would not have been renewed because of her poor classroom management with special needs students. (A120; 21-22).  Carmack did not have any openings in English, Mongelli's field of certification and specialty.  (A116).  He therefore did not have a position for her at Dickinson High School.  (A116-17).

10

Diane Dunmon, the District's Deputy Superintendent, looked into the situation when Carmack contacted her. (A155-59). Dunmon did not have any contact with Mongelli before she spoke to Carmack. Carmack told Dunmon that Mongelli had class room management problems. Dunmon did not know the specifics of Mongelli's student behavior referrals. (A162-63). Debra Davenport, the HR Director, advised Dunmon that Mongelli had taken no action whatsoever to institute the required steps to obtain a standard special education certificate. (A160-61; 13-14). Mongelli, Exhibit 20 is a particularly revealing document. It was produced by Mongelli and it bears the Plaintiff's bates stamp number 11. (A7). It states:

> I am aware that that the District must send a letter to the Office of Professional Accountability reporting on the progress of the educator in meeting certification requirements. . . . If the educator has an unsatisfactory evaluation or makes no attempt to satisfy the requirements the Emergency Certificate will be suspended.

Accordingly, a teacher receiving an emergency certificate who receives an unsatisfactory evaluation or who makes no attempt to satisfy certification requirements will have his or her emergency certificate be suspended. Mongelli admits that one of the Assistant Principals at Dickinson, Stephanie Armstrong, told her about this requirement. (A84-85). In fact, Mongelli conceded that from the beginning of her employment, Armstrong kept telling Mongelli to go for the classes. (A61).

Mongelli likewise conceded that at the time of her termination in June 2004, she literally had made no progress on fulfilling the requirements for a standard certificate in special education. She admitted that she had done nothing to fulfill the three options DOE gave her. (A62-63). Mongelli testified that she was too "stressed" by her teaching experience with special education students to begin the process of fulfilling the DOE

requirements. (A61). She also agreed that she had no ambition or desire to return to teaching special education students, because of the difficulties she encountered with special needs students during January 2004 to June of 2004. (A43). Her failure to take the steps required to obtain a standard certificate in special education is therefore not surprising.

When the District Office determined that Mongelli had not complied with the DOE requirement that she make progress towards a standard certificate, it was determined that Mongelli's contract renewal should be rescinded. (A152-54). Mongelli received notification by a letter dated June 17, 2004, before the June 30 expiration date of her contract, that her employment was terminated because of her lack of certification. (A32). It was not until July 23, 2004, that Mongelli filed a Charge of Discrimination with the Delaware Department of Labor. (A33). Mongelli's "retaliation" claims therefore cannot be based on her actions in filing a charge because she did not file a charge with the DDOL until after she was non-renewed.

**D.    Mongelli's Subsequent Employment.**

The following school year in January 2005, Mongelli was offered and accepted another teaching position at Red Clay in a non-special education setting. (A37; 38). She encountered further difficulties in that teaching position she was non-renewed in June of 2005. She has by Stipulation agreed that her non-renewal in June of 2005 is not issue in this case. (D.I. 47).

Mongelli has also by stipulation withdrawn any claim against the individual defendants and dismissed all claims under the First Amendment based on the U.S. Supreme Court's recent decision in *Garcetti*.[2]

Mongelli later obtained a position at MBNA/Bank of America as an account representative making approximately the same salary did at the school district.[3]  (A52-53).   She was terminated from that job last year, however, when it was discovered that she had inappropriately convinced an elderly customer to enter into a loan transaction he did not want.  (A88; 94-95; 96-103).  Mongelli's testimony shows that she also had difficulty in getting along with her co-workers at MBNA/BOA.  (A89-93).

Based on the facts set forth above and the argument set forth below, Red Clay believes that it is entitled to summary judgment on all remaining counts of Mongelli's First Amended Complaint.

---

[2] *Garcetti v. Ceballos*, 126 S. Ct. 1951, 164 L. Ed 2d 689 (2006).

[3] She testified that she was not certain that she wanted to return to teaching at all.

**STANDARD OF REVIEW**

Summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Facts are "material," and disputes "genuine," only if "'evidence exists from which a rational person could conclude that the position of the person with the burden of proof is correct.'" *Richards v. City of Wilmington*, No. 03-106-SLR, 2004 U.S. Dist. LEXIS 4987, at *8 (D. Del. Mar. 24 2004) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995)).

