

**WILCOX & FETZER LTD.**

In the Matter Of:

# Mongelli

v.

# Red Clay Consolidated School District

## C.A. # 05-359 SLR

---

### Transcript of:

**Mongelli, Christina**

**March 30, 2006**

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

CHRISTINA MONGELLI

4

```
1    BY MR. WILLOUGHBY:

2      Q    All right.  We have marked Exhibits 1 through 7.

3      A    There is one missing.

4      Q    All right.  And these are disciplinary referrals you

5    made for a student named Jonathan White?

6      A    Yes.

7      Q    And do you have any idea how many students referrals

8    for discipline you made when you were a teacher at Dickinson

9    between February of 2004 and June of 2004?

10     A    For this student?

11     Q    No, total.

12     A    No, I don't.

13     Q    You made a lot?

14     A    Not more than any other teacher.

15     Q    You don't think so?  Does the number like 80 sound

16   about right for that time frame?

17     A    I don't know.

18          MR. WILLOUGHBY:  Let's mark this as the next

19   exhibit.

20          (Mongelli Deposition Exhibit No. 8 was

21   marked for identification.)

22   BY MR. WILLOUGHBY:

23     Q    I have handed you a document marked Exhibit 8.  I'm

24   going to represent to you it's a summary of disciplinary
```



CHRISTINA MONGELLI

5

1   referrals you made during your employment.

2           Do you recognize the names of these students?

3   A   Yes.

4   Q   And do these all look like referrals you made?

5           MR. BERNSTEIN:  Take as much time as you need

6   to look at them.

7           THE WITNESS:  Okay.  I didn't put any of these

8   categories on here.

9   BY MR. WILLOUGHBY:

10  Q   I didn't say you created the document.  What I'm

11  saying is, doesn't this look like an accurate representation

12  of the disciplinary referrals you made when you were at

13  Dickinson during that time frame?

14  A   Yes.

15  Q   And your testimony is you think that's no more than

16  any other teacher?

17  A   Considering the class that I had and the teacher

18  previously before me.

19  Q   My question is not considering the students.  Do you

20  think this is more than most teachers at Dickinson had

21  during that time frame?

22  A   I'm not aware.  I don't know how many referrals the

23  other teachers had.

24  Q   So you don't know?



CHRISTINA MONGELLI

6

1    A    No.

2    Q    And you don't know what the other special ed

3   teachers had either, correct?

4    A    No.

5    Q    All right.  Now, you reviewed Exhibits 1 through 7

6   before coming in for your deposition today, is that right?

7    A    Yes.

8    Q    Did you review any other documents?

9    A    No.

10   Q    Did you look at the complaint that was filed in

11  court by you in this case?  Did you review that?

12   A    Yes.

13   Q    Did you review your interrogatory answers, questions

14  that we sent to you?

15   A    Yes.

16   Q    Did you look at any other kinds of documents?

17   A    Just today, you mean?

18   Q    No.  In preparing for your deposition at any point.

19  Whether it was last week, two weeks ago, whenever.

20   A    No.  Just those documents.

21   Q    Okay.

22        MR. WILLOUGHBY:  Let's mark this the next

23  exhibit.

24            (Mongelli Deposition Exhibit No. 9 was



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A42

CHRISTINA MONGELLI

26

```
1    Q    Do you plan on returning to teaching?

2    A    I'm not sure.  This experience has -- it's been a

3    terrible experience and it's still one I'm trying to get

4    over and I just feel safer working in a bank.

5    Q    Safer?

6    A    Yes.

7    Q    From the students?

8    A    From the students and the administration.

9    Q    You don't plan on pursuing a career in teaching

10   special education students?

11   A    No.

12   Q    All right.  Going back to your conversation with

13   Janet Lacy.  Were there any other conversations you had with

14   her or did you finish that conversation with the

15   termination?  Was there more said in that conversation?

16   A    Yeah.  We talked about different things.

17   Q    What else did you discuss?

18   A    She said, oh, maybe it's for the best.  You'll move

19   on.

20   Q    What did you say?

21   A    I said, yeah, I said -- I said I couldn't deal with

22   the school district anymore the way they treated me.  Not

23   only during my time at Dickinson, but also at Warner.

24   Q    Okay.  What else did you say?
```



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

42

1   Q   Did you graduate with honors or any other kind of

2  special commendations?

3   A   No.

4   Q   Now, you also went to Hofstra for a graduate degree?

5   A   Yes.

6   Q   And what was that in?

7   A   Reading.  Teaching with a specialization in reading.

8   Q   And what was your graduate degree?  Was it a

9  master's degree?

10   A   Yes.

11   Q   And was it in teaching and a specialization with

12  reading?

13   A   Yes.

14   Q   And what was your grade there, GPA?

15   A   I don't remember.  It was higher than the 3.3.

16  Maybe 3.4, 3.5.

17   Q   Did you have any special honors or commendations at

18  graduation for the master's?

19   A   No.

20   Q   I know you're anticipating my questions.  So let me

21  finish it so the court reporter can get my question all the

22  way out before you answer.

23   A   Okay.

24   Q   Did you take any courses in dealing with special



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

43

1  education students in your graduate work?

2  A    When you learn teaching reading, it's how to teach

3  kids who are at a lower level.  So I would consider them all

4  to be --

5  Q    Did you take any special courses dealing with

6  special education students?

7  A    I have taken abnormal psychology, child psychology.

8  And besides the one I told you about, child -- is another

9  one, child psychology.

10  Q    That deals with children in general, correct?

11  A    Well, yeah.  The exceptional child is a separate

12  course, though.

13  Q    Did you have any other courses beside that

14  exceptional child course that you talked about dealing

15  specifically with special education students?

16  A    Let me just think.  I don't think so.

17  Q    Is it fair to say that you, at graduation from

18  Hofstra with a master's degree, you would not have been

19  qualified to get a standard certificate in teaching special

20  education courses?

