

**WILCOX & FETZER LTD.**

In the Matter Of:

# Mongelli

v.

# Red Clay Consolidated School District

### C.A. # 05-359-SLR

---

### Transcript of:

### Mongelli, Christina

### December 26, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Christina Mongelli

Page 24

1    loads of gift cards as, you know, rewards.

2        Q.    Did you like the job there?

3        A.    Yes.

4        Q.    What happened in September, I assume it is of

5    '06?

6        A.    Yes.

7        Q.    Am I correct you were terminated from Bank of

8    America at some point during the year of 2006?

9        A.    Yes.

10       Q.    And, of course, we know that MBNA was sold to

11   Bank of America, so you became a Bank of America

12   employee?

13       A.    Right.

14       Q.    Tell me what happened that led to your dismissal.

15       A.    There are three things.  The first is that Bank

16   of America learned of my lawsuit against the Red Clay

17   School District.  I was called into the vice president's

18   office of MBNA, Bank of America, and they told me,

19   because I, I -- they learned of it because I told Candace

20   Russell, she was my first manager, because they weren't

21   giving me days off, like just to go to a deposition.

22   They put me on a waiting list.  They have a very strict

23   attendance policy, and they had to know the reason why I

24   wanted these days off.

Christina Mongelli

1    A.    Yes, several co-workers.

2    Q.    What kind of comments were they making?

3    A.    They said, "Oh, with all the money you make, you

4    should be taking us out to lunch."

5              They checked, because they give out the stat

6    reports to everybody on the floor, they see exactly your

7    score on each aspect of the job, how much you sell, the

8    percentage, time on the phone, time off the phone.  They

9    just see, they see all the stats and they would just

10   comment on the sales.  And this was becoming a daily

11   thing.

12   Q.    So you said you complained to a female manager?

13   A.    Yes.

14   Q.    Who was that?

15   A.    Manisha Antani.

16   Q.    What did you complain about?

17   A.    I said it is -- oh, and they made comments that I

18   suck up to the customers.

19   Q.    These are your co-workers?

20   A.    Yes.  That, some of the ladies said, she said

21   that -- oh, she says that -- she tells the customers that

22   she doesn't have to -- they don't have to pay the loans

23   back.  And this is someone who I really didn't even know.

24   They were just like -- I didn't know her at all.  She

A89

Christina Mongelli

Page 33

1    also said things about other people.  Anybody who is a

2    top seller there, there is a great deal of jealousy.

3        Q.    What else were they saying?

4        A.    There was another male co-worker, right across

5    from me, he listened to every word I said.  He could

6    repeat what I said to each customer.

7        Q.    Who was that?

8        A.    Marcus.  His name was Marcus.

9        Q.    What is his last name?

10       A.    McCullough.  And I complained about him.

11       Q.    He could remember everything you said word for

12   word?

13       A.    Right.  And he used to make lots of comments on

14   my sales.  Because he was also a good performer, so he

15   was competing with me.

16       Q.    And what comments would he make on your sales?

17       A.    He said, "Oh, I taught you how to sell."  I said,

18   "You didn't teach me anything.  You weren't -- you just

19   sat next to me."

20             This was the first two weeks, you know, that

21   he said -- they also change seats, as they keep changing

22   things there, so he just sat near me.  He said, "You

23   learned it from us guys, how to sell."  I said, "I

24   learned" -- I said, "I knew how to sell long before you

A90

Christina Mongelli

1    guys came along."

2        Q.   You said it was after you changed physical

3    location of your seat?

4        A.   Right.

5        Q.   Now, am I right that you are sort of an open

6    area, with cubicles of some kind?

7        A.   Right.

8        Q.   You are sitting at a computer with a phone?

9        A.   Yes.

10       Q.   So there is a number of people in the room?

11       A.   Right.

12       Q.   That can hear each other on the phone?

13       A.   I talk very loud, so people can hear me.  Yes,

14   they heard me.  And he also said that -- he said, "Oh,

15   you talk -- you have a heavy New York accent.  You talk

16   very loud."

17       Q.   How many people were in the room?  How many

18   customer sales representatives?

19       A.   It was a lot.  I really, I can't say.  It is a

20   big room.  Maybe like ten to a row, like this side, this

21   side.

22            I was -- I sat here, and then he is behind

23   me.  So he would just, he would just comment on -- while

24   I'm talking to the customers, he would comment.

Christina Mongelli

1    Q.    How many people, how many of your co-workers
2    complained about you, made remarks about you?
3    A.    They didn't complain about me.  They just made
4    remarks.
5    Q.    How many made remarks?
6    A.    That I know of?
7    Q.    Yes.
8    A.    Well, I also had good friends there that would
9    tell me what other people were saying, so that's how I
10   learned.  I would say maybe about ten throughout the time
11   I was there.
12   Q.    Do you know the names of the ten?
13   A.    Yes.  One was Marcus.
14   Q.    Marcus?
15   A.    But then I became very good friends with him.
16   Q.    Do you know the names of any of the others?
17   A.    Yes.  Let me just think.  It is hard to remember
18   everybody.  There was a lot of people there.
19             Cheryl is another one.
20   Q.    What is her last name?
21   A.    It is hard to know their last names.  She is a
22   middle-age woman, dark hair.  I'm not sure of the last
23   name.
24   Q.    All right.  Who else do you remember?

