IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

CHRISTINA MONGELLI,                     :
                                        :
            Plaintiff,                   : C.A. No. 05-359 SLR
                                        :
      v.                                :
                                        :
RED CLAY CONSOLIDATED SCHOOL:
DISTRICT BOARD OF EDUCATION, :
et al.,                                 :
                                        :
            Defendants.                 :

- - -

          Deposition of JOHN KENNEDY, taken pursuant
to notice, before CAROL DiSERAFINO, Professional
Reporter and Notary Public, duly authorized to
administer oaths, on TUESDAY, OCTOBER 17, 2006, at
10:15 a.m., held at the offices of the Red Clay
Consolidated School District, 4550 New Linden Hill
Road, Wilmington, Delaware.  There being present:

A P P E A R A N C E S:

            JOSEPH M. BERNSTEIN, ESQ.
            800 North King Street, Ste. 302
            Wilmington, Delaware  19801
              on behalf of Plaintiff

            BARRY M. WILLOUGHBY, ESQ.
              YOUNG CONAWAY STARGATT & TAYLOR, LLP
            The Brandywine Building
            1000 West Street, 17th Fl.
            Wilmington, Delaware  19801
              on behalf of Defendants

          Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801
          (302) 658-6697   Fax (302) 658-8418

Kennedy – Direct

Page 18

1    worked at Dickinson High School while you were

2    assistant principal.

3        A.    If an incident occurred in a class or at

4    the school involving a student, the teacher would fill

5    out what's known as an SBR, Student Behavior Referral,

6    and submit it to the appropriate assistant principal.

7        Q.    Now that would be by alphabet --

8        A.    That's correct.

9        Q.    -- depending on the student's name?

10       A.    Their last name.  That is correct.

11       Q.    And the teachers I assume were given a

12   supply of these forms to fill out, or did they have to

13   go to the office to get one?

14       A.    They were available in the teacher

15   mailroom.

16       Q.    And it's just a form that you fill out.

17       A.    That is correct.

18       Q.    Okay.  What happens to that form after

19   the teacher fills it out?

20       A.    The teacher would put it in the

21   assistant principal's mailbox.

22       Q.    Now where is that mailbox located?

23       A.    In the same mailroom.

24       Q.    In the teacher's lounge, or is there a

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A128

Kennedy – Direct

Page 20

1          A.      Yes.

2          Q.      And sometimes there would be behavioral

3    referral forms in there?

4          A.      Yes.

5          Q.      And can you tell me what kind of

6    priority those behavior referral forms got from your

7    own personal standpoint.

8          A.      Student Behavior Referrals were a high

9    priority.

10          Q.      So you would look at them every day?

11          MR. WILLOUGHBY:  Objection.  Asked and

12    answered.

13          MR. BERNSTEIN:  Okay.

14    BY MR. BERNSTEIN:

15          Q.      When you got a Student Behavior Referral

16    form, what did you do after you read it?

17          A.      I would review it and then depending

18    upon what it was for talk to the student who was

19    identified, talk to student witnesses and/or talk to

20    the teacher who wrote it.

21          Q.      So you would do kind of an informal

22    investigation into the merits of the complaint or

23    whatever it was that was being referred?

24          A.      That is correct.

Kennedy – Direct

Page 26

1    out and complete?  It looks like your initials down at

2    the bottom.

3         A.    Yes.  For Part III it says, "Check off

4    the administrative action used to resolve the problem

5    after the referral."  So that would be a portion for

6    the administrator.

7         Q.    And "OSS 3/8" means what?

8         A.    Out-of-school suspension on March 8.

9         Q.    Now an out-of-school suspension, is that

10   typically one day?  Two days?  Three days?

11        A.    An out-of-school suspension could vary

12   in length.  The limit on it was a total of ten days

13   and for Special Education students, the protocol at

14   John Dickinson High School at that time was a ten-day

15   maximum on out-of-school suspensions for Special

16   Education students.

17        Q.    Okay.  Now if I'm a student that gets

18   suspended, how do I get back in?  What do I have to

19   do?

20        A.    You come back on your return date.

21        Q.    So a student who is suspended is given a

22   definite return date?

23        A.    Yes.  For example, this is 3/8.  The

24   student would be allowed back on 3/9, or the next

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A130

Kennedy - Direct

Page 27

1    school day.

2        Q.    So if I see OSS and there's just one

3    date there, 3/8, that would be the date the student

4    serves his suspension?

5        A.    That should be the date of the

6    suspension.

7        Q.    Okay.  And if there's more than one

8    date, it would show on that form, if it was a two-day

9    suspension or a three-day suspension?

10       A.    It is possible it would show on this

11   form.  This form, as you can see there's a check-off

12   box area.  It's possible it would just say

13   "suspension" and that would be it.  This was what was

14   given back to the teacher and it was not what was

15   given to the student and the parent.  So this was an

16   internal form.

17       Q.    Okay.  So the teacher would get back a

18   form showing what action was taken.

19       A.    A carbon copy of this.

20       Q.    Now could you read the top third, the

21   body, of the complaint against JW to yourself --

22       A.    (Witness complies).

23       Q.    -- where it starts "JW continues to be

24   extremely disruptive."

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A131

Kennedy - Direct

1  students from her class, and that was an intervention

2  that was taken to provide her with assistance.

3  BY MR. BERNSTEIN:

4        Q.    Was Jonathan White one of the students

5  who was moved?

6        A.    No, he was not.

7        Q.    Do you know the names of some -- are

8  records available to indicate the names of other

9  students who were moved and why they might have been

10  moved?

