# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **CHRISTINA MONGELLI,** | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : C.A. No. 05-359 SLR |
| | : |
| **RED CLAY CONSOLIDATED SCHOOL** | : |
| **DISTRICT BOARD OF EDUCATION,** | : |
| *et al,* | : |
| **Defendants.** | : |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

JOSEPH M. BERNSTEIN (#780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbern001@comcast.net
Attorney for Plaintiff

Dated: March 5, 2007

## TABLE OF CONTENTS

**PAGE**

**TABLE OF AUTHORITIES**                                              **i**

**NATURE AND STAGE OF PROCEEDINGS**                                   **1**

**SUMMARY OF ARGUMENT**                                               **2**

**STATEMENT OF FACTS**                                                **3**

**STANDARD OF REVIEW**                                                **7**

**ARGUMENT**

    **I.  STUDENT-ON-TEACHER SEXUAL HARASSMENT IS
      ACTIONABLE UNDER TITLE VII AS A MATTER OF LAW**                **9**

   **II.  THE EVIDENCE IS SUFFICIENT TO SHOW THAT THERE
      IS A GENUINE DISPUTE OF FACT CONCERNING THE
      EXISTENCE OF A HOSTILE WORK ENVIRONMENT**                     **18**

   **II.  THERE IS SUFFICIENT EVIDENCE IN THE RECORD
      TO SUPPORT PLAINTIFF'S CLAIM THAT SHE WAS
      FIRED IN RETALIATION FOR HER COMPLAINTS
      CONCERNING JW'S CONDUCT**                                     **24**

  **IV.  PLAINTIFF'S ENTITLEMENT TO AN AWARD OF BACK-PAY
      WAS NOT CUT OFF BY BY HER REINSTATEMENT**                     **32**

**CONCLUSION**                                                       **35**

**ATTACHMENTS - UNREPORTED CASES**

*Peries v. N.Y. City Bd. of Education*, 2001 U.S. Dist. LEXIS 23393
(E.D.N.Y. 2001)                                                      #1

*Richards v. City of Wilmington*, 2004 U.S. Dist. LEXIS 4987 (D. Del. 2004)    #2

*Rosario v. Ken-Crest Services*, 189 Fed. Appx. 79,
2006 U.S. App. LEXIS 13815 (3d Cir. 2006)                           #3

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Albermarle Paper Co. v. Moody*, 422 U.S. 405 (1975)                           33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)                         7

*Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir. 1990)                9,18

*Atkinson v. Lafayette College*, 460 F.3d 447 (3d Cir. 2006)                   29

*Barber v. CSX Distribution Services*, 68 F.3d 694 (3d Cir. 1995)              24,25

*Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269 (4th Cir. 1985)           34

*Childers v. Joseph*, 842 F.2d 689 (3d Cir. 1988)                              7

*Celotex Corp. v. Catrett*,  477 U.S. 317 (1986)                               8

*Collins v. City of Harker Heights*, 503 U.S. 115 (1992)                       23

*Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302 (3d Cir. 2001)     8

*Crist v. Focus Homes*, 122 F.3d 1107 (8th Cir. 1997)                          15,16,17

*EEOC v.  Delight Wholesale Co.*, 973 F.2d 664 (8th Cir. 1992)                 33,34

*EEOC v.Monarch Machine Tool Co.*, 737 F.2d 1444 (6th Cir. 1980)              33

*Erickson v. Wisconsin Department of Corrections*, 469 F.3d 600 (7th Cir. 2006)  21

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)                          19,20

*Fasold v. Justice*, 409 F.3d 178 (3d. Cir. 2005)                              26

*Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982)                                  32,33

*Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006)                               14,15

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994)                               29

*General Electric Co. v. Gilbert*, 429 U.S. 125 (1976)                         9

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17  (1993)          18,19

*Howard v. Board of Education of Sycamore Community Unit School
District No. 427*, 893 F.Supp. 808 (N.D.Ill. 1995)                             14

*Hugh v. Butler County Family YMCA*, 418 F.3d. 265 (3d Cir. 2005)            7,8

*Jensen v. Potter*, 435 F.3d 444 (3d Cir. 2006)                                3,18,20,26

**Cases**                                                                    **Page**

*Jones v. UPS*, 214 F.3d 402 (3d Cir. 2000)                                    8

*Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173 (3d Cir. 1999)          24,26

*Ligenza v. Genesis Health Ventures*, 995 F.Supp. 226 (D. Mass. 1998)         15

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S.57 (1986)                      9,10

 *NLRB v. Smucker Co.*, 130 Fed. Appx. 596 (3d Cir. 2005)                     34

*Peries v. N.Y. City Bd. of Education*, 2001 U.S. Dist. LEXIS 23393
(E.D.N.Y. 2001)                                                               *passim*

*Plaza-Torres v. Rey*, 376 F.Supp.2d 171 (D.P.R. 2005)                        14

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, (2000)           7,31

*Richards v. City of Wilmington*, 2004 U.S. Dist. LEXIS 4987 (D. Del. 2004)   22

*Rosario v. Ken-Crest Services*, 189 Fed. Appx. 79,
2006 U.S. App. LEXIS 13815 (3d Cir. 2006)                                     29

S*chroeder v. Hamilton School District*, 282 F.3d 946 (7th Cir. 2002)        14

*Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311 (3d Cir. 2006)              32

*Sumner v. United States Postal Serv*ice, 899 F.2d 203 (2d Cir. 1990)        25

*Thorne v. City of El Segundo*, 802 F.2d 1131 (9th Cir. 1986)                33

*Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)                    28,29

*Turnbull v. Topeka State Hospital*, 255 F.3d 1238 (10th Cir. 2001)          15

*United States v. City of Chicago*, 853 F.2d 572 (7th Cir. 1988)            34

*Washington v. Autozoners, Inc.*, 452 F.Supp.2d 546 (D. Del. 2006)          7

*Weston v. Pennsylvania*, 251 F.3d 420 (3d Cir. 2001)                        21,22

**Statutes and Court Rules**

42 U.S.C. §1983                                                              1

42 U.S.C. §2000e                                                             1

42 U.S.C. § 2000e-3(a)                                                       24

| **Statutes and Court Rules** | **Page** |
|---|---|
| 42 *U.S.C.* § 2000e-5(g)(1) | 32 |
| 29 *C.F.R.* §1604.11(e) | 9,21 |
| Fed. R. Civ. P. 56c | 7 |
| Fed. R. Civ. P. 56(e) | 8 |
| 14 *Del.C.* §701 | 13 |
| 11 *Del.C.* §763 | 19 |

## NATURE AND STAGE OF PROCEEDINGS

The Plaintiff, Christina Mongelli ("Mongelli") was formerly employed as a special education teacher by the defendant Red Clay Consolidated School District ("District") and defendant Red Clay Consolidated School District Board of Education ("Board").  Mongelli's claims against the District and the Board arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., ("Title VII") and 42 U.S.C. §1983 based on alleged hostile work environment sexual harassment and retaliation for protected activity.[1]  See, First Amended Complaint (D.I. 15 ) (B1).  In Counts I and III, it is alleged that Mongelli was subjected to a hostile work environment in violation of Title VII and §1983.  It is also alleged that the acts giving rise to the hostile work environment sexual harassment were committed by one "JW," a student in one of plaintiff's special education classes.[2]  In Count II of the First Amended Complaint, Mongelli alleges that the Board and District  violated her rights under Title VII in terminating her employment because her termination was made in retaliation for her complaints about the sexual harassment committed by JW.

The defendants have filed an Answer to the Complaint which generally denies all of the material allegations in the Complaint. (D.I. 17) (B10).  Discovery has been completed.  On January 31, 2007, the defendants filed a Motion for Summary Judgment and Opening Brief.  This is the Plaintiff's Answering Brief in opposition to Defendants' Motion for Summary Judgment.

---

[1] The claims originally asserted against the Individual Defendants have been withdrawn. (D.I. 8).  Mongelli has also withdrawn her claims in Count IV of the First Amended Complaint, which alleged violations of Mongelli's First Amendment rights. (D.I. 35).

