## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **CHRISTINA MONGELLI,** | : |
| **Plaintiff,** | : |
| | : |
| **v.** | **: Civil Action No.  05-359 SLR** |
| | : |
| **RED CLAY CONSOLIDATED SCHOOL** | : |
| **DISTRICT BOARD OF EDUCATION,** *et al.* | : |
| **Defendants.** | |

### (REDACTED COPY)

### APPENDIX TO
### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

JOSEPH M. BERNSTEIN (#780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbern001@comcast.net
Attorney for Plaintiff

Dated: March 5, 2007

## TABLE OF CONTENTS

|  | PAGE |
|---|---|
| First Amended Complaint | B1 |
| Answer to First Amended Complaint | B10 |
| Temporary Education Employee Contract Dated 1/20/2004 | B18 |
| Mongelli Initial License Dated 1/20/2004 | B19 |
| Mongelli Initial License Dated 1/20/2004 | B20 |
| Department of Education Letter to Mongelli dated 4/12/2004 | B21 |
| Department of Education Letter to Mongelli dated 4/12/2004 | B23 |
| Carmack Memo to Davenport dated 1/30/04 | B25 |
| Professional Education Employee Contract Dated 5/13/04 | B29 |
| JW Student Behavior Referral dated 3/1/2004 | B31 |
| JW Student Behavior Referral dated 3/2/2004 | B32 |
| JW Student Behavior Referral dated 3/31/2004 | B33 |
| JW Student Behavior Referral dated 3/31/2004 and 4/1/2004 | B34 |
| JW Student Behavior Referral dated4/26/2004 | B35 |
| JW Student Behavior Referral dated 5/3/2004 | B36 |
| JW Student Behavior Referral dated 5/4/2004 | B37 |
| JW Student Behavior Referral dated 5/5/2004 | B38 |
| JW Student Behavior Referral dated 5/5/2004 | B39 |
| JW Student Behavior Referral dated 5/6/2004 | B40 |
| JW Student Behavior Referral dated 5/7/2004 | B41 |
| JW Notice of Suspension dated 3/8/2004 | B42 |

JW Notice of Suspension dated 4/8/2004 — B43

Affidavit of Probable Cause - State v. JW, Case No. 0405018390 — B44

Delinquency Petition - State v. JW, Case No. 0405018390 — B46

Juvenile Disposition - State v. JW, Case No. 0405018390 — B47

Excerpts from the Deposition Transcript of Christina Mongelli — B49

Defendants' Answers to Plaintiff's Interrogatories — B88

Red Clay School District Sexual Harassment Policy — B97

Excerpts from the Deposition Transcript of Debra Davenport — B99

Excerpts from the Deposition Transcript of John Kennedy — B132

Excerpts from the Deposition Transcript of Diane Dunmon — B137

Memo From Donna McDowell to Christina Mongelli dated February 17, 2005 — B144

Professional Education Employee Contract Dated 1/19/2005 — B145

Letter from Debra Davenport to Christina Mongelli dated April 21, 2005 — B147

Letter from Debra Davenport to Christina Mongelli dated April 21, 2005 — B148

Letter from Joseph M. Bernstein to Robert J. Andrzejewski dated April 26, 2005 — B149

Letter from Diane Dunmon dated July 11, 2005 — B150

Stipulation to Amend Scheduling Order (Document 47) — B151

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHRISTINA MONGELLI,<br>     Plaintiff, | : |
| | : |
| | : |
|      v. | : |
| | : |
| | : |
| RED CLAY CONSOLIDATED SCHOOL | : |
| DISTRICT BOARD OF EDUCATION; IRWIN | : |
| J. BECNEL, JR, CHARLES CAVANAUGH, | : Civil Action No. 05-359 SLR |
| GARY LINARDUCCI, LORETTA C. RICE, | : |
| JAMES D. TAYLOR, MARTIN A. | : |
| WILSON, SR., individually and in their official | : |
| capacities as members of the Red Clay | : TRIAL BY JURY IS DEMANDED |
| Consolidated School District Board of | : |
| Education; ROBERT J. ANDRZEJEWSKI, | : |
| individually and in his official capacity as | : |
| Superintendent of the Red Clay Consolidated | : |
| School District; and RED CLAY | : |
| CONSOLIDATED SCHOOL DISTRICT, | : |
|      Defendants. | : |

### FIRST AMENDED COMPLAINT[1]

#### JURISDICTION AND VENUE

1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1343 and 42 U.S.C.

§2000e-5(f)(3) to secure protection of and redress the deprivation of rights secured by:

(a) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, and the Civil

Rights Act of 1991, Pub. L. 102-166 (hereinafter "Title VII"), providing for relief against racial,

religious, national origin and sex discrimination in employment;

(b) The First Amendment to the United States Constitution, providing for freedom

of speech and to petition the government for redress of grievances;

(c) The Fourteenth Amendment to the United States Constitution, providing for the

rights of all persons within the jurisdiction of the United States to be free from the deprivation of

life, liberty and property without due process of law and to enjoy the equal protection of the law; and,

---

[1] Material that is being added in the First Amended Complaint is indicated by <u>underlining</u>.
Material that is being deleted is indicated by [brackets].

(d) 42 U.S.C. §1983, providing for the protection of all persons in their civil rights and the redress of the deprivation of rights under color of law, of a right, privilege and immunity secured by the Fourteenth Amendment to the Constitution of the United States.

2. The acts, unlawful employment practices and violations of plaintiff's civil rights alleged herein were committed within the State of Delaware.

### THE PARTIES

3. The Plaintiff, Christina Mongelli ("Mongelli"), is a white female citizen of the United States and resides in New Castle County, State of Delaware and was formerly employed as a teacher by the defendant Red Clay Consolidated School District Board of Education ("Board").

4. The defendant Board is a "school board" as defined in 14 *Del.C.* §1041(1) organized and existing under the laws of the State of Delaware, 14 *Del.C.* §1041, *et seq.* At all times relevant hereto, the Board was an "employer" as defined by 42 U.S.C. §2000e(b).

5. Defendants Irwin J. Becnel, Jr., Charles Cavanaugh, Gary Linarducci, Loretta C. Rice, James D. Taylor, and Martin A. Wilson, Sr. constitute the individual membership of the Defendant Board.

6. Defendant Robert J. Andrzejewski (hereinafter "Superintendent") is the duly appointed Superintendent of the defendant Red Clay Consolidated School District.

7. Defendant Red Clay Consolidated School District ("District") is a "reorganized school district" as defined in 14 *Del.C.* §1041(1) organized and existing under the laws of the State of Delaware, 14 *Del.C.* §1041, *et seq.* At all times relevant hereto, the District was an "employer" as defined by 42 U.S.C. §2000e(b).

### PROCEDURAL REQUIREMENTS

8. The jurisdictional prerequisites to the maintenance of this action under Title VII have been complied with. to wit: a charge of employment discrimination was filed with the Equal Employment Opportunity Commission ("EEOC") on or about July 23, 2004, within 180 days of the commission of the unfair employment practice; a Notice of Right to Sue was received from the U.S. Department

of Justice, Civil Rights Division on April 13, 2005; The [this] Complaint was [has been] filed within 90 days of the receipt of the Notice of Right to Sue.

9.  Plaintiff is not required to exhaust any administrative procedures prior to suit under the United States Constitution and 42 U.S.C. §1983.

## FACTS COMMON TO ALL COUNTS

10.  On or about January 20, 2004, the plaintiff was hired by the defendants Board/District as a Special Education teacher at Dickinson High School. At the time of her initial employment, the employment relationship was characterized by the Board as a "temporary contract." Effective May 13, 2004, the "temporary contract" was changed to a "regular contract."

11.  At the time of her initial hiring, the plaintiff had been granted an "Emergency Certificate" by the Delaware State Board of Education which stated that she was certified and licensed to hold the position of "Teacher of Exceptional Children - LD. SED and MH (Secondary 7-12). The "Emergency Certificate" was valid until January 31, 2007. At the same time, the plaintiff had also been granted a "Initial License" by the Delaware State Board of Education which stated that she was certified and licensed to hold the position of "Teacher of Early Childhood/Primary K-4." That license was valid through June 30, 2005, pending successful passage of PRAXIS I or its equivalent on or before June 30, 2005.

12.  At all times relevant hereto, the defendants Board and District were informed and were aware that the teaching certificates described in Paragraph 11 had been issued to the plaintiff.

13.  At Dickinson High School, the plaintiff was assigned to teach English and Social Studies to groups of 9th grade special education students.

14..  One of the students in plaintiff's class was an individual named J_____ W_____ ("hereinafter "JW"). At the time of the events at issue here, JW was 14 years of age. The defendants have actual knowledge of the full name and identity of JW.

15.  Beginning on or about March 1, 2004, the plaintiff began sending written reports to the Dickinson High School Principal's Office which contained allegations of disruptive behavior on the part of JW. In all, between March 1, 2004 and May 7, 2004, twelve (12) such reports were sent to

B3

the Principal's Office concerning allegations of disruptive behavior by JW. In addition to written reports, plaintiff also made verbal complaints to administrative personnel at Dickinson High School concerning alleged disruptive behavior by JW.

16. Included in the written reports that were submitted by the plaintiff were the following allegations:

(a) On March 2, 2004, plaintiff reported that JW had used cursing and "sexual language" in the classroom.

(b) On March 2, 2004, plaintiff reported that JW continued to be "extremely disruptive and disrespectful." It was reported that when plaintiff told JW to stop talking out loud in class, he responded by saying "fuck her" and yelled that "I'm going to knock her fucking head off."

(c) On March 31, 2004, plaintiff reported that JW had called her a "fucking bitch."

(d) On April 1, 2004, plaintiff reported that JW had called her a "fucking bitch" on many occasions and had also stated that she was "fucking ugly" and was a "fucking idiot."

(e) On April 26, 2004, plaintiff reported that JW had come up to her from behind while she was leaning over to help a student to was seated, and grabbed her forcefully with his hands on her hips and proceeded to "hump" her.

(f) On May 3, 2004, plaintiff reported that JW looked at the plaintiffs breasts and stated "Your nipples are hard." He then grabbed her and pulled her close to his body.

(g) On May 4, 2004, plaintiff reported that when JW was seated on top of his desk and staring at plaintiff, he opened his legs wide and simulated having sexual intercourse, which was accompanied by him making "sucking" noises and heavy breathing.

(h) On May 5. 2004. plaintiff reported that JW had grabbed her by the arm and refused to let go. He then pulled the plaintiff close to his body and said "Let's do the tango." He also asked plaintiff if she had sex and who she had sex with.

(i) On May 6, 2004, plaintiff reported that JW came up to plaintiff's desk and began to sing a "rap song" which included the phrase "how's your pussy," which was repeated several

times. When plaintiff asked him to stop, JW continued singing even louder and began to make sucking noises with his mouth.

(j) On May 7, 2004, plaintiff reported that JW got out of his seat and walked over to the plaintiff, where he began singing a "rap song" which included the words "Ms. Mongelli gives head," which was repeated several times. As he was singing, JW also pointed to his penis.

17. On May 17, 2004, John Kennedy, an Assistant Principal at Dickinson High School, contacted the Delaware State Police concerning JW's conduct toward plaintiff.

18. On June 15, 2004, in a juvenile criminal proceeding, the State of Delaware charged JW with committing the following offenses: (a) Unlawful Sexual Conduct Third Degree in violation of 11 *Del.C.* §767; (b) two counts of Offensive Touching in violation of 11 *Del.C.* §601; and (c) Sexual Harassment, in violation of 11 *Del.C.* §763.

19. On August 4, 2004, in the Family Court of the State of Delaware, JW entered a plea of guilty to three counts of Offensive Touching and one count of Sexual Harassment.

## CLAIMS ARISING UNDER TITLE VII

### Count One - Sexual Harassment

20. Plaintiff realleges Paragraphs 1 through 19 above as though fully set forth herein.

21. The incidents described in Paragraph 16 above amounted to unlawful "sexual harassment" in violation of Title VII [V] and had the effect of substantially interfering with plaintiff's work performance by creating a hostile, intimidating and offensive working environment in violation of Title VII.

22. At the times of the incidents described in Paragraph 16 above, the defendants Board and District did not have any formal policy concerning sexual harassment of teachers by students and did not have any formal or informal grievance procedure to deal with such allegations of sexual harassment.

23. The defendants Board and District knew or should have known about JW's sexual harassment in the classroom as a result of plaintiff's complaints to the administrators at Dickinson High School set forth in Paragraph 16 above.

24. After being placed on notice concerning JW's conduct, defendants Board and District failed and refused to take any prompt and appropriate corrective or remedial action to end the harassment of the plaintiff by JW.

25. The acts as described above by defendants Board and District, its agents and employees were practiced either intentionally or with reckless indifference to the federally protected rights of the plaintiff.

26. The defendants Board and District are liable to the plaintiff under Title VII for the sexual harassment of plaintiff by JW. Under the EEOC Guidelines, 29 C.F.R. §1604.11(e), provides:

> An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.

27. As a direct and proximate result of the unlawful conduct of defendants, it agents and employees, plaintiff has been injured and has suffered and will continue to suffer emotional pain and suffering, mental anguish, loss of enjoyment of life and other pecuniary and non-pecuniary losses.

### Count Two - Retaliation

28. Plaintiff realleges Paragraphs 1 through 19 above as though fully set forth herein.

29. On June 17, 2004, the plaintiff was informed by the defendant Board that her employment was being terminated "due to lack of certification."

30. The defendants Board and District either knew or should have known that their [its] proffered reason for the termination of plaintiff's employment was untrue.

31. The decision to terminate plaintiff's employment by the defendants Board and District violated plaintiff's rights under Title VII because it was made in retaliation against plaintiff because she complained about the sexual harassment of the plaintiff by JW.

32. As a direct and proximate result of the unlawful conduct of defendants, it agents and employees, plaintiff has been injured and has suffered and will continue to suffer monetary damages, including but not limited to backpay, future earnings and fringe benefits.

B6

## CLAIMS ARISING UNDER 42 U.S.C. §1983

### Count Three - Sex Discrimination/Sexual Harassment

### [Claims Under 42 U.S.C. §1983 and 14th Amendment]

33. Plaintiff realleges Paragraphs 1 through 26 above as though fully set forth herein.

34. At all times referred to in this Complaint, the defendants Board and District were acting under color of the laws, statutes and ordinances of the State of Delaware.

35. The incidents of "sexual harassment" described in Paragraph 16 above had the effect of substantially interfering with plaintiff's work performance by creating a hostile, intimidating and offensive working environment amounting to unlawful sex discrimination in violation of plaintiff's right under 42 U.S.C. §1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

36. The defendants violated the rights secured to plaintiff by 42 U.S.C. §1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution to be free from sex discrimination in public employment in that, having actual or constructive knowledge of the sexual harassment committed by JW, the defendants acted either intentionally or with gross negligence, and with a deliberate indifference to plaintiff's rights, in failing to intervene to stop JW's unlawful conduct, in failing to properly supervise or control JW, and in failing to remedy JW's conduct after they learned about it.

37. As a direct and proximate result of the unlawful conduct of defendants, the plaintiff has been injured and has suffered and will continue to suffer emotional pain and suffering, mental anguish, loss of enjoyment of life and other non-pecuniary losses.

### Count Four - Retaliation

38. Plaintiff realleges Paragraphs 1 through 19 above as though fully set forth herein.

39. On June 17, 2004, the plaintiff was informed by the defendant Board that her employment was being terminated "due to lack of certification."

B7

40.  The defendants Board, individual Board members, District and Superintendent either knew or should have known that the proffered reason for the termination of plaintiff's employment was untrue.

41.  The decision to terminate plaintiff's employment by the defendants Board, individual Board members, District and Superintendent violated plaintiff's rights under the First Amendment to the United States Constitution and 42 U.S.C. §1983  because it was made in retaliation against plaintiff  because she complained about the sexual harassment of the plaintiff by JW.

42.  As a direct and proximate result of the unlawful conduct of defendants, it agents and employees, plaintiff has been injured and has suffered and will continue to suffer monetary damages, including but not limited to backpay, future earnings and fringe benefits.

WHEREFORE, the plaintiff requests that the Court grant relief as follows:

(a)  enter a declaratory judgment that the acts and practices complained of herein were unlawful and violative of Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991;

(b)  enter a declaratory judgment that the acts and practices complained of herein were unlawful and violative of the First and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. §1983;

(c)  order the defendant Board and District [City] to institute and carry out policies and practices which provide equal employment opportunities and which eradicate the effects of the defendant's past and present unlawful employment practices;

(d)  order the defendants, individually and jointly and severally, to make whole the plaintiff, who has been adversely affected by the unlawful employment practices and violation of constitutional rights described herein, by awarding appropriate monetary damages, including but not limited to backpay, future earnings, fringe benefits, emotional pain and suffering, mental anguish, loss of enjoyment of life and other non-pecuniary losses, and compensation for all other injuries and losses proximately caused by the unlawful acts of the defendants;

(e)  award plaintiff punitive damages under §102 of the Civil Rights Act of 1991.

(f)  award plaintiff the costs of the action and her reasonable attorney's fees.

B8

(g) grant such other and further relief as the court deems necessary and proper.

*Joseph M Bernt*

JOSEPH M. BERNSTEIN (#780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbern001@comcast.net
Attorney for Plaintiff

Dated: October 31, 2005

B9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHRISTINA MONGELLI,                          )
                                             )
    Plaintiff,                              )
                                             )    C.A. No. 05-359 SLR
    v.                                      )
                                             )    TRIAL BY JURY DEMANDED
RED CLAY CONSOLIDATED SCHOOL DISTRICT         )
BOARD OF EDUCATION; IRWIN J. BECNEL, JR.,     )
CHARLES CAVANAUGH, GARY LINARDUCCI,           )
LORETTA C. RICE, JAMES D. TAYLOR, MARTIN A.   )
WILSON, SR., INDIVIDUALLY AND IN THEIR        )
OFFICIAL CAPACITIES AS MEMBERS OF THE RED     )
CLAY CONSOLIDATED SCHOOL DISTRICT BOARD OF    )
EDUCATION; ROBERT J. ANDRZEJEWSKI,            )
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS  )
SUPERINTENDENT OF THE RED CLAY                )
CONSOLIDATED SCHOOL DISTRICT; AND RED CLAY    )
CONSOLIDATED SCHOOL DISTRICT,                 )
                                             )
    Defendants.                             )

## ANSWER AND AFFIRMATIVE DEFENSES TO
## FIRST AMENDED COMPLAINT

### JURISDICTION AND VENUE

1.    The allegations of this paragraph of the Amended Complaint state a legal

conclusion as to which no response is required. By way of further answer, it is denied that

Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et. seq., the

First Amendment to the Constitution of the United States of America, the Fourteenth

Amendment to the Constitution of the United States of America, or 42 U.S.C. §1983 in any

respect.

2.    Denied that any wrongful acts, unlawful employment practices, and/or violations

of Plaintiff's civil rights occurred at any time.

## THE PARTIES

3.    Admitted that Plaintiff was formerly employed by the Red Clay Consolidated School District ("RCCSD") as a teacher.  Upon information and belief, Plaintiff is a white, female citizen of the United States. Defendants are without knowledge sufficient to form a belief as to Plaintiff's residence.  Otherwise denied.

4.    Admitted.

5.    Admitted that at the time of the acts alleged in the Amended Complaint the individuals identified in this paragraph were members of the Board of Education of the Red Clay School District.  By way of further answer, Defendant, James D. Taylor, is no longer a member of the Board.

6.    Admitted.

7.    Admitted.

## PROCEDURAL REQUIREMENTS

8.    The allegations of this paragraph of the Amended Complaint state a legal conclusion as to which no response is required.

9.    The allegations of this paragraph of the Amended Complaint state a legal conclusion as to which no response is required.

## FACTS COMMON TO ALL COUNTS

10.    Denied as stated.  By way of further answer, Plaintiff was appointed to a teaching position on February 18, 2004.  The appointment was retroactively effective as of January 20, 2004. Admitted that Plaintiff's appointment was, initially, pursuant to a "temporary contract".

DB02:5098985 1                                                  061778.1004

B11

Admitted that the "temporary contract" was changed to a "regular contract" effective May 13, 2004.

11.    Admitted that Plaintiff held an Emergency Certificate issued by the State Board of Education for the position of "Teacher of Exceptional Children-LD, SED and MH" and that she had an "Initial License" from the State Board of Education for the position of "Teacher of Early Childhood/Primary K-4." Otherwise denied.

12.    Defendants are without knowledge sufficient to form a belief as to the time period referred to in this paragraph of the Amended Complaint as "at all times relevant hereto." By way of further answer, Defendant RCCSD was aware that Plaintiff had the aforementioned certificates during the period she was employed with the District. Otherwise, denied.

13.    Admitted.

14.    Admitted.

15.    Denied.  By way of further answer, Plaintiff sent written disciplinary reports to the Assistant Principal at Dickinson High School at various times.  On many occasions, however, she did not send the reports contemporaneous with the alleged acts of student disruption. Defendants are without knowledge as to the identity of the "administrative personnel at Dickinson High School" referred to in the third sentence of this paragraph of the Amended Complaint and therefore cannot admit or deny the allegation.

16.    The written reports referred to in this paragraph speak for themselves. To the extent that Plaintiff's characterization of her written reports are inconsistent in letter or spirit

3

with the allegations of this paragraph of the Amended Complaint, they are denied. By way of

further answer, see response to paragraph 15 above.

17.     Admitted that John Kennedy contacted the Delaware State Police on or about

May 17, 2004. By way of further answer, the Assistant Principal at Dickinson was not

contemporaneously informed of Plaintiff's contentions with respect to offensive touching by a

student. After Plaintiff reported the incident, prompt remedial measures were taken including

reporting the allegations to the police and removal of the student from Plaintiff's class.

18.     Admitted upon information and belief.

19.     Admitted upon information and belief.

## CLAIMS ARISING UNDER TITLE VII.

### Count One – Sexual Harassment

20.     Defendants reallege and incorporate by reference their responses to paragraphs 1

through 19 as if fully set forth herein.

21.     Denied.

22.     Denied.

23.     Denied.

24.     Denied.

25.     Denied.

26.     Denied.

4

27. Denied.

## Count Two - Retaliation

28. Defendants reallege and incorporate by reference their responses to paragraphs 1 through 27 as if fully set forth herein.

29. Admitted that Plaintiff was sent a letter dated June 17, 2004 which speaks for itself.

30. Denied.

31. Denied.

32. Denied.

## CLAIMS ARISING UNDER 42 U.S.C. §1983

### Count Three – Sex Discrimination/Sexual Harassment

33. Defendants reallege and incorporate by reference their responses to paragraphs 1 through 32 as if fully set forth herein.

34. The allegations of this paragraph of the Amended Complaint state a legal conclusion as to which no response is required. By way of further answer, it is denied that Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e), et. seq., the Fourteenth Amendment to the Constitution of the United States of America, or 42 U.S.C. §1983 in any respect.

35. Denied.

36. Denied.

5

37.    Denied.

## Count Four - Retaliation

38.    Defendants reallege and incorporate by reference their responses to paragraphs 1 through 37 as if fully set forth herein.

39.    Admitted that Plaintiff was sent a letter dated June 17, 2004 which speaks for itself.

40.    Denied.

41.    Denied.

42.    Denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by her failure to exhaust administrative remedies and/or other applicable federal or state statutes of limitation, jurisdictional and/or administrative requirements.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims fail in whole or in part because at all times Defendants made a good faith effort to comply with applicable law, acted lawfully and with legitimate non-discriminatory business reasons that were not a pretext for unlawful discrimination.

