IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CHRISTINA MONGELLI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 05-359-SLR |
| | ) | |
| RED CLAY CONSOLIDATED SCHOOL | ) | TRIAL BY JURY |
| DISTRICT BOARD OF EDUCATION, | ) | DEMANDED |
| et al., | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Barry M. Willoughby, Esquire (No. 1016)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6666, 6553
Facsimile: (302) 576-3345, 3470
Email: bwilloughby@ycst.com;
mstafford@ycst.com

Dated: March 19, 2007

## Table of Contents

Page

ARGUMENT..................................................................................................................1

I.    PLAINTIFF'S "HOSTILE ENVIRONMENT" SEXUAL
      HARASSMENT CLAIMS FAIL AS A MATTER OF LAW................................ 1

      A.    Disruptive Behavior Caused by the Disability of a Special
            Needs Student Does Not Establish a Cognizable Claim of Sexual
            Harassment Under Title VII............................................................................ 1

      B.    Mongelli Has Not Established A *Prima Facie* Case of Sexual
            Harassment Because the Conduct she Alleges Is Not Sufficiently
            Severe or Pervasive to Create a Hostile Working Environment
            for a Reasonable Person.................................................................................. 6

      C.    The District Took Action to Promptly End JW's Behavior and Mongelli
            Unreasonably Failed To Use Red Clay's Policy Against Harassment............... 9

      D.    Mongelli Has Conceded That Defendants Are Not Liable Under
            42 U.S.C. § 1983.......................................................................................... 13

II.   MONGELLI'S RETALIATION CLAIM FAILS AS A MATTER OF
      LAW BECAUSE SHE DID NOT ENGAGE IN PROTECTED ACTIVITY
      AND, ALTERNATIVELY, BECAUSE THERE IS NO CAUSAL LINK
      BETWEEN HER REPORT CONCERNING JW'S BEHAVIOR AND THE
      NON-RENEWAL OF HER EMPLOYMENT CONTRACT............................... 13

      A.    Mongelli did not engage in any protected activity........................................... 13

      B.    No Causal Connection Exists Between Mongelli's Complaint
            About JW and the District's Decision Not to Renew Her Contract. ............... 15

III.  ANY AWARD OF BACK PAY HAS BEEN CUT OFF BY
      MONGELLI'S REINSTATEMENT. .................................................................. 18

CONCLUSION.............................................................................................................20

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adusumilli v. City of Chicago,*
  164 F.3d 353 (7th Cir. 1998) ................................................................ 8

*Bailey v. Commerce National Insurance Serv., Inc.,*
  Civ. No. 05-183-SLR, 2007 U.S. Dist. LEXIS 10094
  (D. Del. Feb. 13, 2007) ................................................................ 15, 17

*Barber v. CSX Distribution Serv.,*
  68 F.3d 694 (3d Cir. 1995) ................................................................ 14

*Booker v. Brown & Tobacco Co., Inc.,*
  879 F.2d 1304 (6th Cir. 1989) ................................................................ 14

*Bowman v. Shawnee State Univ.,*
  220 F.3d 456 (6th Cir. 2002) ................................................................ 8

*Brooks v. City of San Mateo,*
  229 F.3d 917 (9th Cir. 2000) ................................................................ 8

*Crist v. Focus Homes,*
  22 F.3d 1107 (8th Cir. 1997) ................................................................ 4, 7, 8

*Dailey v. Societe Generale,*
  108 F.3d 451 (2d Cir. 1997) ................................................................ 19

*Howard v. Bd. of Educ. of Sycamore Community Unit Sch. Dist. No. 427,*
  893 F. Supp. 808 (N.D. Ill. 1995) ................................................................ 4

*Joyner v. State,*
  No. N-80-09-0435FC, 1982 Del. Super. LEXIS 976
  (Del. Super. Ct. Jan. 15, 1987) ................................................................ 5

*Lovell v. Comsewougue Sch. Dist.,*
  214 F. Supp. 2d 319 (E.D.N.Y. 2002) ................................................................ 3

*McGraw v. Wyeth-Ayerst Labs. Inc.,*
  No. 96-5780, 1997 U.S. Dist. LEXIS 20813 (E.D. Pa. Dec. 30, 1997) ................................................................ 8

*Oncale v. Sundower Offshore Servs.,*
  523 U.S. 75 (1998) ................................................................ 5

DB02:5836723.1

061778.1004

*Peries v. N.Y. City Bd. of Education*,
  97 CV 7109 CARR), 2001 U.S. Dist. LEXIS 23393
  (E.D.N.Y. Aug. 6, 2001)........................................................................................ 4, 6, 8, 12

*Plaza-Torres v. Reye*,
  376 F. Supp. 2d 171 (D.P.R. 2005) ................................................................................. 3

*Richards v. City of Wilmington*,
  Civ. No. 03-106-SLR, 2004 U.S. Dist. LEXIS 4987
  (D. Del.  Mar. 24, 2004) ................................................................................................ 12

*Robinson v. SEPTA*,
  982 F.2d 892 (3d Cir. 1993) ........................................................................................... 14

