IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CHRISTINA MONGELLI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 05-359-SLR |
| | ) | |
| RED CLAY CONSOLIDATED SCHOOL | ) | |
| DISTRICT BOARD OF EDUCATION, | ) | |
| and RED CLAY CONSOLIDATED | ) | |
| SCHOOL DISTRICT, | ) | |
| | ) | |
| Defendants. | ) | |

Joseph M. Bernstein, Esquire, Wilmington, Delaware.  Counsel for Plaintiff.

Barry M. Willoughby, Esquire, and Michael P. Stafford, Esquire, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware.   Counsel for Defendants.

**MEMORANDUM OPINION**

Dated:  June 4, 2007
Wilmington, Delaware

ROBINSON, Chief Judge

## I. INTRODUCTION

On June 6, 2005, plaintiff Christine Mongelli filed suit against the Red Clay

Consolidated School District Board of Education ("the Board"); the Red Clay

Consolidated School District ("the District"); and the following people, both individually

and in their official capacities as members of the Board: Irwin J. Becnel, Jr., Charles

Cavanaugh, Gary Linarducci, Loretta C. Rice, James D. Taylor, Martin A. Wilson, Sr.,

and Robert J. Andrzejewski (collectively, "the Board members"). (D.I. 1) Plaintiff's

amended complaint, filed October 31, 2005, alleged sexual harassment, sex

discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. §§ 2000e et seq.; 42 U.S.C. § 1983 ("§ 1983"); the First

Amendment to the United States Constitution, U.S. Const. amend. 1; and the Equal

Protection Clause of the Fourteenth Amendment, U.S. Const. amend. 14. (D.I. 15 at ¶¶

21-42) On June 7, 2006, the parties filed a stipulation agreeing to dismiss with

prejudice plaintiff's First Amendment claim. (D.I. 35) Plaintiff has also withdrawn her

claims against the Board members, leaving the Board and the District ("defendants") as

the sole remaining defendants in the action at bar. (D.I. 16) Presently before the court

is defendants' motion for summary judgment.[1] (D.I. 59) The court has jurisdiction over

---

[1]Defendants' motion also argues that, should the court allow the case to proceed to trial, plaintiff's potential entitlement to an award of back pay under Title VII is "limited to the period between her non-renewal in June, 2004 and her reemployment in January, 2005." (D.I. 61 at 30-31) This issue became moot on May 18, 2007, when the parties filed with the court a stipulation stating:

> 1. Plaintiff's claim for back pay is limited to the period from July 1, 2004 until January 19, 2005. Plaintiff does not seek back pay for the period [of] January 20, 2005 through the date of trial.

this matter pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e-5(f)(3).

## II. BACKGROUND

### A. Plaintiff's Hiring and Certification Requirements

Defendants in the action at bar are the District, which regulates schools in a

large portion of northern Delaware, and its Board of Education. Plaintiff had previously

worked as a teacher in the State of New York and, upon moving to Delaware, sought a

teaching position with the District as either an "Elementary Teacher" or a "Reading

Teacher." (D.I. 62 at A1) On January 20, 2004, plaintiff and the Board entered into a

"Temporary Education Employee Contract," which stated:

> The Board hereby employs the Employee, and the Employee hereby
> accepts employment upon the terms and conditions of this Agreement as
> a Teacher for the period commencing January 20, 2004, and ending June
> 30, 2004. Nothing in this Agreement shall be deemed a promise of
> continuing employment beyond the ending date specified herein.[2]

(D.I. 68 at B18) The contact also required plaintiff to "observe and comply . . . with the

regulations of the State Board of Education." (Id.) Plaintiff was then assigned to John

Dickinson High School ("Dickinson") in Wilmington, Delaware, as a teacher for ninth

grade special education students.

---

2. Plaintiff does not seek, and waives any claim for, front pay, future
wage loss, or other economic or special damages.

(D.I. 75; see also D.I. 76)

[2]The letter informing plaintiff of the District's employment offer also stated that
"[a]ppointment to this position is of a temporary nature and is not in any way to be
construed that the Board intends to continue your employment beyond [June 30,
2004]." (D.I. 62 at A6)

2

On April 12, 2004, plaintiff received her initial license from the State of Delaware Department of Education ("DDOE"). (Id. at B23, B19) The license, which listed an effective date of January 20, 2004, stated that plaintiff "ha[d] fulfilled the Licensure and Certification requirements of the Professional Standards Board and [was] certified" in the field of "Teacher of Early Childhood/Primary K-4." (Id. at B19) The initial license was set to expire on January 31, 2007, but contained a provision stating that the license "[would] be suspended effective [June 30, 2005] pending successful passage of the PRAXIS I or its equivalent." Plaintiff, therefore, was required to "submit verification of passage of PRAXIS I or its equivalent prior to [June 30, 2005] to the Office of Professional Accountability at the [DDOE]." (Id.) In a letter to plaintiff, the DDOE reiterated that, "[i]n accordance with 14 Del. C. § 1210,"[3] plaintiff was required to pass PRAXIS I or its equivalent (and submit verification of such) by June 30, 2005 in order to keep her license. (Id. at B23) Also on April 12, 2004, plaintiff received from the DDOE an emergency certificate licensing her as a "teacher of exceptional children," i.e., a special education teacher. The certificate was effective as of January 20, 2004, and was set to expire on January 31, 2007. (D.I. 62 at A15) In an accompanying letter, the DDOE informed plaintiff that "[t]he Emergency Certificate is not renewable and is issued

---

[3]"[A]n initial license may be issued to an applicant who meets all other requirements for initial licensure except for passage of the PRAXIS I exam, provided that the applicant must pass PRAXIS I within the period of time from the date of hire to the end of the next, consecutive fiscal year. If proof of passage of PRAXIS I has not been provided during the time period specified, the initial license will be suspended unless the superintendent of the school district submits to the Secretary of Education a written request for a 1-year extension. The request must also document the effectiveness of the applicant." 14 Del. C. § 1210(b).