In an action brought under Title VII, a defendant is entitled to summary judgment when it demonstrates either: "(1) that the plaintiff is unable to establish a *prima facie* case of discrimination; or (2) if the plaintiff can establish a *prima facie* case, the plaintiff cannot produce sufficient evidence from which a fact finder could infer that the defendant's legitimate, non-discriminatory reason for [taking adverse employment action against] plaintiff was a pretext." *Pamintuan v. Nanticoke Mem'l Hosp.*, No. 96-233-SLR, 1998 U.S. Dist. LEXIS 16764, at *41 (D. Del. Oct. 15, 1998) (citing *Stinson v. Del. River Port Auth.*, 935 F. Supp. 531, 539 (D.N.J. 1996)). Put another way, if the non-moving party fails to sufficiently establish an essential element of his case with respect to which he bears the burden of proof, summary judgment shall be granted in favor of the moving party. *See Ebert v. Office of Info. Sys.*, No. 97-530-SLR, 1998 U.S. Dist. LEXIS 9100, at *9 (D. Del. June 12, 1998) (citing *Celotex*, 477 U.S. at 322). Further, the non-movant may not "rest upon mere allegations, general denials, or . . . vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991); *Schoch v. First Fidelity*

14

*Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) ("unsupported allegations in [a non-movant's] memorandum and pleadings are insufficient to repel summary judgment").

   To defeat a summary judgment motion, Rule 56(c) requires the non-moving party to:

> [D]o more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'  [W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Taylor v. Proctor & Gamble Dover Wipes Co.*, 184 F. Supp. 2d 402, 408 (D. Del. 2002) ("mere scintilla of evidence in support of non-moving party is insufficient"); *Richards*, 2004 U.S. Dist. LEXIS 4987, at *11-12  ("There must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue.")

   Measured against this standard, all of Mongelli's claims fail as a matter of law.

**ARGUMENT**

I.    **PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS FAIL AS A MATTER OF LAW.**

      A.    **Red Clay Is Not Liable for Alleged Sexual Harassment of a Teacher by a Special Education Student.**

      Mongelli fails to state a claim of unlawful sexual harassment as a matter of law because the factual allegations contained in her First Amended Complaint do not establish a violation of Title VII nor constitute unconstitutional sex discrimination. As noted above, Plaintiff's so-called "sexual harassment" claim is based entirely on inappropriate classroom conduct by a single special education student. Plaintiff's novel theory should not be recognized for several reasons. First, extending Title VII to student/teacher harassment is bad public policy. The classroom setting and the relationship between a public school teacher and her students is simply not analogous to so-called hostile environment scenarios involving workplace incidents between co-workers or, for that matter, between third parties such as customers and employees. In contrast to other alleged sexual harassment victims, a public school teacher is in a unique position to exercise authority and control over the minor students entrusted to her care. Under Delaware law, a teacher acts *in loco parentis* for the students entrusted to her care and is vested with statutory authority to deal with disruptive students. *See e.g. Joyner v. State*, No. N-80-09-0435FC, 1982 Del. Super. LEXIS 976, at *4 (Del. Super. Ct. Jan. 15, 1987) ("in Delaware, a teacher and/or administrator stands *in loco parentis* to pupils under his or her charge"); 14 *Del. C.* § 701 (authority of teachers and administrators to control the disruptive behavior of students). In other words, it is the teacher, not the student, who is vested with classroom authority, including the right to exclude a student from the classroom.

Second, the novel concept of holding a school district liable for a student's classroom misbehavior under Title VII theory is stretched even further in the circumstances presented here. The student in question is a special needs student. The behavior in question has been determined to be a "manifestation of his disability," that is his behavior was *caused* by his disability. Title VII was never intended to extend to such conduct. Special education teachers are employed for the purpose of assisting such challenged students. To permit a special education teacher to sue a school district under Title VII because of conduct related to the student's behavior problems turns the law on its head.

Third, under Title VII, employers are merely held to a negligence standard for sexual harassment of employees by third parties. *See Lockard v. Pizza Hut,* 162 F. 3d 1062 (10th Cir. 1998). Here, the record clearly shows that the alleged notice the District received of the student's "sexual harassment" was nothing more than a student behavior referral form left in the Assistant Principal's inbox. Even then, upon learning of the student's behavior, the Assistant Principal immediately removed him from Mongelli's class. See pages 23-24, *infra.* Defendants, therefore, were not negligent in their response to JW's behavior.