21  A    Not in New York State.

22  Q    Or in Delaware?  You didn't have the educational

23  background for that particular teaching?

24  A    Well, I have a temporary license here.



WILCOX & FETZER LTD.
Registered Professional Reporters

A45

CHRISTINA MONGELLI

44

1    Q    I'm talking about a standard, a regular standard,
2    putting aside the temporary license.
3    A    Right.
4    Q    So you didn't have that kind of special education in
5    your educational background?
6    A    Right.
7         MR. WILLOUGHBY:  Off the record.
8         (Discussion held off the record.)
9         MR. WILLOUGHBY:  Let's mark this as the next
10   exhibit.
11        (Mongelli Deposition Exhibit No. 11 was marked
12   for identification.)
13   BY MR. WILLOUGHBY:
14   Q    Do you recognize that letter?
15   A    Yes.
16   Q    And what is it?
17   A    It's a cover letter.
18   Q    To whom?
19   A    To Red Clay Consolidated School District.
20   Q    And what's the purpose of it?
21   A    To receive a job, a job at Red Clay.
22   Q    And were you seeking a job in special education
23   through this letter?
24   A    I was seeking any full-time job that they had



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

45

1  available.

2      Q     Okay.   What does the first sentence of your letter

3  say?

4      A     The purpose of this letter is to convey my interest

5  in an elementary teacher position or reading teacher in the

6  Red Clay Consolidated School District.

7      Q     Now, why did you move to Delaware from Hicksville in

8  New York?

9      A     My brother had lived here for about 17 years.   And

10  Long Island -- I visited Delaware.   I liked it here.   I

11  liked the people.   I liked the slower pace of life.   And

12  it's also less expensive than New York.

13      Q     When did your parents move here?

14      A     At the same time.   We all moved together.

15      Q     In September of 2003?

16      A     Yes.

17      Q     Did you have an existing job in New York when you

18  moved here?

19      A     Could I also just point out, I was also an academic

20  intervention services teacher at Lee Avenue and Burns.

21      Q     I see.   That's in your letter.

22      A     So most of those kids were special ed students.

23      Q     Did you have a job when you moved here in September

24  of 2003?



CHRISTINA MONGELLI

47

1   Q    And that's dated September 30, 2003?

2   A    Yes.

3   Q    And is what's represented on here accurate

4   concerning your employment history?

5   A    Yes.

6   Q    Okay.  You graduated with a master's degree from

7   Hofstra in August of 1994, is that correct?

8   A    Yes.

9   Q    And when is the first teaching job you got?

10   A    I subbed before that.  I subbed in -- let me see.

11   1991.  September 1991.  So I was a sub, you know, while I

12   went to college.

13   Q    You were a substitute teacher?

14   A    Yes.

15   Q    And where was that?

16   A    My first job was at Island Trees School District.

17   Q    And how often did you sub?  Do you know how many

18   days you worked?

19   A    Oh, quite often.  Four to five.

20   Q    Per week?

21   A    Yes.

22   Q    And you subbed any classes that they assigned you

23   to?

24   A    Yes.



CHRISTINA MONGELLI

48

```
1    Q    Did you sub in any special education classes?

2    A    Yes.

3    Q    Which ones?

4    A    What do you mean which ones?

5    Q    Which grade levels?  Which kind of students were you

6  substituting for?

7    A    All grades.  Island Trees, they put you everywhere

8  from kindergarten to high school up to 12th grade.

9    Q    And do you have any idea how many times you

10 substituted with a special ed class during that time?

11   A    Many.

12   Q    What's many mean?

13   A    I just know I subbed there a lot.  I did a lot of

14 subbing for them.

15 . Q    After you graduated from Hofstra with a master's

16 degree, looking at your teaching experience, it looks like

17 to me the only full-time job you had was from October of

18 2002 to June of 2003, is that right?

19   A    No.

20   Q    Where else on here --

21   A    They considered permanent substitute teacher a

22 full-time position in New York.

23   Q    Well, I'm looking at what you wrote on here.  The

24 schools.  Is there any position here other than that job
```



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

52

1    Q    And did you apply for regular teaching positions

2   with the school district, Hicksville School District?

3    A    No.  Because I knew I was moving and I thought the

4   move would be sooner than that.

5    Q    So going back throughout the time that you worked at

6   Hicksville from 1999 forward, you never applied for a

7   full-time, for a regular position?

8    A    I might have the first year.  But after that, I

9   didn't.  I thought I was moving like the next year.

10    Q    And you didn't receive an offer for a full-time

11   position?

12    A    No.

13    Q    Were you told why?

14    A    I was never interviewed for a full-time position.

15   They were happy, what I was told by someone else, that they

16   are glad when they have somebody as a permanent sub that

17   they like.

18    Q    Well, you were looking for a regular position and

19   you didn't get an offer or an interview, correct?

20    A    No.

21    Q    That is correct?

22    A    Yes.

23    Q    That is correct.  Okay.

24         Now, the is it Plainedge School District?



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

56

1  was the only teaching you were doing during that time frame?

2      A      No.  I was a permanent sub.

3      Q      You had other classes during the day?

4      A      Yes.

5      Q      And did you have any behavioral problems with these

6  intervention students?

7      A      No.

8      Q      How old were they?  What were their age groups,

9  grades?

10     A      Well, third grade is -- let's see.  Eight to 11.

11     Q      So you had no problems with any of those students?

12     A      No.

13     Q      Did you ever refer any of them for discipline?

14     A      No.

15     Q      When you were in any of your prior teaching

16  positions before Red Clay, did you ever refer a student for

17  discipline?

18     A      Yes.

19     Q      And what were the circumstances of that?

20     A      Maybe at the high school.

21     Q      And what happened?

22     A      Oh, one time a boy yelled out something

23  inappropriate in class.