Christina Mongelli

1    A.    Those are the two that I complained about.

2              There is a lot of people that said different

3    things.  Like Kristen was another one.  What is the other

4    girl's name?  Casey.  Michael Hewitt.

5    Q.    What did Michael say about you?

6    A.    He was best friends with Marcus McCullough.

7    Q.    So what did he say?

8    A.    They would try to compete with me a lot about the

9    sales and say, he also said he taught me how to sell.

10   There is just -- I forget some of their names.  There is

11   so many people working there.

12   Q.    So what did you want MBNA to do about it when you

13   complained?

14   A.    I would figure a big company would take something

15   seriously.  But when I went to her about, I just went to

16   her about -- I didn't give the names of the other people,

17   but I just said the two that were annoying, I found most

18   annoying, and her response is, "Oh, you know how boys

19   are."  She said, "Boys will be boys."

20              And I said, I told her, I said, "I was a

21   teacher and if I said something like that," I said, "I

22   think that's a very inappropriate comment from a manager

23   to say boys will be boys."

24              We are all men and women working together in

Christina Mongelli

Page 77

1   can't believe it, you know."  She said -- I was the top

2   performer.  She said she can because she knows how they

3   treat people.  She said she has been there long enough to

4   know how they treat people.  She said, "Nobody, whether

5   they are a top performer, is worth anything to them."  A

6   top manager, they got rid of the top managers.  Nobody is

7   worth anything.

8       Q.   Any other conversations with her about your

9   employment?

10      A.   No, just that one time I met her.

11      Q.   Were you informed on October 31 of 2006 that you

12  were terminated?

13      A.   Yes.  Terry Seeman called me.

14      Q.   What did she say?

15      A.   Well, she told -- oh, she also, she told me --

16  you didn't finish with the other meeting.

17      Q.   We will go back to the other meeting in a minute.

18      A.   The time when I had the meeting with Jackie, the

19  last I had with them.

20      Q.   We will go back to that.

21      A.   She said, "I'm going to request that you are

22  fired."

23      Q.   Now, let me just make sure we have got the

24  sequence straight.

Christina Mongelli

1    A.    Yes.

2    Q.    We jumped around a little bit.  Is that at the

3  point when you were placed on administrative leave?

4    A.    Yes.

5    Q.    Let's go through that first and then we will go

6  back to the conversation on October 31.

7    A.    Mm-hmm.

8    Q.    At one point you told me that Jackie and I guess

9  it was Terry were yelling at you and they were in your

10  face or something like that?

11    A.    Oh, it was -- I said, I told them, I said, "I

12  have never seen anything as unprofessional as what I'm

13  witnessing right now, to scream in somebody's face."  I

14  said, "No matter how bad somebody does something wrong,"

15  which I didn't, "I would never expect a professional to

16  scream in somebody else's face."

17            They wouldn't let me talk.  They said, "You

18  talk enough."  They said, "Now we are talking."

19            And they just screamed.  She said I -- and

20  then she was being really nasty, saying very nasty

21  things.

22    Q.    Who is "she" now?

23    A.    Actually, both of them.

24    Q.    Now, when you say screaming in your face, were

A95

Christina Mongelli

1    Q.   Anything else that happened in the conversation

2    when you were placed on administrative leave that you

3    haven't described?  You told me you brought various

4    accusations out.  Anything else that you --

5    A.   Right.  She said, "Don't.  I don't want to hear

6    about it."  She says, "I don't want to hear about it."

7    That's all she kept saying.  "Don't even say it.  Don't

8    even say it."

9         She was just rewinding the tape.  She was

10   playing the same half of tape over and over again.  She

11   said, "Do you see what you did wrong?"  And I said, "No.

12   What did I do wrong?  He asked, he said he wanted this

13   loan."

14   Q.   She actually had the tape there and was playing

15   it?

16   A.   Right, right.

17   Q.   And you didn't see any problem with your words?

18   A.   No.  She said, "Oh, you are too friendly with the

19   customer."  Because I was talking to the man, said he had

20   -- he was disabled or something, he was telling me about

21   his disability.  His wife was a cop or he was a cop.  I

22   don't remember.  They were both disabled.

23        And she said, "You don't ask them that.  You

24   don't talk to them like that."  I said, "All the managers

Christina Mongelli

1    before me, I was praised because I had an excellent

2    rapport with the customers."