11       A.    I don't know if records, such records,

12  are available.  I remember one student's name was

13  Ebonie.

14       Q.    First name or last name?

15       A.    First name.  I believe her name is

16  Ebonie Revelle.

17       Q.    And do you recall what the particular

18  complaint --

19            MR. WILLOUGHBY:  Excuse me.  Can we

20  agree that any references to students will be kept

21  confidential?

22            MR. BERNSTEIN:  Yes.

23  BY MR. BERNSTEIN:

24       Q.    Do you recall the nature of the

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A132

Kennedy - Direct

Page 42

1    complaining about Jonathan doing, and so I offered to

2    just handle the entire situation myself.   Teacher

3    doesn't have to bother with the write-up.   I'll put

4    him right in in-school suspension for the day.

5            Q.     So SOS means an in-school suspension.

6            A.     That is correct.

7            Q.     That would have been on March 31st?

8            A.     That is correct.

9                   (Deposition Exhibit Kennedy No. 9 marked

10   for identification).

11   BY MR. BERNSTEIN:

12           Q.     I'm showing you what is marked Kennedy

13   No. 9.  This is a Behavior Referral dated April the

14   26th, 2004 concerning Jonathan White and if you could

15   just read to yourself the behavior that's described.

16           A.     (Witness complies).  Yes.

17           Q.     First question is, do you recall

18   receiving this report?

19           A.     I do recall receiving it.  Yes.

20           Q.     Do you recall receiving it on or about

21   the date that's indicated, on April 26th?

22           A.     I recall receiving it subsequent to

23   that.

24           Q.     How subsequent, if you know.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Kennedy - Direct

Page 43

1    A.    It was the following month.

2    Q.    Following month?

3    A.    It was not a month of time but it was in

4  May when Miss Mongelli came into my office and

5  reported a string of incidents to me at one time.  At

6  that point in time I asked her to write for me a

7  narrative --

8         Well, first I asked her if she could

9  connect the incidents with particular dates.  She said

10 she could.  So I asked her to supply me with a written

11 narrative indicating what incident took place on what

12 date so that I could conduct my investigation.

13        The following day Miss Mongelli supplied

14 me with I want to say a stack -- I'm not sure how

15 many -- quite a few Student Behavior Referrals written

16 out and this would be one of them, indicating dates

17 with student behaviors, and I recall that quite well.

18   Q.    So your testimony is even though Kennedy

19 No. 9 is dated April 26th, you didn't get it around

20 that time.

21   A.    That is correct.

22   Q.    Okay.  And your testimony is that you

23 didn't get that until sometime in early May.

24   A.    That is correct.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Kennedy - Direct

Page 44

1    Q.    Okay.  And you have a specific

2    recollection sitting here today of that?

3        A.    I do.

4            MR. BERNSTEIN:  Mark this as the next.

5            (Deposition Exhibit Kennedy No. 10

6    marked for identification).

7    BY MR. BERNSTEIN:

8        Q.    Now just before I ask you questions

9    about this next exhibit, just a few moments ago you

10   stated that you asked Miss Mongelli to prepare a

11   written narrative --

12       A.    Yes.

13       Q.    -- of the incidents that she was

14   complaining to you about in early May or that came to

15   your attention in early May.

16       A.    Yes.

17       Q.    First, can you tell me the circumstances

18   of your contact with Miss Mongelli that uncovered

19   these incidents.  In other words, how did it come

20   about that you learned Miss Mongelli was complaining

21   about a whole series of incidents that happened in

22   early May?

23       A.    Miss Mongelli during the course of a

24   school day came into my office and said she wanted to

A135

Kennedy - Direct

Page 45

1  talk about Jonathan White, that he had become an

2  ongoing problem.  I began to take notes about what

3  Miss Mongelli was saying.

4          Q.      What was her demeanor?  Did she seem

5  calm?  Upset?

6          A.      She seemed calm.

7          Q.      Okay.

8          A.      And I began to take notes as to what she

9  said and then realized that what she was relating to

10  me was quite serious issues going back over a period

11  of time of I believe a couple of weeks.  Based upon my

12  experience I knew it was gonna be important to be able

13  to tie specific incidents by Jonathan White to

14  specific dates, and that is why I asked her for --

15              I asked her if she knew what dates these

16  occurred.  She said yes, she did.  And so I asked her

17  if she could prepare a written narrative because I

18  knew that would be important, having it in writing.

19          Q.      You mean kind of like a report or a memo

20  or something like that?  Is that what you had in mind?

21          A.      Anything that would indicate in writing

22  that Jonathan White did such and such on a particular

23  date in my class.

24          Q.      Okay.  And you indicated you got a

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A136

Kennedy - Direct

Page 46

1    series of Behavior Referrals in response to that

2    request.

3        A.    The following day Miss Mongelli

4    presented me with more than several, quite a few, of

5    these Student Behavior Referrals, written out for each

6    particular incident, and this (indicating) I believe

7    would be one of them.

8        Q.    Okay.

9             MR. WILLOUGHBY:   "This" is Exhibit No.

10   10.

11   BY MR. BERNSTEIN:

12       Q.    And did K-9 come to your attention

13   around the same time?

14             MR. WILLOUGHBY:  Object.  It's been

15   asked and answered.  He already said it did.

16             MR. BERNSTEIN:  Okay.

17   BY MR. BERNSTEIN:

18       Q.    Other than the Behavior Referrals, which

19   you said K-10 is one of them, did you get anything

20   else in writing from Miss Mongelli other than Behavior

21   Referral slips?

22       A.    Not that I recall.  I recall receiving

23   just these Behavior Referral slips.  More than these

24   two though.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A137

Kennedy - Direct

Page 50

1   the student was no longer in her class after that

2   point in time, so I'm basing my recollection on that.