[2] See, First Amended Complaint, ¶14. (B3).

## SUMMARY OF ARGUMENT

1.  Sexual harassment committed by a student against a teacher is actionable under Title VII.

2.  The defendants' Motion for Summary Judgment as to the hostile work environment claim under Title VII should be denied.  There is sufficient evidence, under the summary judgment standard, to conclude that material issues of fact are in dispute concerning the existence of a hostile work environment and the defendants' liability.

3.  The defendants' Motion for Summary Judgment as to the Title VII retaliation claim should be denied.  There is sufficient evidence, under the summary judgment standard, to conclude that material issues of fact are in dispute concerning the defendants' motivation in rescinding plaintiff's teacher contract.

## STATEMENT OF FACTS[3]

On or about January 20, 2004, the plaintiff was hired by the defendants Board/District as a Special Education teacher at Dickinson High School. At the time of her initial employment, the employment relationship was characterized by the Board as a "temporary contract." (A6). Also, when she was hired, the plaintiff had been granted an "Emergency Certificate" by the Delaware State Board of Education which stated that she was certified and licensed to hold the position of "Teacher of Exceptional Children - LD. SED and MH (Secondary 7-12). The "Emergency Certificate" was valid until January 31, 2007. (A15). Plaintiff had also been granted a "Initial License" by the Delaware State Board of Education for "Teacher of Early Childhood/Primary K-4." That license was valid through June 30, 2005, pending successful passage of PRAXIS I or its equivalent on or before June 30, 2005. (B19). The defendants Board and District were informed and were aware that the teaching certificates described above had been issued to the plaintiff. (A13); (B21-B24).

At Dickinson High School, the plaintiff was assigned to teach English and Social Studies to groups of 9th grade special education students. One of the students in plaintiff's class was a student named "JW." At the time of the events at issue here, JW was 14 years of age. (Complaint, ¶13 and ¶14) (B3); (Answer, ¶13 and ¶14) (B12). Beginning on or about March 1, 2004, the plaintiff began sending written reports to the Dickinson High School Principal's Office which contained allegations of disruptive behavior by JW.[4] In all, between March 1, 2004 and May 7, 2004, twelve (12) such reports were sent to the Principal's Office concerning allegations of disruptive behavior by JW. The SBR's concerning JW's behavior included the following allegations:

---

[3] Under the Summary Judgment standard, all of the facts are viewed in light most favorable to Mongelli (the non-moving party). See, *Jensen v. Potter*, 435 F.3d 444,448 (3d Cir. 2006).

[4] According to school policy, if an incident occurred at school which involved a possible student discipline issue, the teacher would submit a Student Behavior Referral ("SBR") to an assigned Assistant Principal. (Kennedy, 17-18) (B132-B133).

(a) On March 1, 2004, plaintiff reported that JW had used cursing and "sexual language" in the classroom.   This incident resulted in an "out-of-school suspension" for one day. (B31).

(b) On March 2, 2004, plaintiff reported that JW continued to be "extremely disruptive and disrespectful."  It was reported that when plaintiff told JW to stop talking out loud in class, he responded by saying "fuck her" and yelled that "I'm going to knock her fucking head off." This incident resulted in an "out-of-school suspension" for one day. (B32).

(c) On March 31, 2004, plaintiff reported that JW had called her a "fucking bitch."   This incident resulted in an "out-of-school suspension" for one day. (B33).

(d) On April 1, 2004, plaintiff reported that JW had called her a "fucking bitch" on many occasions and had also stated that she was "fucking ugly" and was a "fucking idiot." This incident resulted in an "out-of-school suspension" for one day. (B34).

(e) On April 26, 2004, plaintiff reported that JW had come up to her from behind while she was leaning over to help a student to was seated, and grabbed her forcefully with his hands on her hips and proceeded to "hump" her. (B35).  There is no record of any disciplinary action that was taken as a result of this incident.

(f) On May 3, 2004, plaintiff reported that JW looked at the plaintiffs breasts and stated "Your nipples are hard."  He then grabbed her and pulled her close to his body.  He thaen stated "You're a bitch, but I mean that in a good way."  (B36).  There is no record of any disciplinary action that was taken as a result of this incident.

(g) On May 4, 2004, plaintiff reported that when JW was seated on top of his desk and staring at plaintiff, he opened his legs wide and simulated having sexual intercourse, which was accompanied by him making "sucking" noises and heavy breathing. (B37).  There is no record of any disciplinary action that was taken as a result of this incident.

(h) On May 5, 2004, plaintiff reported that JW had grabbed her by the arm and refused to let go.  He then pulled the plaintiff close to his body and said "Let's do the tango."  He also asked plaintiff if she had sex and who she had sex with. (B38).  Also, on May 5, 2004, was told to report

-4-

to the Principal's Office due to his behavior problems. He refused to leave the classroom and called plaintiff "a fucking bitch." Plaintiff then called the main office and JW was removed from the classroom by Principal Chad Carmack. JW returned to the classroom before the end of the class period. (B39).

(i) On May 6, 2004, plaintiff reported that JW came up to plaintiff's desk and began to sing a "rap song" which included the phrase "how's your pussy," which was repeated several times. When plaintiff asked him to stop, JW continued singing even louder and began to make sucking noises with his mouth. (B40). There is no record of any disciplinary action that was taken as a result of this incident.

(j) On May 7, 2004, plaintiff reported that JW got out of his seat and walked over to the plaintiff, where he began singing a "rap song" which included the words "Ms. Mongelli gives head," which was repeated several times. As he was singing, JW also pointed to his penis. (B41). There is no record of any disciplinary action that was taken as a result of this incident.

In addition to the SBR's described above, plaintiff also made numerous verbal complaints to Assistant Principal John Kennedy ("Kennedy") concerning JW.[5] See, Mongelli Deposition, pp. 92-107. (B49-B65). Mongelli's account of the timing of the delivery of some of the SBR's and the verbal complaints is disputed by Kennedy. Mongelli claims that she left each of the SBR's in Kennedy's "in-box" on the date shown on the form. (A72-A73). Mongelli also testified that the SBR's would often "pile up" in Kennedy's in-box. (A-73). Kennedy claims that the SBR forms dated April 26 through May 7 were given to him as a group on May 7, 2004. (A34-A35).[6]

On May 17, 2004, Kennedy contacted the Delaware State Police concerning JW's conduct toward plaintiff. (Kennedy, pp. 57-59) (B134-B136); (A35-A36). On June 15, 2004, in a juvenile

---

[5] Kennedy was the Assistant Principal who was designated to receive SBR's concerning JW. (Kennedy, pp. 17-18) (B132-B133).

[6] For purposes of defendant's summary judgment motion, any dispute of fact concerning the timing of the delivery of the SBR's and the timing and frequency of plaintiff's verbal complaints concerning JW must be resolved in plaintiff's favor. See, *Jensen v. Potter*, 435 F.3d at 448.

criminal proceeding, the State of Delaware charged JW with committing the following offenses: (a) Unlawful Sexual Contact Third Degree in violation of 11 *Del.C.* §767; (b) two counts of Offensive Touching in violation of 11 *Del.C.* §601; and (c) Sexual Harassment, in violation of 11 *Del.C.* §763. (B44-B46).  On August 4, 2004, in the Family Court of the State of Delaware, JW entered a plea of guilty to two counts of Offensive Touching and one count of Sexual Harassment. (B47).

On May 13, 2004, Mongelli was notified by the District that the Board had approved a change in her contract from a "Temporary Contract" to a "Regular Contract." (A27).  At the same time, Mongelli was given a new contract which began on 5/13/04, with no set termination date, which had been signed by the Board and which Mongelli also signed. (B29).  Subsequently, on June 17, 2004, Mongelli was notified by the Board that her employment was being terminated "due to lack of certification." (A32).  Debra Davenport[7] testified that the new contract dated May 13, 2004 was "rescinded" by the Board on 6/16/04 because Mongelli did not have a certification in Special Education. (Davenport, pp. 47-48) (B116-B117).