6

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by her failure to mitigate damages.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff has waived or is estopped from asserting her claims.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's Amended Complaint may be denied in whole or in part with the doctrine of after-acquired evidence.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims against the individual Defendants are barred by the doctrine of qualified immunity.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims against the Individual Defendants are barred as a matter of law because individuals are not liable to Plaintiff under 42 U.S.C. § 1983. In the alternative, and without limiting the foregoing, Plaintiff cannot as a matter of law establish the requisite intent or causal link between the conduct of any individual and the complaints she makes in the Amended Complaint in order to establish liability under 42 U.S.C.§ 1983.

## NINTH AFFIRMATIVE DEFENSE

Defendants would have made the same decisions and taken the same actions toward Plaintiff absent any alleged consideration of any allegedly impermissible motivating factor.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Defendant, Red Clay Consolidated School District, had in effect at all relevant times a procedure for employees to

7

address claims of harassment or other discriminatory or retaliatory treatment, and Defendants exercised reasonable care to prevent and properly correct any discriminatory or retaliatory treatment, but Plaintiff unreasonably failed to take advantage of these preventative and corrective opportunities or to avoid harm otherwise.

WHEREFORE, Defendants respectfully request that this action be dismissed with prejudice, with costs and attorneys' fees assessed against Plaintiff.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Barry M. Willoughby, Esquire (No. 1016)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6666; (302) 576-3345
Email: bwilloughby@ycst.com; mstafford@ycst.com
Attorneys for Defendants

Dated: November 16, 2005

8

DB02:5098985.1

061778 1004

B17

STATE OF DELAWARE RCCSD
Human Resources

2004 MAR 18 A 10: 22

## TEMPORARY EDUCATION EMPLOYEE CONTRACT

AGREEMENT made this __20th__ day of __January__ , __2004__ . by and between the Board of Education of the ____Red Clay Consolidated____ School District (the "Board") and ____Christina Diane Mongelli____ , (the "Employee").

_(Name of Employee)_

The Board and the Employee mutually agree as follows:

1. **Employment.** The Board hereby employs the Employee. and the Employee hereby accepts employment upon the terms and conditions of this Agreement. as a __Teacher__

_(Position)_

for the period commencing __January 20__ · __2004__ , and ending __June 30__ , __2004__ Nothing in this Agreement shall be deemed a promise of continuing employment beyond the ending date specified herein.

2. **Salary.** The Employee's total salary will be composed of funds from State, local or federal sources or from some combination of the three sources as specified below:

| | |
|---|---|
| State | $ __* TEACHERS' SALARY SCHEDULE__ |
| Local | $ _____ |
| Federal | $ _____ |
| Total | $ _____ |

3. **Duties of Employee.** The Employee shall faithfully perform those duties which may be assigned by the Board. The Employee shall observe and comply with the laws of the State of Delaware and with the regulations of the State Board of Education and the Board as currently in force and as from time to time amended. enacted or promulgated. which law and regulations. are incorporated herein by reference as if set forth in full herein.

The Employee shall not vacate his or her position during the term of this contract without the written consent of the Board.

4. **Governing Law.** This Agreement is to be governed by the laws of the State of Delaware. rorated for the actual number of days worked beginning January 20, 2004 through June 30, 2004 .

D24

License No. 6483

Effective Date:      January 20, 2004
Expiration Date:     January 31, 2007

## Department of Education
### State of Delaware

# INITIAL LICENSE

Know all persons by these Present, that

## CHRISTINA DIANE MONGELLI

has fulfilled the Licensure and Certification requirements of the Professional Standards Board
and is certified in the following area(s):

### TEACHER OF EARLY CHILDHOOD/PRIMARY K-4

*This license will be suspended effective 6/30/2005 pending successful passage of the PRAXIS I or its equivalent. You must
submit verification of passage of PRAXIS I or its equivalent prior to 6/30/2005 to the Office of Professional Accountability at
the Delaware Department of Education.*

_____
Secretary of Education

Certificate valid when raised seal is placed

D25

an 31 05 11:10a

P.1

License No. 7375

Effective Date: January 20, 2004
Expiration Date: January 31, 2007

# Department of Education
## State of Delaware

# INITIAL LICENSE

Know all persons by these Present, that

## CHRISTINA DIANE MONGELLI

has fulfilled the Licensure and Certification requirements of the Professional Standards Board
and is certified in the following area(s):

STANDARD: TEACHER OF EARLY CHILDHOOD/PRIMARY K-4
STANDARD: ELEMENTARY K-6

_Valerie A. Woodruff_
Secretary of Education

Document Control Number 95-01-01-08-03

Each License Holder is Responsible for Knowing and Satisfying License Renewal
Requirements or Any Provisions Required to Reinstate His or Her License/Certificate.

D26



*Delaware*

*Department of Education*

# DEPARTMENT OF EDUCATION

THE TOWNSEND BUILDING
P.O. BOX 1402
DOVER, DELAWARE 19903-1402
DOE WEBSITE: http://www.doe.state.de.us

Valerie A. Woodruff
Secretary of Education
Voice: (302) 739-4601
FAX: (302) 739-4654

April 12, 2004

Christina Diane Mongelli
SSN 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
504 Blackbird Drive
Hockessin, DE 19707

Dear Ms. Mongelli:

We have evaluated your credentials, as requested. For the Standard Certificate as READING SPECIALIST you need to complete the following requirements. There may also be prerequisites and/or co-requisites to courses as determined by the college or university that you attend:

> Minimum of three years of successful teaching experience with at least two years in the K-12 classroom

### AND**

3 Semester Hours - Language Development (undergraduate or graduate)
3 Semester Hours - Children's or Adolescent Literature Across the Curriculum

> Delaware only has reciprocity for reading if the out-of-state license certifies you as Reading Specialist and not Reading Teacher.

### AND

Successful completion of the following sections of the PRAXIS I. Passing written/computer scores are: Reading 175/322, Writing 173/319, and Mathematics 174/319.

**Please be advised that amendments to 14 DE Administrative Code 1554 are being considered by the Delaware Professional Standards Board, which would repeal this regulation approximately by June 30, 2006. If the amendments pass and are approved by the Delaware State Board of Education, it will mean that you must have ALL requirements completed by June 30, 2006 to be eligible for a standard certificate in the area of READING SPECIALIST per DE Administrative Code 1554. If you have not completed these requirements by 6/30/06, *you will need to matriculate from an approved program and meet all new requirements in effect at that time.*

When the above requirements have been completed, please have official transcripts and/or other documentation sent to the DOE Certification Office. If you have any

(OVER)

THE STATE OF DELAWARE IS AN EQUAL OPPORTUNITY EMPLOYER AND DOES NOT DISCRIMINATE OR DENY SERVICES ON THE BASIS OF RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, DISABILITY AND/OR AGE.

EDUCATION INFO LINE:
(877) 838-3787

TEACHER CERTIFICATION INFO:
(888) 759-9133

B21

D230

questions regarding the certification requirements specified above, please feel free to contact the Certification Office.

Sincerely,

Aleta M. Hannah, Ph. D.
Education Specialist
Educator Licensure
Tel: 739-4686

CC: RED CLAY CONSOLIDATED SCHOOL DISTRICT



*Delaware*

*Department of Education*

**DEPARTMENT OF EDUCATION**

THE TOWNSEND BUILDING
P.O. BOX 1402
DOVER, DELAWARE 19903-1402
DOE WEBSITE: http://www.doe.state.de.us

Valerie A. Woodruff
Secretary of Education
Voice: (302) 739-4601
FAX: (302) 739-4654

April 12, 2004

Christina Diane Mongelli
SSN 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
504 Blackbird Drive
Hockessin, DE 19707

Dear Ms. Mongelli:

*Congratulations!* Your Initial License, effective from January 20, 2004 to January 31, 2007, is enclosed. It authorizes you to work in Delaware in the field of education. Your certificate(s) listed on the license, define the area(s) in which you are qualified to work. You are certified in the following area(s):

**Teacher Of Early Childhood/Primary K-4**

Any discrepancies should be corrected immediately by notifying your School District Personnel Office, who will then contact the Certification Office of the Department of Education.

Your license is an important document! Do not surrender it to a school district or agency. Keep your license in a safe place. If lost, misplaced, or a name change is made you may request a duplicate by contacting the Office of Professional Accountability.

> **Our records indicate that you have not passed PRAXIS I. In accordance with 14 Del. C §1210, your license will be suspended effective 6/30/2005 pending successful passage of the PRAXIS I or its equivalent. You must submit verification of passage of PRAXIS I or its equivalent prior to 6/30/2005 to avoid suspension of your license.**
>
> **Successful completion of the following sections of the PRAXIS I. Passing written/computer scores are: Reading 175/322, Writing 173/319, and Mathematics 174/319.**

During the term of the Initial License, you are required to participate in mentoring and other prescribed professional development activities. Prior to moving from an Initial to a

EDUCATION INFO LINE:
(877) 838-3787

THE STATE OF DELAWARE IS AN EQUAL OPPORTUNITY EMPLOYER AND DOES NOT DISCRIMINATE OR DENY SERVICES ON THE BASIS OF RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, DISABILITY AND/OR AGE.

TEACHER CERTIFICATION INFO:
(888) 759-9133

B23

D232

Continuing License, you must demonstrate competence through receiving satisfactory evaluations in the Delaware Performance Appraisal System.

Sincerely,

Aleta Hannah, Ph.D.
Education Specialist
Educator Licensure
Tel: 739-4686

Enclosure

CC: RED CLAY CONSOLIDATED SCHOOL DISTRICT



RED CLAY CO. CONSOLIDATED SCH. DISTRICT
1981

CLAY CONSOLIDATED
SCHOOL DISTRICT

ـert J. Andrzejewski, Ed.D.
*Superintendent*

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

JOHN DICKINSON
HIGH SCHOOL
1801 Milltown Road
ـington, Delaware, 19808

(302) 992-5500
FAX (302) 992-5508

Chad C. Carmack
*Principal*

d.Carmack@redclay.k12.de.us

EXHIBIT

*Carmack*
E-1   10/17/06

Memorandum

To:     Debra Davenport

From:   Chad C. Carmack

Cc:     Assistant Principals
        Tony Orga
        Susan Rash

Date:   January 30, 2004

Re:     *Temporary and Non-Tenured Teacher Contracts*

This memorandum is in reference to your January 20, 2004 memorandum:
*Temporary and Non-Tenured Teacher Contracts.* The following corrections
appear to be needed:

<u>Temporary Contracts</u>

| | | |
|---|---|---|
| Addition | Jonathan Gillespie | guidance |
| Addition | Daniel Bartnik | social studies |
| Addition | George Phillips | English |
| Addition | Christina Mongelli | special education |

Change to Non-Tenured Teacher         Angel Rene Allen      math

<u>Non-Tenured Teachers</u>

| | | |
|---|---|---|
| Remove | Robert Huffman | no longer employed social studies |
| Remove | Gerald Thompson | no longer employed special education |
| Addition | Donald Kukan | behavioral specialist |
| Addition | Kelley Wilson | special education |

**I recommend non-renewal of Melvin Suggs, Jr., math and Stuart
Richardson, math.**

Please let me know if you have questions.

Attachment:   John Dickinson High School Staffing Roster

D29

B25

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in

# JOHN DICKINSON HS 2003 04 UNITS (1/30/04)

| UNIT | Position | Last Name | First Name |
|------|----------|-----------|------------|
| 01 | ART | WINNERLING | DAVID |
| 02 | ASSISTANT PRINCIPAL | ARMSTRONG | STEPHANIE |
| 03 | BUS ED | WEXLER | MICHAEL |
| 04 | BUS ED | JUST | DIANNE |
| 05 | BUS ED | BURGER | SHERRITT |
| 06 | CON SCIENCE | THORNTON-LAKEY | LINDA |
| 07 | COUNSELOR | FULLMER | PATRICIA |
| 08 | COUNSELOR | GILLESPIE | JON |
| 09 | COUNSELOR | SCOTT | ELAINE |
| 10 | DISC | KUKAN | DONALD |
| 11 | DR ED | DISTEFANO | CHRISTOPHER |
| 12 | DR ED | ROBINSON | JACKIE |
| 13 | ENGLISH | PHILLIPS | GEORGE JASON |
| 14 | ENGLISH | DEIDRICK | BEVERLY |
| 15 | ENGLISH | STARKEY | REGINALD |
| 16 | ENGLISH | VYE | REBECCA |
| 17 | ENGLISH | VUCCOLA | MICHAEL |
| 18 | ENGLISH | ZERBE | KRISTIN |
| 19 | ENGLISH | CICORIA | LISA |
| 20 | ENGLISH | BARTH | COLLEEN |
| 21 | ENGLISH | TIPPETT | SUSAN |
| 22 | FL | SHORT | JENNIFER |
| 23 | FL | TRAVALINI | GINA |
| 24 | FL | ZAETTA | MYRNA |
| 25 | FL | CORNISH | MYRON |
| 26 | HLTH/PE | LASORSA | PAUL |
| 27 | HLTH/PE | HAYNES | JENNIFER |
| 28 | HLTH/PE | DICK | ANDREW |

*Friday, January 30, 2004*

B26

| UNIT | Position | Last Name | First Name |
|------|----------|-----------|------------|
| 29 | MATH | POLITE | SHERRY |
| 30 | MATH | HERHOLDT | ANNE |
| 31 | MATH | HOWARD | STEVEN |
| 32 | MATH | ALLEN | ANGEL RENEE |
| 33 | MATH | EHEMANN | KAREN |
| 34 | MATH | SPITSBERGEN | SUSANNE |
| 35 | MATH | SUGGS | MELVIN |
| 36 | MATH | RICHARDSON | STUART |
| 37 | MEDIA | SMITH | SUZANNE |
| 38 | MUSIC | HOCKING | JOSEPH |
| 39 | MUSIC | CASSIDY | SHEILA |
| 40 | NURSE | WATSON | DONNA |
| 41 | SCIENCE | CICCONI | SONJA ANNA |
| 42 | SCIENCE | STEPHENSON | CRAIG |
| 43 | SCIENCE | KARCHA | ROBERT |
| 44 | SCIENCE | LERTOLA | JAMES |
| 45 | SCIENCE | HEATH | LARRY |
| 46 | SCIENCE | BURPEE | KRISTINE |
| 47 | SCIENCE | WARE | DOUGLAS |
| 48 | SP ED | LENKIEWICZ | MARIE |
| 49 | SP ED | WILLIAMS | RACHEL |
| 50 | SP ED | MONGELLI | CHRISTINA |
| 51 | SP ED | REALER | JAMES |
| 52 | SP ED | WILSON | KELLEY |
| 53 | SP ED | FILLINGAME | KEVIN |
| 54 | SP ED ED | NORTON | KRISTEN |
| 55 | SS | BARTNIK | DANIEL |
| 56 | SS | THOMAS | DAVID |
| 57 | SS | LEE | SUK WOO (DAVID) |
| 58 | SS | HARDING | RAHN |

D31    B27

| UNIT | Position | Last Name | First Name |
|------|----------|-----------|------------|
| 59 | SS | CINI | RICHARD |
| 60 | SS | MONTEBELL | JOSEPH |
| 61 | TECH ED | HENSLER | THOMAS |
| 62 | TECH ED | SHEEHY | KATHRYN |
| 63 | TECH ED | MINCHHOFF | MICHAEL |
| 64 | TECH ED | WHARTON | RAY |

*Friday, January 30, 2004*

B28

STATE OF DELAWARE



# PROFESSIONAL EDUCATION EMPLOYEE CONTRACT

AGREEMENT made this ____13th____ day of ____May____ ____2004____, by and between the Board of Education of the ____Red Clay Consolidated____ School District (the "Board") and ____Christina Mongelli____, (the "Employee").

(Name of Employee)

The Board and the Employee mutually agree as follows:

1. **Employment.** The Board hereby employs the Employee, and the Employee hereby accepts employment upon the terms and conditions of this Agreement, as a ____TEACHER____

(Position)

for the school year commencing 5/13/04 and ending and from year to year thereafter, unless the Board shall terminate the Employee's services in accordance with Delaware law, and provided the Employee does now and continues to satisfy the State certification requirements. For purposes of the assignment of duties by the Board to the Employee, a school year shall be a ten-month period, beginning on a date specified by the Board, and consisting of one hundred eighty-five (185) days in accordance with Delaware law.

2. **Salary.** The Employee's total annual salary will be composed of funds from State, local, or federal sources or from some combination of the three sources as specified below:

| | | |
|---|---|---|
| State | $ | *TEACHERS' SALARY SCHEDULE |
| Local | $ | |
| Federal | $ | |
| Total | $ | |

3. **Duties of Employee.** The Employee shall faithfully perform those duties which may be assigned by the Board. The Employee shall observe and comply with the laws of the State of Delaware and with the regulations of the State Board of Education and the Board as currently in force and as from time to time amended, enacted or promulgated, which law and regulations, are incorporated herein by reference as if set forth in full herein.

The employee shall not vacate his or her position during the term of this contract without the written consent of the Board. In the event that the Employee wishes to vacate his or her position and terminate this Agreement at the end of any school year, the Employee must give written notice to the Board of such intention on or before July 1.

D116

4. **Governing Law.** This Agreement is to be governed by the laws of the State of Delaware. B29

rorated for the actual number of days worked beginning May 13, 2004 through June 30, 2004.

5. **Counterparts.** This Agreement has been executed in duplicate counterparts. Each executed counterpart is intended by the parties to be their original act and deed. One counterpart is to be delivered to the Employee and the other is to be retained by the Board.

6. **Contract Modification.** This Agreement is the whole agreement of the parties and may not be amended, modified or altered except as hereinafter set forth. This Agreement may be modified annually or as required with respect to Paragraph 2 by written addendum signed by both parties and attached to the original executed counterpart.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first above written.

ATTEST:                                                    BOARD OF EDUCATION

_____          BY: _____
Executive Secretary                                              President


                                                          EMPLOYEE

                                                          _Christina Mongelli_
                                                                        _(Seal)_


2004 MAY 21 P 10: 11

Human Resources
RCCSD

D117

B30
DOCUMENT NO. 95-01-84-06/06

## STUDENT BEHAVIOR REFERRAL

\* **FOR INTERNAL USE ONLY** - To be completed within a reasonable amount of time.

**ART I.**   Teacher's Name ___Ms. Mongelli___   Date __3/1/04__

Student's Name: | Student - JW |   .   Grade: __9__

Occurrence Date: __3/1/04__   Time: __12:30__   Location: __M109__

Behavior: ☐ New   ☐ Ongoing   Description of <u>OBSERVED</u> Student Behavior: | Student - JW |
continues to be extremely disruptive. Today, | Student - JW |
used inappropriate language, continually got out of his seat,
and refused to keep his hands off other students. He grabbed
other students by their shirts and/or arms. | Student - JW | often uses
inappropriate language (cursing and sexual language). He continues
to do and say whatever he pleases. He will often instigate an
argument for no reason or bully another student. He does no work.

**PART II.**   Check off the attempts used to resolve the problem. *(Indicate date and method used in making parental contact.)*

☐ Student/Teacher Conference   ☐ Parent Contact - Date _____   ☐ Detention
   Date _____      Phone ☐ and/or Letter ☐   ☐ Work Assignment
☐ Disciplinary Probation      Conference ☐   ☐ REACH Referral
☐ Reprimand   ☐ Behavioral Contract   ☐ Other _____
   Teacher's Signature _____

**PART III.**   Check off the administrative action used to resolve the problem after referral. *(Indicate date and method used in making parent contact.)*

☐ Student Counseled   ☐ In-School Alternative   ☐ Restitution/Restoration
☐ Work Assignment   ☐ Denial of Bus Privileges   ☐ Referral to Courts
☐ Reprimand   ☐ Denial of Driving Privileges   ☐ Behavioral Contracts
☐ Detention   ☑ Suspension   ☐ Alternative School Recommendation
☐ Disciplinary Probation   ☐ Exclusion   ☐ Recommendation for Due Process
☐ Removal from Class
☐ In-School Referral _____
☐ Outside Agency Referral _____
☐ Parent Contact - Date _____ Phone ☐ and/or Letter ☐ Conference ☐
Comments ( *if any* ): _____   CONFIDENTIAL

   OSS   3/8   D78

Administrator's Signature _____   Date __3/8__

# THE RED CLAY CONSOLIDATED
## STUDENT BEHAVIOR REFERRAL

*** FOR INTERNAL USE ONLY** - To be completed within a reasonable amount of time.

**PART I.**   Teacher's Name **Ms. Mongelli**                     Date **3/2/04**

Student's Name:        Student - JW                     Grade: **9**

Occurrence Date: **3/2/04**     Time: **12:20**     Location: **M109**

Behavior: ☐ New   ☐ Ongoing  Description of Student Behavior: Student - JW continues
to be extremely disruptive and disrespectful. He continually
got out of his seat and refused to keep his hands off
other students. Student - JW talked very loud while I was
teaching the class. When I told him to stop talking, he yelled
out: "Fuck her. Fucking bitch." Then, Student - JW got out of his
seat and yelled, "I'm going to knock her fucking head off."

**PART II.**   Check off the attempts used to resolve the problem. *(Indicate date and method used in making parental contact.)*

☐ Student/Teacher Conference        ☐ Parent Contact - Date _____        ☐ Detention
Date _____                                Phone ☐ and/or Letter ☐        ☐ Work Assignment
☐ Disciplinary Probation                  Conference ☐                            ☐ REACH Referral
☐ Reprimand                                  ☐ Behavioral Contract                  ☐ Other _____

Teacher's Signature _____

**PART III.**   Check off the administrative action used to resolve the problem after referral. *(Indicate date and method used in making parent contact.)*

☐ Student Counseled              ☐ In-School Alternative          ☐ Restitution/Restoration
☐ Work Assignment              ☐ Denial of Bus Privileges        ☐ Referral to Courts
☐ Reprimand                        ☐ Denial of Driving Privileges    ☐ Behavioral Contracts
☐ Detention                          ☑ Suspension                        ☐ Alternative School Recommendation
☐ Disciplinary Probation        ☐ Exclusion                          ☐ Recommendation for Due Process
☐ Removal from Class
☐ In-School Referral _____
☐ Outside Agency Referral _____
☐ Parent Contact - Date _____ Phone ☐ and/or Letter ☐ Conference ☐

Comments *( if any )* : _____

OSS  3/9                    CONFIDENTIAL

D77

Administrator's Signature _____                     Date **3/8**

Form 240 (Rev. 6/02)          White - Principal   Yellow - Return to Teacher   Pink - Discipline File   Gold - Remains with Teacher

B32

# RED CLAY CONSOLIDATED SCHOOL DISTRICT

## CLASS REPORT

Student Name | Student - JW | Homeroom

Class cut, Lateness, (Behavior)   Refused to stop talking on cell phone.

Date(s) 3/31/04

Subject Social Studies   Called me a "fucking bitch."

Period/Mod 9

Teacher Signature _Ms. Mongelli_

Date(s) of Detention

Confirmation Requested

For Official Use

☐ Detention Assigned          ☐ Student Escorted to Class

☐ Parents Contacted           ☐ Student Suspended

☐ Parent Conference Held       ☐ Other

Copies: White - Office   Canary - Teacher   Pink - Student

CONFIDENTIAL

D80

B33

## CLASS REPORT

Student Name [ Student - JW ]    Homeroom_____

Class cut, Lateness, (Behavior)    [ Student - JW ] called
me a "fucking
Date(s) 4|1|04    bitch" many times,
"fucking ugly"
Subject English    "fucking idiot," and
told me to "get the
Period/Mod 7/8    fuck out
of here."
Teacher Signature _Ms. Mongelli_
Date(s) of Detention

Confirmation Requested

For Official Use

☐ Detention Assigned    ☐ Student Escorted to Class
☐ Parents Contacted    ☒ Student Suspended
☐ Parent Conference Held    ☐ Other

Copies: White - Office   Canary - Teacher   Pink - Student

---

## RED CLAY CONSOLIDATED SCHOOL DISTRIC

## CLASS REPORT

Student Name [ Student - JW ]    Homeroom_____

Class cut, Lateness, (Behavior)    Threw
[ Student - JW ]
Date(s) 3/31/04    [ Student - KB ]
on the floor.
Subject English    [ Student - JW ] Kicked
[ Student - AF ]'s
Period/Mod 7/8    book bag.