*Schroeder v. Hamilton County Sch. Dist.*,
  282 F.3d 946 (7th Cir. 2002) ........................................................................................... 7

*Seldomridge v. Uni-Marts, Inc.*,
  No. 99-496 GMS, 2001 U.S. Dist. LEXIS 9491
  (D. Del. July 10, 2001) ..................................................................................................... 8

*Walden v. Georgia-Pacific Corp.*,
  (3d Cir. 1997), *cert. denied*. 523 U.S. 1074 (1988) ........................................................ 14

**Other Authorities**

14 *Del. C.* § 701 ................................................................................................................... 5

42 U.S.C. § 1983 .................................................................................................................. 13

Disabilities Education Act,
  20 U.S.C. § 1400 *et seq.* ................................................................................................... 3

Title VII ......................................................................................................................... passim

DB02:5836723.1                                   061778.1004

**ARGUMENT**

I.    **PLAINTIFF'S "HOSTILE ENVIRONMENT" SEXUAL HARASSMENT CLAIMS FAIL AS A MATTER OF LAW**

      A.    **Disruptive Behavior Caused by the Disability of a Special Needs Student Does Not Establish a Cognizable Claim of Sexual Harassment Under Title VII.**

Plaintiff's Answering Brief concedes that she bases her entire claim of "sexual harassment" on disruptive conduct by a single special needs student over whom she stood *in loco parentis.* Further, Plaintiff concedes that the conduct in question was a "manifestation of the disability" of the student, i.e., the conduct itself was caused by his disability. Nevertheless, Plaintiff's Answering Brief relies on an EEOC regulation stating that employers may be responsible for harassing conduct of third parties and cites to cases arising in entirely different factual circumstances to support her strained argument that JW's conduct as a special needs student should be recognized as an employment-related "hostile environment" sexual harassment claim under Title VII.

Extending the reach of Title VII to conduct by a special needs student that results from his disability is unwarranted and, indeed, is problematic, in the circumstances such as those present here. Mongelli is a special education teacher who knew that special needs students often engage in disruptive conduct, sometimes including inappropriate sexual comments and behavior. (A51-52). Importantly, she concedes that she *never* complained of sexual harassment in violation of the student code of conduct, her employer's sexual harassment policy covering employees, nor filed a grievance under the collective bargaining agreement covering her employment. All she did was submit routine Student Behavior Referral (SBR) forms to an Assistant Principal. (A76-79).

Notably, while she rests her claim that the Court should extend Title VII "hostile environment" sexual harassment claims to reach student conduct on the theory that the

1

District had greater authority to deal with the student than she did, the SBRs at issue show that in fact Mongelli did not request any special action from the school administration. The cases she relies are therefore inapposite.

Indeed, a review of the Student Behavior Referral forms during the period from April 26, 2004 through May 7, 2004, when Mongelli claims JW's conduct was at its worst, shows that she never took any unusual or special response to his misbehavior. In each and every case, the SBR shows that all Mongelli did was have a student/teacher conference and, on two occasions, call JW's mother. She *never* gave him a detention. She *never* gave him disciplinary probation. She *never* reprimanded him. She never put him on a behavior contract. She *never* gave him a work assignment. She *never* made a referral. She *never* took any "other" action as spelled out on the form itself. (A20-A26).

Importantly, according to Plaintiff, there was only one occasion, May 5, 2004, where she requested the school administration take action to have JW leave the classroom. Even then, she concedes that it was JW's behavior problems, not alleged sexual harassment, that lead her to request that he leave the classroom. When he refused, the Principal immediately responded and JW was removed. (Ans. Br. at 4-5; B39). Further, when she reported JW's conduct two days later on May 7, 2004, singing a "rap song" and making inappropriate comments, the administration removed JW from her classroom for the rest of the year. (A34-36; 75; 138-45).

After the school removed JW from her class, she took no action claiming she had been the victim of a "hostile environment" until her contract was terminated. In other words, she *never contended at the time* that she was a sexual harassment victim, nor that the District failed to respond. She continued to teach for the balance of the 2004 without incident. Her claim of "hostile environment harassment", as she concedes in her Answering Brief, was something she came up with well after May 7, 2004 when JW was no longer in her class. It

2

was a response not to JW's conduct, but to the District's action in terminating her employment on June 30, 2004. (A6; A32).

In her Answering Brief, Mongelli cites several cases which, she claims, establish that student-on-teacher sexual harassment is actionable under Title VII. None of the decisions she cites are remotely similar to this case. First, none of them involve a special education student whose conduct is a "manifestation" of his disability. This difference is significant, because federal law, specifically the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (hereinafter, "the IDEA"), statutorily limits the range of disciplinary options available to public schools in cases involving students with disabilities.

The IDEA is a comprehensive federal statute regulating the education of students with disabilities. It is not disputed that JW is a child with a disability, and thus was a student with a disability covered by the IDEA. The IDEA, and it's implementing regulations, require a school district to conduct a "manifestation determination" before taking disciplinary action that would result in a change in a student's educational placement. Expulsions or suspensions from school that are greater than 10 days in length constitute a change of placement. Conversely, if a district determines that a student's misconduct was not related to his disability, that student is subject to the same sanctions for misconduct as a nondisabled student, with one exception. A properly expelled student with a disability has a continuing right to receive FAPE in accordance with 20 U.S.C. § 1412 (a)(1)(A); 34 C.F.R. § 300.101 (a). 20 U.S.C. § 1415(k)(1)(C).