3

on an emergency basis. It is your responsibility to complete the requirements for full certification." (Id. at A13)

## B. The Alleged Harassment and Defendants' Response

Almost immediately after she began teaching at Dickinson in late January 2004, plaintiff began having problems with one of her students, JW,[4] who was fourteen years old. (D.I. 17 at ¶ 14) Plaintiff avers that, "[b]eginning on or about March 1, 2004, [she] began sending written reports to the Dickinson High School Principal's Office which contained allegations of disruptive behavior by JW. In all, between March 1, 2004 and May 7, 2004, twelve . . . such reports were sent to the Principal's Office . . . ." (D.I. 67 at 3) Plaintiff also claims to have made a number of verbal complaints to Dickinson Assistant Principal John Kennedy ("Kennedy") about JW's behavior, beginning "maybe the first week" that she began teaching at Dickinson.[5] (D.I. 68 at B52; see also id. at B53, B56, B61, B62)

The evidence of record indicates that JW was suspended from school on March 9 and April 19, 2004, presumably as a consequence of Student Behavior Referrals ("SBRs")[6] that plaintiff wrote on March 1, March 2, March 31, and April 1.[7] (Id. at B31,

---

[4]For privacy reasons, the court identifies minors only by their initials.

[5]When deciding a motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); for purposes of this motion, therefore, the court must accept this disputed assertion as true.

[6]According to Kennedy, "[i]f an incident occurred in a class or at the school involving a student, the teacher would fill out what's known as an SBR . . . and submit it to the appropriate assistant principal" by "put[ting] it in the assistant principal's mailbox." (D.I. 68 at B133) For purposes of handling SBRs, students at Dickinson were assigned

4

B32, B34, B42, B43)   The remainder of plaintiff's SBRs for JW alleged the following

pattern of behavior:

> 1) <u>April 26, 2004</u>: "[JW] continues to use very inappropriate language. . . .
> As [plaintiff] leaned over to help a student who was seated, [JW] got out of
> his seat and came up behind [her].  He grabbed [plaintiff] forcefully and
> proceeded to 'hump' [her]."
>
> 2) <u>May 3, 2004</u>: "When [plaintiff] was teaching the class, [JW] looked
> directly at [her] breasts and stated:  'Your n____s are hard.'[8]  At the end
> of the period, [JW] grabbed [plaintiff's] arm forcefully and pulled [her]
> close to his body.  He stated:  '[You're] a b__ch, but I mean that in a good
> way.'"
>
> 3) <u>May 4, 2004</u>: "At the end of the period, [JW] sat on top of the desk and
> stared directly at [plaintiff].  [JW] opened his legs wide and pretended to
> be having sex.  He moved the lower portion of his body up and down quite
> rapidly.  He said:  'Oh, oh, aah.'  He made 'sucking' noises with his mouth
> and pretended he was breathing heavily."
>
> 4) <u>May 5, 2004</u>: "As [plaintiff] walked into the classroom . . . , [JW]
> grabbed [her] arm very forcefully and refused to let go.  He said, 'Let's do
> the tango.'  He pulled [plaintiff] close to his body and moved [her] forward.
> When [she] told him to let go of [her] arm, he said:  "[You're] a b__ch.
> Chill.'  Then, he stated:  'Do you have sex?' and 'Who do you have sex
> with?'"
>
> 5) <u>May 5, 2004</u>:[9]  "When [plaintiff] told [JW] to sit down, he threatened:
> 'My mom is going to take care of you.  She's going to rock you.'  [Plaintiff]

---

(alphabetically, by surname) to a particular assistant principal; Kennedy was the
assistant principal to whom plaintiff was supposed to submit SBRs for JW.  (D.I. 62 at
A128)

[7]Because plaintiff's sexual harassment claim is grounded in the District's alleged
failure to timely and appropriately respond to her complaints about JW, the court will not
consider SBRs filed prior to the April 26 to May 7, 2004 time period, as it is evident that
JW **was** punished for the behavior described in those SBRs once it was brought to the
attention of Dickinson's administrative office ("the administration").

[8]Because JW's exact language is not essential for purposes of the motion at bar,
the court has redacted the inappropriate words contained in these SBRs.

[9]JW received two separate SBRs from plaintiff on May 5, 2004.

wrote out [a referral to the time out room] and gave it to [JW]. He yelled, 'I ain't f__king going anywhere. You're a f__king b__ch.' He tore the form in half. [Plaintiff] called the main office for an administrator. [Principal Chad] Carmack [("Carmack")] came to the classroom and removed [JW]. Mr. Carmack sent [JW] back to [plaintiff's] classroom before the end of the period."