Accordingly, Mongelli cannot state a claim against Red Clay under either the Fourteenth Amendment or Title VII, based on the acts of JW, a special needs student, for whom she has parental-type authority.

B.    **Mongelli Has Not Established A *Prima Facie* Case of Sexual Harassment Because the Conduct she Alleges Is Not Sufficiently Severe or Pervasive to Create a Hostile Working Environment for a Reasonable Person.**

Even if the Court rules that a claim of sexual harassment may be stated based on the conduct of a special needs student over whom Plaintiff stands *in loco parentis*, Plaintiff's Complaint still fails as a matter of law.  In Count I and III of her First Amended Complaint, Mongelli claims that JW's classroom behavior created a hostile work environment and therefore constituted sexual harassment in violation of Title VII and the Fourteenth Amendment.  As noted *supra* Mongelli's entire sexual harassment claim is predicated *solely* on the conduct of one special needs student in her class referred to in the litigation as "JW." The conduct in issue occurred between April 26 and May 6, 2004.  (First Amended Complaint, D.I. 15).

To establish a claim of hostile environment sexual harassment, Mongelli must demonstrate that the workplace was so permeated with discrimination, abuse, ridicule, or insults, which were sufficiently severe or pervasive such that the terms and conditions of her employment were altered and an abusive working environment was created.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  The harassing conduct must be so extreme that it amounts "to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 783 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *see also Pennsylvania State Police v. Suders*, 124 S. Ct. 2342, 2347 (2004) (harassment must be "sufficiently severe or pervasive to alter the conditions of their employment").  In addition, the offensive conduct must occur frequently for a hostile environment to be created; mere sporadic or isolated incidents of harassment are not sufficient.  *See Cooper-*

*Nicholas v. City of Chester*, No. 95-6493, 1997 U.S. Dist. LEXIS 20810 (E.D. Pa. Dec. 30, 1997) (supervisor's comments over nineteen months not frequent enough to create hostile work environment).  Significantly, Mongelli must also show that the discrimination would have detrimentally affected a reasonable person in the same position.  *Richards*, 2004 U.S. Dist. LEXIS 4987 at *11-12.

The Court utilizes a "totality of the circumstances" approach in analyzing whether a hostile environment exists,  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990);  *Bell v. Waste Management, Inc.,* No. 03-002-KAJ, 2004 U.S. Dist. LEXIS 21864, at *17 (D. Del. Oct. 29, 2004).  The U.S. Supreme Court has emphasized the following factors in this determination: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23.

For the reasons outlined below, Mongelli cannot satisfy the crucial severe or pervasive requirement of Title VII.  *See King v. City of Philadelphia*, No. 02-2845, 2003 U.S. App. LEXIS 6290, at *10 (3d Cir. Apr. 1, 2003) (isolated and sporadic incidents do not demonstrate the pervasive atmosphere of harassment required to prove a Title VII violation); *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 280 (3d Cir. 2001) ("simple teasing, offhand comments, and [non-serious] isolated incidents do not amount to discriminatory changes in the terms and conditions of employment and therefore are insufficient to establish an issue of material fact"); *Kidd v. MBNA Am. Bank*, 224 F. Supp. 2d 807, 813-814 (D. Del. 2002); *Al-Salem v. Bucks County Water & Sewer Auth.*, No. 97-6843, 1999 U.S. Dist. LEXIS 3609, at *14-22 (E.D. Pa. Mar. 25, 1999).

Beginning in March of 2004 Mongelli submitted disciplinary referral forms for JW due his use of inappropriate language in the classroom. (A8-12; A20-26; Docs.). A disciplinary action form dated April 26, 2004, contains the first allegation that JW engaged in inappropriate physical conduct towards Mongelli by grabbing her and, in her words, attempting to "hump" her when leaned over to assist another student. (A20). Mongelli wrote seven additional student referrals of various dates between April 26 and May 7 alleging, among other things, that JW directed inappropriate sexual remarks to her. (A20-26; 70-71). Notably, she took no other action until May 6, 2004, when she met with the Assistant Principal.