24     Q      And what did he yell out?



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

57

1    A    Blow job.

2    Q    Okay.  And was he a special ed student?

3    A    Yes.

4    Q    What did you do?

5    A    I told the principal, the assistant principal.

6    Q    And what did the assistant do?

7    A    They handle situations immediately at that school.

8  It was corrected by the next day.

9    Q    And what did they do?

10   A    He was -- I believe he was suspended.

11   Q    Anything else happen to him?

12   A    No.

13   Q    And you're aware, in a lot of this special education

14  students, behavior like that is a manifestation of their

15  disability?

16   A    Yes.

17   Q    And that was true with the students you had at Red

18  Clay, including Jonathan?

19   A    Yes.

20   Q    Let's talk about your current job.  You said you

21  work for is it Bank of America?

22   A    Yes.  MBNA, now Bank of America.

23   Q    And what do you do there?

24   A    I'm an account manager.



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

58

1    Q    And what do you do as an account manager?

2    A    I speak to people all day on the phones.  I'm a

3  small business account manager.  I speak to business people

4  all day.

5    Q    And about what?

6    A    About their accounts, problem solving.

7    Q    Do you like that job?

8    A    Yes.

9    Q    What's your income there?

10   A    Twenty-five thousand a year plus incentives every

11  month.

12   Q    What do you make with incentives?

13   A    Usually a thousand extra a month.

14   Q    Do you have any plans on leaving that job?

15   A    No.  I feel safe there.  I feel that they are

16  professional.

17   Q    When did you apply for that position?

18   A    Let's see.  I started training November 7th.  So

19  before that.  Sometime in October.

20   Q    Of 2005?

21   A    Yes.  October.  I handed my resume' to somebody to

22  give to them.

23   Q    Did you have any jobs between the time you left Red

24  Clay in June of 2005 and that job in October?



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

60

1    A    After that experience, no.

2    Q    All right.  We marked your letter in September 2003

3    to the school district where you applied for a position at

4    the school district.  How did you come to have the position

5    at Dickinson in 2004?  How did that come about?

6    A    I was a substitute I believe from October 2003.

7    Q    And was that through STS or some other --

8    A    Substitute Teacher Service.

9    Q    And did you apply at Red Clay to get that position

10   or did you apply to Substitute Teacher Service?

11   A    No, I didn't apply for that position.  The

12   principal, Chad Carmack, asked me when I was subbing.  I was

13   a substitute.

14   Q    Maybe I confused you with my question.

15        For the substitute teaching position that you

16   had in 2003, did you apply to Red Clay for that or to STS?

17   A    STS.

18   Q    So STS placed you at Dickinson?

19   A    Right.

20   Q    And were you placed in any particular classes or

21   were you just called when there was a need for a teacher

22   that day?

23   A    No, they just called when there was a need.

24   Q    And how many times did you substitute at Dickinson



CHRISTINA MONGELLI

69

1   thought it would be a challenge.  I said I looked to this

2   position as a challenge.

3       Q    But your primary goal was not to be a special

4   education teacher at that point or at any point?

5       A    My primary goal was to be teaching full-time.

6       Q    Well, in your field of study in reading that you got

7   your degree from Hofstra in?

8       A    Um-hmm.

9       Q    That was your primary emphasis?

10      A    Yes.

11      Q    And that's what you were looking for if you had your

12   pick of any job, you would rather be in that position than a

13   special ed position?

14           MR. BERNSTEIN:  Do you understand the question?

15           THE WITNESS:  Yes, I do.  But he is trying to

16   say that, you know, I didn't want this job.

17   BY MR. WILLOUGHBY:

18      Q    I'm not saying that.

19      A    I was very excited about it.  So I'm not going to

20   say I didn't want the job.

21      Q    That's a different question.  I didn't ask you if

22   you didn't want the job.  Obviously you took the job.

23      A    Yes.

24      Q    My question was, if you had the choice between a



CHRISTINA MONGELLI

70

1  special ed position and another position dealing with say

2  elementary reading, isn't it fair to say you would prefer to

3  be in the field that you had studied?

4    A    No.  Because I looked at this job as a challenge.

5    Q    So you wanted to be a special education teacher?

6    A    Well, the field that I took was reading.  I chose

7  reading.

8    Q    Okay.  So you took the job because it was a

9  full-time job and you thought it would be a challenge to

10  deal with special ed students?

11    A    Yes.  I looked forward to it.  I definitely looked

12  forward to it.

13    Q    And did you interview with anyone else besides Chad?

14    A    Debra.  I think I went into Debra Davenport.

15    Q    And what were the discussions you had with her?

16    A    Basically that I was hired and when I would start.

17    Q    Was that at the district office?

18    A    Yes.

19    Q    Were there any other conversations about the

20  position, what you would be doing?

21    A    Not with her, no.  Chad told me what grade it was

22  and what subjects.

23    Q    Have you spoken with Mr. Thompson before you

24  accepted the position?



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

71

1    A    No.

2    Q    Had you received his note before you accepted the

3  position?

4    A    Before I accepted it?

5    Q    Yes.

6    A    No.

7    Q    Had you spoken with any of the other teachers about

8  the makeup of the classroom before you accepted the

9  position?

10   A    No.

11   Q    Had you spoken with any of the other teachers about

12 the kids that you would be teaching before you accepted the

13 job?

14   A    Other teachers had come up to me.

15   Q    And said what?

16   A    They said, do you know what you're getting into?

17 And I said, how bad can it be?  I said, you know, they seem

18 like they are small classes.  And they said they put

19 Mr. Thompson through hell and even the secretary, Chad's

20 secretary, Donna Rotundo, said don't take it, she said,

21 don't take that position.  She said, you don't know what

22 they put him through.  And several teachers came up to me.