3                    I have it in writing if you would like to

4    see it also.  I have my six-month review in writing that

5    all these customers, I had an excellent relationship

6    with.

7                    I said, "How can I get suddenly now, I'm

8    hearing a complaint about the way I'm selling or my phone

9    call."  I said -- she said, "I would like to know that

10   too, how you got through."  I said, "I had six different

11   managers since I've been there."

12       Q.   Now, let me try to understand one thing.  The

13   tape recording of the conversation with the customer

14   where they said the sale was improper, how long before

15   was that, did that occur before the time you were placed

16   on administrative leave?  Do you follow me?

17       A.   Can you say that again?

18       Q.   You had a conversation with a customer where they

19   said you were improperly trying to sell the E block, you

20   said?

21       A.   Mm-hmm.

22       Q.   When did that happen in comparison to when you

23   were placed on administrative leave?  Was it within a

24   week?

Christina Mongelli

1      A.    That same moment.

2      Q.    They must have had a tape from an earlier

3  conversation with a customer?  Do you follow me?  When

4  did that conversation with the customer take place?

5      A.    Oh, that week.

6      Q.    That week?

7      A.    Yes.  That same week.

8      Q.    All right.

9      A.    I don't know exactly when.  They didn't tell me.

10      Q.    I was just trying to get the picture.

11      A.    But I knew it was after I reported the threat.

12      Q.    But it was that same week?

13      A.    Right.

14      Q.    Where you had the conversation with the customer,

15  where you were later called in for the meeting where you

16  were placed on administrative leave?

17      A.    Exactly.

18      Q.    Did anything else come up in that meeting with

19  the two of them that you said, when you were being placed

20  on administrative leave?  Any other complaints you made,

21  any other comments you made to them, or vice versa, that

22  you haven't told me about?  Is there anymore to the

23  conversation, in other words, that you haven't told me

24  about on the administrative leave?

A98

Christina Mongelli

1      A.    Well, then they wouldn't let me talk anymore.

2  They said I talked enough, they would do all the talking.

3      Q.    What did they say at that point?

4      A.    They said they wanted me to leave immediately.

5  They said, "We don't want you disrupting the other

6  representatives and taking your stuff."  T said, "I don't

7  want to work for you anymore."  I said, "I do not want to

8  work for a company like this.  I will take my stuff with

9  me."  She said, "Why do you want to do that?  It is going

10  to distract all the other representatives."

11             And then Jackie Mort, she said, "Christina,"

12  she said, "why are you taking all your personal stuff?"

13  She said, "You are not fired."

14             I said, "I do not want to work for a company

15  like this."  And I took it.  I had the right to take it

16  so I took them.  I took all my personal belongings and

17  cleared out my desk, which I had to do in front of

18  everybody.

19             Everybody said, "Oh, my God.  What

20  happened?"  I mean, it was just really an embarrassing

21  situation.  They walked -- they went through my

22  pocketbook.  They searched -- Jackie Mort open up every

23  part of my pocketbook and searched through my pocketbook.

24      Q.    So after the meeting where you were placed on

Christina Mongelli

1    administrative leave you went back to your desk and took

2    all your stuff?

3        A.    Right.

4        Q.    And left?

5        A.    Right.  They walked me out.

6        Q.    And you told them you didn't want to work for a

7    company like Bank of America slash MBNA?

8        A.    Right.  I said, "If this is the way I'm going to

9    be treated," because she was a new manager, I said, "I

10   got along great with the two top managers before you, and

11   the other managers, I have been friends with several of

12   the managers," I said, I said, "I don't know" -- "I'm

13   sure if it is not this, you will get me on something

14   else."

15            And it is not a company -- I said, "It is

16   not an honest company, it is not a company that I want to

17   work for."  I said, "With my sales, I could go -- my

18   record in sales, I could go to any other bank and work

19   for them and not be treated this way."

20            I said, "I don't want to sell, to work hard,

21   to work overtime, for a company who doesn't appreciate

22   it."  And I'll go to -- I said, "There is a lot of banks

23   and I could go to any one of those banks."

24       Q.    Now, after you were placed on administrative

Christina Mongelli

Page 88

1  leave, you had a conversation with someone from personnel

2  who was investigating the incident with the loan; is that

3  correct?  There was a guy, a man?

4      A.   Yes, this is personnel.  I don't know if he was

5  investigating.  He said --

6      Q.   You had a conversation with him?

7      A.   Right.

8      Q.   Now, was that by telephone?  Did you come into

9  some place at MBNA?

10     A.   No.

11     Q.   Did he come out to see you?

12     A.   Telephone.  He called me about a week later.

13     Q.   Tell me about that.  What did he say?  What did

14  you say?