3           Q.      Now just to kind of recap, your

4   testimony is that Exhibits K-9 through K-15, and you

5   can look at all of them --

6           A.      Yes.  I've looked at them all.

7           Q.      -- Kennedy 9 through Kennedy 15 were all

8   given to you at the same time by Miss Mongelli?

9           A.      Yes.

10          Q.      And the latest date on these is May 7th.

11  Do you have a specific recollection whether you got

12  these May 7th or on some earlier date or some later

13  date?

14          A.      I believe it was around that time.  I do

15  know it was the day after Miss Mongelli came to my

16  office and reported all of these things to me and I

17  asked her for a narrative tying the events to dates.

18          Q.      Okay.  And when you got all these

19  reports as you say, what action did you take?

20          A.      I began an investigation, interviewing

21  students in the class.

22          Q.      Do you recall who you interviewed and

23  what those students said, if you have a recollection

24  today?

Kennedy – Direct

Page 51

1      A.     I recall successfully getting two

2  students to indicate that they witnessed some of these

3  events take place.

4      Q.     Were you satisfied based on your

5  investigation that these incidents actually occurred?

6      A.     I was satisfied enough to take action.

7  I believe that some of them occurred enough and they

8  were of a degree of inappropriateness that I suspended

9  the student I believe for a lengthy period of time.

10     Q.     And do you know when that suspension

11  occurred?  If we could go back to Exhibit No. 1.  Is

12  it listed on there?

13     A.     I believe that the suspension for these

14  would have been 5/14, 5/17, 5/18, 5/19 and 5/20.

15     Q.     Now those all have the notation

16  "suspended-out."

17     A.     Correct.

18     Q.     So that's an out-of-school suspension.

19     A.     Correct.

20     Q.     Now right below that, the next entry is

21  5/21, OA, Outside Agency, and that continues all the

22  way down the bottom of the page.  Do you know what

23  that refers to?

24     A.     Outside agency.  The student is going to

Kennedy – Direct

Page 52

1   someplace that's not John Dickinson High School.

2          Q.      Can you give me some examples of what

3   that might be, what that might refer to?

4          A.      Usually an alternative school.

5          Q.      Do you know whether or not Jonathan

6   White was removed from Dickinson following these May

7   incidents?

8          A.      What occurred subsequent to this

9   five-day suspension ending on 5/20 was I engaged in a

10  conversation with Jonathan's mother in which we

11  mutually agreed that Jonathan would remain home for

12  the remainder of the school year.

13         Q.      Do you know whether or not Jonathan

14  White returned to Dickinson for the 2004/2005 school

15  year?

16         A.      I believe that he did return the

17  following school year.

18         Q.      Do you know whether Jonathan White is

19  still a student at Dickinson?

20         A.      I do not know that.

21         Q.      You left in --

22         A.      This is my second year in my current

23  position, so --

24         Q.      Okay.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Kennedy – Direct

Page 53

1              MR. BERNSTEIN:  Could we have this

2    marked as the next exhibit.

3              (Deposition Exhibit Kennedy No. 16

4    marked for identification).

5    BY MR. BERNSTEIN:

6         Q.   Mr. Kennedy, I'm showing you a document

7    that's been marked as Kennedy 16 and it appears to be

8    a memorandum dated August 20, 2004 to Diane Dunmon

9    from yourself, John Kennedy.

10        A.   That is correct.

11        Q.   And this is a -- looks like a three-page

12   document.

13        A.   Yes.

14        Q.   Now is this a document that you

15   prepared?

16        A.   Yes, it is.

17        Q.   And sent to Miss Dunmon?

18        A.   That is correct.

19        Q.   Do you know the circumstances that led

20   up to your preparing this document?

21        A.   I believe that it was requested from

22   district office, from Miss Dunmon's office, because of

23   some sort of claim that Miss Mongelli had placed.

24        Q.   Do you have any specific recollection of

A141

Kennedy - Direct

Page 54

1   any conversation with Miss Dunmon about preparing this

2   memo or why it was needed?

3           A.      No, I do not.

4           Q.      You were just asked to prepare a memo,

5   this memo?

6           A.      I don't actually know if I was asked to

7   even prepare this memo.  I think I took it upon myself

8   to -- there was a lot of information and I wanted to

9   in some way summarize it.

10          Q.      Now obviously the incidents with

11  Mr. White occurred during the school year, roughly

12  March through May, 2004, and now it's August, 2004 and

13  you're preparing this memo; correct?

14          A.      That is correct.

15          Q.      Okay.  What resources did you use to

16  complete this memo?  Were there records that you

17  looked at?  Was it your memory?  Or just -- what did

18  you rely on?

19          A.      I relied on the discipline file for

20  Jonathan White and my memory.

21          Q.      And --

22          A.      And my memory.

23          Q.      And your memory.  Okay.

24                  The first entry is February 24th, 2004.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Kennedy - Direct

Page 55

1   Does that refresh your recollection about your earlier

2   testimony about students being removed from

3   Miss Mongelli's class?

4           A.      Yes, it does.  And the records for that

5   would have been with the educational diagnostician,

6   Ms. Kristen Norton.

7           Q.      Now there's a reference there to a

8   letter dated 2/24/04.

9           A.      Yes.  I see that.

10          Q.      Do you know what that refers to?

11          A.      No, I do not.

12          Q.      You don't have any recollection sitting

13  here today?