Additional facts relevant to the disposition of the defendants' motion for summary judgment are set out in the Argument sections which follow.

---

[7] Davenport is the District's Manager of Human Resources. (Davenport, p. 5) (B99).

## STANDARD OF REVIEW

The summary judgment standard is well established.  Summary judgment is appropriate where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. See, Fed. R. Civ. P. 56(c) .  A fact is "material" if it might affect the outcome  of the suit under the governing substantive law:

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2725, pp. 93-95 (1983).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "genuine" if evidence exists from which a reasonable juror could find in favor of the non-moving party. *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988); *Washington v. Autozoners, Inc.*, 452 F.Supp.2d 546, 550 (D. Del. 2006).  In determining whether a dispute concerning a "material fact" is "genuine," "the judge's function is not himself to weigh the evidence and determine the matter, but to determine whether there is a genuine issue for trial". *Anderson*, 477 U.S. at 249; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) ("[W]e must draw all reasonable inferences in favor of the nonmoving party" and we "may not make credibility determinations or weigh the evidence"):

> In reviewing the record as a whole, we must "disregard all evidence favorable to the moving party that the jury is not required to believe" and "give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"

*Id.*, at 151 (internal citations omitted); also see, *Hugh v. Butler County Family YMCA*, 418 F.3d. 265, 267 (3d Cir. 2005) (on summary judgment, a court should view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor).

To survive a motion for summary judgment, the non-moving party cannot solely rest upon her allegations in the pleadings, but rather must set forth specific facts such that a reasonable jury

could find in the non-moving party's favor, thereby establishing a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302, 306 (3d Cir. 2001) (where the non-moving party is the plaintiff, and therefore, bears the burden of proof at trial, that party must present affirmative evidence sufficient to establish the existence of each element of his case).  Accordingly, a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid the entry of summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Rather, the plaintiff "must go beyond the pleadings  and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000). While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla. *Hugh*, 418 F.3d at 267.

## ARGUMENT

## I.  STUDENT-ON-TEACHER SEXUAL HARASSMENT IS ACTIONABLE UNDER TITLE VII AS A MATTER OF LAW

The defendants argue that the court should reject, as a matter of law, the plaintiff's "novel theory" that student-on-teacher sexual harassment is actionable under Title VII. (Defendant's Brief, pp. 16-17).  The plaintiff respectfully disagrees.

It is well established that sexual harassment is a species of sex discrimination that is actionable under Title VII.  See, e.g. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S.57, 65-66 (1986) (sexual harassment that creates a hostile or offensive environment for one sex is actionable under Title VII);  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 n. 3 (3d Cir. 1990) ("[t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexually derogatory language is implicit, and thus should be recognized as a matter of course").  Although most sexual harassment/hostile work environment cases concern allegations of sexual harassment committed by co-workers or supervisors, the EEOC Guidelines also provide that an employer can be held liable under Title VII for sexual harassment of its employees committed by non-employees:

> An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.

29 *C.F.R.* §1604.11(e).

In *General Electric Co. v. Gilbert*, 429 U.S. 125, 141-42 (1976), the Court indicated the weight that should be accorded the C.F.R.:

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort

-9-

> for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.[8]

In this case, the defendants also have a written policy concerning sexual harassment in the workplace. The written policy prohibits, among other things, "physical assaults of a sexual nature ... "verbal abuse of a sexual nature"; and "the inappropriate use of sexually explicit or offensive language in discussions with or to describe and individual..." (B97). The defendants' Sexual Harassment Policy further provides:

> Any employee of the Red Clay Consolidated School District who feels that he or she has been a victim of sexual harassment in any form by any manager, supervisor, co-worker, customer, vendor, parent, **student**, visitor or other person should bring the problem to the immediate attention of their supervisor, or the Director of Human Resources.

(B97).

Student-on-teacher harassment is thus clearly covered by the defendants' own Sexual Harassment Policy. While the Defendants' Brief argues that "extending Title VII to student/teacher harassment is bad public policy," (Defendants Brief, p. 16), it is, nevertheless, the District's own policy. Furthermore, if making student-on-teacher sexual harassment actionable under Title VII is "bad public policy," it is noteworthy that the Defendants' Brief fails to cite a single case to support that argument. Conversely, just such a cause of action has been recognized, both directly and in analogous situations, by several courts.

The question whether a school can be held liable, under Title VII, for the misconduct or sexual harassment perpetrated by one of its students upon a teacher/employee of the school was addressed in *Peries v. N.Y. City Bd. of Education*, 2001 U.S. Dist. LEXIS 23393 (E.D.N.Y. 2001). In *Peries*, the plaintiff was a native of Sri Lanka, who was educated in England and emigrated to the

---

[8] The United States Supreme Court has accepted the E.E.O.C. Guidelines for guidance in examining hostile environment claims of sexual harassment. *Meritor*, 477 U.S. at 65.

United States in 1968. He continued his education in this country and received a Ph.D. in Adapted Physical Education and Child Development as well as an MBA in international finance. After teaching at the university level for several years, Peries became a teacher in the New York City public school system. In 1987, Peries joined the staff at Francis Lewis High School in Queens, where he taught special education. According to Peries, since the early 1990's, he was subjected to a "steady barrage of insults and demeaning conduct from students based on [his] national origin and race." *Id.*, at *1-*2. On November 16, 1992, Dr. Peries went into another teacher's room to retrieve a book. While he was there, one of the students students began taunting him, calling him a "fucking Hindu" and asking, "why are you here? You go home." According to Peries, the other teacher did nothing to stop the student and instead giggled. Other students joined in and continued to harass Dr. Peries until a third teacher took Dr. Peries out of the room. Two or three students followed them, continuing the abuse. *Id.*, at *2-*3. Dr. Peries reported this incident to the assistant principal in charge of the special education department. The assistant principal asked Dr. Peries to give him the names of the students who had harassed him and promised that "they will be dealt with in the usual procedures handling troublesome students." He also asked Dr. Peries to write up the particulars of the threat of physical harm from one student and assured that "it will be handled expeditiously." *Id.*, at *3. For the remainder of the 1992-93 year, Dr. Peries was subjected to further taunts. Students threw paper balls at him, called him names like "Gandhi" and "Indian shit," and put a red dot on the forehead of a picture of a polar bear in another teacher's room, where the dot remained for several months. In addition, somebody put notes on Dr. Peries's desk and chair containing messages such as "Hindu, go home. You don't belong here." Dr. Peries states that nothing was done despite his complaints to the school administrators. *Id.*, at *4. According to Dr. Peries, the hostile environment of discrimination based on the plaintiff's national origin continued "virtually unabated" since that time. Dr. Peries also claimed that he had asked the administration to help him, but that they did not do so. In addition to verbal complaints, Dr. Peries submitted five written complaints between February 1996 and May 1997 about students mimicking his accent, calling him

-11-

names such as "Hindu" and "shit Indian," and telling him to "go home. This is my country." Despite these complaints, Dr. Peries alleged that nothing was done. No students were suspended or reprimanded, and some were sent to an administrator's office only to return moments later. *Id.,* at *5-*6.

The defendants did not dispute Dr. Peries's claims that individual students harassed him on the basis of his national origin.  Rather, they questioned his assertion that the harassment was pervasive and explicitly disputed his claims that the administration ignored his pleas for help. *Id.*, at *8.  The defendants in *Peries* also raised a "public policy" defense that is nearly identical to the arguments raised in the Defendants' Brief:

> Perhaps most significantly, the defendants state that their options for dealing with harassment by students were severely limited by rules and regulations governing the suspensions of special education students. Pursuant to procedures set forth by the Chancellor of the New York City Schools, special education students can be suspended only in extreme circumstances:
>
>> Episodes of disruptive behavior are not in and of themselves necessarily cause for suspension. These episodes should signal the need for guidance conferences with the principal, a student's parent, the student, if appropriate, teachers, guidance counselors and other school staff to discuss episodes of behavior as well as possible remedial steps.
>
>> School principals have the authority to suspend special education students only when they believe that a student's behavior poses "a clear and present danger of physical injury . . . or prevents the orderly operation of classes or other school activities." Verbal misconduct alone is not generally considered a basis for suspension, especially for emotionally disturbed students. The defendants also emphasize that Dr. Peries, as a classroom teacher, was the "primary authority figure in [his] classroom," and was therefore "responsible for maintaining discipline."