Teacher Signature _Ms. Mongelli_
Date(s) of Detention

Confirmation Requested

For Official Use

☐ Detention Assigned    ☐ Student Escorted to Class
☐ Parents Contacted    ☒ Student Suspended
☐ Parent Conference Held    ☐ Other

Copies: White - Office   Canary - Teacher   Pink - Student

---

## RED CLAY CONSOLIDATED SCHOOL DISTR

## CLASS REPORT

Student Name [ Student - JW ]    Homeroom_____

Class cut, Lateness, (Behavior)    Refused to
stop talking
Date(s) 3/31/04    on cell phor
Subject Social Studies    called me
a "fucking
Period/Mod 9    bitch."

Teacher Signature _Ms. Mongelli_
Date(s) of Deten

Confirmation Requested

For Official Use

☐ Detention Assigned    ☐ Student Escorted to Cl
☐ Parents Contacted    ☒ Student Suspended
☐ Parent Conference Held    ☐ Other

Copies: White - Office   Canary - Teacher   Pink - Student

CONFIDENTIAL
D83

B34

# THE RED CLAY CONSOLIDATED SCHOOL DISTRICT
## STUDENT BEHAVIOR REFERRAL

\* FOR INTERNAL USE ONLY - To be completed within a reasonable amount of time.

**PART I.**  Teacher's Name ___Ms. Mongelli___  Date _4/26/04_

Student's Name: _____[JW]_____  Grade: _9_

Occurrence Date: _4/26/04_  Time: _Period 7/8_  Location: _M 109_

Behavior: ☐ New  ☑ Ongoing  Description of Student Behavior: ___[JW]___ Continues to use very inappropriate language. Today, [JW] behaved extremely inappropriately. As I leaned over to help a student who was seated, [JW] got out of his seat and came up behind me. He grabbed me forcefully and proceeded to "hump" me.

**PART II.**  Check off the attempts used to resolve the problem. *(Indicate date and method used in making parental contact.)* Parent not home, left message with ___[JW]___'s brother

☑ Student/Teacher Conference  Date _4/26/04_  
☑ Parent Contact - Date _4/26/04_  Phone ☑ and/or Letter ☐  
☐ Disciplinary Probation  Conference ☐  
☐ Reprimand  ☐ Behavioral Contract  
☐ Detention  
☐ Work Assignment  
☐ REACH Referral  
☐ Other _____

Teacher's Signature ___Ms. Mongelli___

**PART III.**  Check off the administrative action used to resolve the problem after referral. *(Indicate date and method used in making parent contact.)*

☐ Student Counseled  ☐ In-School Alternative  ☐ Restitution/Restoration  
☐ Work Assignment  ☐ Denial of Bus Privileges  ☐ Referral to Courts  
☐ Reprimand  ☐ Denial of Driving Privileges  ☐ Behavioral Contracts  
☐ Detention  ☐ Suspension  ☐ Alternative School Recommendation  
☐ Disciplinary Probation  ☐ Exclusion  ☐ Recommendation for Due Process  
☐ Removal from Class  
☐ In-School Referral _____  
☐ Outside Agency Referral _____  
☐ Parent Contact - Date _____ Phone ☐ and/or Letter ☐ Conference ☐

Comments ( *if any* ) : _____

DEPOSITION
EXHIBIT
# 1
3/30/06 ASG

Administrator's Signature _____  Date _____

7

# THE RED CLAY CONSOLIDATED SCHOOL DISTRICT
## STUDENT BEHAVIOR REFERRAL

\* FOR INTERNAL USE ONLY - To be completed within a reasonable amount of time.

**PART I.**    Teacher's Name ___Ms. Mongelli___    Date _5/3/04_

Student's Name: [ Student - JW ]    Grade: _9_

Occurrence Date: _5/3/04_    Time: _Period 7/8_    Location: _M109_

Behavior: ☐ New    ☐ Ongoing    Description of Student Behavior: _When I was_
_teaching the class,_ [ Student - JW ] _looked directly at my_
_breasts and stated: "Your nipples are hard." At the_
_end of the period,_ [ Student - JW ] _grabbed my arm forcefully_
_and pulled me close to his body. He stated: "Your_
_a bitch, but I mean that in a good way."_

**PART II.**    Check off the attempts used to resolve the problem. *(Indicate date and method used in making parental contact.)*    parent not home,
sibling answered phone

☑ Student/Teacher Conference    ☑ Parent Contact - Date _5/3/04_    ☐ Detention
Date _5/3/04_    Phone ☑ and/or Letter ☐    ☐ Work Assignment
☐ Disciplinary Probation    Conference ☐    ☐ REACH Referral
☐ Reprimand    ☐ Behavioral Contract    ☐ Other____

Teacher's Signature ___Ms. Mongelli___

**PART III.**    Check off the administrative action used to resolve the problem after referral. *(Indicate date and method used in making parent contact.)*

☐ Student Counseled    ☐ In-School Alternative    ☐ Restitution/Restoration
☐ Work Assignment    ☐ Denial of Bus Privileges    ☐ Referral to Courts
☐ Reprimand    ☐ Denial of Driving Privileges    ☐ Behavioral Contracts
☐ Detention    ☐ Suspension    ☐ Alternative School Recommendation
☐ Disciplinary Probation    ☐ Exclusion    ☐ Recommendation for Due Process
☐ Removal from Class
☐ In-School Referral ____
☐ Outside Agency Referral ____
☐ Parent Contact - Date____ Phone ☐ and/or Letter ☐ Conference ☐

Comments ( *if any* ): ____

CONFIDENTIAL

D104

Administrator's Signature ____    Date____

Form 240 (Rev. 6/02)    White - Principal    Yellow - Return to Teacher    Pink - Discipline File    Gold - Remains with Teacher

B36

# THE RED CLAY CONSOLIDATED SCHOOL DISTRICT
## STUDENT BEHAVIOR REFERRAL
\* FOR INTERNAL USE ONLY - To be completed within a reasonable amount of time.

**PART I.** Teacher's Name __Ms. Mongelli__ Date __5/4/04__

Student's Name: [ Student – JW ] Grade: __9__

Occurrence Date: __5/4/04__ Time: __Period 9__ Location: __A105B__

Behavior: ☐ New  ☑ Ongoing  Description of Student Behavior: __At the end of the period, [Student – JW] sat on top of the desk and stared directly at me. [Student – JW] opened his legs wide and pretended to be having sex. He moved the lower portion of his body up and down quite rapidly. He said: "Oh, oh, Anh." He made "sucking" noises with his mouth and pretended he was breathing heavily.__

**PART II.** Check off the attempts used to resolve the problem. *(Indicate date and method used in making parental contact.)*

☑ Student/Teacher Conference Date __5/4/04__

☐ Disciplinary Probation

☐ Reprimand

☐ Parent Contact - Date _____
  Phone ☐ and/or Letter ☐
  Conference ☐
☐ Behavioral Contract

☐ Detention

☐ Work Assignment

☐ REACH Referral

☐ Other _____

Teacher's Signature __Mrs. Mongelli__

**PART III.** Check off the administrative action used to resolve the problem after referral. *(Indicate date and method used in making parent contact.)*

☐ Student Counseled
☐ Work Assignment
☐ Reprimand
☐ Detention
☐ Disciplinary Probation
☐ Removal from Class
☐ In-School Referral _____
☐ Outside Agency Referral _____
☐ Parent Contact - Date _____ Phone ☐ and/or Letter ☐ Conference ☐

☐ In-School Alternative
☐ Denial of Bus Privileges
☐ Denial of Driving Privileges
☐ Suspension
☐ Exclusion

☐ Restitution/Restoration
☐ Referral to Courts
☐ Behavioral Contracts
☐ Alternative School Recommendation
☐ Recommendation for Due Process

Comments ( if any ) : _____

CONFIDENTIAL
D105

Administrator's Signature _____ Date _____

orm 240 (Rev. 6/02)

White - Principal   Yellow - Return to Teacher   Pink - Discipline File   Gold - ...

B37

# THE RED CLAY CONSOLIDATED SCHOOL DISTRICT
## STUDENT BEHAVIOR REFERRAL

\* FOR INTERNAL USE ONLY - To be completed within a reasonable amount of time.

**PART I.**   Teacher's Name ___Ms. Mongelli___   Date _5/5/04_

Student's Name: [ Student - JW ]   Grade: _9_

Occurrence Date: _5/5/04_   Time: _Period 7/8_   Location: _M109_

Behavior: ☐ New  ☑ Ongoing   Description of Student Behavior: _As I walked into the classroom at the beginning of the period, [Student - JW] grabbed my arm very forcefully and refused to let go. He said, "Let's do the tango." He pulled me close to his body and moved me forward. When I told him to let go of my arm, he said: "Your a bitch. Chill." Then, he stated: "Do you have sex?" and "Who do you have sex with?"_

**PART II.**   Check off the attempts used to resolve the problem. *(Indicate date and method used in making parental contact.)*

☑ Student/Teacher Conference   ☐ Parent Contact - Date _____   ☐ Detention
  Date _5/5/04_                        Phone ☐  and/or Letter ☐   ☐ Work Assignment
☐ Disciplinary Probation              Conference ☐              ☐ REACH Referral
☐ Reprimand                 ☐ Behavioral Contract             ☐ Other _____
  Teacher's Signature _Ms. Mongelli_

**PART III.**   Check off the administrative action used to resolve the problem after referral. *(Indicate date and method used in making parent contact.)*

☐ Student Counseled          ☐ In-School Alternative          ☐ Restitution/Restoration
☐ Work Assignment            ☐ Denial of Bus Privileges       ☐ Referral to Courts
☐ Reprimand                  ☐ Denial of Driving Privileges   ☐ Behavioral Contracts
☐ Detention                  ☐ Suspension                     ☐ Alternative School Recommendation
☐ Disciplinary Probation     ☐ Exclusion                      ☐ Recommendation for Due Process
☐ Removal from Class
☐ In-School Referral _____
☐ Outside Agency Referral _____
☐ Parent Contact - Date_____ Phone ☐ and/or Letter ☐ Conference ☐

Comments *( if any )* : _____
_____        CONFIDENTIAL
_____          D106
_____

Administrator's Signature _____   Date_____

Form 240 (Rev. 6/02)        White - Principal   Yellow - Return to Teacher   Pink - Discipline File   Gold - Remains with Teacher

B38

# THE RED CLAY CONSOLIDATED SCHOOL DISTRICT
## STUDENT BEHAVIOR REFERRAL

\* FOR INTERNAL USE ONLY - To be completed within a reasonable amount of time.

**PART I.**   Teacher's Name __Ms. Mongelli__   Date __5/5/04__

Student's Name: [ Student - JW ]   Grade: __9__

Occurrence Date: __5/5/04__   Time: __Period 9__   Location: __A105B__

Behavior: ☐ New   ☑ Ongoing   Description of Student Behavior: [ Student - JW ] refused
to sit in his seat and to stop talking. When I told him
to sit down, he threatened: "My mom is going to take
care of you. She's going to rock you." I wrote out an
SOS form and gave it to [ Student - JW ] He yelled, "I ain't
fucking going anywhere. You're a fucking bitch." He tore the
form in half. I called the main office for an administrator.
Mr. Carmack came to the classroom and removed [ Student - JW ]
Mr. Carmack sent [ Student - JW ] back to my classroom before the end of the period.

**PART II.**   Check off the attempts used to resolve the problem. *(Indicate date and method used in making parental contact.)*

☑ Student/Teacher Conference   ☐ Parent Contact - Date _____   ☐ Detention
Date __5/5/04__          Phone ☐ and/or Letter ☐   ☐ Work Assignment
☐ Disciplinary Probation      Conference ☐        ☐ REACH Referral
☐ Reprimand           ☐ Behavioral Contract      ☐ Other _____
    Teacher's Signature __Ms. Mongelli.__

**PART III.**   Check off the administrative action used to resolve the problem after referral. *(Indicate date and method used in making parent contact.)*

☐ Student Counseled       ☐ In-School Alternative       ☐ Restitution/Restoration
☐ Work Assignment        ☐ Denial of Bus Privileges     ☐ Referral to Courts
☐ Reprimand           ☐ Denial of Driving Privileges   ☐ Behavioral Contracts
☐ Detention           ☐ Suspension           ☐ Alternative School Recommendation
☐ Disciplinary Probation     ☐ Exclusion           ☐ Recommendation for Due Process
☐ Removal from Class
☐ In-School Referral _____
☐ Outside Agency Referral _____
☐ Parent Contact - Date _____ Phone ☐ and/or Letter ☐ Conference ☐

Comments ( *if any* ) : _____   CONFIDENTIAL
_____        D107
_____
_____
_____

Administrator's Signature _____   Date _____

Form 240 (Rev. 6/02)     White - Principal   Yellow - Return to Teacher   Pink - Discipline File   Gold - Remains with Teacher

B39

# THE RED CLAY CONSOLIDATED SCHOOL DISTRICT
## STUDENT BEHAVIOR REFERRAL

\* FOR INTERNAL USE ONLY - To be completed within a reasonable amount of time.

PART I.     Teacher's Name __Ms Mongelli__     Date __5/6/04__

Student's Name: [ Student - JW ]     Grade: __9__

Occurrence Date: __5/6/04__     Time: __Period 9__     Location: __A105B__

Behavior: ☐ New   ☑ Ongoing   Description of Student Behavior: [ Student - JW ] __got out of__
__his seat, came up to my desk, and stared directly at me.__
__Then, [ Student - JW ] sang a rap song stating, "How's your__
__pussy?" He sang the word "pussy" several times__
__during his rap song. When I told him to go to sos, he__
__continued singing even louder. After [ Student - JW ] sang,__
__he made "sucking" noises with his mouth.__

PART II.     Check off the attempts used to resolve the problem. *(Indicate date and method used in making parental contact.)*

☑ Student/Teacher Conference        ☐ Parent Contact - Date _____        ☐ Detention
   Date __5/6/04__                            Phone ☐ and/or Letter ☐        ☐ Work Assignment
☐ Disciplinary Probation                    Conference ☐                    ☐ REACH Referral
☐ Reprimand                          ☐ Behavioral Contract                  ☐ Other _____

Teacher's Signature __Ms. Mongelli.__

PART III.     Check off the administrative action used to resolve the problem after referral. *(Indicate date and method used in making parent contact.)*

☐ Student Counseled          ☐ In-School Alternative          ☐ Restitution/Restoration
☐ Work Assignment            ☐ Denial of Bus Privileges       ☐ Referral to Courts
☐ Reprimand                  ☐ Denial of Driving Privileges   ☐ Behavioral Contracts
☐ Detention                  ☐ Suspension                     ☐ Alternative School Recommendation
☐ Disciplinary Probation     ☐ Exclusion                      ☐ Recommendation for Due Process
☐ Removal from Class
☐ In-School Referral _____
☐ Outside Agency Referral _____
☐ Parent Contact - Date _____ Phone ☐ and/or Letter ☐ Conference ☐

Comments *( if any )* : _____          CONFIDENTIAL
_____                D108
_____
_____
_____

Administrator's Signature _____          Date _____

517

# THE RED CLAY CONSOLIDATED SCHOOL DISTRICT
## STUDENT BEHAVIOR REFERRAL

＊ FOR INTERNAL USE ONLY - To be completed within a reasonable amount of time.

PART I.    Teacher's Name  Ms. Mongelli                    Date 5/7/04

Student's Name:  [ JW ]                          Grade:  9

Occurrence Date: 5/7/04'      Time: Period 7/8    Location: M109

Behavior: ☐ New  ☑ Ongoing  Description of Student Behavior: [ JW ] got out of his seat and walked over to me. Then, [ JW ] sang a rap song stating, "Ms. Mongelli gives head." He sang this four times. As he was singing, [ JW ] pointed to his penis three times.

PART II.    Check off the attempts used to resolve the problem. (Indicate date and method used in making parental contact.)

☐ Student/Teacher Conference    ☐ Parent Contact - Date _____    ☐ Detention
   Date _____                 Phone ☐ and/or Letter ☐              ☐ Work Assignment
☐ Disciplinary Probation             Conference ☐                        ☐ REACH Referral
☐ Reprimand                        ☐ Behavioral Contract                 ☐ Other _____
       Teacher's Signature _____

PART III.    Check off the administrative action used to resolve the problem after referral. (Indicate date and method used in making parent contact.)

☐ Student Counseled         ☐ In-School Alternative       ☐ Restitution/Restoration
☐ Work Assignment           ☐ Denial of Bus Privileges    ☐ Referral to Courts
☐ Reprimand                 ☐ Denial of Driving Privileges ☐ Behavioral Contracts
☐ Detention                 ☐ Suspension                  ☐ Alternative School Recommendation
☐ Disciplinary Probation    ☐ Exclusion                   ☐ Recommendation for Due Process
☐ Removal from Class
☐ In-School Referral _____
☐ Outside Agency Referral _____
☐ Parent Contact  - Date _____  Phone ☐ and/or Letter ☐  Conference ☐

Comments ( if any ) : _____

DEPOSITION
EXHIBIT
#7
3/20/06 ASR

Administrator's Signature _____          Date _____

b41

RED CLAY CONSOLIDATED SCHOOL DISTRICT

NOTICE OF SUSPENSION

| TO: | Student - JW's Mother | RE: | Student - JW |
|-----|----------------------|-----|--------------|

Student's Last Name          First

_WILMINGTON, DE 19802_

9     M     02
Grade   Sex   Race

184702
Student Number

OSS ☒ 3/9

This is to inform you that the above named student has been suspended from school for a period of _1_ days and may not return until _3-10_ .
This action is being taken as a result of _____

_DISRUPTION OF THE EDUCATIONAL PROCESS_

_INFLAMMATORY ACTIONS_

This suspension is based on the facts which have thus far been presented to me. We have informally discussed the misconduct with your child who has been presented with the evidence. Also, your child has been given an opportunity to present his/her side of the story.

During the time of this suspension the student:

a. Is to remain off school property, including the school grounds.

b. May not attend nor participate in any school activity.

If you desire to attend a hearing on this matter, please call this office so that one may be arranged as soon as possible. At such a hearing, you and your child will be given the opportunity to present witnesses and to present any facts or reasons, orally or in writing, which in your opinion relate to this suspension.

Please be advised that your failure to respond to this letter and to avail your-self of the opportunity to be heard in the manner provided will signify your desire not to have a hearing and your agreement with the action taken.

In order for your child to be readmitted to school, his/her parent(s) or guardian(s) must attend a conference with the school staff. Please call the school at _____ to arrange this conference, or if you have any question about this notice.

_____        _J. Kennedy_  3/8/04
Signature of Suspended Student/Date        Signature of Principal/Date

Copies: White - Student, Yellow - Parent, Pink - Principal, Goldenrod - File

(H) 762-2096 - LEFT MESSAGE

CONFIDENTIAL

D76

Form 243 (8/80)

B42

RED CLAY CONSOLIDATED SCHOOL DISTRICT

NOTICE OF SUSPENSION

TO: _____Student - JW's mother_____    RE: _____Student - JW_____

Student's Last Name    First

_Wilmington, DE 19702_

Grade    Sex    Race

_7    M    C2_

OSS 4/19 (SOS Refused)

_174702_

Student Number

This is to inform you that the above named student has been suspended from school for a period of _1_ days and may not return until _4/20_. This action is being taken as a result of _ABUSIVE LANGUAGE_ _DISRUPTION OF THE EDUCATIONAL PROCESS_ _DEFIANCE OF AUTHORITY_

This suspension is based on the facts which have thus far been presented to me. We have informally discussed the misconduct with your child who has been presented with the evidence. Also, your child has been given an <u>opportunity to present his/her side of the story.</u>

During the time of this suspension the student:

a.  Is to remain off school property, including the school grounds.

b.  May not attend nor participate in any school activity.

If you desire to attend a hearing on this matter, please call this office so that one may be arranged as soon as possible. At such a hearing, you and your child will be given the opportunity to present witnesses and to present any facts or reasons, orally or in writing, which in your opinion relate to this suspension.

Please be advised that your failure to respond to this letter and to avail yourself of the opportunity to be heard in the manner provided will signify your desire not to have a hearing and your agreement with the action taken.

In order for your child to be readmitted to school, his/her parent(s) or guardian(s) must attend a conference with the school staff. Please call the school at _____ to arrange this conference, or if you have any question about this notice.