Here, JW's IEP team met and determined that the very conduct identified by Mongelli was a manifestation of his disability. (A28; 170). This determination, and JW's status as a special education student, clearly distinguishes the instant matter from the cases relied upon by the Plaintiff, such as *Plaza-Torres v. Reye*, 376 F. Supp. 2d 171 (D.P.R. 2005), *Lovell v. Comsewougue Sch. Dist.*, 214 F. Supp. 2d 319 (E.D.N.Y. 2002), and *Howard*

3

*v. Bd. of Educ. of Sycamore Community Unit Sch. Dist. No. 427*, 893 F. Supp. 808 (N.D. Ill. 1995).[1]  Significantly, *none* of the aforementioned cases involved harassment by a disabled student covered by the IDEA, let alone one whose behavior had been determined to be a manifestation of his disability.

The *sole* case identified by Mongelli involving student-on-teacher harassment by a disabled child under Title VII is *Peries v. N.Y. City Bd. of Education*, 97 CV 7109 CARR), 2001 U.S. Dist. LEXIS 23393 (E.D.N.Y. Aug. 6, 2001).  Unlike the instant matter, *Peries* involved national origin harassment directed towards a Sri Linkin teacher by a number of special education students.  The court in that case largely passed over the status of the students, noting merely that the district's argument that it was hamstrung in disciplining special education students could not be determined on summary judgment.  As noted above, in this case, the teacher merely sought routine disciplinary responses from the school.  Unlike the situation in *Peries* the school did respond.  For example, there is no dispute that JW was given several one-day suspensions from school, and that the student was ultimately removed from plaintiff's classroom.

Perhaps recognizing these crucial distinctions, Mongelli turns to *Crist v. Focus Homes*, 122 F.3d 1107 (8th Cir. 1997), for support.  *Crist* is, however, easily distinguishable from the instant matter.  Although *Crist* did involve sexual harassment by a disabled child, the setting in which the harassment occurred- a residential home for children with disabilities- is far different from the setting here- a public school classroom.  In addition, there is no indication that the plaintiff in *Crist* had *in loco parentis* authority *vis a vis* her harasser.  Here, as defendants pointed out in their Opening Brief, Mongelli had *in loco*

---

[1] The Seventh Circuit's statement in *Schroeder v. Hamilton County Sch. Dist.*, 282 F.3d 946 (7th Cir. 2002), that "were this a Title VII case, the defendants could be liable to Schroeder if he demonstrated that they knew he was being harassed and failed to take reasonable measures to try to prevent it" is mere *dicta*.

4

*parentis* authority over JW. *See e.g.*, *Joyner v. State*, No. N-80-09-0435FC, 1982 Del. Super.
LEXIS 976, *4 (Del. Super. Ct. Jan. 15, 1987) ("in Delaware, a teacher and/or administrator
stands *in loco parentis* to pupils under his or her charge"); 14 *Del. C.* § 701 (authority of
teachers and administrators to control the disruptive behavior of students).

Second, the applicable EEOC regulation, even if accepted by the Court, does not
support Plaintiff's request for an extension of the law to cover her after-the-fact hostile
environment claim. The regulation itself provides that the extent of the employer's
knowledge, control, and "other legal responsibility" must be considered. The U.S. Supreme
Court's decision in *Oncale v. Sundower Offshore Servs.*, 523 U.S. 75 (1998) expressly
"emphasized," in the Title VII context, that "the objective severity of harassment should be
judged from the perspective of a reasonable person in the plaintiff's position, considering 'all
the circumstances,'" which includes the type of workplace and, in some cases, "careful
consideration of the social context in which particular behavior occurs and is experienced by
its target." *Oncale,* 523 U.S. at 81. Here, the workplace is a public school classroom
involving special needs students. The plaintiff is a special education teacher. The social
context is that a single student's misbehavior caused by his disability led him to act out in
class. Indeed, Mongelli's reaction at the time proves the point. She took no special or
unusual action in response to JW's conduct, nor did she make a complaint of sexual
harassment. Indeed, she simply sent the Assistant Principal's routine SBR's. She
characterized JW's conduct as "sexual harassment' only after her contract was terminated at
the end of the school year. Extending Title VII to reach such a situation is unwarranted.

---

Moreover, *Schroeder* is readily distinguishable from this case in that the harassment, much of which was
anonymous, came from both students, parents, and the plaintiff's co-workers.