6) May 6, 2004: "[JW] got out of his seat, came up to [plaintiff's] desk, and stared directly at [her]. Then, [JW] sang a rap song stating, 'How's your p___y?' He sang the work 'p___y' several times during his rap song. When I told him to go to [the time out room], he continued singing even louder. After [JW] sang, he made 'sucking' noises with his mouth."

7) May 7, 2004: "[JW] got out of his seat and walked over to [plaintiff]. Then [he] sang a rap song stating, 'Ms. Mongelli gives h__d.' He sang this four times. As he was singing, [JW] pointed to his p___s three times."

(Id. at B31-B41) After writing each of the six SBRs submitted over the eleven-day period between April 26 and May 6, 2004 ("the SBRs"),[10] plaintiff held student/teacher conferences with JW; in addition, plaintiff twice attempted to contact JW's mother by telephone. (Id. at B35-B40) Nothing of record indicates that JW suffered any other disciplinary action resulting from the SBRs.

On May 6, 2004, plaintiff "sat down . . . a long time with" Kennedy in order to "follow[] up with him verbally" about the status of her SBRs for JW. (Id. at B59) When plaintiff told Kennedy that "[JW] had engaged in inappropriate contact with [her] of a sexual nature," "[h]e wrote it down and he said, [he would] have to investigate it. . . . He ha[d] to speak to Mr. Carmack about this, what [Carmack] want[ed] to do with this."

---

[10]Defendants dispute plaintiff's contention that she placed each SBR in Kennedy's mailbox on the day it was written and that Kennedy failed to respond to any of them until plaintiff met with him in person on May 6, 2004. (D.I. 68 at B58) Instead, defendants claim that plaintiff did not submit any of the SBRs in question until May 7, 2004, when she handed them to Kennedy in a "stack." (D.I. 62 at A134) Again, for purposes of summary judgment, the court must assume that plaintiff submitted each of the referrals to Kennedy on the day it was written.

(Id.) Plaintiff was not sure whether Kennedy then began investigating her complaint.[11]

(Id. at 60) Despite the charges plaintiff levied at the May 6 meeting, JW was still in

plaintiff's class on the following day, May 7, 2004 (id.); Kennedy maintains that this was

an inadvertent error (D.I. 62 at A35).[12]

Plaintiff's final SBR for JW was submitted on May 7, 2004, after which JW was

permanently removed from plaintiff's classroom and suspended from school for five

days; in addition, Kennedy referred JW's behavior to Dickinson's School Resource

---------------

[11]On August 20, 2004, after plaintiff had filed her charge of discrimination and
retaliation with the Delaware Department of Labor ("DDOL"), Kennedy sent to Assistant
Superintendent Diane Dunmon an outline of "the events that occurred during the latter
portion of the 2003-2004 school year involving [plaintiff] and [JW]," which Kennedy
believed would "demonstrate that [he] responded to the issues brought forward by
[plaintiff] in a timely and judicious manner." (D.I. 62 at A34-A36) In this outline,
Kennedy recounted his memory of the May 6, 2004 meeting (including his assertion
that plaintiff had not submitted any of the SBRs before that time) as follows:

> [Plaintiff] verbally reported to me several incidents of inappropriate
> conduct by [JW] in class that had taken place over the preceding two
> weeks. . . . I asked [plaintiff] if she could link the incidents of inappropriate
> conduct to specific dates and submit the information to me in a written
> narrative. The following day, **[plaintiff] submitted 7 SBRs to me** . . . . I
> interviewed [JW] on the same day ([May 7, 2004]). [JW] denied
> misconduct. [JW] was absent from school on . . . [May 10] . . . [and] did
> not have [plaintiff's] class on [May 11 and 12] due to testing. On [May 11],
> I interviewed [Student 1]. On [May 12], I interviewed [Student 2] (Note:
> These were the only students that agreed to make statements. . . .) The
> statements provided by [Student 1] and [Student 2] substantiated many of
> the violations reported by [plaintiff] on the SBRs submitted on [May 7]
> (although neither student reported witnessing the [April 26] incident). On
> [May 13] I met with [JW] prior to the start of class in [plaintiff's] room and
> brought him to my office where I informed [him] of his . . . [suspension].

(Id. at A34-A35 (emphasis in original))

[12]According to plaintiff, however, when she asked Kennedy why JW was still in
her classroom the day after their May 6 meeting, "[h]e said, oh I forgot." (D.I. 68 at
B60)

7

Officer, a member of the Delaware State Police. (D.I. 68 at B60-B61, B134-B136; D.I. 62 at A146) On June 3, a committee comprised of Dickinson's school psychologist, its educational diagnostician, and two of its teachers (one of whom taught special education students, and one of whom taught general education classes) completed a "Manifestation Determination Worksheet" decreeing that, under the applicable guidelines, "[JW's] behavior [WAS] A MANIFESTATION of [his] disability." (D.I. 62 at A28, A148) Subsequently, Kennedy and JW's mother "mutually agreed that [JW] would remain home for the remainder of the school year." (Id. at A140)