A review of Title VII sexual harassment jurisprudence demonstrates that JW's conduct in the instant matter is not sufficiently severe or pervasive to constitute a hostile work environment. *See e.g., Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463-65 (6th Cir. 2002) (supervisor's rubbing employee's shoulders, grabbing employee's buttocks, and offensive touching not severe enough to create a hostile work environment); *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000) (court rejected sexual harassment claim because plaintiff's co-worker reached under her shirt and fondled her breast on only one occasion); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (supervisor's four incidents of unwelcome contact with subordinate's arm, fingers, and buttocks, along with repeated sexual jokes aimed at subordinate, not severe enough to create a hostile work environment); *Seldomridge v. Uni-Marts, Inc.*, No. 99-496 GMS, 2001 U.S. Dist. LEXIS 9491 (D. Del. July 10, 2001) (holding that while inappropriate and offensive, a brief intentional exposure incident involving a female employee's supervisor was not so severe that it altered the terms and conditions of her employment

so as to create a hostile working environment); *McGraw v. Wyeth-Ayerst Labs. Inc.*, No. 96-5780, 1997 U.S. Dist. LEXIS 20813 (E.D. Pa. Dec. 30, 1997) (supervisor's repeated requests for date, kissing subordinate without her consent, and touching her face, not severe enough to create a hostile work environment).  The conduct Mongelli alleges here, even if true, falls far short of the requisite standard.

 Mongelli's sexual harassment claim is also premised on verbal statements JW made.  Although sexual remarks by a student may certainly be annoying or irritating, such comments do not suffice to create a hostile work environment under the circumstances of this case.  It is notable that the cases outlined above typically involve suggestive remarks by supervisor's to employee's under their authority and control. Here, the subordinate relationship is reversed, with Mongelli, the classroom teacher, claiming that remarks by a child in her class created the hostile environment.

 Mongelli's own subjective reaction to JW's behavior is irrelevant to this Court's analysis of whether a hostile work environment existed.  Instead, the relevant line of inquiry is whether a reasonable person in the same position would have been detrimentally affected.  *Richards*, 2004 U.S. Dist. LEXIS 4987 at *11-12.

 As the U.S. Supreme Court has expressly "emphasized," in the Title VII context, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" which includes the type of workplace and, in some cases, "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundower Offshore Servs.,* 523 U.S. 75, 81 (1998).  Indeed, "the real social impact of workplace behavior often depends on a constellation of surrounding circumstances,

expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 81-82.  The court must use its "[c]ommon sense, and an appropriate sensitivity to social context" in determining whether, under the circumstances, a reasonable person in the plaintiff's position would find particular behaviors "severely hostile or abusive." *Id.* at 82.

The teachings of *Oncale* are particularly relevant to the instant matter.   The identity of the harasser, a special needs child, his status as a student, and the special education classroom setting in which the alleged harassment occurred establish as a matter of law that a reasonable person in the plaintiff's position would *not* find JW's behaviors and statements to be severely hostile or abusive.  As Mongelli admitted at her deposition, JW's behavior was not particularly unusual for special needs students, and Mongelli had experienced such conduct before when she was a substitute in New York.  (A52).  Indeed, JW's actions were found to be a manifestation of his disability that led him to be in a special needs class in the first place.  JW's behavior while objectionable, does not rise to the level of creating a hostile work environment for a reasonable person working as a special education teacher standing *in loco parentis* to her students.

Finally, as the Supreme Court has taught, Title VII  is not a "civility code."  *See Overall v. Univ. of Pa.*, No. 02-1628, 2003 U.S. Dist LEXIS 23892, at *24 (E.D. Pa. Dec. 19, 2003) ("Title VII is not a 'general civility code for the American workplace'.") (citing *Oncale*, 523 U.S. at  80).  If Title VII is not a general civility code for America's workplaces, then neither it nor the Equal Protection Clause of the Constitution, are general civility codes for America's public school classrooms.

22

**C.    The District Took Action to Promptly End JW's
Behavior and Mongelli Unreasonably Failed To Use
Red Clay's Policy Against Harassment.**

In the alternative, if the Court determines that Mongelli has established a *prima facie* case of hostile environment sexual harassment, summary judgment is still appropriate because she did not take advantage of the District's policy against sexual harassment.  An employer is not liable for a hostile work environment, when it exercised reasonable care to prevent and correct promptly any harassing behavior, and the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998); *Burlington Indus., Inc.  v. Ellerth*, 524, U.S. 742, 765 (1998).