23 Several.

24   Q    Who else?



CHRISTINA MONGELLI

72

1    A    They said, wow, you're very brave to take on that

2    job.

3    Q    Who else can you remember coming up to you saying,

4    making the statement you said?

5    A    Let's see.  I didn't know who everybody was at the

6    time.  I don't recall at the time.  I was just told by

7    several teachers after I had accepted the position.

8    Q    That you shouldn't take it?

9    A    Right.

10    Q    And that's because they felt the students would be

11    difficult?

12    A    Yes.

13    Q    But you took the position?

14    A    That was after I took the position.

15    Q    Did you talk to anybody before you took the position

16    about the students and the problems, other than the

17    secretary you described?

18    A    What's her name?  The head of the department.  She

19    said, it's a tough class.  She said, but you will be able to

20    do it.

21    Q    And you don't remember her name?

22    A    No, I don't.  She left.  She left that year.

23        MR. WILLOUGHBY:  Would you mark this as the

24    next exhibit, please?



CHRISTINA MONGELLI

73

1              (Mongelli Deposition Exhibit No. 13 was

2    marked for identification.)

3    BY MR. WILLOUGHBY:

4        Q    Do you recognize Exhibit 13?

5        A    Yes.

6        Q    And what is that?

7        A    It says, took action to appoint you to a teaching

8    position at Dickinson, special education.

9        Q    It's a letter you received?

10       A    Yes.

11       Q    From the school district?

12       A    Yes.

13       Q    And it told you that you were receiving a teaching

14   position at Dickinson in special education?

15       A    Yes.

16       Q    And it says, effective January 20, 2004.  So had you

17   started already when you received this?

18       A    Did I start already?

19       Q    Had you already started teaching the classes?

20       A    I think I did.  I think I did.

21       Q    And it says temporary contract?

22       A    Yes.

23       Q    And you understood that, to continue as a special

24   education teacher, you would have to get additional



CHRISTINA MONGELLI

74

1    educational requirements?

2    A    Yes.

3            MR. WILLOUGHBY:  Let's mark this as the next

4    exhibit.

5            (Mongelli Deposition Exhibit No. 14 was

6    marked for identification.)

7    BY MR. WILLOUGHBY:

8    Q    Do you recognize Exhibit 14?

9    A    Okay.

10   Q    You received this letter?

11   A    Yes.

12   Q    And that's to your correct home address?

13   A    Yes.

14   Q    Okay.  And that told you that to receive a regular

15   standard certificate, you had to take additional course work

16   in special education?

17   A    Yes.

18   Q    Looking at the --

19   A    And pass the PRAXIS.

20   Q    Right.  Looking at Option 1.  Had you matriculated

21   in an approved program for exceptional children during the

22   year 2004?

23   A    No.  I was fired from Dickinson.  How could I?

24   Q    You didn't enroll in a program during that school



CHRISTINA MONGELLI

75

1   year?

2     A    I was considering it.  Stephanie Armstrong was

3   trying to tell me to do it.

4     Q    What did she say?

5     A    She said, just go for the classes.  She said -- this

6   was in the beginning.

7     Q    But you hadn't actually, before the end of

8   June 2004, you at any time hadn't actually enrolled in an

9   approved program for special children, is that correct?

10    A    No.  I was going through too much stress for what

11  was going on in Dickinson.

12    Q    It was correct you had not enrolled?

13    A    Yes.

14    Q    Looking at Option 2.  Had you submitted passing

15  scores for PRAXIS II in exceptional children?

16    A    No.

17    Q    How about PRAXIS I in exceptional children?

18    A    I took that that summer and passed it.

19    Q    That summer after you left?

20    A    Yes.

21    Q    So when you said you took the --

22    A    I took it that summer right after I left.

23    Q    Was it PRAXIS I in exceptional children?

24    A    It was PRAXIS I.



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

78

1    A    Yes.

2    Q    So this letter notified you that you had to complete

3    these courses in order to get a certificate for teaching

4    exceptional children, correct?

5    A    Yes.  And I had three years to do that.

6    Q    Now, as of June of 2004 when you were notified that

7    you were being terminated from the school district that

8    year, had you matriculated an approved program in

9    exceptional children seven through 12?

10    A    No.

11    Q    Had you submitted passing scores for the PRAXIS II

12    tests in exceptional children?

13    A    No.

14    Q    Had you taken any program courses to prepare you to

15    do that?  Had you enrolled in any classes or anything else

16    to be prepared to take the tests, PRAXIS tests, for

17    exceptional children?

18    A    No.

19    Q    And am I likewise correct that you had not taken any

20    courses as outlined under Option 3 towards completing the

21    requirement for getting a certificate for teacher of

22    exceptional children?

23    A    No.  Because I was terminated.

24    Q    Right.  But during that time when you were in the



CHRISTINA MONGELLI

79

1   role of a special ed teacher between February of 2004 and

2   when you received your notice of termination, you had not

3   enrolled in any of these courses, is that correct?

4   A    No.

5   Q    It's not correct?

6   A    Yes, it's correct.

7   Q    It is correct.  All right.

8        MR. WILLOUGHBY:  Okay.  Let's take a

9   five-minute break.

10       (A brief recess was taken.)

11  BY MR. WILLOUGHBY:

12  Q    I see you have in front of you a copy of the exhibit

13  with the list of disciplinary referrals?

14  A    Right.

15  Q    Were you reviewing that during the break?

16  A    Myself, yes.

17  Q    What do you mean yourself?

18  A    I looked at it, yes.

19  Q    Did you discuss it with your attorney?

20  A    No.

21  Q    Why were you looking at that?

22  A    Because I wanted to check over it more thoroughly.

23  Q    And are you satisfied it's accurate?

24  A    No.



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

80

1    Q    What's inaccurate about it?

2    A    The full amount of referrals for Jonathan White are

3    not on there.  There is only four listed there.