15     A.   It was very brief.  He called me.  He said, "You

16  have been placed on administrative leave and" -- well,

17  she told me at the meeting, Terry told me, she said, "You

18  are going to be put on administrative leave for two

19  weeks."  So I said, "Well, what is going to happen after

20  the two weeks?"  I asked him.  He said, "No," he said,

21  "usually it is longer than that," which it wound up being

22  really long.  Maybe six, seven weeks.  Maybe about six

23  weeks.

24              So he really didn't say much.  He said he

Christina Mongelli

1   would have to get a copy of the tape.

2          Oh, and another reason why they said I was

3   terminated, they said I used profanity to Jackie Mort as

4   she walked me out.

5   Q.   And what did she say you said?

6   A.   That I called her -- they didn't write the

7   profanity.  They just said profanity.  But he said on the

8   phone, he said, "Jackie Mort said you called her an

9   uneducated Nazi bitch."

10  Q.   Did you do that?

11  A.   I told her -- no, I never used any profanity.

12  And I told him, I said, "I will submit to a lie detector

13  test to prove that."

14          What I told her was, I said, "How could

15  somebody without a college degree think, be -- treat

16  people so poorly?"

17          What I've seen, I know she has got -- Andrea

18  told me she has no college education.  She is the only

19  manager there without any college.  She owned a business,

20  but she has no background in any kind of college, how to

21  deal with people.  I said, "You don't know how to deal

22  with people."

23  Q.   Did you call her a Nazi?

24  A.   No.

Christina Mongelli

1    Q.    You just said she was uneducated?

2    A.    Right.  So I don't even know where she got that

3    from, and I will to this day submit to a lie detector

4    test on that.

5    Q.    Okay.  Any other reasons they gave for your

6    dismissal?

7    A.    That's it.

8    Q.    Those two.  Did you have anymore conversations

9    with the fellow from personnel concerning the incident,

10   other than the one you described by telephone, before

11   October 31 of 2006?

12   A.    Before October?

13   Q.    Between that conversation and October 31, did you

14   have any additional conversations with the person from

15   personnel who called you?

16   A.    No, no.  It was that one conversation.  He said

17   he would have to check with the security guard who was

18   there at the time.

19               But, I mean, I was really upset.  I was

20   crying hysterical.  I was totally shocked that they would

21   do something like that.  And he would check.

22               Lee had been my friend, the security guard

23   there, somebody who I talked to all the time.  And I was

24   just shocked that they would come up with that.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

– – –

CHRISTINA MONGELLI,               :
                                  :
            Plaintiff,            :  C.A. No. 05-359 SLR
                                  :
      v.                          :
                                  :
RED CLAY CONSOLIDATED SCHOOL:
DISTRICT BOARD OF EDUCATION,:
et al.,                           :
                                  :
            Defendants.           :

– – –

        Deposition of CHAD CARMACK, taken pursuant
to notice, before CAROL DiSERAFINO, Professional
Reporter and Notary Public, duly authorized to
administer oaths, on TUESDAY, OCTOBER 17, 2006, at
12:10 p.m., held at the offices of the Red Clay
Consolidated School District, 4550 New Linden Hill
Road, Wilmington, Delaware.  There being present:

A P P E A R A N C E S:

        JOSEPH M. BERNSTEIN, ESQ.
        800 North King Street, Ste. 302
        Wilmington, Delaware  19801
          on behalf of Plaintiff

        BARRY M. WILLOUGHBY, ESQ.
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
        The Brandywine Building
        1000 West Street, 17th Fl.
        Wilmington, Delaware  19801
          on behalf of Defendants

        Hawkins Reporting Service
715 N. King Street, Ste. 3 – Wilmington, Delaware  19801
        (302) 658-6697   Fax (302) 658-8418

Carmack - Direct

1  Delaware.

2       Q.      When did you get your doctoral degree?

3       A.      That was Summer '05.

4       Q.      And when did you get your Master's

5  degree?

6       A.      1988.

7       Q.      Now first I'd like to talk to you about

8  the 2003/2004 school year and, in particular, the

9  circumstances surrounding the hiring of Miss Mongelli.

10  Do you have any recollection of those events?

11      A.      Yes.

12      Q.      Can you tell me how it came about that

13  Miss Mongelli came to your attention as a potential

14  employee.

15      A.      She was working through STS as a

16  substitute.

17      Q.      What is STS?

18      A.      STS is the organization we work with

19  that provides substitutes.

20      Q.      That's an agency?

21      A.      Yes.

22      Q.      And Miss Mongelli was teaching at

23  Dickinson High School as a substitute?

24      A.      Yes.

Carmack - Direct

1    school to work, you're working under the assumption

2    that whatever certifications they need have been

3    provided to the school district or to someone.

4         A.    Can you rephrase that.  I'm not sure --

5         Q.    If a teacher is approved, if the hiring

6    is approved at the district level and they come to

7    work at the school, would it be fair to say that you

8    are working under the assumption that if they're

9    required to be licensed, that they have the required

10   licenses?