14          A.      I think that that letter would refer to

15  the impact of the meeting about what students were

16  moved.  In other words, Ebonie Revelle, Ernest Watson

17  and Courtney Deshield-Watts.

18          Q.      Would that letter indicate --

19          MR. BERNSTEIN:  Take a two-minute break?

20          THE WITNESS:  Yeah.

21          (Break taken)

22  BY MR. BERNSTEIN:

23          Q.      Mr. Kennedy, we're resuming after a

24  short break, and we were going through Kennedy Exhibit

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Kennedy - Direct

Page 56

1   16 and I think we had already talked about the first

2   bullet point on this memo.

3            A.     That is correct.

4            Q.     And the next two bull --

5                   Well, the next bullet point refers to

6   there's a date March 8, 2004 and that refers to a

7   one-day out-of-school suspension.  And would it be

8   fair to say that you relied on the Notice of

9   Suspension for that date that we talked about earlier?

10           A.     Yes.

11           Q.     And would the same thing be true for the

12  next bullet point, April the 8th, 2004?  There's

13  documentation for that suspension?

14           A.     Yes.

15           Q.     Now the next bullet point is dated

16  5/6/2004.

17           A.     Yes.

18           Q.     Now is there any particular reason you

19  picked that date?

20           A.     That is the date that Ms. Mongelli came

21  to my office and reported the misconduct by Jonathan

22  White that had been taking place over the previous two

23  weeks or whatever the amount of time is.

24           Q.     And your narrative here indicates on the

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Kennedy - Direct

Page 57

1  second page, it's the fourth line down where it says,

2  quote, "The following day Miss Mongelli submitted

3  seven SBRs to me dated 5/7, 5/6, 5/5, 5/5, 5/4, 5/3

4  and 4/26."

5        A.      That is correct.

6        Q.      Okay.  And that continues to describe

7  who you interviewed and summarizing what they said

8  with reference to a Mr. Butcher and a Mr. Battle.  Do

9  you see that?

10       A.      Yes, I do.

11       Q.      And this also indicates that you met

12  with Mr. White on May 13th --

13       A.      Yes.

14       Q.      -- and gave him a five-day suspension.

15       A.      That is correct.

16       Q.      And there is also an indication on that

17  same bullet point at the top of the second page of

18  this memo that these incidents were reported to the

19  school resource officer, Detective Alex Nowell.

20       A.      Yes.  That is correct.

21       Q.      Now what's a school resource officer?

22       A.      School resource officer is the name

23  given to a State Police officer assigned to the high

24  school.

Kennedy - Direct

Page 65

1          A.      Yes.

2                  MR. BERNSTEIN:   This is the next

3   exhibit.

4                  (Deposition Exhibit Kennedy No. 19

5   marked for identification).

6   BY MR. BERNSTEIN:

7          Q.      Kennedy 19 appears to be a Notice of

8   Suspension for five days, to return May 21st.

9          A.      That is correct.

10         Q.      Now is this the Notice of Suspension

11  that's related to the incidents that you testified

12  were reported to you in early May, May 6th?

13         A.      Yes.

14         Q.      Is that the connection?

15         A.      Yes.

16                 MR. BERNSTEIN:   Have this marked has the

17  next exhibit.

18                 (Deposition Exhibit Kennedy No. 20

19  marked for identification).

20  BY MR. BERNSTEIN:

21         Q.      I'm showing you what's been marked as

22  Kennedy 20 and this appears to be a form titled

23  Manifestation Determination Worksheet and it's dated

24  June the 3rd, 2004.  Can you tell me what would have

Kennedy - Direct

Page 66

1    occurred that would have led to the creation of this

2    document.

3        A.    Yes.  Jonathan White was a Special

4    Education student and when a Special Education student

5    approaches or reaches ten days of out-of-school

6    suspension, a manifestation meeting is required to

7    look at the behavior or behaviors and determine if

8    those behaviors are a manifestation of his disability.

9    If they are not, then it is appropriate for that

10   student to receive an out-of-school suspension as a

11   consequence.  If it is a manifestation of his

12   disability, that's what the committee determines, then

13   such punishment, if you will, is not appropriate

14   because you're punishing someone for their disability.

15       Q.    Is this kind of determination something

16   that happens automatically once they hit the ten-day

17   suspension?

18       A.    Yes.  It is supposed to.  It's required.

19       Q.    Are there any other circumstances when

20   this sort of determination will be made?

21       A.    As far as I know it's utilized for

22   Special Education students as they reach or approach

23   the ten-day out-of-school suspension mark.

24       Q.    Now there are a number of signatures at

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A147

Kennedy – Direct

Page 67

1     the bottom of that document.  Are you familiar with

2     those signatures?

3          A.     Yes, I am.

4          Q.     Who is the top signature?

5          A.     That's Dr. Janine Corello.  She was the

6     school psychologist for Dickinson High School.

7          Q.     Do you know if she's still the school

8     psychologist?

9          A.     She I believe is employed by the school

10    district but not at that school.

11         Q.     And the next name?

12         A.     I believe that's Rachel Williams.  She

13    was a Special Education teacher.

14         Q.     And the next name?

15         A.     Kristen Norton, and she was the ED, or

16    educational diagnostician, for Dickinson High School.

17         Q.     And the last name?

18         A.     Thomas Kalinowski was a general

19    education teacher at the school.

20         Q.     Okay.  Is there any particular reason

21    that the --

22                Do these committees have a particular

23    makeup or are there different people who man these

24    committees at different times or is it always the same

Kennedy - Direct

Page 68

1    people?

2        A.    I believe it varies based upon

3    availability.