*Id.*, at *9-*10.

As in this case, the defendant School Board in *Peries* moved for summary judgment and argued that the Title VII claim should be dismissed "because Dr. Peries has failed to show that any of the Board's employees or officials engaged in conduct severe enough to create a hostile work environment and because the plaintiff has provided no basis for imposing liability on the Board for

the misconduct of students. *Id.*, at *12.  The Board's summary judgment motion was denied by the court:

> The plaintiff's claim in this case is unusual in that the alleged harassment came not from co-workers, but from students. The court has found no cases, nor have the parties identified any, involving this type of harassment. The most relevant cases in the Title VII context are those in which an employee has been harassed by the customers of his employer. Without deciding "the precise contours of the duty, if any, that employers owe to employees who are subjected to harassment by outsiders such as customers," the Second Circuit has stated that "such a duty can be no greater than that owed with respect to co-worker harassment." (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) and 29 C.F.R. § 1604.11(e), which discusses standards governing sexual harassment by non-employees).

> \* \* \* \*

> Although there may be some circumstances in which an employer truly has little or no authority to control the actions of customers, rendering the employer's duty less than that for co-worker harassment, the relationship between school officials and students is not such a case (citing *Davis v. Monroe County Board. of Education.*, 526 U.S. 629 (1999).

> \* \* \* \*

> More importantly, however, in this setting the Board exercises significant control over the harasser. We have observed, for example, "that the nature of [the State's] power [over public schoolchildren] is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995).

> There are, of course, distinctions between student-on-student harassment and student-on-teacher harassment, the most important of which is that a victim student has no disciplinary authority over the harassing student, while a victim teacher wields at least nominal disciplinary authority. It is] therefore conceivable that school officials would owe a greater duty of protection to powerless students than to teachers. Nevertheless, **as a general rule, school administrators and school board officials have disciplinary authority that exceeds that of a classroom teacher, such as the power to suspend students and take other actions not commonly carried out by individual classroom instructors.**[9]

_____

[9] In their Brief, the defendant emphasize that a classroom teacher has authority to control the disruptive behavior of students. (Defendants' Brief, p. 16).  See, 14 *Del.C.* §701.  That statute gives

(continued...)

* * * *

> While the precise ability of a principal or other school official to
> control the harassment at issue in a given case should, as discussed
> *infra*, be one factor taken into consideration when deciding whether
> or not there is actually liability under Title VII, as a matter of general
> legal standards it is difficult to conceive of a test more appropriate for
> student-on-teacher harassment than that suggested for customer
> harassment in *Quinn*.

*Id.*, at *15-*18.[10]

Other decisions support the conclusion that student-on-teacher harassment is actionable

under Title VII. See, S*chroeder v. Hamilton School District*, 282 F.3d 946, 956 (7th Cir. 2002)

(claims based on Equal Protection Clause that defendant school district did not take appropriate

measures to prevent harassment of teacher from students on the basis of their sexual orientation);[11]

*Lovell v. Comsewogue School District*, 214 F.Supp.2d 319, 323 (E.D.N.Y. 2002) (student-on-teacher

harassment based on sexual orientation is actionable under the Equal Protection Clause); *Howard*

*v. Board of Education of Sycamore Community Unit School District No. 427*, 893 F.Supp. 808, 814-

815 (N.D.Ill. 1995) (recognizing cause of action under Title VII  against school and its

administrators for student-on-teacher sexual harassment); *Plaza-Torres v. Rey*, 376 F.Supp.2d 171,

180-182 (D.P.R. 2005) (recognizing student-on-teacher sexual harassment claim under Title VII

where defendant "could have reasonably exercised their authority to prevent and/or to remedy the

alleged sexual harassment by disciplining, suspending, or even expelling the student perpetrating

---

[9](...continued)
the same power to school administrators who, as the court in *Peries* noted, have greater disciplinary
power than that of a classroom teacher.

[10] The court also concluded, on the facts of the case, that Dr. Peries had made a sufficient
showing of the existence of a hostile work environment and *respondeat superior* liability to defeat
the Board's motion for summary judgment. *Id.*, at *19-*21.

[11] In *Schroeder*, the court ruled that the plaintiff had failed to demonstrate that the defendants
treated his complaints of harassment differently from those of non-homosexual teachers, that
defendants had intentionally discriminated against him, or acted with deliberate indifference to his
complaints because of his sexuality.  Significantly for this case, the court also stated that "where
[sic] this a Title VII case, the defendants could be liable to Schroeder if he demonstrated that they
knew he was being harassed and failed to take reasonable measures to try to prevent it." *Id.*

the harassment"); *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006) (rejecting defendant's contention that it cannot, as a matter of law, be liable under Title VII for maintaining a hostile work environment caused by inmate misconduct); *Turnbull v. Topeka State Hospital*, 255 F.3d 1238, 1244 (10th Cir. 2001) (hospital can be liable under Title VII Guidelines for sexual assault of staff psychologist by a patient); *Ligenza v. Genesis Health Ventures*, 995 F.Supp. 226, 230 (D. Mass. 1998) (court rejected defendant's claim that it was not liable under Title VII Guidelines for sexual harassment of employee by patient at long-term care facility).

Another decision that is particularly instructive to the facts in this case is *Crist v. Focus Homes*, 122 F.3d 1107 (8th Cir. 1997). In *Crist*, the four plaintiffs were employees of Focus Homes, a for-profit organization that operated over fifty residential programs for individuals with developmental disabilities. In November 1994, Focus Homes opened a new facility called Yates House, which provided services for four individuals, all of whom were diagnosed with mental retardation and autism. Focus Homes assigned the plaintiffs to Yates House when it opened and plaintiffs were responsible for providing direct care to the residents. One of the four residents at Yates House was "J.L.,", who was sixteen years old when he moved into the facility. He functioned at the level of a two-to-five-year-old child, was nonverbal, and required significant direct personal care. Physically, he stood over six feet tall and weighed more than two hundred pounds. Almost immediately after he arrived at Yates House, J.L. displayed physical aggression toward the staff and other residents. According to the reports filled out by the staff, on November 4, 1994, J.L. pulled at Elbers' shirt and bra, looked down her shirt, and attempted to rub his body against hers. On November 7, he grabbed a male resident's penis and otherwise physically attacked him. On November 8, he pushed Crist against a door, forced her right hand above her head, pulled open her jeans and her blouse, grabbed her left breast, and pushed his weight and erect penis against her stomach. After Crist successfully pushed J.L. off of her, he continued to hit her and other staff members, pulled at their clothing, and threw a clock at them. *Id.*, at 1108. The number of reported violent incidents involving J.L. decreased in December, although for part of that time J.L. was away

-15-

for the holidays. J.L.'s aggressive conduct began again in the new year, and the plaintiffs continued to report it. As reported, J.L. attempted to assault another resident in late December, but staff restrained him. In January and February, over thirteen reports involved J.L.'s grabbing of the plaintiffs' breasts, buttocks, or genital areas. He also frequently pulled at their clothing and attempted to undress them. At least three times, he attempted to digitally penetrate Crist. It was also reported that J.L. masturbated frequently and repeatedly exposed himself. *Id.*, at 1109.