X _____Student - JW's mother_____    _____4/8/04_____
Signature of Suspended Student/Date    Signature of Principal/Date

Copies: White - Student,  Yellow - Parent,  Pink - Principal,  Goldenrod - File

_SPOKE W/ MOTHER_

CONFIDENTIAL
D82

Form 243 (8/80)    B43

MY-24-2004 MON 10:39 AM    JP 2 VIDEO COURT                                    P. 03

State of Delaware vs. [Student - JW]                    Case: 04 05 018390

## Exhibit B

SBI Number: T1870051                      Also Known As:
Date of Birth/Age: Aug 11, 1989 (14)      Sex: Male                    Race: Black
Eye Color: Brown          Hair Color: Black    Height: 5'5"    Weight: 140 lbs
Driver's License:                              Social Security Number: 000000000

Address:    [REDACTED]                    Parent Name, Address, Employer
                                          [Student - JWS Mother]
Phone:

Employer:

Date and Times of Offense: Between 04/26/2004 at 1300 and 06/07/2004 at 1400
Location of Offense: 1801 Milltown RD - John Dickinson High School - Wilmington, 19808

Your affiant CPL/3 ALEX J NOWELL can truly state that:
1. YOUR AFFIANT IS A 17 YEAR MEMBER OF THE DELAWARE STATE POLICE AND IS ASSIGNED TO THE CRIMINAL INVESTIGATION UNIT AT DELAWARE STATE POLICE TROOP 2. YOUR AFFIANT IS CURRENTLY THE SCHOOL RESOURCE OFFICER AT JOHN DICKINSON H.S.
2. YOUR AFFIANT WAS CONTACTED BY ASST. PRINCIPAL JOHN KENNEDY REFERENCE TO SEVERAL INCIDENTS THAT OCCURRED IN A CLASSROOM WHICH WERE ALARMING AND OFFENSIVE TO THE VICTIM/TEACHER MONGELLI. KENNEDY ADVISED THAT DEF. [Student - JW] [Student - JW] (DOB:08/11/89  14 YOA) HAD GRABBED VICTIM MONGELLI ON TWO OCCASIONS, DEF. [Student - JW] GRABBED HER ARM AND ASKED HER TO DO THE TANGO, AND ON ANOTHER INCIDENT GRABBED VICTIM MONGELLI'S ARM AND FORCEFULLY PULLED HER INTO [Student - JW] BODY. KENNEDY FURTHER ADVISED THAT ON ONE INCIDENT DEF [Student - JW] APPROACHED VICTIM MONGELLI FROM BEHIND AS SHE WAS LEANING OVER ASSISTING A STUDENT AT A DESK. [Student - JW] PROCEEDED TO GRAB VICTIM MONGELLI WITH BOTH HANDS AROUND HER WAIST. [Student - JW] THEN HUMPED VICTIM MONGELLI, MAKING PHYSICAL CONTACT WITH HER BUTTOCKS AREA WITH HIS PENIS. KENNEDY FURTHER ADVISED THAT [Student - JW] ALSO MADE SEVERAL SEXUAL COMMENTS WHICH WERE VERY ALARMING AND OFFENSIVE TO VICTIM MONGELLI. [Student - JW] STATED ONCE, "YOUR NIPPLES ARE HARD". [Student - JW] SAT ON A TOP OF A DESK WITH HIS LEGS SPREAD WIDE OPEN AND PRETENDED TO BE HAVING SEX. HE MOVED HIS LOWER PORTION OF HIS BODY UP AND DOWN QUITE RAPIDLY MAKING MOANING NOISES WHILE LOOKING AT VICTIM MONGELLI. [Student - JW] ALSO MADE SUCKING NOISES AND BREATHED HEAVILY. KENNEDY FURTHER ADVISED THAT [Student - JW] ASKED VICTIM MONGELLI, IF SHE HAD SEX, AND WHO DO YOU HAVE SEX WITH ? [Student - JW] ASKED VICTIM MONGELLI, HOW'S YOUR PUSSY DURING A RAP SONG. HE ALSO MADE SUCKING NOISES WHEN STATING PUSSY SEVERAL TIMES. [Student - JW] MONGELLI GIVES HEAD, WHILE POINTING TO HIS PENIS. 3. YOUR

                                          Affiant

Sworn and subscribed before me this 24th day of May AD, 2004

                              Judge/Master/Commissioner/Clerk

24-2004 MON 10:40 AM    JP 2 VIDEO COURT                                    P. 04

State of Delaware vs. [Student - JW]                        Case: 04 05 018390

INTERVIEWED VICTIM MONGELLI AT DICKINSON H.S. VICTIM MONGELLI WAS VERY UPSET AND OFFENDED BY DEF. [Student - JW] DEMEANOR IN HER CLASSROOM. VICTIM MONGELLI ADVISED THAT DEF. [Student - JW] HAS GRABBED HER BY THE ARMS ON TWO OCCASIONS, ONE TIME DEF. [Student - JW] GRABBED HER ARM AND STATED LET'S DO THE TANGO. VICTIM MONGELLI HAD TO PULL HERSELF AWAY FROM DEF. [Student - JW] DEF. [Student - JW] ON ANOTHER OCCASION GRABBED HER BY THE ARM AND FORCEFULLY PULLED HER INTO HIS BODY. VICTIM MONGELLI ADVISED THAT SHE WAS SCARED BECAUSE DEF. [Student - JW] JUST LAUGHED AND DIDN'T PAY MUCH ATTENTION TO HER REQUESTS TO LET GO. VICTIM MONGELLI FURTHER ADVISED THAT DEF. [Student - JW] HAD APPROACHED HER FROM BEHIND ONCE WHILE SHE ASSISTED A STUDENT AT THEIR DESK. WHILE VICTIM MONGELLI WAS LEANED OVER, DEF. [Student - JW] GRABBED HER HIPS WITH BOTH OF HIS HANDS, AND MADE A HUMPING MOTION. DEF. [Student - JW] S PENIS MADE CONTACT WITH VICTIM MONGELLI'S BUTTOCK AREA. VICTIM MONGELLI ADVISED THAT SHE JUMPED UP AND STATED "WHAT ARE YOU DOING" ? VICTIM MONGELLI ADVISED THAT DEF. [Student - JW] LAUGHED LIKE IT WAS A JOKE. VICTIM MONGELLI STATED THAT DEF. [Student - JW] IS ALWAYS ASKING HER ABOUT HER SEX LIFE, HAS CALLED HER A BITCH, BUT STATED IN A GOOD WAY. DEF. [Student - JW] SINGS RAP SONGS AND LOOKS AT VICTIM MONGELLI AND ASKS, HOW'S YOUR PUSSY WHILE MAKING SUCKING NOISES. ONE TIME DEF. [Student - JW] SAT ON TOP OF A DESK WITH HIS LEGS SPREAD, AND MADE MOTIONS LIKE HE WAS HAVING SEX. VICTIM MONGELLI ADVISED THAT HE LOOKED RIGHT AT HER AND STARTED TO MOAN LIKE HE WAS HAVING AN ORGASM.

    4.  YOUR AFFIANT OBTAINED A WRITTEN STATEMENT FROM A STUDENT/ WITNESS [Student - KB] [Student - KB] (DOB:09/21/88 15 YOA) [Student - KB] ADVISED THAT HE OBSERVED DEF. [Student - JW] GRAB VICTIM MONGELLI 2 TIMES AND TRY TO DANCE WITH HER. [Student - KB] FURTHER ADVISED HE DID OBSERVE DEF. [Student - JW] ON A DESK MAKING NOISES LIKE OH OH A, LIKE HE WAS HAVING SEX. WITNESS [Student - KB] ALSO HEARD DEF. [Student - JW] STATE TO MONGELLI YOUR NIPPLES ARE HARD.

Affiant: CPL/3 ALEX J NOWELL (570) of TROOP 2 STATE POLICE

Victim:                          Date of Birth              Relationship Victim to Defendant
CHRISTINA MONGELLI              07/25/1968                 Otherwise Known

Sworn and subscribed before me this 24th day of May AD, 2004

_____
Affiant

Judge/Master/Commissioner/Court Clerk

CONFIDENTIAL
D128                                                        B45

## *The Family Court of the State of Delaware*
### IN AND FOR NEW CASTLE COUNTY
### JUVENILE PETITION



In the Interest of

| NAME: | | DOB: |
|-------|---|------|
| Student - JW | | 08-11-89 |
| UNIFORM CASE #: | 0405018390 | |

Petitioner, the Attorney General of the State of Delaware, by the undersigned Deputy Attorney General, upon a Sworn Complaint previously filed, alleges that the above named child appears to have committed a delinquent act as defined by 10 Delaware Code, Section 901, in that:

### COUNT I. A MISDEMEANOR

UNLAWFUL SEXUAL CONTACT THIRD DEGREE, in violation of Title 11, Section 767 of the Delaware Code of 1974, as amended.

[Student - JW], on or about the 26th day of April, 2004 in the County of New Castle, State of Delaware, did intentionally have sexual contact with Christine Mongelli by rubbing his penis against her buttocks knowing that the contact was either 9offensive to the victim or occurred without the victim's consent.

### COUNT II. MISDEMEANOR

OFFENSIVE TOUCHING in violation of Title 11, Section 601 of the Delaware Code of 1974, as amended.

[Student - JW], on or about the 3rd day of May, 2004 in the County of New Castle, State of Delaware, did intentionally touch another person Christina Mongelli, either with a member of his body or with any instrument, knowing that he was thereby likely to cause offense or alarm to such person.

### COUNT III. MISDEMEANOR

OFFENSIVE TOUCHING in violation of Title 11, Section 601 of the Delaware Code of 1974, as amended.

[Student - JW], on or about the 5th day of May, 2004 in the County of New Castle, State of Delaware, did intentionally touch another person Christina Mongelli, either with a member of his body or with any instrument, knowing that he was thereby likely to cause offense or alarm to such person.

### COUNT IV. A MISDEMEANOR

SEXUAL HARASSMENT in violation of Title 11, Section 763 of the Delaware Code of 1974, as amended.

[Student - JW], on or about or between the 26th day of April, 2004and the 7th day of May, 2004, in the County of New Castle, State of Delaware did suggest, solicit, request, command, importune or otherwise attempt to induce Christina Mongelli to have sexual contact or sexual intercourse or unlawful sexual penetration with the actor, knowing that the actor is thereby likely to cause annoyance, offense or alar to that person.

An act or acts which would constitute a violation or violations of the Delaware Code above stated.

6-15-04
DATE

ATTORNEY GENERAL

DEPUTY ATTORNEY GENERAL

CONFIDENTIAL
D138

B46

# The Family Court of the State of Delaware

In and For ☒ New Castle ☐ Kent ☐ Sussex County

ATE OF DELAWARE  VS.

Student - JW

UCN: 0405018390

SBI: _____  D.O.B.: 8/11/1989

Telephone No.: _____

## JUVENILE DISPOSITION

Is **4th** day of **August**, **2004** IT IS ORDERED, based upon

⌐ Respondent's guilty plea    ( ) A finding of the Court beyond a reasonable doubt

( ) Defendant is in Violation of Probation of the order dated: _____

(X) The defendant is hereby adjudicated <u>DELINQUENT</u> of the following charges:

T (LID)  11 Del. C. § 601 , Inc. # _____
T (2 cts)  11 Del. C. § 601 , Inc. # _____
Sexual Harrasment  11 Del. C. § 763 , Inc. # _____
_____  Del. C. § _____ , Inc. # _____
_____  Del. C. § _____ , Inc. # _____

( ) The defendant is hereby adjudicated <u>NOT DELINQUENT</u> of the following charges:

_____  Del. C. § _____ , Inc. # _____
_____  Del. C. § _____ , Inc. # _____
_____  Del. C. § _____ , Inc. # _____
_____  Del. C. § _____ , Inc. # _____
_____  Del. C. § _____ , Inc. # _____

( ) A <u>NOLLE PROSEQUI</u> is entered for the following charges:

_____  Del. C. § _____ , Inc. # _____
_____  Del. C. § _____ , Inc. # _____
_____  Del. C. § _____ , Inc. # _____
_____  Del. C. § _____ , Inc. # _____

( ) The following charges are hereby <u>DISMISSED</u>:

_____  Del. C. § _____ , Inc. # _____
_____  Del. C. § _____ , Inc. # _____
_____  Del. C. § _____ , Inc. # _____
_____  Del. C. § _____ , Inc. # _____

( ) The mandatory provisions of 10 Del. C. § 1009(e) were explained.
( ) Effective today you are a person prohibited and you cannot purchase, own, possess or control a deadly weapon/ammunition until your 25th birthday. (§ 1446(a)(4))
(X) A presentence investigation is hereby ordered.    9/22/04  8³⁰  Young
(X) Sentencing is deferred until PSI Complete, continue w/ school counseling

Also psychiatric evaluation, continue w/ school counseling

other conditions of bail continue    Commissioner Loretta Young

Commissioner Loretta Young / Aud. Commiss. C. McPeice

CC: Juvenile, parent/guardian, probation officer, DYRS, Defense Counsel, D. Roberts, Cashier, CrCPU, file, DMV
Deputy Attorney General

<u>YOU MUST REPORT TO PROBATION LOCATED ON LOWER LEVEL 1 IN RM # 1L700 BEFORE YOU LEAVE THE COURTHOUSE (NEW CASTLE COUNTY ONLY)</u>

CONFIDENTIAL

D141        B47

As to each charge adjudicated, IT IS ORDERED the defendant is committed to:

LEVEL V SECURE CARE COMMITMENT TO THE YOUTH REHABILITATIVE SERVICES

( X ) LEVEL V SECURE CARE COMMITMENT TO THE YOUTH REHABILITATIVE SERVICES

     (X) for an indefinite commitment

     ( ) for an indefinite commitment with authority to place at a lower level of security at the discretion of DYRS

     ( ) for a mandatory minimum commitment of six (6) months pursuant to 10 Del. C. § 1009(e), with placement at ( ) Ferris School, ( ) other institution _____

     ( ) The Court finds that reasonable efforts to avoid placement were made. Continuation in the home is contrary to the welfare of the child and the community.

     (X) SUSPENDED FOR:

) LEVEL IV STAFF SECURE COMMITMENT TO _____

X LEVEL III INTENSIVE PROGRAM PLACEMENT FOR ___12___ months with:
     w/ FCICM Program _____

_____ LEVEL II MODERATE INTENSITY PROGRAM PLACEMENT FOR _____ months with:

_____ LEVEL I ADMINISTRATIVE PROGRAM PLACEMENT FOR _____ months with:

) JURISDICTION OF FAMILY COURT IS EXTENDED UNTIL AGE _____ ( 10 Del. C § 928).

(X) SUBJECT TO THE COURT ORDERED SPECIAL CONDITIONS ON THE NEXT PAGE.

ADDITIONAL PROVISIONS / COMMENTS FOR CONSIDERATION BY DYRS-CMH-DFS:
Aggravating Factors: extreme cruelty, prior violent delinquent conduct, repeated delinquency, need for secure treatment, undo deprecation of offense, substantial loss/injury to the victim, prior abuse of victim, custody status at time of offense _____, lack of remorse, monetary restitution / counseling, lack of cooperation with lesser sanctions, family factors outside of the offender's control, vulnerability of victim, weapon used, statutory aggravation, prior delinquent adjudication in other states, not participating / attending education program.
Mitigating Factors: victim participation, voluntary redress or treatment, under duress, inducement by others, physical / mental impairment, concern for victim by non-principal, no prior adjudications, treatment needs exceed punishment needs, could lose employment, statutory mitigation, assistance to prosecutor, family factors outside offender's control, mental retardation, could benefit from MST program.
Other Factors: DYRS recommendation _____, substance abuse, curfew, no parental control, mental health needs, 1st leg of mandatory, capias history _____, prior failure to cooperate with probation, prior L health needs, 1st leg of mandatory, capias history _____, refuses counseling, school behavior, gang _____, runaway history, abuses family members, anger, refuses counseling, school behavior, gang _____, weapon used _____, OSS / SJO, Treatment _____
activity, # prior delinquency _____, weapon used _____, OSS / SJO, Treatment _____

) Since this is your 1st adjudication, you can request an expungement after 3 years.

Commissioner Loretta Young

CONFIDENTIAL
D142

B48

T IS FURTHER ORDERED that the defendant shall:

(X) Perform _100_ hours of community service during the first __8__ months of probation at a location to be determined by Parent / Probation *@ non-profit agency*

(X) Have no contact with (the victim,) witness or co-defendant(s) _____
_____

( ) Have no unlawful contact with _____

( ) Loss of drivers license and / or privileges for:
( ) _____ 30 days / 90 – 180 days or $100 / $200 - $500 (No DE. License) 4 Del. C. § 904
( ) _____ 10 Del. C. § 1009(c 12), 3 months to 4 years
( ) Until age 21, 10 Del. C. § 1009(f) for 4177, 4177B
( ) _____ 2 mos / 6-12 mos or $200/$400-$1000 (no Llc), 4177 zero tolerance.
( ) the later of 17th birthday or 1 year from adjudication, 10 Del. C. §1009(g) for 21 Del. C. §2701
( ) 2 years pursuant to 21 Del. C. . § 2701(b 10), all drug offenses and § 4764 (has no license)
( ) 2 years 16 Del. C. §4764, 4752, 4753, 4754, 4754A: ( ) 3 yrs §4751, 4752A, 4753A, 4755, 4756, 4761
( ) 1 year 16 Del. C. §4764 Drug Diversion First Offender (has license).
( ) First Offender Controlled Substance Diversion Program pursuant to 16 Del. C. § 4764.

( ) Be evaluated for substance abuse and follow any recommendations in the evaluation report.
(X) Be evaluated for emotional and/or psychological problems and follow any recommendations in the evaluation report.

(✓) Completion of the following counseling or treatment program: _____
*as recommended by YRS*

( ) Attend school regularly and exert best efforts.
(X) Obey curfew of _____ p.m. except _____ p.m. of Friday and Saturday nights as set by probation

(✓) Letter of apology to victim on or before _Oct 15, 2004_ with a copy to probation officer.

( ) Pay restitution in the amount of $ _____ to Family Court, which shall be payable:
_____   _____ or
( ) Restitution amount to be set by stipulation submitted by _____
after a hearing.

( ) Pay fines of $ _____, plus 18% ($_____) surcharge payable to the Victim Compensation Fund, ( ) with $ _____ of the fine suspended provided the defendant pays the surcharge of $_____ within _____ days.

( ) In connection with violations of 16 Del. C. §4751-4788, 4761 or 4771–4774, or 21 Del. C. §4177, pay fines of $ _____ plus a 15% ($_____) surcharge payable to the Substance Abuse Rehabilitation, Treatment, Education and Prevention Fund, ( ) with $_____ of the fine suspended provided the defendant pays the surcharge of $_____ within _____ days.

(X) Pay Court costs of $ _55.00_, of which $ _0_ is suspended, payable to Family Court.
( ) Pursuant to 11 Del. C. §4101 (d), the respondent shall pay $1.00 into the Video Phone Fund.
(✓) All fines and costs are to be paid by _Nov 15, 2004_ or a capias will issue for your arrest.

( ) Testify truthfully against co-defendants.
(X) Parent / guardians are Court ordered to co-operate with and participate in counseling / treatment.
(X) Other: *Take all prescribed medication*

Commissioner Loretta Young

...pervised probation may include additional general and / or special conditions established by the Division of Youth ...habilitative Services.

CONFIDENTIAL
D143

B 48.1

1    another classroom.

2        Q    Who requested the meeting?

3        A    I did.

4        Q    And was the purpose of that to request some of the

5    students be changed to different classrooms?

6        A    Yes.

7        Q    Okay.  So the school district representatives,

8    administrators, complied with that request at the meeting

9    and took certain students out?

10       A    Yeah, they did.

11       Q    And the ones that are listed there by initials were

12   put in other classes?

13       A    And then returned to my class, yes.

14       Q    And when were they returned to the class?

15       A    Because they wanted to come back.

16       Q    I said when.

17       A    Maybe about like a month later.

18       Q    And when they came back, were they disciplinary

19   problems again?

20       A    Yes.

21       Q    Were they taken out?

22       A    I'm not sure if it was all three.  I'm not sure who

23   this is.

24       Q    Did all of them come back?

CHRISTINA MONGELLI

1   A    I don't know who this is.

2   Q    Do you recognize the initials of anyone who actually

3   came back?

4   A    Yes.

5   Q    Which one?

6   A    ER.

7   Q    And who was that?

8   A    1   Student - ER   .

9   Q    She returned about a month later?

10  A    Yes.  Because she didn't like Mr. Realer and she

11  said he caught her foot in the door and all that.

12  Q    And she was brought back into your class with your

13  permission, with your agreement?

14  A    Yeah.  Because she came up to me.  She promised she

15  would behave very well this time and all that.  And John

16  Kennedy asked me, so I said, okay.

17  Q    So you agreed to take her back?

18  A    Yes.

19  Q    Is it correct that at that meeting on February 24th,

20  there was no mention of        Student - JW   as indicated in this

21  bullet point?

22  A    I talked about him from the very beginning.  That's

23  not true at all.

24  Q    So you said something --

     A    He was one of the first students that I talked

about.

     Q    At the meeting on February 24th?

     A    Yes.

     Q    Do you have a recollection of talking about  Student-JW


     A    Yes, I do.

     Q    And what did you say?

     A    I said that he can't keep his hands off the other

students.  His language is disgusting.  I brought up every

one of them.  And him I brought up maybe the first week that

I was teaching there.  Because he had a fight with another

kid.   Student-ER   the other kid that was suspended, they

were both drug addicts.  So he threatened the other kid

because he didn't give him money for the drugs.  And I went

and I told -- I told Chad and I told John Kennedy.  He said

he threatened him.  I said if you were to do this on the

streets of Wilmington, you would be dead.

               So I complained about   Student-JW    at that

meeting and way before that.

     Q    So you had only been in the position about a month?

     A    Right.

     Q    By that meeting?

     A    Right.

CHRISTINA MONGELLI
95

Student - JW

1    Q    So you had made previous complaints about

2         before that meeting?

3    A    Exactly.

4    Q    And you remember specifically making complaints

5    about Jonathan White in that meeting?

6    A    Yes.

7    Q    So Mr. Kennedy is inaccurate about that?

8    A    Yes.

9    Q    Anything else on that subparagraph that's

10   inaccurate?

11   A    That paragraph?

12   Q    Yeah, just that bullet.

13   A    I don't know whose these initials are.  So I can't

14   say.

15   Q    Other than that?

16   A    Yes.

17   Q    Other than that, it's accurate?

18   A    Yes.

19   Q    Going down to the next one.  It says, 3/8/2004.

20   Says, JW -- that's   Student - JW  -- received a one day

21   suspension out of school program; is that correct?

22   A    Not because of my referral.  It was because of

23   Michael Wexler.  Because we had discussed this.  And he

24   said, finally he spoke to John Kennedy and that's why he

**WILCOX & FETZER LTD.**
Registered Professional Reporters

```
 1        was -- he received that out of school.

 2           Q  *  Who is Michael Wexler?

 3           A     He is the teacher at Dickinson.

 4           Q     Another teacher?

 5           A     Yes.  He had a lot of trouble with him also.

 6           Q     Another special education teacher?

 7           A     No, he is not special ed.

 8           Q     Just a regular teacher?

 9           A     I think he is technology.  Something technology.

10        I'm not sure.

11           Q     Is it accurate that Student-JW received a suspension,

12        is that accurate, on March 8, 2004?

13           A     I'm not sure.  I don't know.

14           Q     You don't remember?

15           A     No, I don't remember.  I remember Mr. Wexler saying,

16        oh, he finally got suspended.  So I guess he did.  After he

17        spoke to John Kennedy.  Not anything that I said.

18           Q     So you do know that    Student-JW    was suspended,

19        though, at various times?

20           A     Yes.  That one time.  One time.

21           Q     Looking at the next bullet point there, 04/08/2004.

22        Do you see that?

23           A     Yes.

24           Q     And it says that     Student-JW   e again received a
```

 1    suspension based on the reports that you submitted; is that

 2    accurate? "

 3        A    See, I don't know.  Because I never got information

 4    back from John Kennedy that he was being suspended.

 5        Q    You weren't aware of ᵕ    Student-JW ᵊ being suspended?

 6        A    Not that time.

 7        Q    Are you aware of him being suspended at certain

 8    times?

 9        A    That first time.  Only because the other teachers

10    told me.  I didn't know if he was absent or, you know, what

11    it could be.

12        Q    So nobody told you if he was suspended or just

13    absent from school?

14        A    Right.

15        Q    Looking at 05/06/2004.  Do you see that entry?

16        A    Yes.

17        Q    Can you read the first sentence and tell me if

18    that's accurate?

19        A    Ms. Mongelli verbally reported to me several

20    incidents of inappropriate conduct by JW in class that had

21    taken place over the preceding two weeks.

22        Q    Is that accurate?

23        A    There was the -- no.

24        Q    You didn't verbally report several incidents to him?

CHRISTINA MONGELLI

1      A      I verbally -- well, if you go on.  This is, you

2   know, you're not asking me to read the whole paragraph.

3      Q      I'm dealing with the first sentence right now.  Is

4   that first sentence accurate?

5      A      No.

6      Q      What's inaccurate about the first sentence?

7      A      Because this was ongoing.  He is acting like I told

8   him that was the first time that I told him anything.

9      Q      Reading the first sentence, he says you verbally

10  reported several incidents of inappropriate conduct by JW in

11  class that had taken place over the preceding two weeks.

12            Did you verbally report several incidents of

13  inappropriate conduct during that time?

14     A      Yes.  Yes, I did.

15     Q      Now, the next sentence says, this was the first time

16  Ms. Mongelli reported inappropriate physical conduct by JW

17  including inappropriate physical contact of a sexual nature

18  that occurred on 4/26, 11 days prior to Ms. Mongelli

19  reporting the incident.

20            Is that accurate?

21     A      Absolutely not.

22     Q      Okay.  What's inaccurate about it?

23     A      I reported physical contact to him.  He didn't only

24  sexually assault me, he did to other students.  He had his

1   hands on even boys constantly.  I told him about what he did

2   to another girl in the class.  It was a sexual thing.  At

3   other times.