DB02:5836723.1                                                                    061778 1004

**B.    Mongelli Has Not Established A *Prima Facie* Case of
Sexual Harassment Because the Conduct she Alleges Is
Not Sufficiently Severe or Pervasive to Create a Hostile
Working Environment for a Reasonable Person.**

As noted in Defendant's Opening Brief, Mongelli cannot establish a *prima facie* case
of sexual harassment for other reasons. The conduct she alleges, even when viewed in the
light most favorable to her, does not meet the "severe or pervasive" requirement for a hostile
work environment. Mongelli did not regard JW's misbehavior as "severe and pervasive". As
noted above, she knew special education students would act out and make inappropriate
sexual remarks. As a result, she took no unusual or special steps in response to JW's
conduct. She simply had teacher/student conferences and called JW's mother on a few
occasions. In fact, after JW's removal from the classroom, she continued to teach the rest of
the school year, never contending that she was harassed, let alone in a severe and pervasive
manner.

A review of the cases cited in her Answering Brief shows that the authorities she
relies on support Defendants' argument that as a matter of law, she has not met the severe
and pervasive requirement.

For example, the verbal national origin harassment involved in *Peries* continued
"virtually unabated" for four and one-half years. 2001 U.S. Dist. LEXIS 23393 at *2-*6.
Many students engage in such conduct over a long period of time. The *Peries* court found the
scope and duration of the alleged harassment to be of particular significance, noting that
"[t]he ongoing name calling, mimicking, and other abuse described by the plaintiff between
1992 and 1997 constituted more than a single isolated instance of harassment, and may have
indeed amounted to a series of incidents [that] were sufficiently continuous and concerted to
have altered the conditions of [his] working environment." *Id.* at *19-20 (internal quotations
and citations omitted).

6

The severity and duration of the harassment involved in *Schroeder v. Hamilton County Sch. Dist.*, 282 F.3d 946 (7th Cir. 2002), is also readily distinguishable from the instant matter. The plaintiff in *Schroeder*, a male homosexual teacher, was subjected to a steady barrage of harassment from co-workers, parents, and students for over three years. *Id.* at 948. The harassment by students included "accusations that [the plaintiff] had AIDS; a student calling him a faggot and remarking 'How sad there are any gays in the world;' another student physically confronted Schroeder after shouting obscenities at him; catcalls in the hallways that he was a "queer" or a "faggot;" obscenities shouted at him during bus duty; harassing phone calls with students chanting 'faggot, faggot, faggot' and other calls where he was asked whether he was a 'faggot;' and bathroom graffiti identifying Schroeder as a 'faggot,' and describing, in the most explicit and vulgar terms, the type of sexual acts [the students'] presumed he engaged in with other men." *Id.* at 948-949. The harassment continued after Schroeder transferred to an elementary school three years later. *Id.* *Schroeder* complained repeatedly about the conduct to no avail.[2]

Similarly, the harassment involved in *Crist* was far more physically intrusive and severe than any of the incidents identified by Mongelli. The disabled child in *Crist* engaged in prolonged violent behavior including pulling at staff members shirts and bras, looking down their shirts, pinning the plaintiff against a door and opening her jeans and blouse and physically assaulting other disabled male residents. 122 F.3d at 1108. The child's aggressive conduct began again in the new year, and the plaintiffs continued to report it. The child attempted to assault another resident in late December, but staff restrained him. In January and February, over thirteen reports involved the child's grabbing of the plaintiffs' breasts, buttocks, or genital areas. He also frequently pulled at their clothing and attempted to

---

[2] Of course, as noted above, the *Schroeder* case did *not* involve a claim under Title VII, in any event.

7

undress them. At least three times, he attempted to digitally penetrate Crist. It was also reported that the student in *Crist* case masturbated frequently and repeatedly exposed himself. (Ans. Br. at 15-16). Finally, the child also knocked *Crist* unconscious on one occasion. *Crist*, 177 F.2d at 1109.

Obviously, the conduct in *Crist* is far more severe and disturbing than the incidents identified by Mongelli. Moreover, in common with *Peries*, the duration of the aggressive behavior at issue in *Crist* is also far longer than the instant matter.

Mongelli made no response to the numerous authorities provided in the Defendant's Opening Brief which establish that JW's conduct was not sufficiently severe or pervasive to create a hostile work environment. *See e.g., Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463-65 (6th Cir. 2002) (supervisor's rubbing employee's shoulders, grabbing employee's buttocks, and offensive touching not severe enough to create a hostile work environment); *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000) (court rejected sexual harassment claim because plaintiff's co-worker reached under her shirt and fondled her breast on only one occasion); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (supervisor's four incidents of unwelcome contact with subordinate's arm, fingers, and buttocks, along with repeated sexual jokes aimed at subordinate, not severe enough to create a hostile work environment); *Seldomridge v. Uni-Marts, Inc.*, No. 99-496 GMS, 2001 U.S. Dist. LEXIS 9491 (D. Del. July 10, 2001) (holding that while inappropriate and offensive, a brief intentional exposure incident involving a female employee's supervisor was not so severe that it altered the terms and conditions of her employment so as to create a hostile working environment); *McGraw v. Wyeth-Ayerst Labs. Inc.*, No. 96-5780, 1997 U.S. Dist. LEXIS 20813 (E.D. Pa. Dec. 30, 1997) (supervisor's repeated requests for a date, kissing subordinate without her consent, and touching her face, not severe enough to create a hostile

work environment).  Mongelli has, therefore, failed to meet the "severe and pervasive" requirement.