On June 15, 2004, based on a complaint made by plaintiff to the Delaware State Police, JW was charged with Unlawful Sexual Contact in the Third Degree, Sexual Harassment, and two counts of Offensive Touching (all of which are misdemeanors) in the Family Court of the State of Delaware. (D.I. 68 at B44-B45, B46) On August 4, 2004, as the result of a plea bargain, JW was adjudicated delinquent of the original Sexual Harassment and Offensive Touching charges, while the charge of Unlawful Sexual Contact was reduced to a third count of Offensive Touching. (Id. at B47)

## C. Plaintiff's Contract Renewal and Subsequent Termination

On May 13, 2004, plaintiff and the Board entered into a "Professional Education Employee Contract," commencing on that date and renewing "from year to year thereafter, unless the Board [should] terminate the Employee's services in accordance with Delaware law, and provided the Employee [did then satisfy] and continue[d] to satisfy the State certification requirements." (D.I. 68 at B29) The contract was rescinded on June 16, 2004, as evidenced by a handwritten notation across its face.

8

(Id.) A subsequent letter from Human Resources Manager Debra Davenport explained that plaintiff had been terminated "due to lack of certification." (D.I. 62 at A32)

Plaintiff filed a charge of discrimination with the DDOL on July 23, 2004, alleging sex discrimination and retaliation. (Id. at A33) Specifically, plaintiff alleged that "sexual harassment from [a] male student" had caused her to complain to Kennedy, an assistant principal at Dickinson, "about fifteen times." Then, although plaintiff had been "offered . . . a full-time teaching contract on [May 13, 2004]," she was terminated approximately one month later for not having a special education certificate. (Id.) Plaintiff's DDOL complaint charges that defendants "terminated [her] for pre-textual reasons after [she] reported sexual harassment from a student." (Id.)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita,

9

475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts

and all reasonable inferences therefrom in the light most favorable to the party

opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The

mere existence of some evidence in support of the nonmoving party, however, will not

be sufficient for denial of a motion for summary judgment; there must be enough

evidence to enable a jury reasonably to find for the nonmoving party on that issue. See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails

to make a sufficient showing on an essential element of its case with respect to which it

has the burden of proof, the moving party is entitled to judgment as a matter of law.

See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). With respect to summary

judgment in discrimination cases, the court's role is "to determine whether, upon

reviewing all the facts and inferences to be drawn therefrom in the light most favorable

to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact

as to whether the employer intentionally discriminated against the plaintiff." Revis v.

Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple

Univ., 829 F.2d 437, 440 (3d Cir. 1987)).

## IV. DISCUSSION

### A. Title VII

#### 1. Scope of defendants' potential liability

The first issue before the court is whether a teacher, such as plaintiff, may sue

the school district for which she works under causes of action stemming from sexual

harassment allegedly committed by one of the teacher's students. Defendants, who

10

maintain that "[p]laintiff's so-called 'sexual harassment' claim is based entirely on

inappropriate classroom conduct by a single special education student," argue that

plaintiff's complaint fails for three reasons: 1) "extending Title VII to student/teacher

harassment is bad public policy"; 2) "the novel concept of holding a school district liable

for a student's classroom misbehavior under [a] Title VII theory is stretched even further

in circumstances presented" in the case at bar, where the offender was a "special

needs" student; and 3) "under Title VII, employers are merely held to a negligence

standard for sexual harassment of employees by third parties." (D.I. 61 at 16-17)

According to defendants, "[t]he classroom setting and the relationship between a public

school teacher and her students is simply not analogous to so-called hostile

environment scenarios involving workplace incidents between coworkers or, for that

matter, between third parties such as customers and employees." (Id. at 16)  "In

contrast to other alleged sexual harassment victims," defendants claim, "a public school

teacher is in a unique position to exercise authority and control over the minor students

entrusted to her care and is vested with statutory authority[13] to deal with disruptive

---

13Defendants cite 14 Del. C. § 701, which provides, in pertinent part:

While a student is entrusted in their care or supervision, public school
teachers and administrators have the same authority to control the
behavior of the student and to discipline or punish the student as a parent,
custodian, guardian or other person similarly responsible for the care and
supervision of the student except as provided in § 702 of this title.  The
authority includes removing a student from a classroom or school-
sponsored activity.

Id. § 701(b).

students."[14]  (Id.)

The crux of defendants' argument is that they are "not liable for alleged sexual

harassment of a teacher by a special education student." (Id. at 14)  Under Equal

Employment Opportunity Commission ("EEOC") guidelines,

> [a]n employer may also be responsible for the acts of non-employees,
> with respect to sexual harassment of employees in the workplace, where
> the employer (or its agents or supervisory employees) knows or should
> have known of the conduct and fails to take immediate and appropriate
> corrective action. In reviewing these cases the [EEOC] will consider the
> extent of the employer's control and any other legal responsibility which
> the employer may have with respect to the conduct of such
> non-employees.

29 C.F.R. § 1604.11(e).  In 2000, the United States District Court for the Middle District

of Pennsylvania recognized that, "[a]lthough the Third Circuit [had] [not] yet directly

addressed the question, the emerging trend among federal courts is to permit a cause

of action under Title VII against employers for the sexual harassment of employees by

non-employees." Graves v. County of Dauphin, 98 F. Supp. 2d 613, 620 (M.D. Pa.