Here, there is no dispute that the District had a policy regarding the reporting of workplace harassment, and that this policy was known to Mongelli.  Mongelli freely conceded at her deposition that she never filed a complaint with the District under the District's student code of conduct or its employee sexual harassment policy.  (A76-77).  Nor did she file a grievance with the Union that represented her.  (A76-77).  By her own admission, all she did during the April 26 through May 6, 2004 time period was leave disciplinary referral forms in an Assistant's Principal's box.  (A78; 79).  She did not exclude the student from her classroom in response to his April 26, 2004 conduct. She did not personally go to the Principal or Assistant Principal to request assistance as a result of JW's actions.  She did not even attempt to label the student's behavior as "sexual harassment" at that time.  Her after the fact attempt to characterize a student behavior referral form as the equivalent of a sexual harassment complaint is therefore unavailing.  It is simply unreasonable to hold that a student discipline form for inappropriate behavior of a student puts the District on notice that the teacher is

23

complaining about employment-related "sexual harassment" under Title VII and the District's anti-harassment policies.

It is also undisputed that the District through Assistant Principal Kennedy took prompt remedial action when Mongelli verbally advised him of JW's actions on May 6. The very next day, on May 7, 2004 JW was removed from Mongelli's classroom and was never assigned to her again. (A34-36; 75). Furthermore, Kennedy began an investigation to determine the accuracy Mongelli's report. (A81; 34-36). As a result, JW was suspended from school for the balance of the year. (A34-36; 138-45). Red Clay also referred the matter to the police and JW was prosecuted. Mongelli does not allege that there was any incident following her May 6, 2004 verbal report to Kennedy about JW that constitutes "sexual harassment."

**D.    Defendant's are Entitled to Summary Judgment on Mongelli's Claims Under the Fourteenth Amendment Because Mongelli Cannot Show Any Discriminatory Intent.**

It is well established that the constitutional prohibition on sex discrimination does *not* precisely mirror Title VII's statutory claim. The Amended Complaint shows that the Plaintiff has attempted to circumvent this fundamental distinction by simply alleging the elements of Title VII jurisprudence as if they constituted a Section 1983 cause of action. As many courts have noted, there is a distinction between sexual harassment (under Title VII) and that which could be actionable under the Equal Protection Clause. *Saville v. Houston County Healthcare Auth.*, 852 F. Supp. 1512, 1532-33 (M.D. Ala. 1994). Under Section 1983, a defendant's liability turns on that defendant's discriminatory *intent*. In other words, unlike Title VII, "'the defendant must intend to harass'" in order for a

violation of the Equal Protection Clause to occur. *Id.* (*quoting King v. Board of Regents*, 898 F.2d 533, 537 (7th Cir. 1990)).

Here, there is simply no basis for an argument that the Defendants *intended* to harass the Plaintiff.

## II. MONGELLI'S RETALIATION CLAIMS FAIL AS A MATTER OF LAW BECAUSE SHE DID NOT ENGAGE IN PROTECTED ACTIVITY AND, ALTERNATIVELY, BECAUSE THERE IS NO CAUSAL LINK BETWEEN HER REPORT CONCERNING JW'S BEHAVIOR AND THE NON-RENEWAL OF HER EMPLOYMENT CONTRACT.

Retaliation claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Krouse v. American Sterilizer Co.*, 126 F. 3d 494, 500 (3d Cir. 1997). First, Mongelli must establish a *prima facie* case of retaliation by demonstrating that, (1) she was engaged in a "protected activity," (2) that she suffered an "adverse employment action" and, (3) that a "causal link" exists between the adverse employment action and the protected activity. *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1999). If Mongelli carries this burden, the Defendants have an opportunity to assert a non-retaliatory, legitimate business reason for their actions. *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996).

Here, Mongelli cannot establish a *prima facie* case of retaliation.

### A. Mongelli did not engage in any protected activity.

Title VII's anti-retaliation provision is specific and limited. It requires that the employee engage in "protected activity". *See, e.g.*, *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 n.4 (4th Cir. 1998). Retaliation is prohibited against an employee who "participates in" Title VII's statutory processes and against a person who

"opposes" an employment practice made illegal by Title VII.  *See Laughlin*, 149 F.3d at 259-60.