4    Q    So there is more, not less?

5    A    Yes.

6    Q    So there could be additional referrals besides the

7    82 that are listed on this exhibit?

8    A    For Jonathan White, yes.

9    Q    And potentially for other students?

10    A    That I don't know.

11    Q    All right.  Just to back up one second.

12         You were discussing earlier that you were a

13    permanent substitute in Hicksville, New York?

14    A    Yes.

15    Q    Were you paid on a per diem basis?  Did you receive

16    a contract?  How were you compensated?

17    A    Let's see.  I had to sign a contract for that.

18    Q    Did you receive an annual salary or did you receive

19    a per diem?

20    A    It was a contract.  But it also -- it was by the

21    day.  But it was still a contract.

22    Q    So it was a per diem?

23    A    Yes.

24    Q    Do you remember what the conversation was?



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

81

1    A    A hundred and -- around a hundred dollars a day.

2    Q    Did you receive any benefits like health insurance

3    benefits, pension benefits, anything like that on any of

4    those teaching jobs you had at Hicksville?

5    A    I belong to the New York State Teachers Retirement

6    System.  No, not health.

7    Q    Well, is that something you joined yourself or is

8    that something the school district was paying in for you?

9    A    Well, I joined that myself.  But they put part into

10   it.

11   Q    But you were paid basically on a per diem basis

12   during that time?

13   A    Yeah, with the contract.  Right.

14   Q    All right.  Now, is it fair to say, going back to

15   your employment at Dickinson High School when you received

16   the position with the special ed classes in January/

17   February of 2004, that right from the beginning, you had a

18   difficult time with the students?

19   A    Yes.

20   Q    And --

21   A    Certain students.  Not all of them.

22   Q    And some of the students that you had problems with,

23   actually all the ones you had problems with, would be listed

24   on this exhibit with the disciplinary referrals, correct?



CHRISTINA MONGELLI

82

1    A    Yes.

2    Q    And in addition to Jonathan White, you had other

3    students that you had referred for criminal prosecution,

4    correct?

5    A    Yes.

6    Q    And who were they?

7    A    Can I look at that list?

8    Q    Sure.

9    A    I forget the names after a while.

10             What do you mean by criminal?

11   Q    Did you ever refer any of them for any kind of

12   proceedings outside the school?

13   A    I didn't refer it.  It's -- the school police, AJ,

14   said that it had to be referred.

15   Q    And which ones had to be referred?

16   A    Cesar Arrendondo, Deshawn Chase, Jonathan White.

17   That's all I see on here.

18   Q    And what were the circumstances that Cesar

19   Arrendondo got referred to by the police?

20   A    He was -- he was on the opposite side of the door.

21   I was in my classroom.  And he was actually in the other

22   teacher's class at the time.  And I believe there was a sub

23   there in the other class.  The two classrooms were

24   connected.  And the other class was extremely bad.  Throwing



**WILCOX & FETZER LTD.**
Registered Professional Reporters

CHRISTINA MONGELLI

87

1    A    Yes.

2    Q    And as you said before, you're aware that the

3    special ed students, their behavior a lot of times is a

4    manifestation of their disability, correct?

5    A    Does it give them an excuse to do what they do?

6    Q    I'm asking you a question.  You're aware of that,

7    correct?

8    A    Yes.  But I'm not saying that that excuses them from

9    doing what they did to me.  Absolutely not.

10   Q    I didn't say that excuses it.  My question was,

11   you're aware that that's a manifestation of their

12   disability, correct?

13   A    Yes.

14   Q    And you're aware the school district has an

15   obligation to teach all children, if it can, correct?

16   A    Yes.

17   Q    No child left behind, and other statutes like that?

18   A    Yes.  And that the administration has a duty also to

19   protect the teachers at the same time.

20   Q    And you made referrals and there were suspensions,

21   correct?

22   A    Very few.  No.  See, why there is so many referrals

23   is because I had to complain that many times to have

24   something done.  That's why.



CHRISTINA MONGELLI

91

1    educational diagnostician for Dickinson High School.

2    Ms. Kristen Norton.  Ms. Mongelli was present.  The purpose

3    of the meeting was to see if assistance could be provided to

4    Ms. Mongelli, who was experiencing classroom management

5    issues.  I removed several students from Ms. Mongelli's

6    class, including --

7      Q    And it shows initials?

8      A    Yeah.  I know who they are, though.  And they were

9    also put back into my class.

10     Q    Let's break it down.

11                There was a meeting on February 24th?

12     A    Yes.

13     Q    And you recall that meeting?

14     A    Not the exact date.  But I do recall the meeting.

15     Q    And it was shortly after you had taken over the

16    classroom on a temporary contract for the 2004 school year?

17     A    Yes.

18     Q    And you do remember the meeting.  And was it correct

19    that the purpose of the meeting was to see if there could be

20    assistance for you because you were experiencing classroom

21    management issues; is that accurate?

22     A    No.  Because some of the students were not getting

23    along in the class.  And I thought they would be better in

24    different classes.  They just basically changed it to


WILCOX & FETZER LTD.
Registered Professional Reporters

A68

CHRISTINA MONGELLI

92

1    another classroom.

2        Q    Who requested the meeting?

3        A    I did.

4        Q    And was the purpose of that to request some of the

5    students be changed to different classrooms?

6        A    Yes.

7        Q    Okay.  So the school district representatives,

8    administrators, complied with that request at the meeting

9    and took certain students out?

10       A    Yeah, they did.

11       Q    And the ones that are listed there by initials were

12   put in other classes?

13       A    And then returned to my class, yes.

14       Q    And when were they returned to the class?

15       A    Because they wanted to come back.

16       Q    I said when.

17       A    Maybe about like a month later.

18       Q    And when they came back, were they disciplinary

19   problems again?

20       A    Yes.

21       Q    Were they taken out?

22       A    I'm not sure if it was all three.  I'm not sure who

23   this is.