11        A.    (No response).

12        Q.    All right.  We'll skip over that.  I'll

13   drop that question.

14             MR. WILLOUGHBY:  Okay.

15   BY MR. BERNSTEIN:

16        Q.    When Miss Mongelli came on board as a

17   full-time teacher, my understanding is that occurred

18   in the latter part of January of 2004.

19        A.    Yes.

20        Q.    And would it be fair to say that she was

21   assigned to a Special Ed class?

22        A.    She was assigned to a Special Ed class

23   as a temporary employee.

24        Q.    Okay.  Now temporary employees, there's

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A106

Carmack - Direct

1    to your attention that Ms. Mongelli was having

2    problems with some of the students in her class?

3            A.      Yes.

4            Q.      And how did that come to your attention?

5            A.      She actually told me she was having some

6    problems.

7            Q.      What did she do?  Just ask to meet with

8    you?  Drop into your office?  Write you a memo?

9            A.      It was in conversation in her room ...

10   outside of her room.

11           Q.      Was it your practice to visit classrooms

12   and make kind of informal observations of teachers?

13           A.      Yes.

14           Q.      Would that be more so with new teachers

15   than veteran teachers?

16           A.      Yes.

17           Q.      And do you recall particular occasions

18   when you would make observations in Miss Mongelli's

19   classroom?

20           A.      Yes.

21           Q.      And were you able to make some informal

22   assessments of how Miss Mongelli was managing her

23   class?

24           A.      Yes.

Carmack - Direct

Page 18

1          Q.      And do you have any opinions sitting

2     here today based on your observations of

3     Miss Mongelli's teaching abilities?

4          A.      Can you rephrase that.

5          Q.      Okay.  Based on your observations, your

6     personal observations, did you form any opinions based

7     on those observations about Miss Mongelli's teaching

8     ability?

9          A.      In my observations she was doing an

10    effective job.

11         Q.      Now you said you had conversations with

12    Miss Mongelli about behavior problems with certain

13    students?

14         A.      Yes.

15         Q.      How specific were those conversations?

16    Did she mention the names of students or the types of

17    problems that were occurring?

18         A.      I do not remember specifics in the

19    conversations.

20         Q.      Did you give her any advice as to how to

21    deal with those problems?

22         A.      I don't remember giving her any advice.

23         Q.      Now as I understand it, at least in John

24    Dickinson High School, there was a system of Behavior

Carmack - Direct

Page 19

1    Referral forms.  Do you know what I'm talking about?

2          A.      Yes.

3          Q.      And how did that work?

4          A.      The teacher writes the referral and that

5    goes to an assistant principal.

6          Q.      And as I understand it there were three

7    assistant principals in 2003/2004.

8          A.      Yes.

9          Q.      And the referrals would be assigned to a

10   particular assistant principal based on the last name

11   of the student who was being referred.

12         A.      Yes.

13         Q.      The alphabet was kind of divied up?

14         A.      Yes.

15         Q.      And it was the teacher's responsibility

16   to initiate this process.

17         A.      Yes.

18         Q.      And physically once the teacher filled

19   out the form what would happen to the form?

20         A.      The form goes to the assistant principal

21   and then they will actually meet with the student and

22   the teacher.  There's communication with the teacher

23   also.

24         Q.      Now I'm going to show you what has been

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A109

Carmack - Direct

1    marked as Kennedy Exhibit No. 2 and ask you if you've

2    ever seen that document before.

3         A.    Yes.

4         Q.    Tell me what that document is.

5         A.    This is a discipline referral document

6    with a date range of August 1, '03 to June 16th, '04.

7         Q.    And how would that document be compiled?

8    Would it be done manually or is there some database

9    that would generate that kind of report?

10        A.    There is a database.

11        Q.    And that database -- let me ask you how

12   that database is created, if you know.  Do you know?

13        A.    Yes.

14        Q.    How is it created?

15        A.    It's created by administrators inputting

16   the information into the computer.

17        Q.    Okay.  So one of the things that happens

18   when a behavior report is generated is that some

19   information about the report gets put in a database.