4        Q.    Did you participate in that process?

5        A.    I do not recall participating in it.

6        Q.    Do you recall whether you were asked to

7    provide any input to these people in making their

8    decision?

9        A.    I do not recall.

10       Q.    Have you ever served on or participated

11   in a manifestation determination process?

12       A.    Yes, I have.

13       Q.    Okay.  Based on your experience with

14   that process, what kind of things do you look at in

15   making this determination?

16       A.    You look at the behavior that was

17   exhibited and the reasons why the student is

18   classified in Special Education and you see if there's

19   a causality there of the behavior being caused by the

20   disability.

21       Q.    So you look at the behavior on the one

22   hand, the person's disability and see if there's a

23   connect or not.

24       A.    Yes.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Kennedy – Direct

Page 69

1    Q.    And if there's a determination that they
2  are connected, I take it the consequences for the
3  student would be less severe than if they're not
4  connected.
5    A.    My understanding is that further
6  consequences would be prohibited of out-of-school
7  suspensions.
8    Q.    So if a behavior is a manifestation of a
9  person's disability, even if they repeat it in the
10  future, you can't suspend them.
11    A.    Not for that behavior, that's correct,
12  because it's a disability.
13    Q.    No matter what it is?
14    A.    I think that there are exceptions for
15  very extreme things like bringing a gun to school or
16  something.
17    Q.    There are things people can get expelled
18  for no matter what their disability.
19    A.    I believe even that is tricky.  If it's
20  not a manifestation of their disability, then the
21  regular Code of Conduct applies.  If it is, things get
22  tricky.  I think that there are avenues that can be
23  taken that are rare to go straight to a judge or
24  something like that.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A150

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

CHRISTINA MONGELLI,                :
                                   :
              Plaintiff,           :  C.A. No. 05-359 SLR
                                   :
         v.                        :
                                   :
RED CLAY CONSOLIDATED SCHOOL:
DISTRICT BOARD OF EDUCATION, :
et al.,                            :
                                   :
              Defendants.          :

- - -

          Deposition of DIANE DUNMON, taken pursuant
to notice, before CAROL DiSERAFINO, Professional
Reporter and Notary Public, duly authorized to
administer oaths, on TUESDAY, OCTOBER 17, 2006, at
3:35 p.m., held at the offices of the Red Clay
Consolidated School District, 4550 New Linden Hill
Road, Wilmington, Delaware.  There being present:

A P P E A R A N C E S:

          JOSEPH M. BERNSTEIN, ESQ.
          800 North King Street, Ste. 302
          Wilmington, Delaware  19801
            on behalf of Plaintiff

          BARRY M. WILLOUGHBY, ESQ.
            YOUNG CONAWAY STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Fl.
          Wilmington, Delaware  19801
            on behalf of Defendants

          Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801
        (302) 658-6697   Fax (302) 658-8418

Dunmon - Direct

Page 5

1  that I asked other people but I'm going to try to

2  maybe fill in some gaps that you might have some

3  knowledge about; okay?

4      A.    Uh-huh.

5      Q.    Let's start out with how it came to your

6  attention that Miss Mongelli did not have a Special Ed

7  emergency certificate.

8      A.    In a conversation with Miss Davenport it

9  was brought to my attention.

10     Q.    And do you know around when this would

11 have occurred?  Time period?

12     A.    I would say -- gosh ... I want to say

13 April to May time frame, but I don't know exactly in

14 the Spring.

15     Q.    If we use a reference point, the

16 rescinded contract that was dated May the 12th, now --

17         MR. WILLOUGHBY:  The rescission.

18         MR. BERNSTEIN:  The rescinded contract.

19         MR. WILLOUGHBY:  I'll let you finish the

20 question.

21         MR. BERNSTEIN:  I'm using that as a

22 starting point.

23         MR. WILLOUGHBY:  But not the word

24 "rescinded" written on it.

Dunmon – Direct

Page 6

1           MR. BERNSTEIN:  Yeah.

2           THE WITNESS:  Oh.  Before it had that on

3  it.

4  BY MR. BERNSTEIN:

5           Q.     Do you think -- that contract was signed

6  around May 12th? --

7           A.     Yes.

8           Q.     -- correct?

9           A.     Uh-huh.

10          Q.     -- by Miss Mongelli and by the school

11  district?

12          A.     Yes.

13          Q.     Would it be fair to say that that

14  contract would not have been signed if you knew on

15  May 12th or believed on May 12th that Miss Mongelli

16  did not have a certificate in Special Ed?

17          A.     That's correct.

18          Q.     You wouldn't have signed the contract;

19  correct?

20          A.     Correct.

21          Q.     So that knowledge logically would have

22  had to come to your attention after May 12th --

23          A.     Yes.

24          Q.     -- right?

Dunmon - Direct

Page 7

1      A.      Uh-huh.   Yes.

2      Q.      And sometime between May 12th and June

3    16th, or --

4      A.      I think that's correct.

5      Q.      -- when it was rescinded?

6      A.      Yes.

7      Q.      And your understanding is that that was

8    brought to your attention by Miss Davenport?

9      A.      Yes.

10      Q.      Okay.  Now prior to getting that

11    information from Miss Davenport, did you have any

12    conversations with Mr. Carmack about renewing or not

13    renewing Miss Mongelli's contract? --

14      A.      Yes.

15      Q.      -- before May 12th?

16              MR. WILLOUGHBY:  Before May 12th?

17              MR. BERNSTEIN:  Before May 12th.

18              THE WITNESS:  I had a conversation with

19    Mr. Carmack.  The specific date to place it before or

20    after would be difficult for me.  My recollection is

21    that it would have been in that range, but I don't

22    know the exact date and I'm very sorry, but I don't.