The plaintiffs filed suit under Title VII and state law. Specifically, plaintiffs claimed that Focus Homes had a duty under both statutes to take prompt and appropriate corrective action to protect them from J.L.'s behavior and that Focus Homes' inadequate response to J.L.'s behavior violated both Title VII and state law. Focus Homes moved for summary judgment, arguing that it had no duty to act because J.L.'s behavior did not constitute sexual harassment and because it could not control his behavior. Focus Homes further argued that even if it did have such a duty, its response to appellants' concerns was timely and appropriate. The district court granted Focus Homes' motion for summary judgment. *Id.*, at 1110. The grant of summary judgment was reversed by the Court of Appeals. *Id.*, at 1112:

> The district court rejected the appellants' claim on two bases. It held that, given the unique set of facts, particularly J.L.'s severe developmental disabilities, his conduct could not constitute sexual harassment. Even if it did, according to the district court, Focus Homes could not be held responsible for his behavior because it could not control the behavior. Although we recognize that this case proposes a unique application of Title VII and the MHRA, the district court's misplaced emphasis on J.L.'s inability to form intent, rather than on Focus Homes' responsibility to its employees, sweeps too broadly. The court's ruling essentially permits a residential care provider like Focus Homes to tell its employees that they assume the risk of working with developmentally disabled individuals and that they have no right to expect a safe working environment. On the other hand, strict liability on the part of such employers for the conduct of its residents would simply constitute a swing to the opposite extreme. We believe that the EEOC guidelines and MHRA strike a balance between the two extremes and, correctly applied, preclude the grant of summary judgment in this case.

*Id.*, at 1110.

-16-

> If a fact finder were to determine that J.L.'s conduct constituted sexual harassment based on sex, it must then address whether Focus Homes was aware of the conduct and failed to respond appropriately. Given the numerous incident reports filed by the appellants, Focus Homes undoubtedly was aware or should have been aware of J.L.'s behavior. Focus Homes' liability thus turns again on a fact-intensive consideration, this time whether Focus Homes' response was immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility Focus Homes has with respect to J.L.'s behavior.  See 29 C.F.R. § 1604.11(e); Minn. Stat. § 363.01, subd. 41(3).  The district court decided that Focus Homes did not have any control over J.L.'s conduct because it could not have done anything to stop him immediately.  While we recognize that Focus Homes faced multiple obstacles in immediately preventing J.L. from acting out, including J.L.'s limited ability to understand or respond to directives and the regulatory framework within which Focus Homes must operate, that does not end the inquiry.  Focus Homes clearly controlled the environment in which J.L. resided, and it had the ability to alter those conditions to a substantial degree.

*Id.*, at 1111-1112.

In this case the District's own Sexual Harassment Policy and the above cited authorities all refute the defendants' arguments that student-on-teacher harassment is not actionable under Title VII.  Furthermore, the argument that JW's status as a "special needs" student, whose behavior was found to be a "manifestation of his disability" somehow immunizes the defendants from Title VII liability was specifically rejected in *Peries* and *Crist*.  Thus, the real issues here are whether, under the summary judgement standard, the evidence in the record is sufficient to create a genuine issue of fact as to the existence of a hostile work environment and employer liability, and whether the evidence supports plaintiff's claims of a retaliatory discharge.  Those issues are discussed in the arguments which follow.

## II.  THE EVIDENCE IS SUFFICIENT TO SHOW THAT THERE IS A GENUINE DISPUTE OF FACT CONCERNING THE EXISTENCE OF A HOSTILE WORK ENVIRONMENT

### Elements of a Sexual Harassment Hostile Work Environment Claim

It is well established that sexual harassment that is sufficiently severe or pervasive to create a hostile working environment is actionable under Title VII.  See, *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  A plaintiff can establish a *prima facie* case for a sexual harassment hostile work environment claim under Title VII by showing:  (1) that she has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature;[12] (2) the harassment was sufficiently "severe or pervasive"[13] so as to create a hostile or abusive working environment; (3) the discrimination detrimentally affected the plaintiff and would have detrimentally affected a reasonable person of the same sex in plaintiff's position;[14] and (4) a basis for holding the employer liable.[15]

### (1) Existence of Sexual Harassment

The defendants do not argue that JW's conduct did not constitute sexual harassment.  The conduct described in the SBR's involved physical assault, sexual propositions and innuendo, and sexually derogatory remarks.  Mongelli's allegations against JW were investigated by Kennedy, who interviewed other students in Mongelli's class.  Those students substantiated many of Mongelli's allegations. (A35).  Furthermore, JW pled guilty in Family Court to two counts of Offensive

---

[12] Third Circuit has noted that, "[t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexually derogatory language is implicit, and thus should be recognized as a matter of course." See, *Andrews*, 895 F.2d at 1482 n. 3.

[13] See, *Jensen*, 435 F.3d at 449 n.3.

[14] See, *Andrews*, 895 F.2d at 1482.

[15] *Id.*

-18-

Touching and one count of Sexual Harassment. (B47).[16]  The court should therefore conclude that

Mongelli has presented sufficient evidence to satisfy the first prong of her Title VII claim.

### (2) Existence of Hostile Work Environment

The defendants claim that JW's conduct was not sufficiently "severe or pervasive" as a

matter of law to be actionable under Title VII.  See, Defendants' Brief, pp. 18-21. "The conduct

Mongelli alleges here, even if true, falls far short of the requisite standard." (Defendants' Brief, p.

21).  For the reasons set forth herein, the defendants' arguments should be rejected.

The United States Supreme Court has adopted a "totality of the circumstances" approach to

determine whether a hostile or abusive work environment exists::

> Whether an environment is "hostile" or "abusive" can be determined
> only by looking at all the circumstances. These may include the
> frequency of the discriminatory conduct; its severity; whether it is
> physically threatening or humiliating, or a mere offensive utterance;
> and whether it unreasonably interferes with an employee's work
> performance. The effect on the employee's psychological well-being
> is, of course, relevant to determining whether the plaintiff actually
> found the environment abusive. But while psychological harm, like
> any other relevant factor, may be taken into account, no single factor
> is required.

*Harris*, 510 U.S. at 23.

It is true that not all conduct which might be deemed to be "sexual harassment" is actionable

under Title VII.  The Supreme Court has cautioned that "standards for judging hostility are

sufficiently demanding to ensure that Title VII does not become a 'general civility' code." *Faragher*

*v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Thus, complaints attacking "the ordinary

tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes,

and occasional teasing" will not be actionable.  *Id.*  While there may be  no bright line that separates

conduct that is merely offensive or rude from conduct that is actionable, there can be little doubt,

for purposes of summary judgment, that JW's conduct crossed the line.    JW's conduct was the

subject of 10 separate SBR write-ups between March 1, 2004 and May 5, 2004.   Three of the

---

[16] "Sexual Harassment" is defined in 11 *Del.C.* §763.

incidents resulted in JW being suspended from school and one of the incidents resulted in criminal charges against JW. Three of the incidents involved physical contact which was clearly threatening and humiliating to plaintiff. The language used by JW took place in a classroom setting and was directed at the teacher. The language included sexual propositions and sexually derogatory terms. This language was not employed in a "joking" or "teasing" manner. Rather, the remarks were delivered in a hostile manner that was clearly intended to humiliate plaintiff and undermine her authority as a teacher. These incidents undoubtedly interfered with plaintiff's job performance. Even if it is true, as defendants claim, that plaintiff had "classroom management issues," (A122), the conduct of students like JW was no doubt a contributing factor. In sum, sufficient evidence exists in the record for a reasonable juror to conclude that JW's conduct was both "severe" and "pervasive" to the extent that it interfered with and impaired her job performance so as to be actionable under Title VII.

### (3) Detrimental Effect of Harassment on the Plaintiff

In *Faragher*, the Supreme Court explained that "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.*, 524 U.S. at 787; *Jensen*, 435 F.3d at 451 (hostile work environment inquiry "has both subjective and objective components"). The evidence to support the conclusion that a reasonable person would find that JW's conduct created a hostile work environment is discussed above and need not be repeated here. Nevertheless, the defendants claim that because JW was a "special needs" student and because the harassment occurred in a special education classroom setting, a reasonable person in plaintiff's position would have expected JW's behaviors and would therefore have not been offended by it. (Defendants' Brief, p. 22). Much the same argument was considered and rejected by the court in *Peries* and *Crist* and should likewise be rejected here.