4   Q    Is it accurate that's the first time you reported

5   inappropriate physical contact involving you personally?

6   A    No.  I gave him the referrals.  That was not the

7   first time.

8   Q    The first time you reported it in writing before

9   that date?

10  A    Yes.

11  Q    And what day did you first submit a referral

12  indicating that you had been physically contacted

13  inappropriately?

14  A    On the first date.  That's where I have the

15  referrals, on the first date.

16  Q    Okay.  We've got Exhibits 1 through 7.  Tell me the

17  first date --

18  A    And there is one that's missing from there.  Because

19  I thought you had them.

20  Q    Tell me if the first time you reported an incident

21  involving sexual contact or inappropriate contact that was

22  sexual in nature was April 26, 2004, as shown by Exhibit 1?

23  Was that the first written report?

24  A    Yes, the first written report.

1    Q    And did you give that to Mr. Kennedy?

2    A    Yes, I did.

3    Q    On April 26th?

4    A    Yes. This one.

5    Q    Okay. The other reports involving the alleged

6    inappropriate contact, did you give those to Mr. Kennedy on

7    the date that's indicated on those reports?

8    A    Yes.

9    Q    So you didn't give him several reports at once as he

10    indicates here?

11    A    No.

12    Q    And do you know why he would say that?

13    A    No. I put it in his box as teachers are supposed to

14    do.

15    Q    So you took --

16    A    I had been to him before and he showed me this whole

17    pile of referrals. He said he doesn't have enough time to

18    get to each one. They were all piled up.

19    Q    So you took these and put them in his box?

20    A    Right.

21    Q    And did you follow up to tell him on April 26th

22    verbally what happened?

23    A    This one, I don't know the exact date.

24    Q    The first one on April 26th?

1    A    No.

2    Q    When was the first time you followed up with him

3    verbally to ask him what was going on with your complaint of

4    inappropriate physical contact?

5    A    I believe it was May 6th.

6    Q    This was a verbal report?

7    A    Well, I used to talk to him three times a week.  So

8    it's not the first time a verbal report, you know, he is

9    always busy.  So I said, I'd like to speak to you.  And I

10   said that during these.  But when I sat down and sat a long

11   time with him, it was on May 6th.

12   Q    Okay.  So on May 6th.  And that's when you said that

13   Jonathan White had engaged in inappropriate contact with you

14   of a sexual nature?

15   A    Right.

16   Q    And what did he do?

17   A    He wrote it down what I said.

18   Q    And then what happened?

19   A    He wrote it down and he said, I'd have to

20   investigate it.  Oh, he has got to speak to Chad.  He has to

21   speak to Mr. Carmack about this, what he wants to do with

22   this.

23   Q    And was the conversation on May 6th, the end of the

24   day?

1        A    Yeah, it had to be.  Yes, it was.

2        Q  .. So the following day, May 7th, Mr. Kennedy began to

3    investigate these allegations?

4        A    I don't know when he did.  I don't know.  This kid

5    was in my class, though, the next day.

6        Q    And what was the last day that the kid was in your

7    class?

8                  MR. BERNSTEIN:  You're talking about JW?

9                  MR. WILLOUGHBY:  Right.

10                  THE WITNESS:  He came the next day and I asked,

11    I said, John, after everything we talked about yesterday,

12    why is he in my class today.  He said, oh, I forgot.  And I

13    said, how could you forget something like that?  And I

14    just -- I walked away.  I just had it with them.  And he

15    also -- after this, he came up when I was in the library,

16        Student - JW   to take -- he came up.  He was sent up to my

17    class during test taking.

18    BY MR. WILLOUGHBY:

19        Q    Backing up.  After May 7th, i- that the last day

20    that he was in your regular class, Jc.   Student - JW  :?

21        A    Yes.

22        Q    After that, he was removed, you never had him again

23    as a student other than that library testing?

24        A    Right.

Q     And was he suspended?  Do you know?

A     Yeah, he was.

Q     And was he referred to the Family Court for prosecution in accordance with the Family Court rules?

A     Yes.

Q     And did you have to testify at that?

A     Yes.

Q     And --

A     I had to go but I didn't have to testify.  He pleaded guilty.  And   Student-KB  , another student, was a witness.

Q     So the school district followed through and made the referrals to the Family Court, correct?

A     After many, many, many, many verbal.

Q     We already went through the contacts that you had.

A     No, that's not all of them.  But you're not starting from the beginning.

Q     Of a sexual nature now is what I'm talking about.

A     Yeah, he used sexual language throughout.

Q     Sexual language and saying F you and things like that?

A     No, he didn't just say F you.

Q     Let me stop for one second.  We can't talk over each other.

WILCOX & FETZER LTD.
Registered Professional Reporters

B61

1          Okay.  Now, did you tell me earlier that the

2     first time that you sat down and had a conversation with

3     Mr. Kennedy about inappropriate physical contact --

4          A     Physical.

5          Q     Physical contact --

6          A     With me.

7          Q     With you?

8          A     Yes.

9          Q     Was May 6th?

10         A     Right.

11         Q     Now, you're saying you had other conversations with

12    Mr. Kennedy involving verbal statements by     Student - JW  ?

13         A     Yes.  And physical with other students.

14         Q     And did you submit disciplinary reports for each of

15    those other occasions?

16         A     Not all of them, no.  Because I wanted to speak to

17    him personally.

18         Q     Why not?

19         A     Because my first written reports, I didn't get a

20    response.  So I wanted to speak to him in writing.  I mean

21    in person.

22         Q     Speak to Mr. Kennedy in person?

23         A     Yes.

24         Q     But the first physical contact was the one listed in

1    April and the conversation about that was on May 6th,

2    correct?

3        A    Yes.

4        Q    And then Jonathan White was there on May 7th?

5        A    Yes.

6        Q    And then he was out of your classroom after that,

7    correct?

8        A    He came up to the library with my class.  No, he

9    knew that my class was there and he came up to take the

10   test.  That was his class.  So it's the second time.

11       Q    So the one occasion you saw him where you were

12   responsible for him as a teacher was when he took a test

13   after May 8th?

14       A    Two.  It's May 7th I had him, which he acted up

15   again.  And then another day when he had to take a test.

16       Q    And he came to the library to take what test?

17       A    Some kind of -- I don't know what test it was at the

18   time.

19       Q    And how long was he there?

20       A    He said somebody sent him up there.  One of the

21   counselors.  For the whole period of the test.  An hour, two

22   hours.  I'm not sure.

23       Q    You don't know what the test was?

24       A    No, I don't remember.

1    Q    Was there any incident involving that at that time?

2    Was there any kind of inappropriate conduct?

3    A    He was staring at me.  Very strange stare.

4    Q    Anything else besides that?

5    A    No.  He was busy with the test.

6    Q    So how much was he staring at you if he was working

7    on the test?

8    A    He was -- kept looking back and I seen him.  He was

9    looking at my legs.  He was just like looking up and down.

10   Q    Did you report that to anybody?

11   A    No.  Because I figured they would take care of it.

12          MR. WILLOUGHBY:  Let me mark this as the next

13   exhibit.

14               (Mongelli Deposition Exhibit No. 17 was

15   marked for identification.)

16   BY MR. WILLOUGHBY:

17   Q    Let me ask you if you have seen Exhibit 17.

18               Had you seen that when you were at the school

19   district at Dickinson High School during the period January

20   of 2004 through June of 2004?

21   A    I think so.

22   Q    And did you receive the copy of the collective

23   bargaining agreement between the union and the school

24   district at any point?

1     A    Do you have a copy of that?

2     Q    Did you receive a copy of a contract or anything

3  else involving the union and the school district?

4     A    The union?

5     Q    Um-hmm.

6     A    Do you mean the contract itself?

7     Q    Yes.

8     A    Oh, yes.  The teaching contract?

9     Q    Yes.

10    A    Yes.

11    Q    Did you file a grievance with the school district at

12  any point from January of 2004 and June of 2004 concerning

13  the treatment that you say occurred in your classroom?

14    A    Yeah.  I went to the principal.

15    Q    You filed these disciplinary reports?  Did you file

16  a union grievance?

17    A    A union grievance?

18    Q    Yes.

19    A    No.

20    Q    And did you file any complaint under the student

21  code of conduct or any other policy other than just

22  submitting the student referral, student disciplinary

23  referrals?

24    A    No.

1       A    Yes, immediately.

2       Q    And what did you say to Ms. Davenport and what did

3   she say to you?

4       A    I said, now he says that I'm not certified.  And I

5   said, you know that I'm certified.  I faxed over the copies

6   of the certifications.  And I went through -- I said, how

7   can you do this?  She said, oh, well, you didn't pass the

8   PRAXIS.  I said, it is nothing to do with me not passing the

9   PRAXIS.  I have three years to take that test.  Or a year

10  for the PRAXIS, I think, and three years to meet the

11  requirements.  And her total -- she changed completely,

12  completely.  She said, oh, call me back in August.  Maybe

13  I'll have a position for you in August.  I said, what does

14  that have to do?  I have a regular contract now.  I said,

15  I'm not going to call you back in August.  And she was just

16  making all different excuses.

17      Q    What else did she say, that you can recall?

18      A    She said, no, she said, you're not certified.  I

19  said, I have the certification, I sent it to you.  She just

20  kept insisting that I wasn't certified.

21      Q    Do you remember anything else about that

22  conversation, anything else you said, she said?

23      A    I said -- well, I told her, I said, how can you do

24  this?  I said, the school board meeting is coming up.  I may

1    have talked to her three times because I know I called her

2    right before that school board meeting and I said, you're

3    going to terminate my contract at that meeting. And I said,

4    how can you do something like this? You know I have

5    certification. And that's when she said, oh, she said, you

6    didn't pass the PRAXIS. She was just giving different

7    excuses.

8        Q    What I'm asking you is, you say different excuses.

9    You mentioned the PRAXIS. What were the other things that

10   you remember her saying?

11       A  .  Just mainly about the certification, the

12   certification. I didn't have certification. She kept

13   insisting.

14       Q    Okay. When was that conversation in relation to

15   when you got the letter saying that you were being

16   terminated for lack of certification? How much before?

17       A    I think I had three conversations with her. That

18   one I think was after. Wait a minute. No.

19       Q    Let me do this. Let me give you a copy of your

20   letter.

21       A    No, it couldn't have been. It was right before the

22   board meeting.

23              MR. WILLOUGHBY: Let me have this marked. This

24   is the letter of termination. And hopefully that will

B67

CHRISTINA MONGELLI

1    A    Yes.

2                    (Mongelli Deposition Exhibit No. 25 was marked

3    for identification.)

4    BY MR. WILLOUGHBY:

5    Q    I hand you Exhibit 25 and ask you if you can

6    identify that?

·7    A    Yes.

8    Q    And what is that?

9    A    I accepted Ms. Davenport's offer of a position as an

10    elementary teacher at Warner.

11    Q    So that was your official acceptance of the offer at

12    Warner?

13    A    Yes.

14                    (Mongelli Deposition Exhibit No. 26 was

15    marked for identification.)

16    BY MR. WILLOUGHBY:

17    Q    And can you identify Exhibit 26?

18    A    Yes.

19    Q    Okay.  What is that?

20    A    It's a professional education employee contract.

21    Q    Is that for your position at Warner?

22    A    Yes.

23    Q    And that began on January 19th of 2005, correct?

24    A    Yes.  It started that week.  I'm not sure of the

1    date.  It was after a holiday.  After Martin Luther King.  I

2    think it was that week.

3                    MR. WILLOUGHBY:  Mark this as the next exhibit.

4                    (Mongelli Deposition Exhibit No. 27 was

5    marked for identification.)

6    BY MR. WILLOUGHBY:

7        Q    Can you identify Exhibit 27?

8        A    Yes.

9        Q    Okay.  What's that?

10       A    One of my lesson analyses.  One of them.

11       Q    How many times were you observed?

12       A    By Irene Hills?

13       Q    Yes.

14       A    Twice.  And by Janet Lacy once.

15       Q    And what's your understanding of their observation

16   of your performance?

17       A    Where are the other ones?

18       Q    We haven't gotten to those yet.  I'm asking what

19   your understanding is of their observation of your

20   performance?

21       A    I don't know what you expect me to say there.

22       Q    Do you think they were positive?  Do you think they

23   were negative?  What was your reaction to them?

24       A    Two were extremely positive and one was in between.

CHRISTINA MONROE, L.P.

1      Q     Did you have some problems with other teachers at

2    Warner, any kind of run-ins with any other teachers?

3      A     Yes.   One.

4      Q     And who was that?

5      A     Let me just think.

6      Q     That's all right.

7      A     Thompson her name was.   Last name.

8      Q     What happened?

9      A     We were set to have a meeting in the morning.   Just

10   to discuss the students.   A regular meeting.   And finally it

11   was accomplished.   After speaking to Janet.   I said, none of

12   them, they don't want to meet to discuss the plans or

13   anything like that.

14     Q     Who are you referring to now when you say none of

15   them want to meet?

16     A     I told Dr. Lacy.   And she said, okay, she would set

17   it up.   So I meant Ms. Thompson.   What's the other one?   I

18   don't recall their names.   That's all the fourth grade

19   teachers.

20     Q     And they didn't want to meet, you were the only one

21   that wanted to meet?

22     A     Well, they are supposed to be meeting.   They are

23   supposed to be mandatory, those meetings, to discuss, you

24   know, the students and the planning.   And they all always

CHRISTINA MONTELL

1    said they were busy, they didn't have time for it.  So

2    finally a meeting was set up.

3        Q    Okay.  What happened?

4        A    I was sitting down with -- I'm just trying to

5    remember all their names.  Do you have a list of the names?

6    Do you have that?

7        Q    I don't have them right in front of me.  But go

8    ahead and tell me what you recall without that.

9        A    I was sitting down with the fourth grade.  She is

10   the head of the fourth grade.  Ms. Fisher.

11       Q    Yvette Fisher?

12       A    Yes.

13       Q    And Athena Fullerton?

14       A    No, that's at a different meeting.

15       Q    Yvette Fisher was one of the people?

16       A    Yes.  Just me and her.  Because Mr. Williams said

17   that he didn't feel like going to the meeting.  He didn't

18   feel well.  And the other fourth grade teacher, I forget her

19   name, she said that she was too busy and she couldn't attend

20   it.  And Ms. Thompson came in at a later time.  She was

21   late.  So it was just me and Mrs. Fisher.  So we were

22   discussing the planning with the students and it was just --

23   it was going well at that moment.

24       Q    You said there was a run-in there with Ms. Thompson?

1      A     Then Ms. Thompson came in in a real hurry.

2      Q     To the meeting?

3      A     Yes.  She never sat down.  She stood up the whole

4     time.  And we discussed -- I said, why -- this was over one

5     of the students.  I said, why did you pull him out of the

6     class?  The student's father was very upset.  He called me

7     twice.  He did not want his son out of my math class.  And

8     he said that Ms. Thompson had no right to do that.  I said,

9     before you do that, you discuss something like that with me.

10                  And then she pointed in my face.  It was in a

11     truly threatening manner.  And just -- she was just yelling.

12     I sat down the whole time.  Sat quietly down.

13     Q     And what did she say?

14     A     Let me just think.  I wrote everything down.  I

15     wrote it all out.

16     Q     Just tell me what you remember.

17     A     I know she screamed out.  She said, I'm going to

18     curse her out in a minute.  I said, oh, my God, I said, in

19     my years of dealing with teachers, I had never heard a

20     teacher talk like that.  And Ms. Fisher said -- she told her

21     to calm down.  Let me just think.  And she said to --

22     Ms. Fisher told her, she said, you should have asked her

23     permission before you take a student out of the class.  And

24     she got so mad.  She said, are you siding with her?

CHRISTINA MONGELLI                                                    761

1              It's all written down.  I don't remember

2      everything.

3          Q    And did you submit a statement about what you say

4      happened in the school district?

5          A    Yes.  Irene Hills told me to.

6          Q    Did you --

7          A    She went down to Mrs. Hills, Ms. Thompson, and told

8      her.

9          Q    Did you discuss what happened with your students?

10         A    Discuss to who?

11         Q    Discuss what happened with Ms. Thompson with your

12     students?  Did you tell them what happened?

13         A    No, I did not.

14         Q    Did you make any reference to it, in your class,

15     about the incident?

16         A    No.

17         Q    Did you tell them that you were concerned that she

18     was going to beat you up and that you were afraid?

19         A    No, I never said that.  Never.  Two kids came to me

20     and they said that they overheard her yelling.

21              MR. WILLOUGHBY:  Let's mark that.

22              (Mongelli Deposition Exhibit No. 28 was marked

23     for identification.)

24     BY MR. WILLOUGHBY:

1      Q      Which two kids were those?

2      A      One was Kytel. And I don't know who the other one

3    was. It was a girl.

4      Q      The question is, you never told your students that

5    you were afraid that Ms. Thompson was going to beat you up?

6      A      Never.

7      Q      Do you recognize Exhibit 28?

8      A      Yes.

9      Q      And what is that?

10     A      It's a professional behavior reprimand from Irene

11   Hills.

12     Q      To you?

13     A      Yes.

14     Q      Reprimanding you?

15     A      Yes.

16     Q      And what's it reprimanding you for?

17     A      At the team meeting, it said that I said

18   Mrs. Thompson was going to beat me up and I was afraid.

19     Q      It says the student reported to Irene Hills?

20     A      Right. But the kids, two kids came back to me after

21   Irene. They said, Mrs. Hills told us to say that. They

22   said, we don't want you to get in trouble, Ms. Mongelli, but

23   they said Mrs. Hills brought us into the office and made us

24   say this.

CHRISTINA MONGELLI

163

1    Q    So Mrs. Hills told them to say it?

2    A    That's what they told me, yeah.  They were talking

3    about it at lunch.  Actually, Ms. Thompson said something to

4    Mrs. Hills and then -- and she said something to Mrs. Hills

5    and then Mrs. Hills called the students in.  Two of them.

6    Q    And do you know who the two students are, the ones

7    you just identified?

8    A    I don't remember the names.  One was a girl.  The

9    other is a boy.

10   Q    By that time, you already had made contact with Rudy

11   Norton, had you not, by April of 2005?

12   A    Yes.

13   Q    And did you call him to file a grievance over this

14   reprimand?

15   A    Yes.

16   Q    And was there a grievance filed?

17   A    Well, Rudy and I went to speak to Debra Davenport.

18   We had a meeting about this.

19   Q    Okay.  What happened?

20   A    Let me just think.  Let's see.

21        Maybe it wasn't about this.  No, I didn't have

22   a meeting with Debra about this.  This was Irene.  Rudy

23   said -- he said, Irene, even he agrees, has a terrible

24   temper.  He said she is the worst person to deal with.  And

1    he said -- yeah, because he got mad.  He said I should have

2    brought this -- before I met with Irene, I should have told

3    him that I had a meeting scheduled with her.

4    Q    Did you file a grievance or did the union file a

5    grievance on your behalf concerning this written reprimand?

6    A    No.

7    Q    And everything that's in this reprimand is untrue,

8    you're saying?

9    A    Yes.  Yes.  Because -- and then she came up.  She

10   said the students were crying.

11   Q    So she is just making it up?

12   A    Oh, yes.

13   Q    And what would be her motive for doing that?

14   A    Well, like she told me, she said, I wasn't a tenure

15   teacher and she has to believe Ms. Thompson.  She knows I

16   have a lawsuit against the district.

17   Q    She said that to you or you're saying that that's

18   what your belief is?

19   A    She knows I have a lawsuit.  She knew at that time.

20   Q    Did she tell you that that was the reason she gave

21   you a reprimand?

22   A    No.  She is not going to say that.

23   Q    Did she tell you that the reason she gave you the

24   reprimand was that she believed Mrs. Thompson?

1    A    She said because she has tenure and I don't, she

2    gave me the reprimand.

3    Q    Did she say anything else about why she gave you the

4    reprimand?

5    A    No.  She gave me this letter.

6    Q    And that was all the conversation you had with the

7    reprimand?

8    A    We talked about Mrs. Thompson.

9    Q    What did you talk about with Ms. Thompson?

10    A    Oh, that she told the kid, two kids, actually.  Two

11    of hers.  See, they were her kids to begin with.  And she

12    said -- she said, those are my two students in the first

13    place, and if I want them back, I'll take them back.

14    Q    This is Ms. Thompson?

15    A    Yes.

16    Q    And she is referring to the students that were taken

17    out of your class?

18    A    Right.  That she took out.  Right.  And I told Janet

19    Lacy and Janet said she had no right to do that.

20    Q    But were they Ms. Thompson's students who spoke with

21    Irene Hills about what was --

22    A    Possibly.

23    Q    -- said in class?

24    A    Possibly.

1        Q    I thought you said they were your students?

2        A    Yeah, they were both our students.

3        Q    So they were your students, they could have been

4    hers as well?

5        A    Yeah.  See, they are her students to begin with.

6    They were having math with her.  When I came along, I took

7    her students.  I was assigned to her students.

8        Q    But going back to the reference in the reprimand

9    where the students reported that you were upset and shared

10    the information concerning the meeting on April 14th.  Were

11    they your students that were being referred to there, the

12    boy and the girl you referred to?

13        A    Yeah.  Yeah.

14        Q    Okay.

15                MR. WILLOUGHBY:  Let's mark that as the next

16    exhibit.

17                (Mongelli Deposition Exhibit No. 29 was

18    marked for identification.)

19    BY MR. WILLOUGHBY:

20        Q    Can you identify what Exhibit 29 is?

21        A    Yes.  In fact, there were two letters.  One

22    different than this one.  And I gave my lawyer both.  Irene

23    Hills gave me the first copy and then she realized I had the

24    wrong copy.  She followed me to the bus but I had already

1    gone.  She called my house and left two or three messages on

2    the machine.  She was very worried that I had the copy, the

3    first copy.

4        Q    And did you respond to this note?

5        A    What do you mean respond?

6        Q    Did you write a written response to this memo from

7    her?

8        A    At the end.

9        Q    At the end of what?

10       A    At the end of the year, I responded, yes.

11       Q    So you didn't at the time?

12       A    I don't think I was asked to, no.

13       Q    And you didn't file a grievance concerning the

14   reprimand?

15       A    I asked Rudy.  I guess -- no.  He said that he

16   wanted to be at the meeting with her.

17       Q    Right.  But you didn't file any written response to

18   the reprimand, which is Exhibit 28 either, correct?

19       A    No.  I didn't think I could.

20       Q    When you talked to Rudy, did you ask him if you

21   could file a grievance?

22       A    I don't remember.

23       Q    You do know there was no grievance filed?

24       A    Yes.

1      Q    Did you have any other difficulties with teachers at

2    Warner in 2005 besides the incident we talked about?

3      A    No.

4      Q    Now, we talked earlier in the deposition about your

5    going to Dickinson High School in 2005 for some kind of a

6    function?

7      A    No.  The workshops that were mandatory.

8      Q    A mandatory workshop?

9      A    Yes.

10      Q    And how many days was the mandatory workshop?

11      A    Three.

12            MR. WILLOUGHBY:  Let's mark that.

13                (Mongelli Deposition Exhibit No. 30 was

14    marked for identification.)

15    BY MR. WILLOUGHBY:

16      Q    Let me show you Exhibit 30, and ask you if you have

17    seen that before?

18      A    Oh, my God.  Why is JW in here.

19      Q    That's redacted.  JW is, on the actual document, it

20    says,     Student - JW ,  JW, everywhere you see JW.

21            Have you ever seen this e-mail before?

22      A    Never.

23      Q    Was there an incident in which, as you have

24    described earlier, you had a discussion with a student about

1    where you were working?