### C.    The District Took Action to Promptly End JW's Behavior and Mongelli Unreasonably Failed To Use Red Clay's Policy Against Harassment.

The record shows that prompt, remedial action was taken in response to Mongelli's submissions of SBRs for JW, even if they are considered "sexual harassment" reports.

Beginning on March 1, 2004, Mongelli submitted twelve (12) SBR reports concerning JW's classroom behavior.  The problem behaviors described in the SBRs included:

(a)    On March 1, 2004, Mongelli wrote that JW "continues to be extremely disruptive" and that he "used inappropriate language, continually got out of his seat, and refused to keep his hands off other students."  In addition, Mongelli noted that JW "often uses inappropriate language (cursing and sexual language)."  (A8).  Mongelli submitted the SBR, and, as she concedes in her Answering Brief, the conduct described in the March 1, 2004 SBR resulted in a one day out of school suspension for JW.  (Ans. Br. at 4).

(b)    On March 2, 2004, Mongelli completed another SBR for JW.  She noted that he continued "to be extremely disruptive and disrespectful" in class and that he yelled out "Fuck her" and "I'm going to knock her fucking head off" at her when she instructed him to stop talking.  (A9).  Mongelli submitted the SBR, and, as she concedes, this incident resulted in another one day out of school suspension for JW.

(c)    Twenty-nine days later, on March 31, 2004, Mongelli again wrote an SBR report for JW.  This time, Mongelli wrote that JW "[r]efused to stop talking on his cell phone" and called Mongelli, "a 'fucking bitch.'" (A11).  Mongelli submitted the SBR, and, as she concedes, this incident also resulted in a one-day out of school suspension for JW.

9

(d)    On April 1, 2004, Mongelli wrote another SBR for JW. This time, Mongelli reported that he had "called me a 'fucking bitch' *many times*, 'fucking ugly,' 'fucking idiot,' and told me to 'get the fuck out of here.'" (A12). Once again, Mongelli submitted the SBR, and the District gave JW a one-day out of school suspension for this conduct.

(e)    After a twenty-five day interlude, Mongelli wrote yet another SBR for JW concerning conduct that occurred on April 26, 2004. Although dated for April 26, 2004, as noted in Defendant's Opening Brief there is a factual dispute between the parties concerning the timing of Mongelli delivery on the SBR forms from April 26, 2004 through May 7, 2004. Although Mongelli claims that she left each referral in Kennedy's "in-box" on the date shown on the form (A72-73), Kennedy testified that Mongelli gave him the referrals dated April 26 through May 7 to him as a group on May 7, 2004 following their meeting on May 6, 2004 at which she made her first verbal report to him concerning JW's inappropriate conduct. (A133-36; 34-36). Notably, even Plaintiff concedes that she did nothing other than leave the forms in Mr. Kennedy's inbox.

(f)    The April 26th SBR states that JW "continues to use very inappropriate language" and that as Mongelli "leaned over to help a student who was seated, JW got out of his seat and came up behind me. He grabbed me forcefully and proceeded to 'hump' me." Mongelli notes that she merely had a student/teacher conference with JW and left a telephone message concerning his behavior with his brother. She did not put him on disciplinary probation, a behavior contract, or give him a detention. She did not dismiss him from the classroom, call for assistance, or do anything else. (A20).

(g)    The SBR report for May 4, 2004 states that JW looked directly at Mongelli's breasts and said "your nipples are hard." She also states that he "grabbed my arm forcefully and pulled me close to his body. He stated: 'You're a bitch, but I mean that in a good way.'" Once again, Mongelli had a student/teacher conference with JW and left a telephone message

10

concerning his behavior with his "sibling." She did not dismiss him from the classroom, put him on disciplinary probation, a behavior contract, or give him a detention. She did not dismiss him from the class. (A21).

(h)    The SBR report for May 4, 2004 indicates that JW "sat on top of the desk and stared at directly at me. [JW] opened his legs wide and pretended to be having sex. He moved the lower portion of his body up and down quite rapidly. He said: 'Oh, Oh, Aah.' He made 'sucking' noises with his mouth and pretended he was breathing heavily." Although Mongelli indicates that she had a student/teacher conference with JW, she did not put him on disciplinary probation, a behavior contract, or give him a detention. She did not dismiss him from the classroom. By her own account, she just left a SBR in Mr. Kennedy's inbox. (A22).

(i)    The SBR report for May 5, 2004 written by Mongelli notes that JW grabbed her arm and did not let go. He also pulled Mongelli close to him and said "Let's do the tango." He asked her if she had sex and who she had it with. Mongelli had a student/teacher conference with JW, she did not place him on disciplinary probation, a behavior contract, give him a detention, or attempt to contact his parents.

This time, however, she directed that JW leave the class. The Principal, Carmack, immediately responded and came to Mongelli's classroom and removed JW after he refused to leave the room at Mongelli's direction. (A24).

(j)    The SBR report for May 6, 2004 notes that JW approached Mongelli's desk signing a rap song containing sexual statements. Once again, Mongelli held a student/teacher conference with JW, she did not place him on disciplinary probation, a behavior contract, give him a detention, or even attempt to contact his parents. She did not ask him to leave the room. (A25).