2000). According to the court, "[t]he First, Eighth, Ninth, and Tenth Circuits, as well as

several district courts, have followed the EEOC's guidelines on this subject," as outlined

in 29 C.F.R. § 1604.11(e). Graves, 98 F. Supp. 2d at 620 (footnotes omitted). Accord

Zupan v. State, No. Civ. A. 95 C 1302, 1999 WL 281344, at *4 (N.D. III. Mar. 31, 1999)

("[N]umerous federal courts, following the EEOC's guidelines regarding employer

liability, have held that employers can be liable for harassment perpetrated by non-

_____

[14]The court notes that defendants' sexual harassment policy, which applies to
"[a]ny employee . . . who feels that he or she has been a victim of sexual harassment in
any form by any manager, supervisor, co-worker, . . . **student**, . . . or other person,"
contemplates the possibility of student-on-teacher harassment. (D.I. 68 at B97
(emphasis added))

employees."[15]). The court sees no reason to deviate from this trend and, therefore,

finds that employers may, under certain circumstances, be held liable for sexual

harassment suffered by their employees at the hands of non-employees.

In light of the facts at bar, the court's next decision must then be whether such

employer liability can arise as a result of student-on-teacher harassment.[16] The court is

cognizant of the fact that such a scenario involves competing public interests, namely, a

school's duty to protect teachers from abusive students versus its obligation to teach

those students how to conduct themselves in a socially acceptable way. Unlike cases

involving abusive co-workers or customers, a school district cannot easily "terminate" a

student or permanently ban him from the premises; instead, the district must attempt to

deal with the abusive student using the limited tools and resources at its disposal. With

---

[15]For examples of such holdings, see Watson v. Blue Circle, Inc., 324 F.3d 1252,
1258 n.2 (11th Cir. 2003); Little v. Windermere Relocation, Inc., 301 F.3d 958, 968 (9th
Cir. 2002); Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1244 (10th Cir. 2001);
Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1073-74 (10th Cir. 1998);
Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 854 (1st Cir. 1998); Crist v.
Focus Homes, Inc., 122 F.3d 1107, 1111-12 (8th Cir. 1997); Folkerson v. Circus Circus
Enters., Inc., 107 F.3d 754, 756 (9th Cir. 1997); Gliatta v. Tectum Inc., 211 F. Supp. 2d
992, 1002 (S.D. Ohio 2002); Ligenza v. Genesis Health Ventures of Mass., Inc., 995 F.
Supp. 226, 230 (D. Mass. 1998); Kudatzky v. Galbreath Co., No. 96 Civ. 2693 (HB),
1997 WL 598586, at *5 (S.D.N.Y. Sept. 23, 1997); Jarman v. Northlake, 950 F. Supp.
1375, 1378 (N.D. Ill. 1997); Sabo v. Lifequest, Inc., No. Civ. A. 95-3757, 1996 WL
583169, at *5 (E.D. Pa. Oct. 8, 1996); Mart v. Dr Pepper Co., 923 F. Supp. 1380, 1388
(D. Kan. 1996); Hallberg v. Eat'n Park, No. Civ. A. 94-1888, 1996 WL 182212, at *8-*9
(W.D. Pa. Feb. 28, 1996); Menchaca v. Rose Records, Inc., No. Civ. A. 94 C 1376,
1995 WL 151847, at *3 (N.D. Ill. Apr. 3, 1995); Powell v. Las Vegas Hilton Corp., 841 F.
Supp. 1024, 1027-28 (D. Nev. 1992); Magnuson v. Peak Tech. Servs., Inc., 808 F.
Supp. 500, 512-13 (E.D. Va.1992), aff'd 40 F.3d 1244 (4th Cir. 1994); Sparks v. Reg'l
Med. Ctr. Bd., 792 F. Supp. 735, 738 n.1 (N.D. Ala. 1992).

[16]Again, this question has not yet been addressed by the United States Court of
Appeals for the Third Circuit.

13

these considerations in mind, the court agrees with the reasoning employed by the United States District Court for the Eastern District of New York in Peries v. New York City Board of Education, No. Civ. A. 97CV7109 (ARR), 2001 WL 1328921 (E.D.N.Y. Aug. 6, 2001), which found that a school and its board of education could be held liable for failing to appropriately respond to a special education teacher's claims of national origin harassment by his students.

In so holding, the Peries court noted that the "plaintiff's claim in this case [was] unusual in that the alleged harassment came not from co-workers, but from students." Id. at *5. Accordingly, the court found, "[a]lthough there may be some circumstances in which an employer truly has little or no authority to control the actions of customers, rendering the employer's duty less than that for co-worker harassment, the relationship between school officials and students is not such a case." Id. at *6. In Davis v. Monroe County Board of Education, 526 U.S. 629 (1999), the United States Supreme Court "held that a school board may be liable for the failure to stop students from sexually harassing other students if school officials are deliberately indifferent to the harassment." Peries, 2001 WL 1328921, at *6. According to the Peries court, the Supreme Court's decision "was based in large part on the Court's determination that a school board 'retains substantial control over the context in which the harassment [by students] occurs.'" Id. (alteration in original) (quoting Davis, 526 U.S. at 646). "More importantly, however," the court stated, "in this setting the Board exercises significant control over the harasser." Id. While Peries recognized that "a victim teacher wields at least nominal disciplinary authority" over a student harasser, it found that, "as a general rule, school administrators and school board officials have disciplinary authority that

14

exceeds that of a classroom teacher, such as the power to suspend students and take

other actions not commonly carried out by individual classroom instructors." Id. (citing

Howard v. Bd. of Educ. of Sycamore Cmty. Unit School Dist. No. 427, 893 F. Supp.