In the instant matter, Mongelli rests her claim on the "opposition" clause.  She asserts that the submission of her various disciplinary referrals and her verbal complaint regarding JW's classroom behavior  is somehow protected from "retaliation" under 42 U.S.C. § 2000e 3(a).  Her actions do not constitute "protected activity" under Title VII, however.

The scope of Title VII's "opposition" clause, is limited and specific to an employment practice made illegal by the statute.  By its own terms, retaliation is prohibited only where the employee engages in opposition to an *unlawful employment practice* under Title VII: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has *opposed any practice made an unlawful employment practice by this subchapter . . . .*" 42 U.S.C. § 2000e 3(a) (1988) (emphasis added); *Lamb-Bowmin v. Delaware St. Univ.,* 152 F. Supp. 2d 553, 560 (D. Del. 2001) (no protected activity where a female basketball coach communicated her displeasure with defendant's perceived violations of Title IX).

Mongelli therefore fails to state a valid retaliation claim because she did not oppose any *employment practice* made *unlawful* by Title VII.  Mongelli's actions in submitting student disciplinary referral forms hardly constitute opposition to an unlawful employment practice.  They were simply reports of student misbehavior.

The limited nature of Title VII's anti-retaliation clause has been recognized by numerous courts, including this one.  As the Third Circuit recently noted in *Curay-Cramer v. Ursuline Academy of Wilm., Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)

26

"opposition to an illegal employment practice must identify the employer and the practice - if not specifically, at least by context.".

Likewise, in *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 n.4 (3d Cir. 1997), *cert. denied*, 523 U.S. 1074 (1988), the Third Circuit held that grievances about working conditions are not protected activity when they do not concern acts made unlawful by Title VII. *See also*, *Crowley v. Prince George's County*, 890 F.2d 683, 687 (4th Cir. 1989); *Cass v. American Prop.*, 861 F. Supp. 55 (N.D. Ill.1994) ("the employee's opposition must in some way be directed at an unlawful employment practice of the employer").

The Third Circuit's decision in *Barber v. CSX Distribution Services.*, 68 F.3d 694 (3d Cir. 1995) is similarly instructive. *Barber* shows that it takes more than a vague assertion of statutory rights to invoke opposition to an alleged "employment practice." In *Barber*, the Third Circuit ruled as a matter of law that a letter complaining about the alleged unfairness of the employer's decision not to promote the plaintiff was insufficient to create "protected activity" under the ADEA's anti-retaliation provision. *Id.* at 702.

The Sixth Circuit reached a similar conclusion in *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989), holding that vague charges of discrimination, even an internal letter or memorandum, are simply "insufficient to constitute opposition to an unlawful employment practice." The Court observed that "[o]therwise, every adverse employment decision . . . would be subject to challenge under either state or federal civil rights legislation simply by an employee asserting a charge of discrimination. In our view, such would be an intolerable intrusion into the workplace." *Id.*

27

A comparison between Mongelli's purported protected activity in the instant

matter and *Robinson v. SEPTA*, 982 F.2d 892 (3rd Cir. 1993), is also instructive.  In

*Robinson*, the plaintiff specifically referenced his employer and its allegedly

discriminatory employment practices in his "inartfully drawn" letter to his Congressman.

982 at 896.  Mongelli's submission of standard classroom disciplinary referrals is not

even comparable the "inartfully drawn" letter in *Robinson*.  Indeed, the student referral

forms she submitted do not state anything other than that she was referring student

misbehavior to the Assistant Principal.  There is no reference to any practice that

allegedly violated Title VII.

Simply put, Mongelli's classroom disciplinary referrals for JW do not constitute

protected activity.  As such, her retaliation claim must fail.

### B.    No Causal Connection Exists Between Mongelli's Complaint About JW and the District's Decision Not to Renew Her Contract.

Furthermore, assuming *arguendo*, that Mongelli did engage in protected activity,

she cannot show, as she must, that there is a causal connection between her the alleged

protected activity and the District's decision not to renew her contract.  *See e.g. Richards*,

2004 U.S. Dist. LEXIS 4987, at *15 (D. Del. Mar. 24, 2004) (plaintiff must show a

causal link between adverse employment action and protected activity and "'present

sufficient evidence to raise the inference that her protected activity was the likely reason

for the adverse action.'") (quoting *Ferguson v. E .I. DuPont de Nemours and Co.*, 560 F.