24       Q    Did all of them come back?



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

94

1      A      He was one of the first students that I talked

2   about.

3      Q      At the meeting on February 24th?

4      A      Yes.

5      Q      Do you have a recollection of talking about Jonathan

6   White?

7      A      Yes, I do.

8      Q      And what did you say?

9      A      I said that he can't keep his hands off the other

10  students.  His language is disgusting.  I brought up every

11  one of them.  And him I brought up maybe the first week that

12  I was teaching there.  Because he had a fight with another

13  kid.  Eric Rettig, the other kid that was suspended, they

14  were both drug addicts.  So he threatened the other kid

15  because he didn't give him money for the drugs.  And I went

16  and I told -- I told Chad and I told John Kennedy.  He said

17  he threatened him.  I said if you were to do this on the

18  streets of Wilmington, you would be dead.

19              So I complained about Jonathan White at that

20  meeting and way before that.

21      Q      So you had only been in the position about a month?

22      A      Right.

23      Q      By that meeting?

24      A      Right.



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

98

1   A    I verbally -- well, if you go on.  This is, you

2   know, you're not asking me to read the whole paragraph.

3   Q    I'm dealing with the first sentence right now.  Is

4   that first sentence accurate?

5   A    No.

6   Q    What's inaccurate about the first sentence?

7   A    Because this was ongoing.  He is acting like I told

8   him that was the first time that I told him anything.

9   Q    Reading the first sentence, he says you verbally

10  reported several incidents of inappropriate conduct by JW in

11  class that had taken place over the preceding two weeks.

12       Did you verbally report several incidents of

13  inappropriate conduct during that time?

14  A    Yes.  Yes, I did.

15  Q    Now, the next sentence says, this was the first time

16  Ms. Mongelli reported inappropriate physical conduct by JW

17  including inappropriate physical contact of a sexual nature

18  that occurred on 4/26, 11 days prior to Ms. Mongelli

19  reporting the incident.

20       Is that accurate?

21  A    Absolutely not.

22  Q    Okay.  What's inaccurate about it?

23  A    I reported physical contact to him.  He didn't only

24  sexually assault me, he did to other students.  He had his



**WILCOX & FETZER LTD.**
Registered Professional Reporters

CHRISTINA MONGELLI

99

1   hands on even boys constantly.  I told him about what he did

2   to another girl in the class.  It was a sexual thing.  At

3   other times.

4     Q    Is it accurate that's the first time you reported

5   inappropriate physical contact involving you personally?

6     A    No.  I gave him the referrals.  That was not the

7   first time.

8     Q    The first time you reported it in writing before

9   that date?

10    A    Yes.

11    Q    And what day did you first submit a referral

12  indicating that you had been physically contacted

13  inappropriately?

14    A    On the first date.  That's where I have the

15  referrals, on the first date.

16    Q    Okay.  We've got Exhibits 1 through 7.  Tell me the

17  first date --

18    A    And there is one that's missing from there.  Because

19  I thought you had them.

20    Q    Tell me if the first time you reported an incident

21  involving sexual contact or inappropriate contact that was

22  sexual in nature was April 26, 2004, as shown by Exhibit 1?

23  Was that the first written report?

24    A    Yes, the first written report.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

CHRISTINA MONGELLI

100

1   Q    And did you give that to Mr. Kennedy?

2   A    Yes, I did.

3   Q    On April 26th?

4   A    Yes.  This one.

5   Q    Okay.  The other reports involving the alleged

6   inappropriate contact, did you give those to Mr. Kennedy on

7   the date that's indicated on those reports?

8   A    Yes.

9   Q    So you didn't give him several reports at once as he

10  indicates here?

11  A    No.

12  Q    And do you know why he would say that?

13  A    No.  I put it in his box as teachers are supposed to

14  do.

15  Q    So you took --

16  A    I had been to him before and he showed me this whole

17  pile of referrals.  He said he doesn't have enough time to

18  get to each one.  They were all piled up.

19  Q    So you took these and put them in his box?

20  A    Right.

21  Q    And did you follow up to tell him on April 26th

22  verbally what happened?

23  A    This one, I don't know the exact date.

24  Q    The first one on April 26th?



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

101

1    A    No.

2    Q    When was the first time you followed up with him

3    verbally to ask him what was going on with your complaint of

4    inappropriate physical contact?

5    A    I believe it was May 6th.

6    Q    This was a verbal report?

7    A    Well, I used to talk to him three times a week.  So

8    it's not the first time a verbal report, you know, he is

9    always busy.  So I said, I'd like to speak to you.  And I

10    said that during these.  But when I sat down and sat a long

11    time with him, it was on May 6th.

12    Q    Okay.  So on May 6th.  And that's when you said that

13    Jonathan White had engaged in inappropriate contact with you

14    of a sexual nature?

15    A    Right.

16    Q    And what did he do?

17    A    He wrote it down what I said.

18    Q    And then what happened?

19    A    He wrote it down and he said, I'd have to

20    investigate it.  Oh, he has got to speak to Chad.  He has to

21    speak to Mr. Carmack about this, what he wants to do with

22    this.

23    Q    And was the conversation on May 6th, the end of the

24    day?



CHRISTINA MONGELLI

102

1    A    Yeah, it had to be.  Yes, it was.

2    Q    So the following day, May 7th, Mr. Kennedy began to

3    investigate these allegations?

4    A    I don't know when he did.  I don't know.  This kid

5    was in my class, though, the next day.

6    Q    And what was the last day that the kid was in your

7    class?

8            MR. BERNSTEIN:  You're talking about JW?

9            MR. WILLOUGHBY:  Right.

10           THE WITNESS:  He came the next day and I asked,

11   I said, John, after everything we talked about yesterday,

12   why is he in my class today.  He said, oh, I forgot.  And I

13   said, how could you forget something like that?  And I

14   just -- I walked away.  I just had it with them.  And he

15   also -- after this, he came up when I was in the library,

16   Jonathan White, to take -- he came up.  He was sent up to my

17   class during test taking.