20        A.    Yes.

21        Q.    And the information would be the date of

22   the report; correct?  Looks like the grade of the

23   student, the name of the student and a summary of the

24   behavior and the action that was taken.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A110

Carmack - Direct

1    Q.    And there's also the last item there.
2  You have, quote, "I recommend non-renewal of Melvin
3  Suggs, Jr., math, and Stuart Richardson, math."
4         So is that what you're talking about
5  when you say that's your input about hiring for the
6  next school year?
7    A.    No.  I was making a general statement
8  about the entire memo is a way of communicating.
9    Q.    I'm sorry?
10   A.    Will you give me the question that you
11 asked.
12   Q.    At the bottom there it says in bold, "I
13 recommend non-renewal of Melvin Suggs, Jr., math, and
14 Stuart Richardson, math."
15        And my question is, is that the type of
16 input you would have in hiring or retention decisions?
17   A.    Yes.
18        MR. BERNSTEIN:  Have this marked as the
19 next exhibit.
20        (Deposition Exhibit Carmack No. 2 marked
21 for identification).
22 BY MR. BERNSTEIN:
23   Q.    Mr. Carmack, I'm showing you what's been
24 marked as Carmack No. 2 and this is a memo dated

Carmack - Direct

1    April 22nd, 2004, from yourself to Diane Dunmon and

2    Debra Davenport with copies to some other people.

3         A.    Yes.

4         Q.    Okay.  Were you the author of this memo?

5         A.    Yes.

6         Q.    And who is Diane Dunmon?

7         A.    Diane Dunmon is director -- complete

8    title at that time, she was the director of our Red

9    Clay School District that worked with Human Resources.

10        Q.    Now the body of this memo says, quote,

11   "Attached you will find the most recent John Dickinson

12   High School 2004/2005 staffing plan."

13              Now are staffing plans something that

14   are routinely prepared by you and transmitted to the

15   district for the upcoming school year?

16        A.    Yes.

17        Q.    What's the reason for or what's the need

18   to do that?

19        A.    The need for that is it goes back to

20   your question about units.  We get so many units and

21   we have to --

22        Q.    When do you --

23        A.    -- respond.

24        Q.    When do you find out how many units

Carmack - Direct

1    other people get involved?

2         A.    Other people get involved.

3         Q.    Assistant principals?

4         A.    Yes.

5         Q.    If you make a decision that someone's

6    contract should not be renewed, is that something that

7    other people get involved in?

8         A.    Human Resources.

9         Q.    At the district level?

10        A.    Yes.

11        Q.    Now on this particular document it looks

12   like there is a three-page attachment that has

13   teachers' names and positions and unit numbers and the

14   total number of units looks like 61.

15        A.    Yes.

16        Q.    So would it be fair to say that that

17   three-page attachment is a proposed staffing for John

18   Dickinson High School for the 2004/2005 school year?

19        A.    Yes.

20        Q.    Now I notice in going through that list

21   that Miss Mongelli does not appear on that list.

22        A.    That's correct.

23        Q.    Okay.  Now would the fact that her name

24   does not appear on that list mean that there was some

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Carmack - Direct

Page 32

1    recommendation being made that her contract not be

2    renewed?

3          A.    Can you restate that, please.

4          Q.    Okay.  Would you agree with me that

5    Miss Mongelli's name is not on that three-page list?

6          A.    Yes.

7          Q.    Okay.  Now my question is -- obviously

8    Miss Mongelli is teaching during the 2003/2004 school

9    year on a temporary contract; correct?

10         A.    That's correct.

11         Q.    Okay.  Now what decisions would have

12   been made that resulted in Miss Mongelli not being

13   listed on the 2004/2005 roster?

14         A.    One of the decisions for me would be the

15   certification of an individual.

16         Q.    How do you get involved in

17   certification?

18         A.    It's communicated to me by the

19   individuals in the building.

20         Q.    Now did someone communicate to you that

21   Miss Mongelli did not have proper certifications?

22         A.    Yes.

23         Q.    And do you know who that was?

24         A.    Miss Mongelli.

Carmack - Direct

1       Q.     She told you she wasn't certified?

2       A.     Yes.

3       Q.     How did that come up?

4       A.     Well, in a conversation she said she was

5  not certified in Special Education.

6       Q.     Did you ask her whether she was

7  certified?  I mean did she just walk into your office

8  and say Oh, by the way, you ought to know I'm not

9  certified in Special Ed?

10      A.     I don't know if was in my office, but

11  she did say she was --

12      Q.     This was something she volunteered?

13      A.     (Witness moves head up and down).

14      Q.     Just out of the blue?

15      A.     I don't know if it was out of the blue.

16      Q.     And when you learned this information,

17  what did you do?

18      A.     I kept that as information.

19      Q.     Were you surprised that the district

20  approved hiring somebody to teach Special Ed who

21  wasn't a certified Special Ed teacher?

22      A.     No.

23      Q.     Who didn't have any certifications?

24           MR. WILLOUGHBY:  That's a different

Carmack - Direct

1    question.  You mean certification besides Special Ed?

2                MR. BERNSTEIN:  No.  Just limited to

3    Special Ed.

4                THE WITNESS:  Are you talking about --

5    try to clarify.  Are you talking about this year and

6    this memo, or this year?

7                MR. BERNSTEIN:  The 2004/2005 staffing

8    memo.

9                MR. WILLOUGHBY:  Talking about Carmack

10   2?

11               MR. BERNSTEIN:  Yeah.

12               THE WITNESS:  Can you rephrase the

13   question.