23    BY MR. BERNSTEIN:

24      Q.      Okay.  Let's put the date aside for a

Dunmon - Direct

Page 8

1    moment.

2        A.        Yes.

3        Q.        Do you remember the substance of the

4    conversation?

5        A.        I do.

6        Q.        What was the substance?

7        A.        Basically Mr. Carmack called my office

8    because he had been informed that Miss Mongelli was

9    given a regular contract rather than temporary, moved

10   from temporary to regular, and that he had a concern

11   because she was having difficulties in the classroom

12   and he believed that she was remaining on a temporary

13   contract which would have ended in June.

14       Q.        So he called you because he found out

15   that her contract was being rolled over to the next

16   school year.

17       A.        That's correct.

18       Q.        Okay.  And did he express some

19   displeasure with that?

20       A.        He expressed puzzlement to a certain

21   extent as to why that had occurred and he expressed

22   concern because of the difficulties because of

23   classroom management issues that he mentioned at that

24   upper grade level in Special Education.

Dunmon - Direct

Page 9

1      Q.      Do you know how it came about that

2    Miss Mongelli was offered a new contract for

3    2004/2005?

4      A.      As I understand it Miss Davenport, being

5    aware that Special Education teachers, particularly at

6    the secondary level, are difficult to find, believed

7    that Miss Mongelli would be a person that we would

8    continue employment with and she believed that

9    Mr. Carmack at that time was pleased with her

10   performance.

11     Q.      Now her testimony was she didn't get

12   anything from Carmack one way or the other in any form

13   of report saying I recommend this contract be extended

14   or I don't recommend --

15     A.      Correct.

16     Q.      -- this contract be extended.

17     A.      Yes.

18     Q.      Did you have any conversations with

19   Mr. Carmack to the effect of Well, if you didn't want

20   her back, why didn't you make a recommendation?

21     A.      I did have a conversation with him.  I

22   don't know that it was exactly that kind of wording.

23   He believed that in the absence of her name on his

24   roster, that we understood or that Debra understood

Dunmon - Direct

Page 10

1   that he did not expect that she would be returning in

2   the Fall.

3        Q.    In your experience and -- well, let me

4   ask you this just to preface:  Do you have a lot of

5   familiarity with these rosters the principals fill

6   out?

7        A.    Yes.

8        Q.    Do they cross your desk?

9        A.    Yes.

10       Q.    Is that unusual, to kind of just leave

11  somebody's name off the list and leave it to the

12  people who are getting the list to divine Well, that

13  person's name isn't on the list so they must not want

14  to re-hire them?

15       A.    It is indeed unusual and I will say I've

16  had principals previously who automatically assumed

17  that all temporary contracts would disappear, so that

18  certainly happened before, but it is unusual for them

19  to think that -- a principal to believe that we'll

20  interpret that in that manner.

21       Q.    You mean literally you would have to

22  look down the list and think to yourself Who is not on

23  the list; right?

24       A.    Yes.  Correct.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Dunmon - Direct

Page 11

1          Q.      And then make another assumption from

2     the fact that their name isn't on the list as to what

3     the principal wants to do --

4          A.      Correct.

5          Q.      -- correct?

6                  And wouldn't it be fair to say that most

7     of the time you either get some memo or some form, you

8     know, I recommend you re-hire these people or I

9     recommend you don't re-hire these people?

10         A.      That would be accurate; however I would

11    also say that due to the proximity of that memorandum

12    going out with Mrs. Mongelli's hire, that made it a

13    little bit unusual because, as Debra pointed out,

14    we're doing those kind of decision-making in January

15    and February, and Miss Mongelli began as I recall

16    January 20.

17         Q.      Well, don't you think then -- would it

18    be fair to say that because of the timing of that,

19    that it would even be more likely that if Mr. Carmack

20    didn't want Miss Mongelli back, he would take some

21    affirmative action?

22                 MR. WILLOUGHBY:  Likely you're saying?

23                 MR. BERNSTEIN:  More likely.

24                 MR. WILLOUGHBY:  You're asking her to

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

Dunmon - Direct

1    testify to his state of mind.

2                THE WITNESS:  I really can't answer

3    that.

4                MR. BERNSTEIN:  All right.  Fair enough.

5    BY MR. BERNSTEIN:

6        Q.    Did Mr. Carmack in your conversations

7    with him flat out say I don't want Miss Mongelli back?

8        A.    I honestly -- I really don't recall.  I

9    don't know that those words were used.

10        Q.    Did you take it that way?

11        A.    That he did not want her to return to

12    that building?

13        Q.    Yes.

14        A.    Yes.

15        Q.    Just based on his concerns, or anything

16    else?

17        A.    No.  Simply based on classroom

18    management.  It was a very general conversation.

19        Q.    Okay.  Do you know what the problems

20    were with classroom management?

21        A.    I do not.

22        Q.    Did you ask Mr. Carmack?

23        A.    I did not.

24        Q.    Did he volunteer?

Dunmon – Direct

Page 16

1      A.      As I recall, the conversation was about

2   the fact that Miss Mongelli had an emergency

3   certificate, that she was required to do an extensive

4   amount of course work, and that was the conversation.

5      Q.      Well, you heard Miss Davenport's

6   testimony.

7      A.      Yes.

8      Q.      She said she told you she did not have a

9   certification.

10     A.      No.  I recall having a conversation

11  about the fact that Miss Mongelli's certificate either

12  was or would be -- I recall her saying it was an

13  emergency based upon her credential, and that would

14  not be unusual, to be able to ascertain that, whether

15  you had a document or not.