As to the subjective component, the defendants do not dispute that plaintiff herself believed that JW's conduct was abusive and created a hostile work environment. In fact, the defendants

claim that plaintiff's reaction to JW's conduct is "irrelevant" to the inquiry. (Defendants' Brief, p. 21).

### (4) The Defendants' Liability for JW's Conduct

In cases involving sexual harassment arising from the acts of non-employees, the plaintiff's employer will be held liable "where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 *C.F.R.* §1604.11(e); *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) (in order to establish vicarious liability of an employer for the actions of a plaintiff's coworkers, the plaintiff must show that the employer failed to provide a reasonable avenue for complaint or was aware of the alleged harassment and failed to take appropriate remedial action); *Peries,* 2001 U.S. Dist. LEXIS 23393, at *15 ( plaintiff could prevail on an action for student-on-teacher harassment against the school if he could show that a hostile environment existed and that the school board provided no reasonable avenue of complaint or knew of the harassment and failed to take appropriate remedial action).

A second factor in the liability calculus is "the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees." 29 *C.F.R.* §1604.11(e); see, *Erickson v. Wisconsin Department of Corrections*, 469 F.3d 600, 605 (7th Cir. 2006):

> [F]or purposes of Title VII hostile work environment liability based on negligence, whether the potential harasser is an employee, independent contractor, or even a customer is irrelevant: "The genesis of inequality matters not; what does matter is how the employer handles the problem." (citation omitted). This is because "[e]mployers have an arsenal of incentives and sanctions. .. that can be applied to affect conduct" that is causing the problem. (citation omitted). As the district court noted, it can be easier for employers who run residential enterprises (as WDC did here) to use that arsenal of incentives and sanctions with their residents in order to avoid the creation of a hostile work environment.

In this case, it is clear that the defendants' written Sexual Harassment Policy covered student-on-teacher sexual harassment. (B97). It is also clear that the SBR was at least one of the

mechanisms available to teachers to report instances of student misconduct – including sexual harassment. Although the defendants complain that plaintiff did not "label" the SBR's involving JW as "sexual harassment" complaints, (Defendants' Brief, p.23), the content of the complaints provide sufficient detail so that anyone who bothered to read them would have immediately recognized that plaintiff was being sexually harassed by JW.

Thus, the defendants' liability for JW's sexual harassment turns on whether the defendants took "prompt remedial action." See, *Weston*, 251 F.3d at 427 ("when an employer's response stops the harassment, there can be no employer liability under Title VII"). In this case, the defendants were in a unique position to control JW's behavior. The District had the power to remove JW from plaintiff's class. They also had the power to suspend or expel him from school. Whether or not the defendants' responses to plaintiff's complaints were timely or effective to end the harassment is ultimately a question of fact. See, *Richards v. City of Wilmington*, 2004 U.S. Dist. LEXIS 4987, *13-*14 (D. Del. 2004) (dispute of fact as to sufficiency of plaintiff's notice to defendant and its response thereto will preclude summary judgment). In this case, the first two SBR's, on 3/1/04 and 3/2/04 concerning JW's behavior resulted in one day suspensions from school. (B31-B32). JW was suspended again for behavior that occurred on 3/31/04 and 4/1/04. (B34). Clearly, those suspensions did not stop the harassment. Between April 26, 2004 and May 7, 2004, plaintiff delivered six more SBR's to Kennedy. These SBR's described escalating verbal abuse and physically threatening conduct. Kennedy claims that no action was taken in response to these SBR's because plaintiff gave these SBRs to him as a group on May 7, 2004. (A133-A135). Plaintiff claims that she handed in the SBR's on the same dates as the incidents occurred and denied ever giving him several reports at once. (A73). That dispute of fact is sufficient under *Richards* to deny summary judgment as to the defendants' liability for JW's conduct.

-22-

**Liability of Defendants Under 42 U.S.C. §1983**

The Plaintiff agrees with the defendants' argument that the defendants are entitled to summary judgment on the plaintiff's claims that the defendants are liable under Section 1983 and the 14th Amendment for sexual harassment committed by JW.[17]  Plaintiff agrees that under Section 1983, the defendants cannot be held vicariously liable for the conduct of JW.  See, *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992) (In a Section 1983 action, governmental agency is not liable under doctrine of *respondeat superior* for  constitutional violations committed by its agents unless the violations reflect "official policy or custom").

---

[17] See, Defendants' Brief, pp. 24-25.

-23-

### III. THERE IS SUFFICIENT EVIDENCE IN THE RECORD TO SUPPORT PLAINTIFF'S CLAIM THAT SHE WAS FIRED IN RETALIATION FOR HER COMPLAINTS CONCERNING JW'S CONDUCT

In Count Two of the First Amended Complaint, plaintiff alleges that the defendants violated Title VII when they rescinded the renewal of her teaching contract and terminated her employment in June 2004. Plaintiff alleges that the non-renewal of her contact was in retaliation for her complaints concerning JW's behavior. (B6).

The elements of a "retaliation" claim under Title VII are well established. The pertinent provision of Title VII states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter."

42 U.S.C. § 2000e-3(a).

The plaintiff can establish a *prima facie* case of retaliation under Title VII by showing: (1) that she engaged in protected activity; (2) that the employer took adverse action against her; and, (3) that a causal link exists between the protected activity and the employer's adverse action. See, *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1999).

### (1) Existence of Protected Activity

The defendants claim that Mongelli's actions in complaining about JW's sexual harassment did not constitute a "protected activity" that is actionable under Title VII's anti-retaliation provision. (Defendants' Brief, pp. 25-26). An employee who complains to his or her employer about sexual harassment in the workplace is engaging in a "protected activity." See, *Barber v. CSX Distribution Services*, 68 F.3d 694, 702 (3d Cir. 1995) (explaining that acceptable forms of protected activity under Title VII's analogous opposition clause include formal charges of discrimination "as well as informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges" (quoting

-24-

*Sumner v. United States Postal Serv*ice, 899 F.2d 203, 209 (2d Cir. 1990) ).  Furthermore, as the court in *Barber* explained:

> It is important to note that we do not require a formal letter of complaint to an employer or the EEOC as the only acceptable indicia of the requisite "protected conduct" under [Title VII] ... **Our analysis requires only that we analyze the message that Barber conveyed, and not the medium of conveyance.**

*Id.* (emphasis added).

In their Brief, the defendants claim that in *Barber* the court "ruled as a matter of law that a letter complaining about the alleged unfairness of the employer's decision not to promote plaintiff was insufficient to create a "protected activity." (Defendant's Brief, p. 27).  That interpretation is incorrect.  In *Barber*, it was not the form of the complaint – a letter – that doomed Barber's retaliation claim.  Rather, it was the fact that the letter itself "did not specifically complain about age discrimination." *Id.*, at 701.  In this case, the SBR's were clear on their face that plaintiff was complaining about sexual harassment.  Finally, the defendants' argument ignores the District's own Sexual Harassment Policy:

> Retaliation in any form against an employee or applicant who exercises his or her right to make a complaint under this policy is strictly prohibited and will itself be cause for disciplinary action.

(B98).

Based on the above discussion, the Court should conclude that the SBR's, as well as plaintiff's verbal complaints concerning JW, constitute sufficient evidence, under the summary judgment standard, that plaintiff had engaged in a "protected activity."

### (3) Adverse Employment Action

In this case, it is not disputed that the District made the decision not to renew plaintiff's teacher contract within one month after she had been notified that her contract would be renewed and within two months after she reported to Kennedy that JW had sexually assaulted her.  The most serious incidents involving JW occurred in late April and early May 2004.  On May 13, 2004, plaintiff was notified that her contract was being changed from a "temporary contract" to a "regular

-25-

contract." (A27). At the same time, plaintiff and the Board signed a new employment contract for the school year commencing 5/13/04 with no termination date. (B29). That new contract was later marked as "Rescinded" by Davenport on 6/16/04. (Davenport, p. 48) (B117).