2      A    This is all a lie.  This is all made up.  This is

3    unbelievable.

4      Q    It's another lie?

5      A    Absolutely.

6      Q    Everything there is a lie?

7      A    Yes.  Absolutely.

8      Q    So nothing like this, even remotely resembling this,

9    ever happened?

10     A    Absolutely.  It never happened.  Never happened.

11     Q    Anything like it happen where you had conversations

12    with students that there was discussions about whether you

13    were afraid they might come over and kill your kids or

14    anything like that?

15     A    Never.  Never.

16     Q    So this is another completely made up e-mail?

17     A    Completely.  From a mother, his own mother, who says

18    he is a liar, yes.

19     Q    And did you ever ask anyone, any of the students or

20    the teachers at Dickinson, if people were talking about you?

21     A    Never.

22     Q    And did you ever ask a student or teachers to give

23    you names of people who might be saying things about you?

24     A    Absolutely not.

1      Q      So this is all made up?

2      A      Absolutely.

3      Q      Okay.

4                     (Mongelli Deposition Exhibit No. 31 was

5      marked for identification.)

6      BY MR. WILLOUGHBY:

7      Q      Do you recognize Exhibit 31?

8      A      Yes.

9      Q      And what is that?

10     A      A letter from Debra Davenport.

11     Q      To you?

12     A      Yes.

13     Q      And is it scheduling a meeting because of your

14     interaction with a Dickinson High School student?

15     A      Yes.

16     Q      Did you have the meeting?

17     A      Yes.

18     Q      And what was said at the meeting?  What were the

19     interactions you had with the Dickinson High School student?

20     A      Well, see, when I got to the meeting, she wanted to

21     discuss Rachel Williams.  It had very little to do with the

22     kid.

23     Q      What was said about the kid?

24     A      She said, did you say this, that I would be afraid

1    that he would come and kill me and my students.  And I said,

2    no.  I said, I never said that.

3        Q    Was Rudy there with you?

4        A    Yes.

5        Q    Was anybody else present?

6        A    No.  Just Davenport.

7        Q    What did she say about Rachel Williams?

8        A    She said that she said some things that I came over

9    to her and I told her things about the lawsuit.

10       Q    Rachel Williams told people in the district that you

11   came into her room and said things about the lawsuit?

12       A    Yes.

13       Q    And did you do that?

14       A    We discussed it.  She questioned me.

15       Q    That's the conversations you outlined earlier?

16       A    Yes.

17       Q    And you weren't trying to get information from her

18   to use in your lawsuit?

19       A    Absolutely not.  She was trying to get information

20   from me for the entire time.

21       Q    So that was made up, too?

22       A    Yes.

23       Q    And it was Rachel Williams who was making that up?

24       A    Yes.  She questioned me.  Brought a seat over, made

1       sure I sat down and answered everything.  And I told her, I

2       just want to tell you, you might be called for questioning.

3       And her whole -- you could tell it just affected her, that

4       she would be a part of this.

5           Q    So you did tell her that she might be a witness in

6       the case?

7           A    Right.

8                   MR. WILLOUGHBY:  Mark that as the next exhibit.

9                      (Mongelli Deposition Exhibit No. 32 was

10      marked for identification.)

11                  THE WITNESS.  And, in fact, she said to me, she

12      said, where have you been?  I said, I came here to sub one

13      day and Chad said I couldn't stay here.  She said, well, why

14      didn't you come see me.

15      BY MR. WILLOUGHBY:

16          Q    And what did you say?

17          A    I said, I couldn't, I had to leave right away.  Chad

18      forced me to leave right away.  She said, oh, my goodness,

19      she said, that's terrible.

20          Q    Let me ask you if you have seen Exhibit 32 before?

21          A    What is this?

22          Q    Exhibit 32.  Have you seen this before?

23          A    Who is this from?

24          Q    My question is, have you seen it before?

1    A     No.

2    Q     Okay.  Are you sure, at the bottom, it says, student

3    name redacted.  That means the student's name was taken out.

4          Did you ever have any conversations with a

5    student that are similar to the statement made on this

6    Exhibit 32?

7    A     No.

8    Q     So this is made up, too?

9    A     Yes.

10   Q     So why are all these people making things up about

11   you, the students and teachers?

12   A     Because Rachel Williams does not want to be involved

13   in a lawsuit.  She went too far and she knows she did.  This

14   student was a liar from the year before.  Who else should I

15   say?  Irene Hills is also afraid of the lawsuit.

16   Q     So there is --

17   A     They are all involved in the school district.  And

18   Rudy Norton said it was ridiculous that I was called in for

19   something like this.  He said, it's all a bunch of nonsense.

20   Q     So they are all making this up?

21   A     Yes.  So they have a good -- so they look good for

22   the lawsuit.  That's what Rudy Norton said.

23   Q     So the student is doing that as well?

24   A     Yes.  Yeah, he was mad at me from the year before.

1    Q    So you know who the student is?

2    A    Yes.

3    Q    Who is it?

4    A        Student - LD

5    Q    And why was he mad at you?

6    A    Because I wrote a few referrals on him and I got him

7    in trouble with his mother.  I had a conference with his

8    mother.  The mother said, he lies about everything.  He told

9    me his uncle is in the Mafia and he is half Italian.  She

10    said, no, he is not Italian at all.  And at the end of the

11    year, I said, Dr. Smith took him out and put him in time out

12    to take the test, the final exams.  So he was really angry

13    that he did that.

14    Q    So he made this up?

15    A    Absolutely.  Definitely.

16        MR. WILLOUGHBY:  Let's take about a five-minute

17    break here.

18        (A brief recess was taken.)

19        MR. WILLOUGHBY:  Back on the record.

20    BY MR. WILLOUGHBY:

21    Q    Exhibit 23, the charge of discrimination.  That is

22    the only charge of discrimination filed with the Delaware

23    Department of Labor and the EEOC, is that correct?

24    A    Yes.

1    Q   Now, quite a ways back, we were talking about the

2   incident involving    Student - JW  and the sexual contact

3   that you said he had.

4    A   Yes.

5    Q   And the first incident of sexual contact was on

6   April 26th and then you said there were further incidents

7   and you sent written reports to the assistant

8   superintendent, John Kennedy, correct?

9    A   Assistant principal.

10    Q   Assistant principal, John Kennedy?

11    A   Yes.

12    Q   But you didn't have a verbal conversation with him

13   until May 6th?

14    A   Right.

15    Q   Why didn't you go to the principal, to

16   Ms. Davenport, to Ms. Dunmon, to anybody else in the

17   meantime if you were that upset?

18    A   I did.  I went to John Kennedy.  Because previously

19   before that, I had been to him three times a week to

20   complain about this kid, and which he did nothing.  So then

21   I spoke to Rachel Williams.  She said, put it all in

22   writing.  So I put it all in writing.

23    Q   My question is, between April 26th and May 6th, 11

24   days, you claimed there were ongoing incidents involving

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHRISTINA MONGELLI,                          )
                                             )
        Plaintiff,                           )
                                             )   C.A. No. 05-359 SLR
    v.                                       )
                                             )   TRIAL BY JURY
RED CLAY CONSOLIDATED SCHOOL DISTRICT        )   DEMANDED
BOARD OF EDUCATION; IRWIN J. BECNEL, JR.,    )
CHARLES CAVANAUGH, GARY LINARDUCCI,          )
LORETTA C. RICE, JAMES D. TAYLOR, MARTIN A.  )
WILSON, SR., INDIVIDUALLY AND IN THEIR       )
OFFICIAL CAPACITIES AS MEMBERS OF THE RED    )
CLAY CONSOLIDATED SCHOOL DISTRICT BOARD      )
OF EDUCATION; ROBERT J. ANDRZEJEWSKI,        )
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY    )
AS SUPERINTENDENT OF THE RED CLAY            )
CONSOLIDATED SCHOOL DISTRICT; AND RED        )
CLAY CONSOLIDATED SCHOOL DISTRICT,           )
                                             )
        Defendants.                          )

## DEFENDANTS' ANSWERS TO PLAINTIFF'S
## FIRST SET OF INTERROGATORIES

### General Responses and Objections

1.      Defendants object to any and all Interrogatories to the extent they seek the

disclosure of information or documents protected by the attorney-client and/or work product

privileges.

2.      Defendants object to any and all Interrogatories to the extent they seek

information not relevant to the subject matter of this action and information not reasonably

calculated to lead to the discovery of admissible evidence.

3.      Defendants object to any and all Interrogatories to the extent they require

them to respond in any other way than as required by F.R.C.P. 33.

B88

Each of the responses provided below are subject to the general responses and objections outlined herein. Defendants reserve the right to supplement these interrogatories as additional responsive non-privileged information becomes available.

## Answers

1.    Please identify the person or persons who participated or assisted in the preparation of the answers to these Interrogatories.

**ANSWER:  Objection.  This request calls for attorney-client privileged information and/or information protected by attorney work product immunity.  Without waiving such objection, counsel for the Defendants are responsible for preparing answers to interrogatories.**

2.    With respect to the termination of plaintiff's employment which became effective June 30, 2004, please identify each person who played a role in the decision to terminate plaintiff's employment.  As to each person so identified, please describe the role played by that person.

**ANSWER:  Chad Carmack – Principal of Dickinson High School; John Kennedy – Assistant Principal; Debra Davenport – Manager, Human Resources; Diane Dunmon – Deputy Superintendent.**

3.    Please identify all document which were relied upon by you in reaching the decision to terminate Plaintiff's employment, effective June 30, 2004.

**ANSWER:  See documents produced in response to Plaintiff's Request for Production.**

B89

DB02:5272948.1                                              061778.1004

4. Do you content that the termination of plaintiff's employment, which became effective June 30, 2004, was due to any reason other than a "lack of certification?"

**ANSWER: Defendant, Red Clay Consolidated School District Board of Education authorized Plaintiff's termination due to lack of certification. See Davenport letter dated June 17, 2004.**

5. If your answer to the preceding interrogatory is "yes," then state the following:

(a) the reason or reasons which you content supported the decision to terminate plaintiff's employment;

(b) identify the person or persons who have first hand knowledge of the existence of such reasons.

**ANSWER: See Answer to Interrogatory No. 4.**

6. With respect to the termination of plaintiff's employment which became effective June 30, 2005, please identify each person who played a role in the decision to terminate plaintiff's employment. As to each person so identified, please describe the role played by that person.

**ANSWER: Objection. This request is beyond the scope of Plaintiff's complaint.**

7. Please identify all documents which were relied upon by you in reaching the decision to terminate Plaintiff's employment, effective June 30, 2004.

**ANSWER: See documents produced in response to Plaintiff's Request for Production.**

B90

3

061778.1004

8.    Between January 1, 2004 and June 30, 2004, did you have any procedures or policies for classroom teachers to follow in reporting incidents of disruptive behavior by students?

ANSWER: Yes.

9.    If your answer to the preceding interrogatory is "yes," then identify all such policies or procedures.

ANSWER: As set forth Plaintiff's deposition, teachers should report disruptive behavior to the Assistant Principal or Principal. Teachers are also expected to take all necessary steps to ensure order in the classroom and are expected to request immediate assistance when appropriate. Responsive documents have been produced.

10.    Between January 1, 2004 and June 30, 2004, did you have any procedures or policies concerning sexual harassment in the classroom?

ANSWER: Yes.

12.    If your answer to the preceding interrogatory is "yes," then identify all such policies or procedures.

ANSWER: See documents produced in response to Plaintiff's Request for Production.

13.    Identify the person or persons who were employed at Dickinson High School between September 1, 2002 and June 30, 2004 who were responsible for receiving complaints from classroom teachers concerning incidents of disruptive behavior by students.

4

DB02:5272948.1                                             061778.1004

ANSWER:  The Principal during the applicable period was Chad Carmack. The Assistant Principals during the applicable period were John Kennedy, Gerald Smith, Stephanie Armstrong.  By way of further answer, see Answer to Interrogatory No. 9.

14.    Identify all records maintained by you which reflect complaints concerning alleged disruptive behavior by JW.

ANSWER:  See documents produced in response to Plaintiff's Request for Production.

15.    Identify each non-expert witness you intend to call as a witness at trial. With respect to each such person, state the following:

(a)    the subject matter on which he or she is expected to testify;

(b)    the substance of the facts to which he or she is expected to testify;

(c)    the identity of all documents used or relied on by him or her related to (a) and (b) above.

ANSWER:  Defendants object to this interrogatory on the grounds that it is premature at this early stage of the litigation.  Subject to and without waiving the foregoing objections, Defendant will supply this information in accordance with Rule 26.

16.    Identify each expert witness you intend to call as a witness at trial.  With respect to each such person, state the following:

(a)    all information which the defendants contend would tend to establish this witness as qualified to express an expert opinion on any issue of this action.

(b)    the subject matter on which he or she is expected to testify;

(c)    the substance of the facts and opinions to which he or she is expected to testify;

5

061778.1004

B92

(d)    the identity of all documents used or relied on by him or her in formulating or supporting each such opinion.

ANSWER: Defendants object to this interrogatory on the grounds that it is premature at this early stage of the litigation. Subject to and without waiving the foregoing objections, Defendant will supply this information in accordance with Rule 26.

17.    State the total amount of compensation paid to the plaintiff during the period beginning January 20, 2004 through June 30, 2004.

ANSWER: Objection. This information is equally available to Plaintiff.

18.    Identify and describe all "fringe benefits" which plaintiff was entitled to receive as a result of her employment.

ANSWER: Objection. This information is equally available to Plaintiff. This information is included in the applicable collective bargaining agreement which has been produced.

19.    With respect to each "fringe benefit" identified in your answer to the preceding interrogatory, state the dollar value, on an annualized basis, for each such fringe benefit.

ANSWER: Objection. Defendants will supply responsive information quantifying the cost of fringe benefits purchased or supplied by third party carriers. All benefits are included in the collective bargaining agreement that Plaintiff received with the exception of the pension. The pension is provided by statute and is a matter of public record.

B93

061778.1004

20.    State all facts and identify all documents which you contend support the contentions set forth in your Second Affirmative Defense to the First Amended Complaint.

ANSWER: Objection. This interrogatory calls for a statement of legal conclusion. Without waiving such objection, Plaintiff failed to file a charge of discrimination following her non-renewal in the 2004-05 school year following her reinstatement in January, 2005. Her Complaint and First Amended Complaint do not allege that her non-renewal following the 2004-05 school year was based on impermissible reasons. In addition, as a matter of law, any allegations that arose more than 300 days before the date of her charge are barred by Title VII as are allegations under the Delaware Discrimination Law that arose more than 120 days before the date of her charge. Relevant documents include Plaintiff's Complaint and First Amended Complaint, her Charge of Discrimination filed with the EEOC on July 23, 2004, and the lack of any other administrative filing with the EEOC/DDOL.

21.    State all facts and identify all documents which you contend support the contentions set forth in your Fifth Affirmative Defense to the First amended Complaint.

ANSWER: Objection. This interrogatory calls for a statement of legal conclusion. Without waiving such objection, see response to preceding interrogatory. In addition, Plaintiff failed to take prompt action to report alleged physical or verbal sexual harassment by a student. When she submitted student disciplinary referrals to the Assistant Principal responsible for her area, she submitted them all on the same day. Further, even if her inaccurate claim that she submitted student referrals on the dates indicated on the referral forms is correct (and this is denied), she took no other action to seek administrative assistance. A reasonable person in her position would have done so if

7

061778.1004

B94

she believed the conduct to be as severe as she now alleges. When she reported alleged

misconduct by a special education student for whom she was responsible *in loco parens*, the

School District took prompt, remedial action and permanently removed the student from

her classroom. Relevant documents include the student disciplinary referral forms she

submitted.

22.    State all facts and identify all document which you contend support the
contentions set forth in your Sixth Affirmative Defense to the First Amended Complaint.

ANSWER: Objection. This interrogatory calls for a statement of legal

conclusion. Without waiving such objection, the individual Defendants are entitled to

qualified immunity because Plaintiff does not have any viable constitutional claims; she has

asserted a novel and meritless constitutional claim; she cannot establish a violation of any

clearly established constitutional right; and she stipulated to the dismissal to her First

Amendment claims.

23.    State all facts and identify all documents which you contend support the
contentions set forth in your Tenth Affirmative Defense to the First Amended Complaint.

ANSWER: Objection. This interrogatory calls for a statement of legal

conclusion. Without waiving such objection, see response to Interrogatory No. 21 above.

By way of further answer, Red Clay had at all applicable times a student code of conduct

setting forth its Anti-Harassment Policy. Plaintiff took no steps under that policy (copy

produced), the applicable collective bargaining agreement (copy produced), or otherwise to file a formal complaint of sexual harassment.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Barry M. Willoughby, Esquire (No. 1016)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6666; 6553
Facsimile: (302) 576-3345; 3470
Email: bwilloughby@ycst.com; mstafford@ycst.com
Attorneys for Defendants

Dated: August 8, 2006

9

B96

061778.1004

## SEXUAL HARASSMENT POLICY

Sexual harassment in the workplace is a form of employment discrimination, and is prohibited by law. It has been and continues to be the policy of Red Clay Consolidated School District ("Red Clay") that the sexual harassment in any form of employees or applicants for employment is unacceptable conduct which will not be tolerated by Red Clay. Under this policy, all employees share responsibility for assuring that the workplace is free from all forms of sexual harassment.

Federal law defines sexual harassment as unwelcome sexual advances, requests for sexual advances, requests for sexual favors, and/or other verbal, visual or physical conduct of a sexual nature where:

(1)    Submission to such conduct is made either explicitly or implicity a term or condition of an individual's employment;

(2)    Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual; or

(3)    Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

The federal regulations which are found at 29 C.F.R. §1604.11(a)* mean that no manager, supervisor or other employee shall threaten or suggest, either explicitly or implicitly, that another employee or applicant's refusal to submit to sexual advances in any form will adversely affect that person's employment, performance evaluation ratings, wages, compensation, advancement, assigned duties, or any other term or condition of employment. Furthermore, all employees are prohibited from offering, promising or granting preferential treatment to any employee or applicant for employment as a result of the individual engaging in or agreeing to engage in sexual conduct.

The following behavior is also prohibited: physical assaults of a sexual nature; other unwanted and unnecessary physical contact with another employee; unwelcome advances, propositions or sexual flirtations; subtle pressure or requests for sexual activities; verbal abuse of a sexual nature, including but not limited to inappropriate verbal comments about an individual's body or sexual activities; the inappropriate use of sexually explicit or offensive language in discussions with or to describe an individual; sexually explicit or offensive jokes; and the display in the workplace of sexually suggestive objects or pictures.

Any employee of the Red Clay Consolidated School District who feels that he or she has been a victim of sexual harassment in any form by any manager, supervisor, co-worker, customer, vendor, parent, student, visitor or other person should bring the problem to the immediate attention of their supervisor, or the Director of Human Resources. If the complaint involves someone in the employee's direct line of supervision or if the employee is uncomfortable for any reason with discussing such matters with the individuals designated or is not satisfied after bringing the matter to the attention of one or more of these individuals, that employee should report the matter promptly to the Superintendent or designee.

*This is the federal regulation governing sexual harassment.

B97

Red Clay will investigate all allegations of sexual harassment in as prompt and confidential a manner as possible and will take appropriate corrective action when warranted. Any employee who is found, as a result of such an investigation, to have engaged in sexual harassment in violation of this policy will be subject to appropriate disciplinary action, up to and including termination of employment. Furthermore, retaliation in any form against an employee or applicant who exercises his or her right to make a complaint under this policy is strictly prohibited, and will itself be cause for appropriate disciplinary action.

Any questions regarding this policy should be addressed to the Director of Human Resources.

ARP:dl
1/14/93
P7:74

1          A.      Not yet.

2          Q.      First can you tell me what your position

3    is with the Red Clay School District.

4          A.      I'm the manager of Human Resources.

5          Q.      And does that involve the administrative

6    staff?

7          A.      Yes.

8          Q.      Teachers?

9          A.      Yes.

10         Q.      Non-teaching staff at schools --

11         A.      Yes.

12         Q.      -- like custodians?

13         A.      Yes.

14         Q.      Cafeteria workers, et cetera?

15         A.      Yes.

16         Q.      Okay.  And how long have you been in

17   that position?

18         A.      Eight years.

19         Q.      And what's your educational back?

20         A.      I have -- I'm a Doctoral student at Del

21   State right now.

22         Q.      Do you have a Master's degree?

23         A.      I do.

24         Q.      When did you receive your Master's

1        Q.    SED I'm not sure.

2        A.    I'm not sure.

3        Q.    Would it have been --

4              When the Department -- let me put it

5    this way:  When the school district initiates a

6    request for an emergency certificate and the

7    Department issues an emergency certificate, would the

8    school district routinely be notified that that

9    certificate had been issued?

10       A.    They would send us -- I think this was

11   the year they were still sending us a copy because

12   sometimes -- one of those years they decided they

13   weren't gonna do it and have the educator send it to

14   us, but yes, we would be notified.

15       Q.    Now going back to Davenport 2 which

16   talks about "Enclosed is an emergency teacher of

17   exceptional children certificate --"

18       A.    Yes.

19       Q.    -- and Red Clay is copied, do you think

20   you probably got a copy of the certificate along with

21   the cover letter?

22       A.    Can I tell you what I remember?

23       Q.    If you can remember.

24       A.    I don't remember getting a copy of the

1   letter until Miss Mongelli brought it to us.

2          Q.    So your testimony is even though there's

3   an indication that a copy was mailed to you

4   April 12th, you didn't get it then?

5          A.    I don't believe we did.

6          Q.    And when did Miss Mongelli bring it to

7   you?

8          A.    Sometime in May.

9          Q.    And what prompted her --

10         A.    That I can't answer.

11         Q.    -- to bring that to you?

12         A.    I don't know.

13         Q.    You don't know.

14               Did some question arise as to whether or

15   not she actually had an emergency certificate?

16         A.    I can't remember.

17         Q.    Do you remember her bringing it to you?

18         A.    I remember -- I remember that she walked

19   it in.

20         Q.    Did she talk to you?

21         A.    No, she did not.

22         Q.    Do you know who she talked to?

23         A.    No.  I don't know who she talked to.

24         Q.    Okay.  If I were to go look at

1   Miss Mongelli's personnel file right now, would there

2   be a copy of the emergency certificate in there?

3        A.    Yes.

4        Q.    But you don't know exactly when it got

5   there.

6        A.    No.

7        Q.    Or why?

8        A.    What do you mean "or why"?

9        Q.    You said she brought it in but you

10  didn't know why.

11       A.    No.  I don't know why.

12       Q.    What about the teacher of early

13  childhood certificate, which is Davenport 6.  Do you

14  know whether that certificate was received along with

15  the cover letter?

16       A.    I don't think that we would have

17  received this because we didn't apply for these.

18       Q.    So the only one you applied for was the

19  emergency certificate.

20       A.    Correct.  And so if we have them, it's

21  because they were given to us at the same time the

22  emergency was given to us.

23       Q.    Okay.  And you have no recollection as

24  to why Miss Mongelli brought those into the district

```
 1  office --

 2          A.      No, I don't.

 3          Q.      -- or when.

 4          A.      Sometime in May.

 5          Q.      Sometime in May.

 6                  Now does your office play any role in

 7  staffing requirements for upcoming years?

 8          A.      Yes.

 9          Q.      What role does your office play?

10          A.      Making sure -- basically assigning the

11  number of units that the schools are entitled to for

12  the upcoming year.

13          Q.      Now when you say number of units, that's

14  really teaching -- one unit equals one teacher?

15          A.      Yes.  That's correct.

16          Q.      Okay.  And are the assignments of units

17  to different schools made at a district level?

18          A.      Yes, it is.

19          Q.      And I assume that has to do with

20  budgeting concerns, how much money we have?

21          A.      Based on the number of students.

22          Q.      It's based on the number of students.

23                  Does the school district get a certain

24  amount of money to hire teachers based on number of
```

 1  students?  Is there a formula?