(k)    The SBR report for May 7, 2004, indicates that JW approached Mongelli again singing "a rap song stating, 'Ms. Mongelli gives head,'" while also pointing to his

11

penis. Plaintiff claims that there was no disciplinary action taken in response to this incident. The undisputed record, however, shows that JW never returned to Mongelli's class after May 7 as a result of action taken by the assistant principal. (A34-36; 75). In addition, Mongelli's reports were investigated and JW was subsequently suspended from school. (A81; 34-36; 138-45).

The evidence also shows that the first time Mongelli verbally advised Kennedy of JW's behavior was at their meeting on May 6, 2004. (A73-75; 133-36; 34-36). Kennedy testified that Mongelli gave him the SBR reports for the period April 26, 2004 through May 6, 2004 because he specifically requested a listing of incidents at their May 6, 2004 meeting. (A34-36; 136-38; 144-45). Instead of preparing a narrative, she returned with a series of back-dated SBR's.

Of course, JW was removed from Mongelli's class permanently after May 7, 2004. Defendant's response to Mongelli's complaints distinguishes this case from many of the authorities relied on by Plaintiff. For example, in *Peries,* the plaintiff's repeated complaints did not result in *any* student suspensions or reprimands whatsoever, and many students returned to the plaintiff's classroom after only a few moments. 2001 U.S. Dist. LEXIS 23393 at*5-6.

Mongelli attempts to turn the issue of the sufficiency of her notice regarding the alleged harassment, and the District's response to it, into a jury question by citing to *Richards v. City of Wilmington*, Civ. No. 03-106-SLR, 2004 U.S. Dist. LEXIS 4987, *13-*14 (D. Del. Mar. 24, 2004). The court in *Richards*, however, granted the defendant employer's motion for summary judgment with respect to *Richards* sexual harassment claims for conduct that occurred prior to July, 1999. The court found that genuine issues of material fact existed with respect to the sufficiency of the plaintiff's notice to the defendant, and the defendant's response, only for a limited time period running from July, 1999 until September 21, 2001.

12

*Id.* Thus, the issue of the adequacy of an employee's notice and the sufficiency of an employer's response is an appropriate one for disposition on summary judgment where, as here, genuine disputes of material fact do not exist. Here, given the brief duration of the alleged "harassment," the nature of the alleged "notice" (routine SBR's), and the school's response, the court should find that Defendant's took prompt remedial action as a matter of law.

### D.     Mongelli Has Conceded That Defendants Are Not Liable Under 42 U.S.C. § 1983.

In her answering Brief, Mongelli "agrees with the Defendants' argument that the defendants are entitled to summary judgment on the plaintiff's claims that the defendants are liable under Section 1983 and the 14[th]Amendment for sexual harassment committed by JW." As such, Defendant's Motion for Summary Judgment on Count Three of the First Amended Complaint must be granted.

### II.    MONGELLI'S RETALIATION CLAIM FAILS AS A MATTER OF LAW BECAUSE SHE DID NOT ENGAGE IN PROTECTED ACTIVITY AND, ALTERNATIVELY, BECAUSE THERE IS NO CAUSAL LINK BETWEEN HER REPORT CONCERNING JW'S BEHAVIOR AND THE NON-RENEWAL OF HER EMPLOYMENT CONTRACT

In her Answering Brief, Mongelli argues that she engaged in protected activity, that a causal link exists between that protected activity and the decision not to renew her teaching contract, and defendant's stated reason for the non-renewal is pretextual.

### A.     Mongelli did not engage in any protected activity.

The authorities Mongelli relied on to support her argument that the submission of the student behavior referral forms constitutes protected activity under Title VII are not on point. Specifically, in advancing this argument, Mongelli points to the *Barber* court's guidance that courts "analyze the message [the plaintiff] conveyed, and not the medium of conveyance." *Barber v. CSX Distribution Serv.*, 68 F.3d 694, 702 (3d Cir. 1995).

13

Here, however, the precise problem *is* the message Mongelli conveyed through the SBR reports. Simply put, the message conveyed was that JW was misbehaving in class. The medium chosen by Mongelli, a standard SBR student behavior referral form, does not convey that she believed she was being "sexual harassed" or that her classroom had become a "hostile working environment" in violation of Title VII. Further, as noted above the forms show that Mongelli herself treated them as routine student referrals. (A8-A12; A20-A26). Her response to JW's misbehavior was limited to having a student-teacher conference and calling his mother a couple of times. (See e.g., A20-A26). In fact, the form itself has a place for the teacher to request "Other" action. This space was left blank in each and every case.

Plaintiff is, therefore, incorrect in stating that routine behavior referrals made clear "on their face that plaintiff was complaining about sexual harassment." Ans. Br. at 25. Indeed, if it were "manifest on its "face" that Mongelli was complaining about something as serious as "sexual harassment", why didn't she do anything besides submit the forms? Why didn't she call the assistant principal, the principal, HR, or the school disciplinarian to the classroom? Why was it that she never claimed to be the victim of "sexual harassment" until after her contract was not renewed? On the contrary, nothing about the SBRs suggests that Mongelli was complaining about conduct covered by Title VII. As Plaintiff concedes, the District had two policies she could have used to complain had she really believed she were the victim of sexual harassment. She could have used the Student Code of Conduct or the District's anti-harassment policy relating to employees. She did neither.