808, 819 (N.D. Ill. 1995)).

Having determined that liability for hostile work environment claims under Title

VII may attach to schools that fail to address teachers' claims of harassment by

students in general, the court next turns its attention to whether such claims may arise

when the abuse is perpetrated by a special education student. The competing public

interests discussed above become even more pronounced (and a district's options are

even more limited) in cases involving harassment by special education students, whom

school districts are obligated under federal law to teach.[17]  As plaintiff in the case at bar

---

[17]Under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq.
("IDEA"), "[a] free appropriate public education is available to all children with disabilities
residing in the State between the ages of 3 and 21, inclusive, including children with
disabilities who have been suspended or expelled from school." Id. § 1412(a)(1)(A).
The Code of Federal Regulations states that

> [s]chool personnel . . . may remove a child with a disability who violates a
> code of student conduct from his or her current placement to an
> appropriate interim alternative educational setting, another setting, or
> suspension, for not more than 10 consecutive school days . . . , and for
> additional removals of not more than 10 consecutive school days in that
> same school year for separate incidents of misconduct (as long as those
> removals do not constitute a change of placement . . . ).

34 C.F.R. § 300.530(b)(1).  See also id. § 300.356(a) (defining "change of placement"
as a suspension lasting ten or more consecutive school days or a "series of removals
that constitute a pattern" of disruptive behavior).

> Within 10 school days of any decision to change the placement of a child
> with a disability because of a violation of a code of student conduct, the
> [local education agency ("LEA")], the parent, and relevant members of the
> child's [Individualized Education Program ("IEP")] Team . . . must review

15

has acknowledged, special education students are prone to disruptive behavior by

virtue of their disabilities (D.I. 62 at A52); even so, defendants are essentially asking the

court to "immunize" schools from liability for harassment of a teacher by a special

education student, no matter what the circumstances or how severe the harassment.

Such a blanket prohibition would do a disservice to teachers, who deserve a working

environment free from abuse, and would provide schools with no incentive to remedy

incidents of harassment in their special education classrooms. Therefore, while the

requisite threshold of abuse will necessarily be higher than with students lacking

developmental disabilities, the court finds that harassment of teachers by special

education students can constitute a hostile work environment for Title VII purposes.

## 2. Hostile work environment

Claims brought pursuant to Title VII are analyzed under a burden-shifting

framework. If plaintiff makes a prima facie showing of discrimination or retaliation, the

burden shifts to defendants to establish a legitimate, nondiscriminatory reason for their

actions. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If

defendants carry this burden, the presumption of discrimination drops from the case,

and plaintiff must "cast sufficient doubt" upon defendants' proffered reasons to permit a

---

all relevant information in the student's file . . . to determine . . . [i]f the
conduct in question was caused by, or had a direct and substantial
relationship to, the child's disability . . . .

Id. § 300.530(e)(1)(I).
    Barring the existence of any "[s]pecial circumstances," see id. § 300.530(g), if it
is determined "that the conduct was a manifestation of the child's disability, the IEP
Team must . . . return the child to the placement from which the child was removed,
unless the parent and the LEA agree to a change of placement as part of the
modification of the behavioral intervention plan." Id. § 300.530(f)(2).

reasonable factfinder to conclude that the reasons are fabricated. See Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc).

Plaintiff's first allegation under Title VII is what she has labeled "a sexual harassment hostile work environment claim" (D.I. 67 at 18), which the court will analyze under the traditional "hostile work environment" standard. Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). "It is well established that a plaintiff can demonstrate a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment." Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999). "In order to be actionable, the harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment." Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001). In order to determine whether an environment is sufficiently hostile or abusive, courts must look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

To state a Title VII claim premised on a hostile work environment, plaintiff must demonstrate the following: "(1) [she] suffered intentional discrimination because of [her]

sex;[[18]] (2) the discrimination was [severe or pervasive[19]]; (3) the discrimination detrimentally affected . . . plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." Andrews, 895 F.2d at 1482 (footnote omitted) (citations omitted). A prima facie showing, therefore, contains both a subjective standard (that plaintiff was in fact affected) and an objective standard (that a reasonable, similarly situated woman would have been affected). See id. at 1483.

The court notes that the first Andrews factor does not fit neatly within the unique set of facts in the case at bar; given, however, that "the thrust of [plaintiff's] lawsuit is [defendants'] conduct in response to [plaintiff's] complaints about [JW's] . . . behavior, not [JW's] underlying conduct," a decision by the court to focus "on [JW's] inability to form intent, rather than on [defendants'] responsibility to [their] employees, [would] sweep[] too broadly." Crist v. Focus Homes, Inc., 122 F.3d 1107, 1110 (8th Cir. 1997).