Supp. 1172, 1200 (D. Del. 1983)).  Thus, even construing the facts in the light most

favorable to her, Mongelli cannot meet her ultimate burden in a retaliation case of

establishing that retaliatory intent in fact had a "determinative effect" on the District's

decision not to renew her contract.  *Shaner v. Synthes (USA)*, 204 F.3d 494, 501 (3d Cir. 2000).

Here, Mongelli worked pursuant to a temporary teaching contract which, by its own terms, expired on June 30, 2004.  Mongelli sought and obtained an emergency teacher certificate from the Delaware Department of Education.  (A13; 15; 82-83).

It is uncontested, however, that Mongelli knew that she needed additional educational requirements to continue working as a special education teacher.  (A59-60).  Although her emergency certificate was good for three years, Delaware Department of Education rules specify that a teacher employed on an emergency certificate must make progress towards a standard certificate.  (A7).  Mongelli, however, admits that at the time of her termination in June 2004, she literally had made no progress on fulfilling the requirements for a standard certificate in special education.  She admitted that she had done nothing to fulfill the three options DOE had provided her because she was "too stressed" by teaching special adult students.  (A62-63).  In fact, she had no ambition to continue teaching special education students.

It is important to note that it is undisputed that Chad Carmack, the Principal at Dickinson High School, had determined no later than April 22, 2004 that Mongelli's employment contract should not be renewed.  On that date, Carmack excluded Mongelli's name from staffing list for Dickinson High School in the belief that because Mongelli was a temporary teacher this would lead automatically to her non-renewal.  This list was submitted on April 22, 2004, four days before April 26, 1006, the date when Mongelli claims she first a submitted a student behavior form to the Assistant Principal concerning

JW's inappropriate actions that she belatedly terms "sexual harassment." Carmack's decision not to renew Mongelli therefore predates *any* purported protected activity.

"[A]s the Supreme Court has held, an employer need not refrain from carrying out a previously reached employment decision because an employee subsequently claims to be engaging in protected activity." *Curay-Cramer*, 450 F.3d at 137 (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). As the Third Circuit has noted, "[t]he caselaw provides that an employee may not insulate herself from termination by covering herself with the cloak of Title VII's opposition protections after committing non-protected conduct that was the basis for the decision to terminate. If subsequent conduct could prevent an employer from following up on an earlier decision to terminate, employers would be placed in a judicial straight-jacket not contemplated by Congress." *Id.* (citing cases).

Here, Mongelli's purported protected activity, her complaints regarding JW's classroom behavior post-date Carmack's decision not to re-new her contract. As such, she cannot establish the requisite causal connection between her purported protected activity and her non-renewal nor establish a *prima facie* case of retaliation.

## III. MONGELLI'S REINSTATEMENT CUTS OFF ANY RIGHT TO DAMAGES.

It is well established that a plaintiff's entitlement to an award of back pay under Title VII is cut off by an unconditional offer of reinstatement. *See Ford v. EEOC*, 458 U.S. 219 (1982). In the instant matter, Mongelli was offered, and accepted, another teaching position within the District in January of 2005. Although Mongelli was subsequently non-renewed again in June of 2005, she has agreed, by Stipulation, that her non-renewal in June of 2005 is not issue in this case. (D. I. 47) ("[p]laintiff stipulates and

agrees that she is not asserting a claim that her non-renewal for the 2005-2006 school

year violated Title VII of the Civil Rights Act of 1964 or other state or federal law"").

Mongelli also admits that she has no desire to return to teaching special education

students. Thus, Mongelli's potential damages under Title VII are limited to the period

between her non-renewal in June, 2004 and her reemployment in January, 2005.

31

## CONCLUSION

For the foregoing reasons and authorities cited herein, summary judgment must be granted to the Defendants on all remaining counts of Plaintiff's First Amended Complaint.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Barry M. Willoughby*
Barry M. Willoughby, Esquire (No. 1016)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6666; 6553
Facsimile: (302) 576-3345; 3470
Email: bwilloughby@ycst.com; mstafford@ycst.com
Attorneys for Defendants

Dated:  January 31, 2007