18   BY MR. WILLOUGHBY:

19   Q    Backing up.  After May 7th, is that the last day

20   that he was in your regular class, Jonathan White?

21   A    Yes.

22   Q    After that, he was removed, you never had him again

23   as a student other than that library testing?

24   A    Right.



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

107

1    A    Do you have a copy of that?

2    Q    Did you receive a copy of a contract or anything

3    else involving the union and the school district?

4    A    The union?

5    Q    Um-hmm.

6    A    Do you mean the contract itself?

7    Q    Yes.

8    A    Oh, yes.  The teaching contract?

9    Q    Yes.

10   A    Yes.

11   Q    Did you file a grievance with the school district at

12   any point from January of 2004 and June of 2004 concerning

13   the treatment that you say occurred in your classroom?

14   A    Yeah.  I went to the principal.

15   Q    You filed these disciplinary reports?  Did you file

16   a union grievance?

17   A    A union grievance?

18   Q    Yes.

19   A    No.

20   Q    And did you file any complaint under the student

21   code of conduct or any other policy other than just

22   submitting the student referral, student disciplinary

23   referrals?

24   A    No.



WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

108

1    Q    So basically what you did to complain was submit the

2    referral and have verbal conversations with Mr. White?  I'm

3    sorry, Mr. Kennedy?

4    A    Yes.

5    Q    And that was true as of the time you got your letter

6    in June of 2004 that you were going to be terminated?

7    A    Is what?

8    Q    That was correct, that was the case when you got

9    your letter in June of 2004 that you were being terminated

10   because you didn't have certification?

11   A    Yes.

12   Q    So the first time you actually filed an allegation

13   of sexual harassment followed that in June of 2003 other

14   than these student reports, is that correct?

15   A    No.  They terminated the job after these reports.

16   Q    The charges of discrimination with the EEOC that you

17   filed?

18   A    Yes.

19   Q    You filed after you were terminated?

20   A    Yes.

21   Q    And what you did in the way of giving the school

22   district notice of your complaints concerning Jonathan

23   White's behavior was to submit the student referral forms,

24   correct?



CHRISTINA MONGELLI

109

1    A    Yes.

2    Q    Nothing beyond that?

3    A    No.

4    Q    Let's go back to the previous exhibit there.  That

5    is Exhibit 16.  And we were at the bullet point at the

6    bottom of the page, going to the top of the next page.  I

7    think we read the first sentence.  Reading down that next --

8    the rest of that paragraph.  Read that to yourself and tell

9    me if you disagree with what Mr. Kennedy has written here,

10   and if so, why you disagree with that?

11   A    Read the whole thing?

12   Q    Yeah, take your time and read it to yourself.

13        Just focus on this one bullet before we go on

14   to the next one.

15   A    Which one?

16   Q    The one you're reading, the long paragraph that

17   starts at the top of the first page and we covered that and

18   now we are on the second page, which is D226, that long

19   bullet point there.

20   A    Yeah.  I mean it's physical contact.  That's okay.

21   But not just with me.  I reported with other students before

22   that.

23   Q    All right.  Anything else before we get down to the

24   sentence that says, it's important to note the following.



CHRISTINA MONGELLI

111

1    that you submitted them on the dates that were written on

2    the reports?

3        A    Yes.

4        Q    And you put them in Mr. Kennedy's in box?

5        A    Yes.

6        Q    All right.  Tell me what else you believe is

7    inaccurate?

8        A    I know he came to me one of those testing dates.

9    I'm not sure which one.

10       Q    That's what we talked about before, the one in the

11   library?

12       A    Right.

13       Q    Okay.  Anything else in that bullet point that's

14   inaccurate, to your belief?

15       A    I don't know who he interviewed.

16       Q    Okay.

17       A    That's all his doing.  He interviewed students.  He

18   brought Jon White to his office.

19       Q    Were you aware of any of those things?

20       A    No.

21       Q    You didn't know he interviewed students?

22       A    I heard -- overheard one of them talking.

23       Q    Who did you overhear talking?

24       A    I don't know at this time.  But I just heard them.


WILCOX & FETZER LTD.
Registered Professional Reporters

CHRISTINA MONGELLI

119

1    A    Was arrested and charged with unlawful sexual

2  contact third degree, sexual harassment and offensive

3  touching.  A superintendent's student conduct report was

4  filed.

5    Q    Is that accurate?

6    A    I don't know if they filed that.

7    Q    Do you know he was arrested and charged with

8  various --

9    A    I know he was arrested.  I didn't know exactly for

10  what, though.

11    Q    You got a notice from the Court later on?

12    A    From the Court, right.

13    Q    But you know from your conversations with the SRO

14  that he was going to be arrested?

15    A    Yes.

16    Q    Okay.  The next Berger dot?

17    A    I have no idea that went on, no.

18    Q    You weren't involved in that?

19    A    No.

20    Q    And you don't know anything about that?

21    A    Nope.

22    Q    All right.  The next Berger dot?

23    A    Notified the situation.  Made my reports.  What do

24  you mean?  The situation meaning --



WILCOX & FETZER LTD.
Registered Professional Reporters

A80

CHRISTINA MONGELLI

120

1   Q    Well, this is what Mr. Kennedy wrote.  It seems to

2   me he was saying that you were notified about what the

3   outcome of the investigation was and what was going to be

4   done.

5   A    I don't know everybody.  I had no idea that all

6   these other people were notified.

7   Q    But you were notified?

8   A    I'm the one that wrote the reports.

9   Q    You were notified of what the outcome of the

10  investigation was and that JW was going to be arrested?