14   BY MR. BERNSTEIN:

15         Q.    Mongelli is not on the list.

16         A.    Right.

17         Q.    So I'm asking you why she wasn't on the

18   list, and your answer was she wasn't certified.

19               MR. WILLOUGHBY:  That wasn't his whole

20   answer.

21               MR. BERNSTEIN:  Among other things.

22               THE WITNESS:  She communicated she was

23   English certified and I had no English openings.

24                         -   -   -

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Carmack - Direct

1    BY MR. BERNSTEIN:

2         Q.    Did you have Special Ed openings?

3         A.    Yes.

4         Q.    And she told you she was not Special Ed

5    certified.

6         A.    Yes.

7         Q.    That's what she told you.

8         A.    That's what I remember her telling me.

9         Q.    Okay.  Now did she tell you she had any

10   other certifications besides English?

11        A.    I don't remember.

12        Q.    Okay.  And was there --

13              Other than the question about Special Ed

14   certifications, was there any other reason that

15   Miss Mongelli's name was not on the staffing list for

16   2004/2005?

17        A.    No.

18        Q.    That was it?

19        A.    I had to put the list together based on

20   what I knew at that time, the positions I would have

21   open.

22        Q.    For example, if you thought that

23   Miss Mongelli was just a bad teacher, wasn't doing a

24   good job, would that have been a reason not to put

Carmack - Direct

1    Miss Mongelli on the staffing list for 2004/2005?

2        A.    Yes.

3        Q.    Would that be memorialized someplace?

4    Is there some document that you may have prepared

5    indicating why a teacher was not being recommended for

6    a new contract?

7                MR. WILLOUGHBY:  Are you then saying all

8    teaches or are you breaking it down by temporary --

9                MR. BERNSTEIN:  No.  Just Miss Mongelli.

10               MR. WILLOUGHBY:  Temporary?

11               MR. BERNSTEIN:  Yeah.

12               THE WITNESS:  No.

13   BY MR. BERNSTEIN:

14       Q.    Her name just wouldn't appear on the

15   list and that was it.

16       A.    Yes.  That's correct.

17       Q.    And if her name is not on the list, the

18   district doesn't offer her a new contract.

19       A.    I mean, that's a question for Human

20   Resources.

21       Q.    All you do is send in the list of these

22   are the people were gonna be on board, 2004/2005, and

23   the district takes it from there.

24       A.    Yes.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Carmack - Direct

1      Q.    And they would either send out a new

2  contract or not send out a new contract.

3      A.    I'm sure that that's some of their

4  options.

5      Q.    Okay.  Now when teacher contracts are

6  not gonna be renewed, isn't there a State law

7  requirement that the teacher has to be notified by a

8  certain date of a non-renewal?  Do you know anything

9  about that?

10          MR. WILLOUGHBY:  You can answer if you

11  know.  What's your understanding?

12          THE WITNESS:  I know that there's a date

13  but I don't deal with that.

14          MR. BERNSTEIN:  Okay.  That's fair

15  enough.

16  BY MR. BERNSTEIN:

17      Q.    I may have asked you this before.  If I

18  did I apologize.

19          Were there openings for Special Ed

20  teachers in 2004/2005?

21          MR. WILLOUGHBY:  At Dickinson?

22          MR. BERNSTEIN:  At Dickinson.

23          THE WITNESS:  Yes.

24                    -  -  -

Carmack - Direct

1    BY MR. BERNSTEIN:

2        Q.    And is that indicated on Carmack No. 2?

3        A.    Yes.

4        Q.    And where is that indicated?

5        A.    There is -- (47) and (50).

6        Q.    Unit 47?  Is that what you're referring

7    to?

8        A.    Yes.

9        Q.    On Line Unit 47, SP ED means Special Ed,

10   and that's an unfilled slot?

11       A.    Yes.

12       Q.    And also on (50) --

13       A.    (No response).

14       Q.    -- correct?

15       A.    Uh-huh.

16       Q.    So there are two Special Ed slots --

17       A.    Right.

18       Q.    -- that were unfilled for the next year.

19       A.    Yes.

20       Q.    Would it be fair to say that you would

21   have put Miss Mongelli's name on one of those slots

22   but for this certification issue?

23       A.    I would say no.

24       Q.    You would not?

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Carmack - Direct

Page 40

1    don't necessarily wind up back on the list.

2        Q.    Okay.  Well, you have a need for at

3    least two Special Ed teachers; correct?

4        A.    Correct.

5        Q.    Okay.  Now you have someone who is on a

6    temporary contract like Miss Mongelli who is already

7    in the school, already teaching.  Now what would cause

8    you -- is it just the fact that there's a temporary

9    contract not to put her name on the list?  Does that

10   automatically disqualify --

11       A.    I believe State law has a major effect

12   on this and Human Resources could clarify that we need

13   to find certified teachers or make a good-faith effort

14   to find certified teachers prior to putting a

15   temporary contract into place.