16     Q.      Did Miss Davenport tell you, I don't

17  have any documentation that she has a certificate?

18     A.      No.  She did not say that to me.

19     Q.      So would it be fair to say that your

20  concern from your conversation with Miss Davenport was

21  not so much about whether she had a certificate or not

22  but was about whether she was making progress and the

23  requirement such as Praxis II or taking courses to

24  become a regular certificate?

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A160

Dunmon - Direct

1      A.      My concern was that she meet the

2    requirements of the Delaware Code and the requirements

3    of the Department of Instruction which tell us that a

4    person on an emergency certificate must be working,

5    making attempts, to complete the required work, and

6    that was my concern.

7      Q.      Now if you look at Davenport 9 there are

8    two paragraphs at the bottom that talk about the

9    school district's responsibility to either document

10   progress or lack of progress; is that correct?

11     A.      Yes.

12     Q.      And I asked Miss Davenport if she ever

13   submitted anything to the State Department of

14   Education.

15           MR. WILLOUGHBY:  Object.  Document

16   speaks for itself.  I don't think it says what you're

17   saying.

18           MR. BERNSTEIN:  All right.  I'll go

19   back.

20   BY MR. BERNSTEIN:

21     Q.      Miss Dunmon, what do you think those two

22   paragraphs mean?

23     A.      The paragraph that begins "I am aware"

24   indicates that documentation needs to be sent to DOE

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801

A161

Dunmon – Direct

Page 20

1    the district level thinks it should be rescinded?  Do

2    they notify the Board?

3         A.    Yes.  Because the Board took the action,

4    the Board has to undo the action and therefore the

5    name would have to go before the Board of Education in

6    order to be non-renewed or terminated.

7         Q.    Do you know whether or not Miss Mongelli

8    was informed along the way after she signed the

9    contract to the effect that Miss Mongelli, there's a

10   question about your certificates.  Can you show us

11   something, that you have a certificate or don't have a

12   certificate?  Did that ever happen?

13        A.    I cannot answer that question.  Did I

14   ask that?  No, I did not.  Did Human Resources?  I

15   don't know.

16        Q.    You don't know whether they did or not?

17        A.    I do not know.

18        Q.    Did you ever review any of

19   Miss Mongelli's reports from classroom observations

20   about her teaching abilities?

21        A.    No, I did not.

22        Q.    Other than your conversations with

23   Mr. Carmack, did you have any knowledge of

24   Miss Mongelli's teaching abilities?

A162

Dunmon – Direct

Page 21

1          A.      No, I did not.

2          Q.      Did you ever meet Miss Mongelli --

3          A.      I had not.

4          Q.      -- prior to having these conversations

5     with Mr. Carmack?

6          A.      Not as I recall.

7                  MR. BERNSTEIN:  Okay.  I think that's

8     it.

9                  MR. WILLOUGHBY:  I just have one

10    question.  I want to make sure I understand this

11    right.

12                         -   -   -

13    BY MR. WILLOUGHBY:

14         Q.      Emergency certificate is issued only to

15    a particular school district; correct?

16         A.      That's correct.

17         Q.      So if Miss Mongelli had an emergency

18    certificate at Red Clay, she couldn't take that over

19    to Christina or Brandywine or somewhere else and use

20    it?

21         A.      She could show it to them but they would

22    have to reapply.

23         Q.      It's district by district specific,

24    though.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

-   -   -

CHRISTINA MONGELLI,                    :
                                       :
            Plaintiff,       : C.A. No. 05-359 SLR
                                       :
       v.                              :
                                       :
RED CLAY CONSOLIDATED SCHOOL:
DISTRICT BOARD OF EDUCATION, :
et al.,                                :
                                       :
            Defendants.      :

-   -   -

          Deposition of DEBRA DAVENPORT, taken
pursuant to notice, before CAROL DiSERAFINO,
Professional Reporter and Notary Public, duly
authorized to administer oaths, on TUESDAY,
OCTOBER 17, 2006, at 2:07 p.m., held at the offices of
the Red Clay Consolidated School District, 4550 New
Linden Hill Road, Wilmington, Delaware.  There being
present:

A P P E A R A N C E S:

          JOSEPH M. BERNSTEIN, ESQ.
          800 North King Street, Ste. 302
          Wilmington, Delaware  19801
            on behalf of Plaintiff

          BARRY M. WILLOUGHBY, ESQ.
           YOUNG CONAWAY STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Fl.
          Wilmington, Delaware  19801
            on behalf of Defendants

          Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801
          (302) 658-6697   Fax (302) 658-8418

Davenport - Direct

Page 43

1      A.      No, because when I look at something

2  like this, I'm counting noses to check how many units

3  there are and to see, make sure -- so the names don't

4  mean much to me really.

5      Q.      Is it expected of a principal, let's say

6  you have teachers under temporary contracts teaching

7  at a school, to notify the district whether or not the

8  principal is recommending a new contract for those

9  teachers or not?

10     A.      I'm sorry.  Ask me again.

11     Q.      Okay.  In any given time there might be

12  teachers, let's say at John Dickinson High School, who

13  are teaching under temporary contracts and those

14  contracts as you said have a limited duration.

15     A.      Correct.

16     Q.      Now if the principal of that school

17  either wants to recommend that that person be carried

18  over to the next year or recommends that that person

19  not be carried over, is there some form of

20  communication that's sent to you or your office

21  telling them that?