### (4) Existence of Causal Link Between the Protected Activity and the Firing

In *Kachmar*, the court noted that "the element of causation [in a retaliation case], which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Id.*, 109 F.3d at 178. In determining whether conduct was retaliatory, the courts have generally focused on two factors: (1) the "temporal proximity" between the protected activity and the alleged discrimination and (2) the existence of "'a pattern of antagonism in the intervening period." See, *Jensen*, 435 F.3d at 450; *Kachmar*, 109 F.3d at 177 (the courts have often focused on the temporal proximity between the two events "because this is an obvious method by which a plaintiff can proffer circumstantial evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action'"). In some cases, timing alone can raise the requisite inference when it is "unusually suggestive of retaliatory motive." *Id.* See, *Fasold v. Justice*, 409 F.3d 178, 189-190 (3d. Cir. 2005)(three month interval between exercise of protected activity and termination was sufficient, under summary judgment standard, to raise inference of retaliatory motive). Despite this focus, "these are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Jensen*, 435 F.3d at 450.

In this case, the defendants contend that plaintiff cannot establish a causal connection between her complaints about JW and the decision to terminate her employment because the defendants had decided not to renew her teaching contract **before** plaintiff made any substantial complaints concerning JW's conduct. (Defendants' Brief, pp. 29-30). The defendants' arguments should be rejected. Taken as a whole, the timing of the decision to terminate the plaintiff and the evidence of the circumstances related to that decision are sufficient to establish that material facts are in dispute concerning the defendants' motivation and reasons for terminating plaintiff's employment.

When Mongelli was hired in January 2004, she was working under a "temporary contract" which, by its terms, expired on June 30, 2004. (B18). Debra Davenport, the District's Manager of Human Resources, explained the process for the renewal of teacher contracts. According to Davenport, each school in the Red Clay District is allocated a number of "units" based on the number of students in each school. These "units" are then allocated by the school's Principal among the different subject areas, which results in a staffing grid for that school for the next school year. (Davenport 34-37) (B103-B106). On January 30, 2004, Carmack sent a Memo and staffing roster to Davenport for the 2003-2004 school year. Mongelli is listed on the Memo as a special education teacher under a "temporary contract." (B25). On April 22, 2004, Carmack sent a Memo to Davenport and Dunmon concerning the Dickinson High School 2004/2005 staffing plan. The Memo states, "I have highlighted those teachers listed as temporary employees. I recommend they be rolled over into the 2004/05 school year." (A16). The staffing roster that accompanied the Memo listed eight "special education " slots, including two vacancies. Mongelli's name was not on that roster. (A18). However, the April 22 Memo, unlike the January 30 Memo, did not list the names of any teachers whose contracts Carmack was recommending should not be renewed. Nevertheless, in its Brief, the defendants claim that the April 22 Memo is evidence that Carmack had decided that Mongelli's contract should not be renewed:

> On that date [April 22, 2004], Carmack excluded Mongelli's name from [the] staffing list for Dickinson High School in the belief that because Mongelli was a temporary teacher this would automatically lead to her non-renewal.[18]

The only problem with the above argument is that it is not supported by any evidence in the record. There is no testimony from Carmack that he believed that Mongelli's contract would automatically not be renewed. In fact, Carmack's Memo of January 30, where he affirmatively recommends the non-renewal of two contracts, whose names are both listed on the roster, suggests just the opposite. In contrast, the April 22 Memo does not contain the names of any teachers whose

---

[18] Defendants' Brief, p.29.

non-renewal is recommended.  Furthermore it appears from the Memo that Carmack intended to recommend that all of the temporary contract teachers [presumably including Mongelli] be rolled over to the 2004/05 school year.  Thus, it is just as likely that Mongelli's name was left off the April 22 staffing list due to oversight or inadvertence than by design.[19]  Further evidence that the defendants intended to renew Mongelli's contract for the 2004/2005 school year is the fact that on May 13, 2004, Mongelli was notified by  Davenport that her contract for the next school year was being changed from a "temporary contract" to a "regular contract." (A27).  However, the contract for the 2004/2005 school year was "rescinded" by Davenport on June 16, 2004. (Davenport, p. 48) (B117); (B29).  The timing of the "recission," which occurred approximately one month **after** Mongelli had reported JW's conduct is evidence which raises an inference of retaliatory motive that is sufficient to defeat defendants' motion for summary judgment.

### (5) Existence of a Legitimate Non-Discriminatory Reason for the Non-Renewal of Plaintiff's Contract

In this case, the defendants claim that Mongelli's contract for the 2004/2005 school year was "rescinded," not because of any retaliatory motive, but because Mongelli lacked the required "certifications" in Special Education. (Davenport, p. 48) (B117).  If the Court agrees that the plaintiff has made out a *prima facie* claim for retaliation under Title VII, the Court must determine whether the defendants are nevertheless entitled to summary judgment because they have proffered an alleged non-discriminatory reason for the non renewal of plaintiff's contract.

Once a prima facie case is established, the defendant has the burden of producing a legitimate, non-discriminatory explanation for its decision.  If the defendant proffers such a reason, the burden shifts back to the plaintiff who must demonstrate that the proffered explanation for the adverse employment action is a pretext for discrimination.  See, *Tomasso v. Boeing Co.*, 445 F.3d

---

[19] Diane Dunmon, the District's Deputy Superintendent, testified that it would be "unusual" for a school Principal to assume that all temporary contracts would "disappear" at the end of the school year, or that the District Administration would somehow divine that because a teacher's name was not on the roster that the Principal did not want that person's contact to be renewed. (Dunmon, pp. 9-11) (B141-B143).

702, 706 (3d Cir. 2006) (In order to create a genuine issue of material fact as to whether the proffered reasons are pretextual, plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action). There are two ways in which a plaintiff can prove pretext: (1) present evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication," or (2) present evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." See, *Atkinson v. Lafayette College*, 460 F.3d 447, 454 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)). "This burden is met through demonstration that such 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action are such that a reasonable factfinder could rationally find them unworthy of credence.'" *Rosario v. Ken-Crest Services*, 189 Fed. Appx. 79, 2006 U.S. App. LEXIS 13815, at *7 (3d Cir. 2006) (quoting *Fuentes*, 32 F.3d at 765).

In this case, there is substantial evidence to believe that the defendants' proffered reason for the non-renewal of plaintiff's contract was a fabrication. At the time Mongelli was hired, the District assisted her to obtain an "emergency Certificate" in Special Education. (A7). The Certificate was issued effective January 20, 2004 and was good for three years. (A15). Red Clay was also notified by the State Board of Education that the Special Education Certificate had been issued to Mongelli. (A13).[20] Davenport has testified that she decided to "rescind" plaintiff's contract because she had a conversation with Diane Dunmon that Carmack "had concerns about [Mongelli's] performance in the classroom." (Davenport, pp. 48-49) (B117-B118). After the conversation with Carmack, Davenport went to check Mongelli's file. The file indicated that an Emergency

---

[20] According to Davenport, she did not remember getting a copy of the Emergency Certificate until Mongelli brought her a copy sometime in May 2004. (Davenport, pp. 31-32) (B110-B101).

certificate had been applied for, but Davenport could not find anything to evidence that a Certificate had been issued. (Davenport, pp. 49-50) (B118-B119). Davenport then reported back to Dunmon that Mongelli was not certified in Special Education. (Davenport, pp. 52-53) (B121-B122). Other than looking in Mongelli's file, Davenport did not take any steps to learn the true facts. She did not contact the State Board of Education to see if a certificate had been issued, although she easily could have done so. (Davenport, pp. 50-51) (B119-B120). Davenport also knew that Mongelli gave her a copy of the Special Education Certificate "sometime in May," but claimed that she did not know why that had occurred." (Davenport, pp. 31-32) (B100-B101). Mongelli testified that Davenport kept insisting that she was not certified even after Mongelli sent Davenport copies of her Certificates. According to Mongelli, Davenport told her she was not certified because she had not passed the PRAXIS exam. (Mongelli, pp. 136-137) (B66-B67).[21]