 2          A.      There's a formula.

 3          Q.      So is it a district-wide formula or a

 4  school-specific formula?

 5          A.      It's -- I'm not understanding the

 6  question.

 7          Q.      Let's say Dickinson High School has a

 8  thousand students.  Are they gonna get allocated units

 9  based on the thousand students?

10          A.      Yes.

11          Q.      And who makes that allocation?

12          A.      The State give us the formula for the

13  allocation.

14          Q.      Does the district have some discretion

15  to allocate units among different schools?

16          A.      I don't know.  What do you mean?

17  Differently than, like, if one -- differently -- what

18  do you mean?

19          Q.      Well, for example, Red Clay School

20  District.  Let's say they're told by the State we're

21  gonna give Red Clay School District 5,000 units just

22  for example; okay?  And does Red Clay School District

23  have the ability to decide where those 5,000 units are

24  gonna go?

1          A.     I don't know how to answer that

2     question.

3          Q.     All right.  Or does the State say you've

4     got 60 units for Dickinson High School and you have to

5     use them at Dickinson High School?

6          A.     No.  It doesn't work that way.

7          Q.     Okay.  So you get a pot of units.

8          A.     It's based on number of students.

9          Q.     Okay.  And you have to allocate those

10    units based on number of students in each school.

11         A.     Correct.

12         Q.     Okay.  So the factor that drives the

13    number of units a school gets is the number of

14    students.

15         A.     That's correct.

16         Q.     Now at the school level is there any

17    discretion about how those units are gonna be

18    allocated among different subject areas?

19         A.     Yes.

20         Q.     And who makes that allocation?

21         A.     The principal.

22         Q.     So at the district level you will tell a

23    principal at a school you've got 50 units, 55 units --

24         A.     Correct.

```
 1          Q.      -- whatever the number is.

 2          A.      Yes.

 3          Q.      And the principal then comes back to you

 4   with a roster?  Is that what happens?

 5          A.      Not necessarily.

 6          Q.      Well, how does the district know how

 7   those units are gonna be staffed up?

 8          A.      Meaning how they're using them?

 9          Q.      Yeah.

10          A.      I don't think -- we don't -- really it's

11   at the principal's discretion how they use the units.

12   We just need to make sure that they're not over those

13   units.

14          Q.      Let me show you a document marked

15   Carmack No. 2.

16          A.      Okay.

17          Q.      Are you familiar with that kind of

18   document?

19          A.      I mean, I've seen this letter.  Yes.

20          Q.      What is that?

21          A.      It's basically a letter from the

22   principal saying what his anticipated vacancies are.

23          Q.      There's a three-page list of teachers

24   names --
```

B106

Davenport - Direct                          38

1        A.       Yes.

2        Q.       -- and subject --

3        A.       Yes.

4        Q.       -- areas and total number of units.

5        A.       Yes.

6        Q.       Okay.  Some of them are vacant where it

7   says "open"?

8        A.       Yes.

9        Q.       Is that the kind of document that the

10  district would receive from a school?

11       A.       No.  It's not typical.

12       Q.       What do you get typically?

13       A.       I mean, if we ask for a roster of

14  students -- I mean of teachers -- and, I mean, it's

15  not -- the format could be different, but -- if that's

16  what you're asking, if this is the format that we

17  usually receive it in.

18       Q.       That's what I'm asking.

19       A.       No, it's not.

20       Q.       What is the normal format?

21       A.       There is no normal format.  It could be

22  a computer-generated list.  However the principal puts

23  it together.

24       Q.       Would it be fair to say that at some

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801
(302) 658-6697    Fax (302) 658-8418

1  point during a school year you get from the principal

2  at each school a roster in some form --

3      A.    Yes.

4      Q.    -- showing names and supposedly filling

5  up the number of units as they're allocated?

6      A.    This looks like an end-of-the-year type

7  of roster.

8      Q.    It looks like it's here's our forecast

9  for next year; correct?

10      A.    Yes.

11      Q.    Is it up to the principal of the

12  individual school to plug in the names of teachers

13  that are gonna be on the roster for the next year?

14  Who does that?

15      A.    If that's the way they choose to do it.

16      Q.    Is there some other way you can do it?

17      A.    No.  I guess -- yeah.  I guess they

18  would do that.  Yes.

19      Q.    Now with respect to Carmack No. 2, that

20  looks like it transmits the staffing for John

21  Dickinson High School for the 2004/2005 school year --

22      A.    Yes.

23      Q.    -- is that correct?

24      A.    That's correct.

1          Q.      Now with respect to Miss Mongelli,

2    Miss Mongelli was teaching under an emergency

3    certificate; correct?

4          A.      Yes.

5          Q.      And my understanding is she was also --

6    at least her employment relationship with Red Clay was

7    in what they call a temporary contract?

8          A.      Yes.

9          Q.      Are you familiar with what a temporary

10   contract is?

11         A.      Yes.

12         Q.      What's that?

13         A.      A contract with limited duration.

14         Q.      And it ran through the end of the school

15   year?

16         A.      That's correct.

17         Q.      Now does the fact that a teacher is

18   operating under a temporary contract have any bearing

19   in and of itself on whether or not that teacher would

20   be recommended to be re-hired for the next year?

21         A.      Can you ask it again, please.

22         Q.      Okay.  Does the fact that a teacher is

23   operating under a temporary contract all by itself

24   have any significance as to whether or not that

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801
(302) 658-6697    Fax (302) 658-8418

```
 1   teacher might be hired for the next year?

 2           A.     No.

 3                  MR. WILLOUGHBY:  You're asking her her

 4   opinion now; is that correct?

 5                  MR. BERNSTEIN:  Yeah.  Her opinion.

 6                  MR. WILLOUGHBY:  She's not the sort of

 7   person making the recommendation.

 8                  MR. BERNSTEIN:  I'm not talking about

 9   recommendations.  I'm just asking her whether or not

10   the fact that a teacher is operating under a temporary

11   contract in and of itself would have a bearing on

12   whether that teacher might be re-hired.

13                  THE WITNESS:  Depends.

14   BY MR. BERNSTEIN:

15           Q.     What does it depend on?

16           A.     On the subject matter.

17           Q.     Pardon?

18           A.     Subject matter.

19           Q.     Subject matter.

20           A.     Or whether there's units available.

21           Q.     Okay.  What if in Special Ed, which is

22   what Miss Mongelli was teaching, if you look at that

23   roster, you'll see where Special Ed units are there

24   are two open slots.
```

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980]
(302) 658-6697    Fax (302) 658-8418

1         A.      Uh-huh.

2         Q.      See that, where it says "open"?

3         A.      Yes.

4         Q.      No names are filled in.

5         A.      Yes.

6         Q.      Would the fact that someone who is

7    currently teaching at John Dickinson High School on an

8    emergency certificate with a temporary contract, would

9    that have any bearing on the re-hiring decision all by

10   itself?

11        A.      It still depends.

12        Q.      Depends on what?

13        A.      On recommendations from the principal.

14        Q.      Okay.  What if the only factors were

15   emergency certificate and temporary contract?

16              MR. WILLOUGHBY:  You're asking a

17   hypothetical question?

18              THE WITNESS:  I don't know.  It depends.

19              MR. BERNSTEIN:  You don't know.

20   BY MR. BERNSTEIN:

21        Q.      Is there any significance -- when you

22   get this type of roster, is there some way for you to

23   tell whether or not an existing teacher is being

24   recommended for re-hire?

Davenport - Direct

1      A.      No, because when I look at something

2   like this, I'm counting noses to check how many units

3   there are and to see, make sure -- so the names don't

4   mean much to me really.

5      Q.      Is it expected of a principal, let's say

6   you have teachers under temporary contracts teaching

7   at a school, to notify the district whether or not the

8   principal is recommending a new contract for those

9   teachers or not?

10      A.      I'm sorry.  Ask me again.

11      Q.      Okay.  In any given time there might be

12   teachers, let's say at John Dickinson High School, who

13   are teaching under temporary contracts and those

14   contracts as you said have a limited duration.

15      A.      Correct.

16      Q.      Now if the principal of that school

17   either wants to recommend that that person be carried

18   over to the next year or recommends that that person

19   not be carried over, is there some form of

20   communication that's sent to you or your office

21   telling them that?

22      A.      Okay.  I send a memo to principals

23   around January/beginning of February asking for --

24   giving them a list of teachers who are on temporary

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801
(302) 658-6697    Fax (302) 658-8418

```
 1   contracts and are not tenured, asking the status of

 2   these particular educators, whether or not they should

 3   continue employment or not.

 4        Q.     You send that memo out in January or so?

 5        A.     Yes.

 6        Q.     And when do you expect to get a

 7   response?

 8        A.     Within -- by the beginning of February.

 9        Q.     I'm showing you Carmack No. 1 and that

10   looks like a response to just the type of memo you

11   described you sent out --

12        A.     That's correct.

13        Q.     -- is that right?

14        A.     Yes.

15        Q.     And that says here are the teachers

16   under temporary contract and there are some that are

17   recommended to be approved or carried over.

18        A.     Yes.

19        Q.     And I don't think -- in that particular

20   memo it looks like there's a recommendation that a

21   couple people not be rehired.

22        A.     That's correct.

23        Q.     Is there a recommendation on there that

24   any of the temporary people be rolled over to the next
```

```
 1  year or not, or does it just say here are the temps?
 2          A.      It just says here are the temps.
 3          Q.      Now would you expect something else --
 4          A.      Yes.
 5          Q.      -- from the principal about status of
 6  the temps for the next year?
 7          A.      There would have been a notation of who
 8  not to bring back.
 9          Q.      And if there had been --
10                  So let me make sure I understand this.
11  People who are in the Temporary Contract category, you
12  would expect the principal to send you something, yes,
13  I recommend this person be rolled over to the next
14  year, or no, I don't?
15          A.      Yes.
16          Q.      And everybody would be covered with
17  either a "yes" or a "no."
18          A.      Yes.
19          Q.      And if you don't get that by a certain
20  date, what do you do?
21          A.      It depends.
22          Q.      Is there some place in your records
23  where those memos would exist?
24          A.      Oh, yes.
```

1          Q.      Where would that be?

2          A.      From other principals?

3          Q.      No.  Let's say from John Dickinson High

4   School.  If I went to look in some file somewhere in

5   your office or Personnel Office, where would I find a

6   memo saying these temporary teachers I'm recommending

7   to roll over, these other temporary teachers I'm

8   recommending not be rolled over?

9          A.      From Dickinson High School?

10         Q.      Yeah.

11         A.      This would -- it would be with the

12  staffing information for that year.

13         Q.      There would be a file?

14         A.      It's with all the schools for that

15  particular staffing year.

16         Q.      Sitting here today do you have any

17  recollection --

18         A.      This is the letter that he sent back.

19         Q.      You didn't let me finish.  Sitting here

20  today do you have a recollection of getting any other

21  memos from Mr. Carmack about the status of temporary

22  teachers other than that memo?

23         A.      No.

24         Q.      Do you think if such a memo had been

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware   19801
(302) 658-6697    Fax (302) 658-8418

```
 1   sent you would have gotten it?

 2          A.    Yes.

 3          Q.    Did you ever look for such a memo

 4   recently?

 5          A.    No.

 6          Q.    Anybody ask you to?

 7          A.    No.

 8          Q.    Okay.

 9                MR. BERNSTEIN:  Could we have this

10   marked as 8.

11                (Deposition Exhibit Davenport No. 8

12   marked for identification).

13   BY MR. BERNSTEIN:

14          Q.    Miss Davenport, I'm showing you

15   Davenport 8.  Professional Education Employee Contract

16   is the header at the top, dated May 13, 2004, between

17   Red Clay Consolidated School District and Christina

18   Mongelli, and it indicates hiring as a teacher

19   beginning May 13th, 2004 and ending ... and there's no

20   date in there.  And it's signed by Mr. -- executive

21   secretary -- I can't read the name -- and the

22   president of the Board of Education and Miss Mongelli,

23   and it looks like it's time-stamped Human Resources,

24   May 12, 2004 on the second page.  Do you see that?
```

B116

1        A.      Yes.

2        Q.      Now would it be fair to say that this

3    was signed by these people probably before you got it?

4        A.      Yes.

5        Q.      Now in handwriting written across the

6    front of the page it looks like it says "Rescinded

7    6/16/04."

8        A.      Yes.

9        Q.      Do you know whose handwriting is that?

10       A.      It's mine.

11       Q.      Do you know what prompted you to write

12   that?

13       A.      Yes.  We rescinded the contract.

14       Q.      And what was the reason it was

15   rescinded?

16       A.      Lack of certification.

17       Q.      What was the certification that was

18   lacking?

19       A.      The Special Ed.

20       Q.      Is that why Miss Mongelli brought the

21   certificate in, showing she had the certification?

22       A.      I can't answer that question.

23       Q.      Why not?

24       A.      Because I don't know why she brought it

1    in.

2         Q.    Did somebody ask her to bring it in?

3         A.    I don't know.

4         Q.    Well, how did it come to your attention

5    that Miss Mongelli didn't have a Special Ed

6    certification?

7         A.    I had had a conversation with

8    Miss Dunmon that Mr. Carmack had concerns about her

9    performance in the classroom.

10        Q.    And what did you do?

11        A.    I went to look to see what her

12   credentials were.

13        Q.    And did you find the transmittal letter

14   in her file?

15        A.    The --

16        Q.    I'm now talking about Davenport No. 2.

17   You can look at it.

18        A.    I know which letter you're talking

19   about.  I don't believe we had that letter at the

20   time.

21        Q.    So you didn't have that letter?

22        A.    I didn't have that letter but I did have

23   her transcripts and so I knew that she wasn't

24   certified and that she would --

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801
(302) 658-6697    Fax (302) 658-8418

1              She wasn't certified in Special Ed.    I

2    knew that from her transcripts.

3         Q.    Did you have anything indicating that

4    you had applied for an emergency certificate for her?

5         A.    Yes.

6         Q.    Did that cause you to see if one had

7    ever been issued?

8         A.    No.

9         Q.    It didn't?

10        A.    No.

11        Q.    Why not?  Why wouldn't -- I mean, if you

12   knew you had applied for one and you didn't have one,

13   weren't you curious at all as to whether one had been

14   issued?

15        A.    I mean, I can't remember.

16        Q.    Okay.  Well, let me ask you this:   If

17   you knew that you'd applied for one and you look in

18   the file and you don't see a certificate, wouldn't it

19   be a rather simple matter to pick up a telephone,

20   contact someone at the State Board of Education to

21   determine whether or not a certificate had been

22   issued?

23        A.    I could have.

24        Q.    Did you do that?

Davenport - Direct

```
 1          A.    No, I didn't.

 2          Q.    Okay.  Well, were you concerned about

 3   finding out what the true state of affairs was --

 4          A.    I'm sorry?

 5          Q.    -- whether she had a certificate or not?

 6          A.    Was I interested in finding out?

 7          Q.    Were you concerned about that?  You

 8   didn't have anything in your file -- right? --

 9   according to you.

10          A.    Correct.

11          Q.    But you know one had been applied for.

12          A.    Correct.

13          Q.    And my question is, were you concerned

14   about whether one had been issued and just finding out

15   yes or no?

16          A.    At the time I don't know whether I was

17   concerned or not.  I don't know.

18          Q.    But, I mean, it's important, isn't it?

19          A.    It could be.

20          Q.    I mean, you have a teacher teaching

21   Special Ed kids who might not have a certificate.

22   That's not important?

23          A.    That is important.

24          Q.    Okay.  But you didn't do anything to
```

B120

1  find out one way or the other.

2          A.     That's correct.

3          Q.     Okay.  Well, what did you report back to

4  Mr. Carmack, if you did?  He made an inquiry about her

5  qualifications.  You looked in the file.

6                 MR. WILLOUGHBY:  Object.  She had that

7  conversation with Miss Dunmon.

8                 MR. BERNSTEIN:  I'm sorry.  Miss Dunmon.

9  BY MR. BERNSTEIN:

10         Q.     You look in the file; right?  Don't see

11 an emergency certificate.  Don't do anything to follow

12 up.  So what did you report back to Miss Dunmon?

13         A.     That she did not hold a Special Ed

14 certificate.

15         Q.     She didn't have one or you didn't know

16 whether she had one?

17         A.     No.  She didn't have one.

18         Q.     But you didn't know whether she did or

19 she didn't; right?

20         A.     We didn't have one in the folder.  Her

21 credentials pointed to the fact that she didn't have

22 what was needed for Special Ed certificate.

23         Q.     You never checked with the State Board

24 of Education; correct?

Davenport - Direct

1        A.      No, I did not.

2        Q.      Yet you told Miss Dunmon she didn't have

3  a certificate; correct?

4        A.      That's correct.

5        Q.      Okay.  That's right?

6        A.      That's correct.

7        Q.      Okay.  And is that what caused you to

8  write "rescinded" on that contract?

9        A.      Yes.

10        Q.      And is that what caused you to recommend

11  to the Board that Miss Mongelli not be offered a new

12  contract?

13        A.      Yes, but I also knew that she would

14  probably -- I knew that she would probably be issued

15  an emergency certificate, but also there's a proviso

16  in that certificate that she should be working on that

17  particular credential.

18        Q.      I thought somebody had three years to do

19  that.

20        A.      But they need to be continuously working

21  on that credential in order for that to be valid.

22        Q.      And is there some regulation that says

23  that?

24        A.      Yes.  It's actually -- it's on a form

B122

```
 1  that we send to the Department, requesting the

 2  emergency certificate.

 3          Q.    So when you request an emergency

 4  certificate, even though the person hasn't gotten an

 5  emergency certificate, you're already telling them

 6  that the person is working towards this --

 7          A.    Yes.

 8          Q.    -- is that right?

 9          A.    Yes.

10                MR. WILLOUGHBY:  Saying --

11                THE WITNESS:  We're required to report

12  it.

13                MR. WILLOUGHBY:  -- saying they're

14  required to report it.

15  BY MR. BERNSTEIN:

16          Q.    How does that connect with the State

17  standard that somebody has three years to complete

18  those requirements?

19                MR. WILLOUGHBY:  Asked and answered.

20  Objection.  They have to be continuously working on

21  it.  Do you want to see the form?

22                MR. BERNSTEIN:  Take a break.

23                MR. WILLOUGHBY:  Here you go.

24                        -   -   -
```

1    BY MR. BERNSTEIN:

2         Q.    What -- just for the record --

3              MR. WILLOUGHBY:   Do you want to mark it?

4              MR. BERNSTEIN:   Yeah.   I'm going to mark

5    it in just a second.

6              Mr. Willoughby handed me a document

7    marked at the bottom Bates stamped Mongelli 11.   I'm

8    going to have this marked as Davenport 9.

9              (Deposition Exhibit Davenport No. 9

10   marked for identification).

11   BY MR. BERNSTEIN:

12        Q.    Miss Davenport, I'm am showing you

13   what's been marked as Davenport 9.   Is that document a

14   part of the packet that you send in with an

15   application for an emergency certificate?

16        A.    Yes.

17        Q.    It also indicates -- it looks like your

18   signature on there; right?

19        A.    Yes.

20        Q.    And close to the bottom there's a

21   paragraph that begins "I'm aware the district must

22   send a letter to the Office of Professional

23   Accountability reporting on the progress of the

24   educator in meeting certification requirements."

1              Now did you ever send any letters in

2     compliance with that paragraph concerning

3     Miss Mongelli?

4          A.    No.  A letter wasn't sent.

5          Q.    Pardon?

6          A.    A letter was not sent.

7          Q.    Did you ever --

8              Now the next paragraph says, "If the

9     educator has an unsatisfactory evaluation or makes no

10    attempt to satisfy the certification requirements, the

11    emergency certificate will be suspended."  Do you see

12    that?

13         A.    Yes.

14         Q.    My question is, did you ever send to the

15    State Board of Education, State Department of

16    Education, a letter indicating that Miss Mongelli had

17    an unsatisfactory evaluation or wasn't making any

18    attempt to satisfy certification requirements?

19         A.    No.

20         Q.    Now once you marked "rescinded" on that

21    contract, Davenport 8 I think it is, what happened

22    from that point on with Miss Mongelli's status as an

23    employee?  Was she notified that her contract wasn't

24    going to be renewed?

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801
(302) 658-6697    Fax (302) 658-8418

Davenport - Direct

```
 1            A.      I believe so.

 2            Q.      And on the school district side, does

 3   the Board of Education get notified, because they had

 4   already signed a contract here; correct?

 5            A.      Correct.

 6            Q.      Were they notified that the contract had

 7   been rescinded by you?

 8            A.      I don't know if by me specifically, but

 9   they were notified.  Yes.

10            Q.      Well, I guess I used the wrong term,

11   "you."

12                    Let me ask you this:  My understanding

13   is that the Board of Education has the final say on

14   contracts with teachers --

15            A.      Yes.

16            Q.      -- correct?

17            A.      Yes.

18            Q.      And the district or the administration

19   makes recommendations to the Board.

20            A.      Yes.

21            Q.      And the Board typically follows those

22   recommendations; correct?

23            A.      Yes.

24            Q.      Is that what happened in this case?
```

1   Some communication was sent to the Board, this

2   contract that you signed, we're recommending it be

3   rescinded?

4          A.    Yes.

5          Q.    Okay.  Would there be a separate

6   document, some sort of transmittal letter, to the

7   Board?

8          A.    I don't remember how it went.  I don't

9   know if it was an actual Board authorization so it

10  appeared on the Board Reporter, or it was a walk-in.

11         Q.    A walk-in?

12         A.    Which means that Diane Dunmon would have

13  taken -- would have walked it into the Board.

14         Q.    I see.  Okay.

15               And based on the information that you

16  had about Miss Mongelli, was there any other reason

17  the contract was rescinded other than this lack of

18  certification, Special Ed?

19         A.    The conversation that I had with

20  Miss Dunmon was that Mr. Carmack had concerns about

21  her performance in the classroom and that she was not

22  handling this particular population very well.

23         Q.    Okay.  Now did you ever get anything

24  from Mr. Carmack, either verbally or in writing,

1    saying I don't want Miss Mongelli back next year?

2            A.      I don't recall talking to him directly.

3            Q.      Did you ever get anything verbally or in

4    writing from Miss Dunmon saying I don't think we

5    should re-hire Miss Mongelli whether she has her

6    certificate or not?

7            A.      That wasn't the conversation that we

8    had.

9            Q.      Did she ever say in so many words, I

10   don't think we should re-hire Miss Mongelli?

11           A.      Yes.

12           Q.      What did she say?

13           A.      If she's having trouble in the

14   classroom, we shouldn't have her back, and so it was

15   because of the certification.

16           Q.      Which was it?  Troubles in the

17   classroom --

18           A.      Trouble in the classroom.

19           Q.      -- or certification?

20           A.      It was both.

21                   MR. WILLOUGHBY:  Let her finish.

22                   THE WITNESS:  It was both.

23   BY MR. BERNSTEIN:

24           Q.      Both?

```
 1              A.      Yes.

 2              Q.      And let me ask you this:  Do those sort

 3    of recommendations usually come from the principal?

 4              A.      I'm sorry.  What sort of

 5    recommendations?

 6              Q.      About rehiring a teacher in my school.

 7              A.      It can.

 8              Q.      My question is don't they usually --

 9              A.      Usually, yes.

10              Q.      -- come from the principal?

11              A.      Yes.

12              Q.      Is it unusual for that sort of thing to

13    come from somebody like Miss Dunmon?

14              A.      No.

15              Q.      No?  Okay.

16                      Can you recall other incidents where you

17    didn't hear it from the principal one way or the other

18    but Miss Dunmon said don't hire Mister X?

19              A.      It would have been based on conversation

20    that the principal had with Miss Dunmon.

21              Q.      Do you know that for sure?

22              A.      Absolutely.  I mean, yes, I believe that

23    that happened.

24              Q.      Well, you believe it happened or you
```

Davenport - Direct

1    know it happened?