She, therefore, did not engage in protected activity. See e.g. *Robinson v. SEPTA*, 982 F.2d 892 (3d Cir. 1993); *Booker v. Brown & Tobacco Co., Inc.,* 879 F.2d 1304, 1313 (6th Cir. 1989); *Walden v. Georgia-Pacific Corp.,* (3d Cir. 1997), *cert. denied.* 523 U.S. 1074 (1988).

14

**B.     No Causal Connection Exists Between Mongelli's
          Complaint About JW and the District's Decision Not to
          Renew Her Contract.**

With respect to the existence of a causal link between Mongelli's alleged protected

activity and the decision not to renew her contract, Mongelli points to the alleged "temporal

proximity" between her alleged complaints and the rescission of her contract.  Mongelli

argues that there is no evidence showing that a decision had been made not to renew her

contract prior to her complaints about JW.  This is simply inaccurate.

First, nothing about the alleged "temporal proximity" between Mongelli's submission

of the SBR reports and the decision not to renew her contract is unusually suggestive of a

retaliatory motive.  In this regard, the recent case of *Bailey v. Commerce National Insurance

Serv., Inc.*, Civ. No. 05-183-SLR, 2007 U.S. Dist. LEXIS 10094 (D. Del. Feb. 13, 2007), is

instructive.  In *Bailey,* the court found that even an eight-week period was not "unusually

suggestive of a retaliatory motive." *Id.* at *19.  The court also noted that the plaintiff could

not  "establish a pattern of antagonism following her complaint of sexual harassment."  *Id.*

Therefore, the court held that "[a]side from plaintiff's own conclusory statements and

assumptions, she has not proffered sufficient evidence to indicate the existence of a causal

link between her decision to file a harassment complaint and her termination; therefore,

plaintiff is unable to meet her prima facie burden of proof." *Id.* at *23.

Second, the linchpin of Mongelli's  retaliation argument appears to be that no

decision not to renew her contract had been made prior to her complaints about JW.

Specifically, Mongelli claims that there is no support in the record for the claim advanced by

Defendants in their Opening Brief that Carmack, the principal, excluded Mongelli's name

from a staffing list for Dickinson High School that he submitted on April 22, 2004 in the

belief that this would automatically lead to her non-renewal because she was on a temporary

contract.  This is a mere play on words that leaves her in a hopeless dilemma.  If Mongelli's

claim is that Carmack retaliated against her, the record is clear that her SBRs involving JW came after Carmack submitted reports showing that he did not want Mongelli to return to Dickinson. If she is claiming the District Office through Deputy Superintendent Dunmon is retaliating against her, there is literally no evidence to support her claim that Dunmon was aware of Mongelli's submission of what she now calls a sexual harassment complaint.

Carmack's deposition testimony shows that his purpose in excluding Mongelli's name from the April 22, 2004 list was to ensure that Mongelli not return to Dickinson High School. (A118). He testified out right that he did not believe that she was a capable teacher in Special Education. (A120; 21-22). Indeed, as Plaintiff concedes, the April 22 report shows that Carmack had openings in Special Education. He hardly would have reported to the District Office that he had openings if he planned on having Mongelli return.

The District Office, however, issued a letter of renewal to Mongelli because her name was not on the list of teachers who were identified as teachers not to be renewed (A27; 165-67). Simply put, Carmack and the District Office had different understandings concerning the method by which he should communicate his desire not to re-employ Mongelli at Dickinson. Carmack thought that since Mongelli was a temporary employee he could merely omit her from the staffing list for Dickinson High School. (A119; 125-26; 156-57). The District Human Resources Office practice, however, required that he include Mongelli's name on the list of teachers who were not to be re-employed. (A165-67; 156).

Carmack's reaction upon his discovery that Mongelli's contract had been renewed is consistent with his belief that the omission of her name from the April 22, 2004 list would result in her not being re-employed at Dickinson. Carmack was surprised when he learned that Mongelli's contract was renewed. He contacted Diane Dunmon, Red Clay's Deputy Superintendent, about it. (A155). Carmack explained to Dunmon that he did not want Mongelli to continue working as a special education teacher because of her classroom

16

management problems. (A120; 121-22; 159). In fact, Mongelli, herself, wanted an English position, not a special education job. It was at that point Dunmon became involved. (A116-17).

Diane Dunmon looked into Mongelli's renewal after being contacted by Carmack. (A155-59). Dunmon had no contact with Mongelli before Carmack advised her that Mongelli should not be employed as a special education teacher. Although Carmack informed Dunmon about Mongelli's classroom management problems, Dunmon was not aware of the specifics involved, nor even Mongelli's SBR referrals for JW. (A162-63).