---

[18]The United States Court of Appeals for the Third Circuit has noted that

> [t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course. A more fact intensive analysis will be necessary where the actions are not sexual by their very nature.

Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990).

[19]While the Andrews court stated that the discrimination in question must have been "pervasive and regular," the United States Supreme Court has employed a "severe or pervasive" standard, see Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001), which the Third Circuit recently adopted, noting that "[t]he difference is meaningful, and the Supreme Court's word controls," Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006).

The court finds, therefore, that plaintiff has satisfied the first prong of Andrews for purposes of summary judgment.

With respect to the remaining factors, defendants argue that plaintiff has failed to establish a prima facie case of sexual harassment because she "cannot satisfy the crucial severe or pervasive requirement of Title VII."[20] (D.I. 61 at 19) "To determine whether a hostile work environment is sufficiently severe or pervasive, the court must look at all the relevant circumstances surrounding the discriminatory conduct." Arasteh v. MBNA Am. Bank, N.A., 146 F. Supp. 2d 476, 494-95 (D. Del. 2001) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The court should judge the objective severity of the harassment and can consider (1) the frequency, (2) the severity, (3) whether it is physically threatening or humiliating (rather than an offensive utterance), (4) whether it unreasonably interferes with employee's work performance and (5) the effect on employee's psychological well-being. No single factor is required or dispositive." Id. at 495 (citing Harris, 510 U.S. at 23).

The harassment described in the SBRs occurred over a twelve-day period (ten of which were school days) between April 26 and May 7, 2004. JW harassed plaintiff both physically (for which he was later charged criminally) and verbally, through frequent use of crude and vulgar language when talking to or talking about plaintiff. These incidents occurred in front of plaintiff's other students. Under these circumstances, the conduct

---

[20]From the arguments set forth in defendants' briefs, it appears to the court that defendants are not challenging plaintiff's contention that she has satisfied the third prong of the hostile work environment test (i.e., that plaintiff was subjectively affected by JW's actions). The court has already determined the existence of the fifth prong, respondeat superior liability, through its holding that a school may be held liable for student-on-teacher harassment, even if the harasser is a special education student.

at issue could be described as humiliating (rather than a mere offensive utterance), and could have interfered with plaintiff's work performance by disrupting the classroom and undermining her authority as a teacher. However, because JW's actions occurred over a short period of time, after which he was permanently removed from plaintiff's classroom, the court finds that the severity of the conduct and the context in which it took place is not sufficient to satisfy Title VII's "severe or pervasive" requirement.

Even if JW's conduct were deemed to satisfy the "severe or pervasive" requirement, the court concludes that plaintiff has failed to establish that a reasonable person in her situation would have been detrimentally affected by the objectionable conduct. The United States Supreme Court "[has] emphasized . . . that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" including "careful consideration of the social context in which particular behavior occurs and is experienced by its target." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quoting Harris, 510 U.S. at 23). Citing the above language from Oncale, defendants argue that "[t]he identity of the harasser, a special needs child, his status as a student, and the special education classroom setting in which the alleged harassment occurred establish as a matter of law that a reasonable person in the plaintiff's position would **not** find JW's behaviors and statements to be severely hostile or abusive." (D.I. 61 at 22 (emphasis in original)). In support of this proposition, defendants cite plaintiff's acknowledgment that it is not uncommon for special education students to act out in an inappropriate manner; likewise, they point out, "JW's actions were found to be a

20

manifestation of his disability that led him to be in a special needs class in the first place."  (Id., citing D.I. 62 at A52)

As discussed above, the court has declined defendants' invitation to find that no special education student's behavior could ever constitute harassment actionable under Title VII.  Even so, the court finds that plaintiff has failed to establish a prima facie case of a hostile work environment claim under the Andrews analysis; while plaintiff has made it clear that she was subjectively offended by JW's behavior, nothing in the record purports to show where the tolerance threshold of a reasonable special education teacher lies, let alone whether it was crossed in the case at bar.  Because the evidence of record is insufficient to allow a jury to determine whether JW's behavior would have detrimentally affected a reasonable special education teacher in plaintiff's position, the court shall grant defendants' motion for summary judgment on plaintiff's hostile work environment claim.

### 2. Retaliation

A plaintiff claiming retaliation under Title VII must first establish a prima facie case.  The plaintiff must demonstrate, by a preponderance of the evidence, that:  (1) she engaged in protected activity;[21] (2) the defendant took adverse employment action against her; and (3) a causal link exists between the protected activity and the adverse action.  See Kamchar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1999).

---

[21]Title VII defines a "protected activity" as an instance in which an employee has "opposed any practice made an unlawful employment practice by this subchapter, or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

21

Once a plaintiff has established a prima facie case, the burden shifts to the

defendant to "clearly set forth through the introduction of admissible evidence" reasons

for its actions that, if believed by the trier of fact, would support a finding that unlawful

discrimination was not the motivating force behind the adverse employment action.

See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981).

If the defendant successfully rebuts the plaintiff's prima facie showing, the

presumption of discrimination drops from the case, and plaintiff must present sufficient

evidence for a reasonable factfinder to conclude "that the proffered reason was not the

true reason for the employment decision." Id. at 256. See also Bray v. Marriott Hotels,

110 F.3d 986, 990 (3d Cir. 1997) ("The plaintiff must produce evidence from which a

reasonable factfinder could conclude either that the defendant's proffered justifications

are not worthy of credence or that the true reason for the employer's act was

discrimination.").