11  A    Only from -- not from John Kennedy, from --

12  Q    From the SRO?

13  A    Yes.

14  Q    And you don't know who else was notified?

15  A    No.

16  Q    Did you have conversations with any of the other

17  people listed here in that?

18  A    No.

19  Q    So you didn't talk to the DED, the school

20  psychologist, the principal or the two assistant

21  superintendents?

22  A    No.  They were all quiet.  They seemed like they

23  didn't want to speak to me.  If I passed by, they would just

24  look the other way.



CHRISTINA MONGELLI

123

1   A    Yes.

2   Q    And what is that?

3   A    That's the Department of Education initial license,

4   teacher of early childhood/primary K to 4.

5   Q    So that's not the special education license?

6   A    Right.

7   Q    That's the early childhood education primary K to 4?

8   A    Right.

9   Q    And when did you request this and why?

10  A    The school district requested this.

11  Q    Okay.  In connection with your employment prior to

12  taking on the special ed position at Dickinson?

13  A    No.  It's when I accepted the job.  They said --

14  Q    Accepted which job?

15  A    At Dickinson.

16  Q    As a substitute or in the special ed?

17  A    No, in the special ed.

18              (Mongelli Deposition Exhibit No. 19 was

19  marked for identification.)

20  BY MR. WILLOUGHBY:

21  Q    And Exhibit 19 is what?

22  A    Department of Education State of Delaware emergency

23  certificate for teacher of exceptional children.

24  Q    So that's the emergency certificate for the special



WILCOX & FETZER LTD.
Registered Professional Reporters

A82

CHRISTINA MONGELLI

124

1    ed assignment?

2    A    Yes.

3    Q    And did you receive a copy of this?

4    A    Yes.

5    Q    And directly from the Department of Education?

6    A    Yes.

7        (Mongelli Deposition Exhibit No. 20 was marked

8    for identification.)

9    BY MR. WILLOUGHBY:

10   Q    Let me ask you to look at Exhibit 20.  And this was

11   a document that you had produced to us, or your lawyer had.

12   It's marked Mongelli 11.  Let me ask you if you can identify

13   that?  How did you obtain a copy of that document?  Was it

14   given to you or did you receive it from some other source?

15   A    Did I give this to you?

16       MR. BERNSTEIN:  I can't answer that.

17   BY MR. WILLOUGHBY:

18   Q    You had to because it says Mongelli at the bottom.

19   A    Oh, it must be from Rudy Norton when we went through

20   my personnel file in June.

21   Q    Okay.  So you and Mr. Norton, who was the DSEA

22   representative --

23   A    Yes.

24   Q    Went through your personnel file at the Red Clay



CHRISTINA MONGELLI

125

1    School District?

2    A    Right.  And made copies.

3    Q    And this is a copy in that file?

4    A    Yes.

5    Q    And this is a letter or a form submitted by the

6    school district to DOE.

7              Let me ask you to read the bottom two

8    paragraphs.

9    A    It says, I'm aware that the district must send a

10   letter to the Office of Professional Accountability

11   reporting on the progress of the educator and meeting

12   certification requirements.  Documentation should include

13   copies of transcripts and the summative evaluation.

14             If the educator has an unsatisfactory

15   evaluation or makes no attempt to satisfy the certification

16   requirements, the emergency certificate will be suspended.

17   Q    Okay.  Did you ever have conversations with anybody

18   at the school district about the subjects listed there,

19   either before or after you saw this document?

20   A    Well, I gave them all my copies of transcripts.

21   Q    Well, you just read that the district has got to

22   send the Office of Professional Accountability report of the

23   progress in meeting certificate requirements?

24   A    Right.  Oh, yes.  Stephanie Armstrong told me this.



CHRISTINA MONGELLI

126

1  Right.

2    Q    And she is who?

3    A    She is the assistant principal at Dickinson.

4    Q    All right.

5    A    Or was.

6    Q    Do you know where she is now?

7    A    She is at one of the middle schools.  I think she is

8  at Stanton.

9    Q    When is the last time that you spoke with her?

10   A    When I went to sub there.

11   Q    At Stanton?

12   A    Yes.  In September.

13   Q    Of '04?

14   A    '04, yes.

15              (Mongelli Deposition Exhibit No. 21 was

16  marked for identification.)

17  BY MR. WILLOUGHBY:

18   Q    Let me ask you to look at Exhibit 21.  And this is a

19  letter saying that your contract is going to be changed from

20  temporary to regular.  Do you see that?

21   A    Yes.

22   Q    And you received that?

23   A    Yes.

24   Q    And did you receive it shortly after or on May 13th?



WILCOX & FETZER LTD.
Registered Professional Reporters

A85

CHRISTINA MONGELLI

128

1    Q    Chad, Stephanie, James and who was it?

2    A    James Realer.  And John Kennedy.

3    Q    Anybody else?

4    A    Let me think.  No.

5    Q    Tell me about your conversations concerning the

6  May 13th letter changing your contract from temporary to

7  regular that you had with Chad Carmack?

8    A    This is when I brought -- oh, first I called -- oh,

9  and Debra Davenport on the phone, yes.

10   Q    Okay.  Let's start with Chad.

11   A    Okay.  I said Debra Davenport told me to ask you

12 what position that he would put me in for next year.  He

13 said, no, he said, we are not hiring any new teachers for

14 next year.  He said, there is a hold on hiring new teachers.

15 His exact words.

16   Q    What did you interpret that to mean, any new

17 teachers or just special education teachers.  He just

18 thought he meant any new teachers.  I said, I also teach

19 English?

20   A    I said I could teach an English class.  So then I

21 thought he meant any teacher.  He said, no, there is a hold.

22 He said, they are not hiring.  And that was the first

23 conversation that I had with him.

24   Q    Why did you go to him when you got that letter?



WILCOX & FETZER LTD.
Registered Professional Reporters

A86