16       Q.    And who would within the district know

17   about those things?

18       A.    Debra Davenport.

19       Q.    Let's say apart from concerns about

20   certifications or temporary contracts, what other --

21   were there any other reasons that would have caused

22   you not to put Miss Mongelli's name on the staffing

23   list?

24       A.    Another reason would be classroom

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Carmack - Direct

Page 41

1   management concerns.

2        Q.    And what were those?

3        A.    When we looked at the list of 82

4   referrals for example, that shows that there may be a

5   classroom management issue.

6        Q.    Now Miss Mongelli was employed for

7   roughly five and a half months in 2004, mid-January to

8   the end of the school year; correct?

9        A.    Correct.

10        Q.    And according to the Exhibit No. Kennedy

11   2 there were a total of 82 referrals.

12        A.    Correct.

13        Q.    Is that an unusually high number of

14   referrals --

15        A.    Yes.

16        Q.    -- in your opinion?

17              And was that something that you

18   specifically had in mind or did you have to generate

19   some kind of document to refresh your recollection

20   about that?

21        A.    I don't remember generating any

22   document.

23        Q.    But my understanding is you're not

24   personally involved in the whole referral process at

Carmack - Direct

Page 42

1   all; correct?  The assistant principals handle that.

2        A.      Right.

3        Q.      And you kinda leave it to them; correct?

4        A.      (Witness moves head up and down).

5        Q.      So how would you know that there were

6   classroom management problems based on referrals if

7   you weren't involved in them?

8        A.      Miss Mongelli told me she was having

9   classroom management problems.

10       Q.      This is something she volunteered?

11       A.      Yes.

12       Q.      Did Miss Mongelli say anything to the

13   effect, You know ... teaching Special Ed is such a

14   headache that I don't really wanna come back here?

15       A.      I don't remember that in the

16   conversation.

17       Q.      Did she ever indicate anything to that

18   effect?  You know, I've just had it?  I'm not

19   interested?

20       A.      She did emphasize that she was having

21   problems.

22       Q.      Did she ever indicate to you that the

23   problems were so severe that she was not interested in

24   coming back to Dickinson?

A123

Carmack - Direct

1          A.      I do not remember that.

2          Q.      Okay.  So would it be fair to say that

3    the source of your impression that, or opinion,

4    whatever you want to call it, that Miss Mongelli was

5    having classroom management problems came from

6    Miss Mongelli?

7          A.      Yes.

8          Q.      Any other source?

9          A.      The assistant principals.

10         Q.      Did you ask --

11                 When you heard this conversation from

12   Miss Mongelli, did you go back and ask one of the

13   assistants, Hey, what's up with Miss Mongelli?  Is she

14   having management problems?  Or how did that come

15   about?

16         A.      We had the discussions.  I don't know

17   how it came about.

18         Q.      Discussions with one or more of the

19   assistant principals?

20         A.      Yes.

21         Q.      Other than certification, the status of

22   a temporary contract and this classroom management

23   issue, was there anything else that might have played

24   a role in your decision not to have Miss Mongelli on

Carmack - Direct

Page 50

1    questions.

2                              -  -  -

3    BY MR. WILLOUGHBY:

4         Q.    I want to go back because I think there

5    was some confusion created by the way you were

6    questioned, and the first question I have is, when you

7    have a teacher on a temporary contract, is it your

8    understanding you have to affirmatively recommend that

9    they be rolled over to the following year for them to

10   be employed?  Do you have to do something affirmative

11   on the list?

12        A.    Yes.

13        Q.    I'm looking at your memo.  Looking at

14   Carmack 2, you say, "Also I have highlighted those

15   teachers listed as temporary employees.  I recommend

16   that they be rolled over into the 2004/2005 list."

17        A.    Correct.

18        Q.    So am I correct that when you go --

19              This is -- just so we're clear for the

20   record, the first page of Carmack 2 is D96.  When you

21   go to the actual listing of teachers at D97, D89 and

22   D99, your understanding and state of mind was that to

23   continue a temporary teacher, such as Mrs. Mongelli,

24   you would have to affirmatively include her on that

Carmack - Cross

Page 51

1    list.

2    A.    Yes.

3    Q.    So the people that you identified who

4    were temporary contract employees that you

5    affirmatively included were the temporary contract

6    people that you were recommending be brought back.

7    A.    Yes.

8    MR. WILLOUGHBY:  That's all I have.

9    MR. BERNSTEIN:  Okay.

10    -  -  -

11    (Deposition concluded at or about

12    1:17 p.m.)

13    (Deposition transcript was

14    presented to the witness for reading and

15    signing.)

16    -  -  -

17

18

19

20

21

22

23

24