22     A.      Okay.  I send a memo to principals

23  around January/beginning of February asking for --

24  giving them a list of teachers who are on temporary

Davenport - Direct

Page 44

1    contracts and are not tenured, asking the status of

2    these particular educators, whether or not they should

3    continue employment or not.

4         Q.    You send that memo out in January or so?

5         A.    Yes.

6         Q.    And when do you expect to get a

7    response?

8         A.    Within -- by the beginning of February.

9         Q.    I'm showing you Carmack No. 1 and that

10   looks like a response to just the type of memo you

11   described you sent out --

12        A.    That's correct.

13        Q.    -- is that right?

14        A.    Yes.

15        Q.    And that says here are the teachers

16   under temporary contract and there are some that are

17   recommended to be approved or carried over.

18        A.    Yes.

19        Q.    And I don't think -- in that particular

20   memo it looks like there's a recommendation that a

21   couple people not be rehired.

22        A.    That's correct.

23        Q.    Is there a recommendation on there that

24   any of the temporary people be rolled over to the next

Davenport - Direct

Page 45

1    year or not, or does it just say here are the temps?

2          A.    It just says here are the temps.

3          Q.    Now would you expect something else --

4          A.    Yes.

5          Q.    -- from the principal about status of

6    the temps for the next year?

7          A.    There would have been a notation of who

8    not to bring back.

9          Q.    And if there had been --

10          So let me make sure I understand this.

11   People who are in the Temporary Contract category, you

12   would expect the principal to send you something, yes,

13   I recommend this person be rolled over to the next

14   year, or no, I don't?

15          A.    Yes.

16          Q.    And everybody would be covered with

17   either a "yes" or a "no."

18          A.    Yes.

19          Q.    And if you don't get that by a certain

20   date, what do you do?

21          A.    It depends.

22          Q.    Is there some place in your records

23   where those memos would exist?

24          A.    Oh, yes.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY


CHRISTINA MONGELLI,            )
                              )
            Plaintiff,        )
                              )  C.A. No. 05-359 SLR
v.                            )
                              )
RED CLAY CONSOLIDATED         )
SCHOOL DISTRICT BOARD OF      )
EDUCATION, et al.,            )
                              )
            Defendants.  )


        Deposition of J. JANINE CARELLO, Ph.D.,
taken pursuant to notice at the offices of the
Red Clay Consolidated School District, 4550 New
Linden Hill Road, Wilmington, Delaware, beginning
at 9:10 a.m. on NOvember 28, 2006, before Heather
M. Triozzi, Registered Professional Reporter,
Certified Shorthand Reporter, and Notary Public.


APPEARANCES:


        JOSEPH M. BERNSTEIN,. ESQ.
        LAW OFFICES OF JOSEPH M. BERNSTEIN
            800 North King Street, Suite 302
            Wilmington, Delaware  19899
            for the Plaintiff



        BARRY M. WILLOUGHBY, ESQ.
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
            1000 West Street, 17th Floor
            The Brandywine Building
            Wilmington, Delaware  19801
            for the Defendants

Also Present:

        Ms. Diane Dunmon

1  that's why it's checked as no?

2      A.  Right.  And since then, they've changed it

3  in the law.

4      Q.  Okay.

5      A.  Because everybody complained about it,

6  because you have a hard time explaining it at

7  meetings.

8      Q.  Okay.

9      A.  And then the third is the same thing, the

10  double negative.

11      Q.  So, again, to restate the double negative

12  in a positive form, so it really means the

13  student's disability does impair his ability to

14  control the behavior that led to the discipline?

15      A.  Correct.  That's correct.

16      Q.  So, and then under the law, as I

17  understand it, then basically if it's determined

18  that his conduct was a behavior of his

19  manifestation of his disability as is listed

20  here, you're not to hold him responsible in a

21  sense of depriving him of a free appropriate

22  education?

23      A.  Correct.

24      Q.  If it were something he were capable of

Page 51

1    controlling, then that kind of discipline could

2    be a consequence?

3        A.   Correct.

4        Q.   Okay.  So basically the purpose of this is

5    to decide whether or not you're going to hold the

6    child responsible in that sense or --

7        A.   That's it.

8        Q.   -- his behavior?

9        A.   Right.

10       Q.   And in this case, you determined, the

11   group of you, that the student unfortunately was

12   not able to control his behavior; is that

13   correct?

14       A.   Correct.

15       Q.   Okay.

16              MR. BERNSTEIN:  All right.  That

17   prompted some questions --

18              MR. WILLOUGHBY:  I'm just thinking

19   if there's anything else.

20              MR. BERNSTEIN:  -- whenever you're

21   done.

22              MR. WILLOUGHBY:  I think I am done.

23   I think that's all have.

24              Mr. Bernstein said he may have a

Page 53

1    Q.   Is that right?

2    A.   Correct.

3    Q.   Okay.  And when you make this

4  manifestation determination, the purpose of that

5  is to determine whether or not whatever

6  disciplinary action might be taken, that student

7  continues to receive appropriate education?

8    A.   Correct.

9    Q.   And that's the only purpose for this

10  determination?

11    A.   Whether or not they continue to be

12  suspended or not suspended, correct, for that

13  same behavior.

14    Q.   Okay.  Well, if a student doesn't know

15  what he's doing is wrong, okay, and can't control

16  the behavior, does that play a role in whether

17  his suspension continues or not?

18    A.   If it's determined that he can't control

19  it and it is a manifestation of his disability,

20  he will remain in school

21    Q.   So you can't suspend that student?

22    A.   Correct, by federal guidelines.

23    Q.   Okay.  What do you do with that student?

24    A.   That's for the principal and assistant