Dunmon testified that allegations that Mongelli did not have a Certificate in Special Education came to her attention from Davenport after May 12, 2004, when the renewal contract was signed. (Dunmon, pp. 5-7) (B137-B139). Dunmon also testified that during that same time period, she had a conversation with Chad Carmack concerning Ms. Mongelli. According to Dunmon, Carmack called her because he had learned that Mongelli had been given a "regular contract" for the next school year and he was concerned because Mongelli "was having difficulties in the classroom" and had "classroom management issues." (Dunmon, pp. 7-8) (B139-B140). The testimony by Davenport and Dunmon that classroom management issues and lack of progress towards getting a "Regular" Special Education Certificate palyed a role in the decision to rescind Mongelli's contract in May 2004 is contradicted by Defendants' Interrogatory Answers. In Interrogatory No.4, the defendants were asked, "Do you contend that the termination of plaintiff's employment, which became effective June 30, 2004, was due to any reason other than 'lack of

---

[21] Davenport suggested that Mongelli was not certified because she was not working on the educational requirements (such as passing the PRAXIS exam) needed to get a permanent Certificate. (Davenport, p. 53) (B122). Davenport admitted, however, that she never informed the State Board of Education that Mongelli was not attempting to complete the certification requirements. (Davenport, p. 56 (B125).

certification.'" The defendants' answer was that plaintiff was terminated by the Board "due to lack of certification." (B90).

In *Reeves v. Sanderson Plumbing Products, Inc.*, *supra*, the Court held that proof of pretext does not have to include direct evidence of discrimination, but rather "in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." 530 U.S. at 147. In this case, there is substantial evidence that the defendants actually knew that Mongelli had the required Certifications when they rescinded her contract due to "lack of certification." In this circumstance, it would clearly be reasonable for a jury to conclude that a discriminatory purpose was the real reason that plaintiff's contract was not renewed.

-31-

## IV.  PLAINTIFF'S ENTITLEMENT TO AN AWARD OF BACK-PAY WAS NOT CUT OFF BY BY HER REINSTATEMENT

### Factual Background

After Mongelli's teaching contract was terminated in June 2004, she filed a Charge of Discrimination with the Delaware Department of Labor and EEOC. (A33).  On January 14, 2005, while the EEOC charge was pending, the defendant made an "unconditional offer" to re-employ Mongelli as a teacher at Warner Elementary School. (A37).  This offer was accepted by Mongelli. (A38).  Mongelli's new employment contract ran from January 19, 2005 through June 30, 2005. (B145).  On April 21, 2005, the defendants notified Mongelli that her contract would not be renewed. (B147; (B148).

### Argument

Based upon the above facts, the defendants now argue that Mongelli's re-employment in January 2005 "cut off" any claim for back-pay after that date.  Defendants also argue that Mongelli has agreed "by Stipulation[22], that her non-renewal in June 2005 is not an issue in this case."  See, Defendants' Brief, p. 30.

42 *U.S.C.* § 2000e-5(g)(1) provides in part, "[i]nterim earnings or amounts earnable with reasonable diligence by the persons . . . discriminated against should operate to reduce the back pay otherwise allowable."  It is also clearly established that back pay is an equitable remedy to be awarded within the discretion of the court. See, *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 316 (3d Cir. 2006).  In in *Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982), the Supreme Court ruled that an employer charged with discrimination can toll the continuing accrual of back pay liability by unconditionally offering plaintiff the job, and the underemployed or unemployed plaintiff cannot reasonably refuse.

---

[22] See, D.I. 47 (B151).

-32-

Mongelli agrees that her earnings from the period of her employment with defendants from January 19, 2005 through Jane 30, 2005 should be applied to reduce any back pay award "otherwise allowable."  Mongelli does not agree, however, that her re-employment with Red Clay operates to automatically prevent her from recovery of back pay for any periods of unemployment after June 30, 2005.[23]  See, *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136  n.4 (9th Cir. 1986) ("the termination date for back pay awards in Title VII cases is particularly dependent upon each case's unique facts"); *EEOC v.Monarch Machine Tool Co.*, 737 F.2d 1444, 1452 (6th Cir. 1980) ("Precisely when an award of back pay should end appears to depend upon the circumstances in each case and upon ... the 'make whole' principles enunciated ... in *Albemarle* ....").

The fundamental purpose for a back pay award is to make the victim of discrimination whole for injuries suffered through past discrimination. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 418-419 (1975) ("The injured party is to be placed, as near as may be, in  the situation he would have occupied if the wrong had not been committed").  In *Ford Motor Co.*, the rationale for the rule that an unconditional offer of re-employment will toll the accrual of back pay was explained:

> Ford's proposed rule also is consistent with the policy of full compensation when the claimant has had the good fortune to find a more attractive job than the defendant's, because the availability of the better job terminates the ongoing ill effects of the defendant's refusal to hire the claimant... continuing to hold Ford responsible for backpay after Gaddis and Starr lost their GM jobs would be to require, in effect, that Ford insure them against the risks of unemployment in a new and independent undertaking. Such a rule would not merely restore Gaddis and Starr to the "'position where they would have been were it not for the unlawful discrimination,'" (citation omitted); it would catapult them into a better position than they would have enjoyed in the absence of discrimination.

*Id.*, 458 U.S. at 234.

The above rationale has been applied in a variety of situations.  Back pay will not resume if the plaintiff voluntarily resigns from a new employment.  See, *EEOC v.  Delight Wholesale Co.*,

---

[23] Mongelli was unemployed from July 1, 2005 through November 7, 2005, when she was hired by MBNA (now Bank of America) as an account manager. (A52-A53).  Mongelli's employment with Bank of America was terminated effective October 31, 2006.  Mongelli agrees that her earnings from MBNA/Bank of America should be applied to reduce any pay bay award.

973 F.2d 664, 670 (8th Cir. 1992); *United States v. City of Chicago*, 853 F.2d 572, 579 (7th Cir. 1988).  Back pay will also not resume where the employee is discharged from subsequent employment as a result of misconduct.  See, *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1277-78 (4th Cir. 1985).

It is submitted that the defendants' liability for back pay after Mongelli's second term of employment was terminated as of June 30, 2005 will turn on the reasons for that termination.  If the termination was caused by Mongelli's misconduct, then back pay will be cut off.  On the other hand, if the defendants arbitrarily terminated the employment, then back pay should not be cut off.  The burden of proof on this issue lies with the defendants.  See, *NLRB v. Smucker Co.*, 130 Fed. Appx. 596, 601-602 (3d Cir. 2005).  In this case, the circumstances concerning the termination of Mongelli's employment in June 2005 appear to be in dispute.  The defendants will claim that the termination was for cause. (B150).  Those facts are disputed by Mongelli. (Mongelli, pp. 156-175) (B68-B87).  Summary judgment on this issue is therefore inappropriate.

Finally, the defendants' reliance on the Stipulation is misplaced. The Stipulation clearly relates to claims that the non-renewal of Mongelli's contract for the 2005/2006 school year violated Title VII. (B151).  As discussed above, whether the defendants had a valid reason not to renew Mongelli's contact in April 2005 is relevant to determine back pay for the retaliation claim that arose in June 2004 even if that action is not separately actionable under Title VII.

-34-

**CONCLUSION**

Based on the foregoing reasons, the Court should deny the defendants' Motion for Summary Judgment on the Title VII claims for sexual harassment/hostile work environment and retaliation. Plaintiff agrees that the claims under Section 1983 and the 14th Amendment should be dismissed.


      */s/ Joseph M. Bernstein*
      JOSEPH M. BERNSTEIN (#780)
      800 N. King Street - Suite 302
      Wilmington, DE 19801
      302-656-9850
      302-656-9836 (Fax)
      E-mail: jmbern001@comcast.net
      Attorney for Plaintiff


Dated: March 5, 2007