2           A.     It happened.

3                  MR. BERNSTEIN:   Excuse me for a moment.

4                  (Break taken)

5                  MR. BERNSTEIN:   Okay, Miss Davenport.

6    Thanks for coming in.

7                  MR. WILLOUGHBY:   I just have a couple

8    questions.

9                          -   -   -

10   BY MR. WILLOUGHBY:

11          Q.     Looking at Exhibit 9, you were asked

12   about whether or not Ms. Mongelli had taken any steps

13   to satisfy the certification requirements for the

14   emergency certificate.   See that?

15          A.     Yes.

16          Q.     When you were looking into her

17   credentials, did you have any information or

18   understanding about whether or Ms. Mongelli had done

19   anything to take steps to satisfy the certification

20   requirements in exceptional children - 7 through 12?

21          A.     As far as I was aware she had not.

22          Q.     Had she given you anything to indicate

23   that she had taken any courses, signed up for Praxis

24   II, done anything at all to meet the requirements for

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801
(302) 658-6697    Fax (302) 658-8418

1    a certificate in exceptional children - 7 through 12?

2         A.     She had not.

3                MR. WILLOUGHBY:  That's all I have.

4                MR. BERNSTEIN:  Okay.  Thanks very much.

5                MR. WILLOUGHBY:  We'll read and sign.

6                     -  -  -

7                (Deposition concluded at or about

8          3:30 p.m.)

9                (Deposition transcript was

10         presented to the witness for reading and

11         signing.)

12                    -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

1        Q.    And were there ever occasions when you

2    would -- let's say an assistant principal at Dickinson

3    or a principal might get a heads-up from a middle

4    school administrator, Hey, you better look out for

5    this kid.  He's a bad number.  Anything like that?

6        A.    We actually -- I personally did not

7    encounter that.  No.

8        Q.    Never happened on your watch to you.

9        A.    Correct.

10        Q.    Now were you involved in any way in the

11    decision to hire Miss Mongelli?

12        A.    I do not recall playing a role in that.

13        Q.    Okay.  At the high school level at John

14    Dickinson who is typically involved in hiring

15    decisions?

16        A.    The principal.

17        Q.    Is there anybody else that plays a role

18    in that outside of the school?

19        A.    Outside of the school?

20        Q.    At the district level.

21        A.    It's my understanding that Human

22    Resources does.

23        Q.    Now can you explain to me -- I'm kind of

24    switching subjects now -- how disciplinary referrals

B132

1    worked at Dickinson High School while you were

2    assistant principal.

3         A.    If an incident occurred in a class or at

4    the school involving a student, the teacher would fill

5    out what's known as an SBR, Student Behavior Referral,

6    and submit it to the appropriate assistant principal.

7         Q.    Now that would be by alphabet --

8         A.    That's correct.

9         Q.    -- depending on the student's name?

10        A.    Their last name.  That is correct.

11        Q.    And the teachers I assume were given a

12   supply of these forms to fill out, or did they have to

13   go to the office to get one?

14        A.    They were available in the teacher

15   mailroom.

16        Q.    And it's just a form that you fill out.

17        A.    That is correct.

18        Q.    Okay.  What happens to that form after

19   the teacher fills it out?

20        A.    The teacher would put it in the

21   assistant principal's mailbox.

22        Q.    Now where is that mailbox located?

23        A.    In the same mailroom.

24        Q.    In the teacher's lounge, or is there a

1    second page, it's the fourth line down where it says,

2    quote, "The following day Miss Mongelli submitted

3    seven SBRs to me dated 5/7, 5/6, 5/5, 5/5, 5/4, 5/3

4    and 4/26."

5         A.    That is correct.

6         Q.    Okay. And that continues to describe

7    who you interviewed and summarizing what they said

8    with reference to a Mr. Butcher and a Mr. Battle. Do

9    you see that?

10        A.    Yes, I do.

11        Q.    And this also indicates that you met

12   with Mr. White on May 13th --

13        A.    Yes.

14        Q.    -- and gave him a five-day suspension.

15        A.    That is correct.

16        Q.    And there is also an indication on that

17   same bullet point at the top of the second page of

18   this memo that these incidents were reported to the

19   school resource officer, Detective Alex Nowell.

20        A.    Yes. That is correct.

21        Q.    Now what's a school resource officer?

22        A.    School resource officer is the name

23   given to a State Police officer assigned to the high

24   school.

1          Q.      And is this an officer on regular duty?

2          A.      Yes.  It's a regular State trooper whose

3     actual office is at the school.

4          Q.   .  How much time does the trooper spend on

5     school property typically?

6          A.      Quite a bit.  That's where he reports to

7     work on a daily basis.

8          Q.      Nine to 5, or -- or whenever school is

9     in session?

10         A.      Yes.

11         Q.      What's the protocol for getting the

12    State Police officer involved in school disciplinary

13    matters?

14         A.      If an incident is severe enough or of a

15    degree of severity, it is to be reported to the State

16    Police.  The actual mechanism can vary.

17         Q.      Are there guidelines for doing that?

18         A.      There are.

19         Q.      Is it in the Code of Conduct?

20         A.      I believe it's State regulations.

21         Q.      Okay.  So, for example, if something

22    happens between a student and a student or a student

23    and a teacher that the administration believes

24    constitutes crime, you're gonna report that to the

1   police.

2      A.      Certain things you're required to, yes,

3   and other things you may just report it to them so

4   they're aware of it.

5      Q.      So if      Student - JW₃  tried to hump

6   Miss Mongelli, that would be a crime?

7      A.      It would be something that I deem worthy

8   enough to report to the school resource officer, and

9   once I've done that my duty is fulfilled insofar as

10  reporting it to him.  What they do --

11     Q.      You report what happened and it's up to

12  them to take it from that point, on?

13     A.      To deal with their aspect.  What we do

14  at the school level still continues on.

15     Q.      So conduct may or may not result in a

16  criminal charge --

17     A.      Correct.

18     Q.      -- depending on the nature of the

19  conduct and how much evidence there is.

20     A.      Depending on the judgment of the State

21  trooper.

22     Q.      Okay.  Fair enough.

23             Now apparently, according to your

24  testimony, when Miss Mongelli reported these incident.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware   19801
(302) 658-6697    Fax (302) 658-8418

```
 1   that I asked other people but I'm going to try to

 2   maybe fill in some gaps that you might have some

 3   knowledge about; okay?

 4          A.     Uh-huh.

 5          Q.     Let's start out with how it came to your

 6   attention that Miss Mongelli did not have a Special Ed

 7   emergency certificate.

 8          A.     In a conversation with Miss Davenport it

 9   was brought to my attention.

10          Q.     And do you know around when this would

11   have occurred?  Time period?

12          A.     I would say -- gosh ... I want to say

13   April to May time frame, but I don't know exactly in

14   the Spring.

15          Q.     If we use a reference point, the

16   rescinded contract that was dated May the 12th, now --

17              MR. WILLOUGHBY:   The rescission.

18              MR. BERNSTEIN:   The rescinded contract.

19              MR. WILLOUGHBY:   I'll let you finish the

20   question.

21              MR. BERNSTEIN:   I'm using that as a

22   starting point.

23              MR. WILLOUGHBY:   But not the word

24   "rescinded" written on it.
```

1             MR. BERNSTEIN:  Yeah.

2             THE WITNESS:  Oh.  Before it had that on

3    it.

4    BY MR. BERNSTEIN:

5        Q.    Do you think -- that contract was signed

6    around May 12th? --

7        A.    Yes.

8        Q.    -- correct?

9        A.    Uh-huh.

10       Q.    -- by Miss Mongelli and by the school

11   district?

12       A.    Yes.

13       Q.    Would it be fair to say that that

14   contract would not have been signed if you knew on

15   May 12th or believed on May 12th that Miss Mongelli

16   did not have a certificate in Special Ed?

17       A.    That's correct.

18       Q.    You wouldn't have signed the contract;

19   correct?

20       A.    Correct.

21       Q.    So that knowledge logically would have

22   had to come to your attention after May 12th --

23       A.    Yes.

24       Q.    -- right?

 1          A.      Uh-huh.  Yes.

 2          Q.      And sometime between May 12th and June

 3    16th, or --

 4          A.      I think that's correct.

 5          Q.      -- when it was rescinded?

 6          A.      Yes.

 7          Q.      And your understanding is that that was

 8    brought to your attention by Miss Davenport?

 9          A.      Yes.

10          Q.      Okay.  Now prior to getting that

11    information from Miss Davenport, did you have any

12    conversations with Mr. Carmack about renewing or not

13    renewing Miss Mongelli's contract? --

14          A.      Yes.

15          Q.      -- before May 12th?

16          MR. WILLOUGHBY:  Before May 12th?

17          MR. BERNSTEIN:  Before May 12th.

18          THE WITNESS:  I had a conversation with

19    Mr. Carmack.  The specific date to place it before or

20    after would be difficult for me.  My recollection is

21    that it would have been in that range, but I don't

22    know the exact date and I'm very sorry, but I don't.

23    BY MR. BERNSTEIN:

24          Q.      Okay.  Let's put the date aside for a

1  moment.

2       A.    Yes.

3       Q.    Do you remember the substance of the

4  conversation?

5       A.    I do.

6       Q.    What was the substance?

7       A.    Basically Mr. Carmack called my office

8  because he had been informed that Miss Mongelli was

9  given a regular contract rather than temporary, moved

10  from temporary to regular, and that he had a concern

11  because she was having difficulties in the classroom

12  and he believed that she was remaining on a temporary

13  contract which would have ended in June.

14       Q.    So he called you because he found out

15  that her contract was being rolled over to the next

16  school year.

17       A.    That's correct.

18       Q.    Okay.  And did he express some

19  displeasure with that?

20       A.    He expressed puzzlement to a certain

21  extent as to why that had occurred and he expressed

22  concern because of the difficulties because of

23  classroom management issues that he mentioned at that

24  upper grade level in Special Education.

1        Q.      Do you know how it came about that

2   Miss Mongelli was offered a new contract for

3   2004/2005?

4        A.      As I understand it Miss Davenport, being

5   aware that Special Education teachers, particularly at

6   the secondary level, are difficult to find, believed

7   that Miss Mongelli would be a person that we would

8   continue employment with and she believed that

9   Mr. Carmack at that time was pleased with her

10  performance.

11       Q.      Now her testimony was she didn't get

12  anything from Carmack one way or the other in any form

13  of report saying I recommend this contract be extended

14  or I don't recommend --

15       A.      Correct.

16       Q.      -- this contract be extended.

17       A.      Yes.

18       Q.      Did you have any conversations with

19  Mr. Carmack to the effect of Well, if you didn't want

20  her back, why didn't you make a recommendation?

21       A.      I did have a conversation with him.  I

22  don't know that it was exactly that kind of wording.

23  He believed that in the absence of her name on his

24  roster, that we understood or that Debra understood

B141

1    that he did not expect that she would be returning in

2    the Fall.

3            Q.        In your experience and -- well, let me

4    ask you this just to preface:  Do you have a lot of

5    familiarity with these rosters the principals fill

6    out?

7            A.        Yes.

8            Q.        Do they cross your desk?

9            A.        Yes.

10           Q.        Is that unusual, to kind of just leave

11   somebody's name off the list and leave it to the

12   people who are getting the list to divine Well, that

13   person's name isn't on the list so they must not want

14   to re-hire them?

15           A.        It is indeed unusual and I will say I've

16   had principals previously who automatically assumed

17   that all temporary contracts would disappear, so that

18   certainly happened before, but it is unusual for them

19   to think that -- a principal to believe that we'll

20   interpret that in that manner.

21           Q.        You mean literally you would have to

22   look down the list and think to yourself Who is not on

23   the list; right?

24           A.        Yes.  Correct.

1        Q.    And then make another assumption from
2   the fact that their name isn't on the list as to what
3   the principal wants to do --
4        A.      Correct.
5        Q.    -- correct?
6             And wouldn't it be fair to say that most
7   of the time you either get some memo or some form, you
8   know, I recommend you re-hire these people or I
9   recommend you don't re-hire these people?
10       A.      That would be accurate; however I would
11  also say that due to the proximity of that memorandum
12  going out with Mrs. Mongelli's hire, that made it a
13  little bit unusual because, as Debra pointed out,
14  we're doing those kind of decision-making in January
15  and February, and Miss Mongelli began as I recall
16  January 20.
17       Q.    Well, don't you think then -- would it
18  be fair to say that because of the timing of that,
19  that it would even be more likely that if Mr. Carmack
20  didn't want Miss Mongelli back, he would take some
21  affirmative action?
22             MR. WILLOUGHBY:  Likely you're saying?
23             MR. BERNSTEIN:  More likely.
24             MR. WILLOUGHBY:  You're asking her to



**MEMORANDUM**

**RED CLAY CONSOLIDATED
SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

Human Resources

(302) 683-6656
FAX (302) 636-8778

Debra Davenport
*Manager*

Debra.Davenport@redclay.k12.de.us

To:         Christina Diane Mongelli

From:      Donna McDowell
            Secretary Human Resources

Re:         Employee contract

Date:      February 17, 2005

Enclosed is your teaching contract with the Red Clay Consolidated
School District.  Please sign and return to the Human Resources
Office for additional signatures.  You will receive a copy of the
completed contract for your records.

If you have any questions, please don't hesitate to contact me at 683-6660.

Thank you.

B144

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in
its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is
Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE  19808  (302) 683-6662.

Mongelli-37

RCCSD
Human Resources

**STATE OF DELAWARE**

RCCSD
Human Resources

2005 FEB 23 A 10: 2b

## PROFESSIONAL EDUCATION EMPLOYEE CONTRACT

AGREEMENT made this ___19th___ day of ___January___ , ___2005___ , by and between the Board of Education of the _____Red Clay Consolidated_____ School District (the "Board") and _____Christina Diane Mongelli_____ . (the "Employee").
<span style="text-align:center">*(Name of Employee)*</span>

The Board and the Employee mutually agree as follows:

1. **Employment.** The Board hereby employs the Employee, and the Employee hereby accepts employment upon the terms and conditions of this Agreement, as a ___Teacher___
<span style="text-align:center">*(Position)*</span>
for the school year commencing ___1/19/05___ , and ending _____ and from year to year thereafter, unless the Board shall terminate the Employee's services in accordance with Delaware law, and provided the Employee does now and continues to satisfy the State certification requirements. For purposes of the assignment of duties by the Board to the Employee, a school year shall be a ten-month period, beginning on a date specified by the Board, and consisting of one hundred eighty-five (185) days in accordance with Delaware law.

2. **Salary.** The Employee's total annual salary will be composed of funds from State, local, or federal sources or from some combination of the three sources as specified below:

| | |
|---|---|
| State | $ *TEACHERS' SALARY SCHEDULE |
| Local | $ _____ |
| Federal | $ _____ |
| Total | $ _____ |

3. **Duties of Employee.** The Employee shall faithfully perform those duties which may be assigned by the Board. The Employee shall observe and comply with the laws of the State of Delaware and with the regulations of the State Board of Education and the Board as currently in force and as from time to time amended, enacted or promulgated, which law and regulations are incorporated herein by reference as if set forth in full herein.

The employee shall not vacate his or her position during the term of this contract without the written consent of the Board. In the event that the Employee wishes to vacate his or her position and terminate this Agreement at the end of any school year, the Employee must give written notice to the Board of such intention on or before July 1.

4. **Governing Law.** This Agreement is to be governed by the laws of the State of Delaware.

*Prorated for the actual number of days worked beginning January 19, 2005 through June 30, 2005.

B145

5.  **Counterparts.**  This Agreement has been executed in duplicate counterparts. Each executed counterpart is intended by the parties to be their original act and deed. One counterpart is to be delivered to the Employee and the other is to be retained by the Board.

6.  **Contract Modification.**  This Agreement is the whole agreement of the parties and may not be amended, modified or altered except as hereinafter set forth. This Agreement may be modified annually or as required with respect to Paragraph 2 by written addendum signed by both parties and attached to the original executed counterpart.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first above written.

ATTEST:                                                    BOARD OF EDUCATION

_____          BY:  _____
Executive Secretary                                                         President

                                                            EMPLOYEE

                                                    _____
                                                    Christina Diane Mongelli
                                                                                      (Seal)

DOCUMENT NO. 9508B146



April 21, 2005

### HAND DELIVERED

**RED CLAY CONSOLIDATED**
**SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

**Human Resources**

(302) 683-6656
FAX (302) 636-8778

**Debra Davenport**
*Manager*

Debra.Davenport@redclay.k12.de.us

Ms. Christina Mongelli
504 Blackbird Drive
Hockessin, DE 19707

Dear Ms. Mongelli:

I have been directed by the Red Clay Consolidated School District's Board of Education to notify you that the Board intends to terminate your services as a teacher, effective at the end of the 2004-05 school year pursuant to Title 14, Chapter 14 of the Delaware Code (copy enclosed).

As a non-tenured teacher, you are not entitled to a hearing before the Board under Title 14, Chapter 14 of the Delaware Code.

Your name will not be placed on the recall list for the Red Clay Consolidated School District.

A letter will be sent from the Benefits Office regarding the continuation of your benefits and disposition of your pension contributions.

On behalf of the Board, I wish to thank you for your services.

Very truly yours,

Debra Davenport
Manager

DD/DLD/z
Enclosures
Non-Tenured Non-Renew Performance.2005

B147

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.



April 21, 2005

**RED CLAY CONSOLIDATED
SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

**Administrative Offices**
2916 Duncan Road
Wilmington, DE 19808

;Human Resources

(302) 683-6656
FAX (302) 636-8778

Debra Davenport
*Manager*

Debra.Davenport@redclay.k12.de.us

Ms. Christina Mongelli – 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
504 Blackbird Drive
Hockessin, DE 19707

Dear Ms. Mongelli,

    Board Action – 04/20/2005
    Non-renewal – Non-Tenured Teacher
    Effective –    06/30/2005

The Board of Education on the above date authorized your termination due to non-renewal of your contract.

If your salary was subject to deduction for pension and you are not continuing employment with another state agency, you have two options for funds accumulated as a result of that deduction:

    *Request to with draw these funds (Refer to Form No. WB-1)

    *Elect to leave these funds on deposit (Refer to Form No. CRN-1)

Please complete the upper portion of the form which indicates your preference and return it to this office. We will complete and forward it to the Office of Pensions.

Enclosed is a copy of the "Notice to All Employees and Spouses concerning Continuation coverage Under Group Health Plans". Please contact the Employee Benefits Office, 683-6672, for additional information.

If we can be of any help in the future, please advise us.

                Sincerely,

                *Debra Davenport*

                Debra Davenport
                Manager
                Human Resources

DD:vb

B148

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

## JOSEPH M. BERNSTEIN
### ATTORNEY-AT-LAW

800 N. KING STREET • SUITE 302
WILMINGTON, DELAWARE 19801
(302) 656-9850
FAX (302) 656-9836

April 26, 2005

**Registered Mail No. RB 858 390 505 US**

Robert J. Andrzejewski, Ed.D., Superintendent
Red Clay Consolidated School District
2916 Duncan Road
Wilmington, DE 19806

### Re: Christina Mongelli

Dear Superintendent Andrzewewski:

I represent Christina Mongelli, a school teacher in the Red Clay District, who received the enclosed notice that her services will be terminated at the end of the school year. I understand that because Ms. Mongelli is a "non-tenured" teacher, she has no right to a hearing before the Board under Section 1413, I am requesting, under Section 1410(b), on behalf of Ms. Mongelli, a conference with the Superintendent to review this matter.

Please contact Ms. Mongelli directly to schedule this conference.

Very truly yours,

Joseph M. Bernstein

JMB/jm
cc: Christina Mongelli



RECEIVED JUL 1 5 2005

July 11, 2005

ED CLAY CONSOLIDATED
SCHOOL DISTRICT

Robert J. Andrzejewski, Ed.D.
Superintendent

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

Diane L. Dunmon
Deputy Superintendent

(302) 683-6612
FAX (302) 636-8774

   The meeting was held in the Superintendent's Office on June 22, 2005, with Ms. Mongelli. Ms. Mongelli has had problems with her interactions with staff and students at both John Dickinson High and Warner Elementary Schools. In her special education classroom, she continues sending students out of the classroom for bad behaviors; which exhibits a lack of classroom control. On numerous occasions, at both Dickinson and Warner, she made inappropriate comments to student exhibiting a lack of professionalism. She was informed, both verbally and in writing, with regard to these concerns. For these reasons, the Superintendent upholds the Board's non-renewal of Ms. Mongelli's contract.

                    Very truly yours,

                    Diane L. Dunmon
                    Deputy Superintendent

DLD/z

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

CHRISTINA MONGELLI,
    Plaintiff,

v.

: Civil Action No. 05-359 SLR

RED CLAY CONSOLIDATED SCHOOL
DISTRICT BOARD OF EDUCATION; *et al,*
    Defendants.

### STIPULATION TO AMEND SCHEDULING ORDER

IT IS HEREBY STIPULATED by and between the undersigned, subject tot the approval of the Court, as follows:

1. Paragraph 2(g) of the Scheduling Order dated June 30, 2006, relating to reports from retained experts, is hereby amended to provide that reports from retained experts on any issue for which a party has the burden of proof are due on or before November 15, 2006 and rebuttal expert reports are due on or before December 15, 2006.

2. Plaintiff stipulates and agrees that she is not asserting a claim that her non-renewal for the 2005-2006 school year violated Title VII of the Civil Rights Act of 1964 or other state or federal law.

3. In all other respects, the Scheduling Order shall remain unchanged.

4. This Stipulation shall not affect the right of any party to make any objection to either the content of any expert report or to the admissibility of any expert testimony.

[signatures continued on following page]

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP

   /s/ Barry M. Willoughby
Barry M. Willoughby, Esquire (No. 1016)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street – 17th Floor

Wilmington, DE 19801
Telephone: (302) 571-6666; 6653
Facsimile: (302) 576-3345; 3470
Email: bwilloughby@ycst.com; mstafford@ycst.com
Attorneys for Defendants


_/s/ Joseph M. Bernstein_
Joseph M. Bernstein, Esquire (No. 780)
800 N. King Street, Suite 302
Wilmington, DE 19801
Telephone: (302) 656-9850
Facsimile: (302) 656-9836
Email: jmbern001@comcast.net
Attorney for Plaintiff

SO ORDERED this ____ day of _____, 2006.


The Honorable Sue L. Robinson, USDJ

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2007, I electronically filed the foregoing Appendix to Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Jusgment with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> Barry M. Willoughby, Esquire
> Michael P. Stafford, Esquire
> Young, Conaway, Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street - 17th Floor
> Wilmington, DE 19801
> Attorneys for Defendants

I hereby further certify that a paper copy of the above was sent to the above attorneys for the defendants by Hand Delivery.

> /s/ Joseph M. Bernstein
> JOSEPH M. BERNSTEIN (Bar #780)
> 800 N. King Street - Suite 302
> Wilmington, DE 19801
> 302-656-9850
> E-mail: jmbern001@comcast.net