Dunmon was subsequently advised by Debra Davenport, Red Clay's Human Resources Director, that Mongelli had taken no action whatsoever to commence the necessary steps towards obtaining her standard special education certificate. Mongelli had received a copy of an Emergency Certificate Request Form which specifically notified her of her obligation to satisfy the requirements of her Emergency Certificate (A7). Mongelli also admits that a Dickinson High School Assistant Principal, Stephanie Armstrong, informed her of the requirement. (A84-85). Notwithstanding this knowledge, Mongelli concedes that she took no steps towards fulfilling the requirements for a standard certificate in special education. She accounts for her failure by claiming that she was too "stressed" by her teaching experience with special education students to begin the process of fulfilling the standard certificate's requirements. (A61).

Dunmon's lack of knowledge concerning Mongelli's SBR referrals is critical and fatal to her case if she claims that Dunmon is the District official who retaliated against her. This Court recently held in *Bailey* that a plaintiff was unable to meet her *prima facie* burden of proof where she had no evidence beyond her own "conclusory statements and assumptions" that the main decision-maker in her termination had any knowledge of her prior protected activity. 2007 U.S. Dist. LEXIS 10094 at *21-23. The Court reached this

17

conclusion despite that fact that other individuals who were aware of the protected activity were involved in the decision to terminate the plaintiff.  *Id.*  Mongelli, of course, has absolutely no evidence that Dunmon was aware of her SBR referrals or her problems with JW.

As such, Mongelli cannot make a *prima facie* case of retaliation against Dunmon because she cannot show that the primary decision maker had any awareness of prior protected activity.  If she claims Carmack is responsible, the undisputed record shows that he decided against having Mongelli return to Dickinson at least by April 22, 2004, *before* Mongelli submittal of her SBR's dated April 26-May 7, 2004.

Finally, Mongelli cannot show that Defendants' rationale for her non-renewal is pretextual.  Mongelli simply did not take the necessary steps to meet the requisite additional educational requirements in order to make adequate progress towards her standard certificate.  Mongelli has not shown that the Defendants contention that rules adopted by the Delaware Department of Education specify that teachers employed on emergency certificates make progress towards a standard certificate is false or erroneous.

## III.    ANY AWARD OF BACK PAY HAS BEEN CUT OFF BY MONGELLI'S REINSTATEMENT.

Following the expiration of her contract in June, 2004, Mongelli was offered, and accepted, another teaching position with Red Clay.  (A37-38).  She began work on January 19, 2005.  (A37-38).  Although she was no longer teaching special education students, Mongelli once again encountered difficulties in her new position and was not renewed in June, 2005.  Subsequently, Mongelli left the education field, accepting a position at MBNA/Bank of America as an account representative earning approximately the same salary as she did in her teaching positions at Red Clay.  (A52-53).  However, Mongelli was terminated by MBNA when it was discovered that she had inappropriately convinced an

18

elderly customer to enter into a loan transaction he did not want. (A88; 94-95; 96-103). Mongelli's deposition testimony also shows that she had difficulty getting along with her co-workers at MBNA. (A89-93).

In their Opening Brief, Defendants noted that Mongelli's unconditional reinstatement to a teaching position within Red Clay in January, 2005 precluded an award of back-pay under Title VII. In support of this argument, Defendants pointed to, among other things, a Stipulation entered into by Plaintiff which states in relevant part that Mongelli "stipulates and agrees that she is not asserting a claim that her non-renewal for the 2005-2006 school year violated Title VII or other state or federal law." (D.I. 47). Yet, Mongelli advances precisely this argument in her Answering Brief by attempting to re-frame the relevant inquiry to whether the Defendants "had a valid reason not to renew Mongelli's contract in April 2005."

Of course, the inquiry into whether Mongelli was non-renewed a second time for a "valid reason" is indistinguishable from an inquiry into whether her second non-renewal was in violation of "Title VII or other state of federal law." Indeed, Mongelli's second termination could only have been invalid *if* it violated a state or federal law. None of the authority cited by Plaintiff is on point. Semantics aside, the inquiry Mongelli proposes into the validity of the reasons behind her second non-renewal is clearly precluded by her unconditional reinstatement and by the Stipulation she previously entered into narrowing and clarifying the issues before the Court in the instant matter.

In addition, Mongelli's decision to leave the teaching field also operates to terminate any right she may claim to a back pay award. Mongelli's decision to change careers and become an account representative permanently removed her from the teaching job market. *See Dailey v. Societe Generale*, 108 F.3d 451, 456-57 (2d Cir. 1997) (failure to mitigate where plaintiff pursues education that precludes her from accepting employment similar to

that which she held with the defendant); *Miller v. Marsh*, 766 F.2d 490, 492-93 (11th Cir. 1985).

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted. Her back pay claim, other than the period from June 30, 2004 to January 19, 2005, is, therefore, barred.

YOUNG CONAWAY STARGATT & TAYLOR, LLP


*/s/ Barry M. Willoughby*
Barry M. Willoughby, Esquire (No. 1016)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6666; 6553
Facsimile: (302) 576-3345; 3470
Email: bwilloughby@ycst.com; mstafford@ycst.com
Attorneys for Defendants

Dated:  March 19, 2007

DB02:5836723.1                                                                                            061778 1004