In the present case, plaintiff alleges that her renewed employment contract was

rescinded, only one month after having been signed, "in retaliation for her complaints

concerning JW's behavior." (D.I. 67 at 24) Defendants, meanwhile, argue that plaintiff

can show neither that she engaged in a protected activity nor that there was a causal

relationship between that purported activity and her termination.[22]  (D.I. 61 at 25-29)

### a. Protected activity

"With respect to 'protected activity,' the anti-retaliation provision of Title VII

protects those who participate in certain Title VII proceedings (the 'participation clause')

---

[22]It is undisputed that plaintiff's termination constituted an adverse employment
action.

22

and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')."[23] Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (citing Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006)). "[T]he employee must hold an objectively reasonable belief, in good faith, that the activity [he or she] oppose[s] is unlawful under Title VII." Id. (citing Clark County v. Breeden, 532 U.S. 268, 271 (2001) (per curiam) ("rejecting retaliation claim where '[n]o reasonable person could have believed that' the underlying incident complained about 'violated Title VII's standard' for unlawful discrimination")); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996) ("retaliation plaintiff must 'act[ ] under a good faith, reasonable belief that a violation existed'" (alteration in original)). "Moreover," the Third Circuit has stated, "the employee's 'opposition' to unlawful discrimination must not be equivocal." Id. (citing Barber v. CSX Distribution Servs., 68 F.3d 694, 702 (3d Cir. 1995)).

The Third Circuit has stated that "there is no hard and fast rule as to whether the conduct in a given case is protected," although "opposition to an illegal employment practice must identify the employer and the practice – if not specifically, at least by context." Curay-Cramer v. Ursuline Academy of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006) (citing Barber, 68 F.3d at 702). In Barber, an Age Discrimination in Employment ("ADEA") retaliation case,[24] the Third Circuit found that the plaintiff's letter

---

[23]Plaintiff in the case at bar is relying on the opposition clause.

[24]"The procedural framework in ADEA retaliation cases also follows that of Title VII disparate treatment cases as set forth in McDonnell Douglas, 411 U.S. at 802-05[.]" Barber, 68 F.3d at 701 (citing Geary v. Visitation of Blessed Virgin Mary, 7 F.3d 324, 329 n.4 (3d Cir. 1993)).

23

to the EEOC, which did not specifically allege age discrimination, was "just too vague to

support a finding" of retaliation; despite this, the court opined,

> it is important to note that we do not require a formal letter of complaint to
> an employer or the EEOC as the only acceptable indicia of the requisite
> "protected conduct" under the ADEA. See, e.g., Sumner v. United States
> Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (explaining that acceptable
> forms of protected activity under Title VII's analogous opposition clause
> include formal charges of discrimination "as well as informal protests of
> discriminatory employment practices, including making complaints to
> management, writing critical letters to customers, protesting against
> discrimination by industry or society in general, and expressing support of
> co-workers who have filed formal charges"). It is neither necessary, nor
> appropriate to here attempt to define with precision the type of conduct
> that will give rise to a retaliation claim under the ADEA. Our analysis
> requires only that we analyze the message that Barber conveyed, and not
> the medium of conveyance.

Barber, 68 F.3d at 702.

In the case at bar, plaintiff contends that "the SBRs were clear on their face that

plaintiff was complaining about sexual harassment." Therefore, she states, "the SBRs,

as well as [her] verbal complaints concerning JW, constitute sufficient evidence, under

the summary judgment standard, that plaintiff had engaged in a 'protected activity.'"

(D.I. 67 at 25) Defendants, meanwhile, maintain that "[plaintiff's] actions in submitting

student disciplinary referral forms hardly constitute opposition to an unlawful

employment practice. They were simply reports of student misbehavior." (D.I. 61 at 26)

The court agrees with defendants that the act of submitting SBRs, which plaintiff

was supposed to do as a matter of course when students misbehaved, was insufficient

to constitute protected activity under Title VII. Likewise, the content of the SBRs and

plaintiff's verbal complaints about JW, as reflected in the record, do not persuade the

court that plaintiff was engaged in active "opposition" to an unlawful employment

24

practice for purposes of a Title VII retaliation claim.[25]  The court finds that plaintiff has failed to establish a prima facie case of retaliation; it, therefore, will grant defendants' motion for summary judgment on that count.

## C. Section 1983 and the Fourteenth Amendment

In her brief opposing defendants' motion for summary judgment, "[p]laintiff agrees with the defendants' argument that the defendants are entitled to summary judgment on the plaintiff's claims that the defendants are liable under [§] 1983 and the [Fourteenth] Amendment for sexual harassment committed by JW." (D.I. 67 at 23) Consequently, defendants' motion for summary judgment is granted as to plaintiff's claims under § 1983 and the Fourteenth Amendment.

## V. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (D.I. 59) is granted.  An appropriate order shall issue.

---

[25]Because the court has determined that plaintiff was not engaging in protected activity when she submitted the SBRs, it need not address the third retaliation factor, causal link.

25